Rongping Wu (*pro hac vice* forthcoming)
lwu@dgwllp.com
Katherine Burghardt Kramer (*pro hac vice* forthcoming)
kkramer@dgwllp.com
DGW KRAMER LLP
One Rockefeller Plaza, Ste 1060
New York, NY 10020
Telephone: (917) 633-6860
Fax: (917) 630-6183

Olivia M. Goetsch (SBN 319012)
DGW KRAMER LLP
7545 Irvine Center Drive, Ste 200
Irvine, CA 92618
Tel.: (949) 266-6311
Fax: (917) 630-6183

*Attorneys for Plaintiffs Hui MA, Ailing ZHAO,*
*Xi LIU, Yixuan WANG, and Rui ZHANG*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| HUI MA, AILING ZHAO, XI LIU, YIXUAN WANG, and RUI ZHANG,<br><br>Plaintiffs,<br><br>v.<br><br>GOLDEN STATE RENAISSANCE VENTURES, LLC, *dba* Golden Gate Global, a California Limited Liability Company; GSRV MANAGEMENT, LLC, a California Limited Liability Company; GSRV-VTI MANAGEMENT, LLC, a California Limited Liability Company; ERIC CHELINI, an individual; STEVEN KAY, an individual; and VERTEBRAL TECHNOLOGIES, INC., a Minnesota corporation,<br><br>Defendants. | Case No.: _____<br><br>**COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER APPROPRIATE EQUITABLE RELIEF**<br><br>**– JURY TRIAL DEMANDED**<br><br>CLAIMS FOR RELIEF<br>1. FRAUDULENT INDUCEMENT – *against all Defendants*<br><br>2. BREACHES OF FIDUCIARY DUTIES OWED BY LLC MANAGERS (Cal. Corp. Code § 17704.09) – *against all Defendants (direct liability and/or aiding and abetting liability)*<br><br>3. BREACHES OF FIDUCIARY DUTIES OWED BY GENERAL PARTNERS (Cal. Corp. Code § 16404) – *against all Defendants (direct liability and/or aiding and abetting liability)* |

- 1 -

4. CONSTRUCTIVE FRAUD – *against GSRV-VTI Management, LLC, and all other GSRV Defendants as alter egos*

5. FRAUDULENT CONCEALMENT – *against GSRV LLC, GSRV Management, LLC, the Individual GSRV Defendants, and VTI*

6. CONVERSION – *against all Defendants*

7. VIOLATION OF MINNESOTA'S VOIDABLE FRAUDULENT TRANSFERS ACT (Minn. Stats. Ann. §§ 513.44– 513.45) – *against VTI*

8. VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (Cal. Bus. & Profs. Code § 17200 *et seq.*) – *against the GSRV Defendants*

9. FAILURE TO PROVIDE DOCUMENTS AND ACCOUNTING – *against GSRV-VTI Management, LLC and VTI*

**[DEMAND FOR JURY TRIAL]**

Plaintiffs HUI MA, AILING ZHAO, XI LIU, YIXUAN WANG, and RUI ZHANG (collectively "Plaintiffs"), by and through their undersigned counsel, allege as follows:

**<u>NATURE OF THE CASE</u>**

1. Plaintiffs are individual citizens of China. They had hoped to immigrate to the United States and become permanent U.S. residents through the EB-5 Immigrant Investor Program ("EB-5 Program") administered by the United States Citizenship and Immigration Services ("USCIS").

2. Each Plaintiff made a $540,000 cash payment — $500,000 in capital investment, with the additional $40,000 to pay certain "fees" — to invest in a purported "commercial enterprise" ("GSRV-VTI" or "the Project"), which Defendants had jointly promoted to Plaintiffs, and which was supposed to be managed by Defendants in concert under the sponsorship of a USCIS-designated "regional center."

3.     This regional center is, and at all relevant times has been, owned by Defendant Golden State Renaissance Ventures, LLC ("GSRV LLC" or "the Regional Center").  GSRV LLC operates the regional center, and the center's various investment projects, through a series of interrelated entities, which are alter egos of one another.

4.     The asserted purpose of the Project was to develop the manufacturing capacity of Defendant and medical device manufacturing company Vertebral Technologies, Inc. ("VTI") in the San Jose, California area.

5.     At all relevant times, federal law has required that the Regional Center manage its projects and report any significant changes to USCIS.

6.     The vehicles created for Plaintiffs' investments in the GSRV-VTI Project were ownership shares in one of two investment funds (collectively, "the Project Funds"): GSRV-VTI, LP, established in February 2010 (the "Investor LP"), and GSRV-VTI II, LLC, established in December 2014 (the "Investor LLC").  In total, twelve EB-5 investors subscribed to the Investor LP ("Phase I Investors"), and four EB-5 investors subscribed to the Investor LLC ("Phase II Investors").[1]  (Copies of the form subscription agreements for each Project Fund are attached as **Exhibits A and B** to this Complaint.)

7.     Plaintiffs and the Project Funds' other investors did not have any management or oversight authority over the Project or the Project Funds.

8.     The capital contributions from the Project's EB-5 investors were used to purchase VTI "Class B preferred" stock, which VTI had issued for the purpose of raising EB-5 capital, pursuant to a Stock Purchase Agreement between VTI and the Project Funds.

9.     Under the express terms of the Stock Purchase Agreement, VTI could only use its EB-5 funds for specific purposes consistent with the GSRV-VTI Project, as it had been promoted to the EB-5 investors and USCIS.

10.     Yet VTI used its EB-5 capital for entirely other purposes.  It has no remaining EB-5 funds left.

---

[1] Plaintiffs Ma, Wang, and Zhao are limited partners of GSRV-VTI, LP; Plaintiffs Liu and Zhang are non-managing members of the GSRV-VTI II, LLC.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

- 3 -

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma* et al. *v. Golden State Renaissance Ventures, LLC* et al.

11.     VTI is in fact now running out of funds entirely.  To make matters worse, VTI has started to authorize transfers improperly disposing of its only remaining assets of value, its intellectual property, in favor of its directors.  Then VTI sought to obtain <u>more</u> money from Plaintiffs under false pretenses.

12.     The substantial sums Plaintiffs entrusted to Defendants often amounted to virtually everything Plaintiffs had or could obtain by mortgaging their homes or anything else they had of value.

13.     This outcome could have been avoided at multiple points.  But for several years, the Regional Center and the related GSRV Defendants appear to have exercised no oversight whatsoever, or even shown any interest, as to VTI's operations, despite ostensibly serving as Plaintiffs' fiduciaries.  Worse, the GSRV Defendants withheld and concealed from Plaintiffs material information that they did know in order to protect their own interests to the detriment of Plaintiffs.

14.     Most recently, Plaintiffs demanded that their investments be returned and that Defendants provide them with access to financial records and other documents to which they are entitled by law.  Defendants have largely ignored Plaintiffs' demands.

## **JURISDICTION AND VENUE**

15.     ***Subject Matter Jurisdiction.***  This Court has jurisdiction over this case under 28 U.S.C. § 1332(a)(2).  The amount in controversy exceeds $75,000, and the dispute is between "citizens of a State and citizens or subjects of a foreign state": Plaintiffs are all foreign citizens, while Defendants are all citizens of California, Minnesota, or another U.S. state.

16.     ***Venue.***  This Court is a proper venue in which to bring this action under 28 U.S.C. §1391(b)(2), as a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.  Moreover, a forum selection clause applicable to part of Plaintiffs' claims provides that those claims "shall be prosecuted exclusively in the state or federal courts residing in San Francisco, California."  (*See, e.g.*, **Ex. B**, GSRV-VTI II, LLC Subscription Agreement, § 16(c).)

*Cf.* 28 U.S.C § 1404(a).  In the alternative, venue is also proper pursuant to 28 U.S.C. §1391(b)(3).

17.     **Intradistrict Assignment.**  Because of the forum selection clause quoted in the previous paragraph, this matter should be assigned to the Court's San Francisco Division.

## THE PARTIES

### *Plaintiffs*

18.     Plaintiffs are individual Chinese citizens.

19.     None of the Plaintiffs is a permanent resident of a U.S. state.

### *Defendants[2]*

20.     All of the named Defendants are citizens and/or permanent residents of at least one U.S. state.

21.     Defendant GOLDEN STATE RENAISSANCE VENTURES, LLC, *dba* Golden Gate Global[3] ("GSRV LLC" or "the Regional Center") is a California Limited Liability Company ("LLC").  GSRV LLC owns the USCIS-designated regional center for participation in the EB-5 Program.  In addition, GSRV LLC was the General Partner of GSRV-VTI, LP until around early 2016.

a.     Filings with the California Secretary of State provide that GSRV LLC's current address is One Sansome Street, Suite 2080, San Francisco CA 94104, and that its agent for service of process is Steven Kay.  All members of GSRV LLC are California residents, corporations with a permanent place of business in California, and/or other entities composed of residents of California or at least one other U.S. state.

---

[2] All allegations regarding Defendants' citizenship and/or state of residence are made upon reasonable information and belief.

[3] GSRV LLC has previously operated under other fictitious business names, including "San Francisco Bay Area Regional Center"/"SFBARC" and "FFC-East Bay Regional Center."

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma* et al. *v. Golden State Renaissance Ventures, LLC* et al.

22. Defendant GSRV MANAGEMENT, LLC ("GSRV Management") is a California LLC, created in 2011 to serve as GSRV's manager.

    a.    Filings with the California Secretary of State provide that GSRV Management's current address is One Sansome Street, Suite 2080, San Francisco CA 94104, and that its agent for service of process is Steven Kay. Pursuant to GSRV Management's Second Amended and Restated Operating Agreement, Section 2.9, all GSRV Management members are required to be California residents or corporations with a permanent place of business in California, and members cannot be "foreign Person[s], as such term is defined in Regulations [26 C.F.R.] Section l.897-1(k)." Since 2011, GSRV and GSRV Management have had the same members.

23. Defendant GSRV-VTI MANAGEMENT, LLC (the "Project Management LLC") is a California LLC. The Project Management LLC[4] has always been the designated manager of GSRV-VTI II, LLC. In addition, the Project Management LLC eventually replaced GSRV LLC as General Partner of GSRV-VTI, LP.

    a.    Filings with the California Secretary of State provide that the current address of GSRV-VTI Management, LLC is 5 Bay Forest Place, Oakland CA 94611, and that its agent for service of process is Eric Chelini. Eric Chelini is also GSRV-VTI Management, LLC's manager and sole member.

24. Defendant ERIC CHELINI is an individual who resides in the State of California, in Alameda County. Defendant Chelini founded the GSRV Regional Center. At all relevant times, he managed GSRV-VTI Management, LLC, of which he is the sole member. He was also a co-manager of GSRV Management until around November 2015.

25. Defendant STEVEN KAY is an individual who resides in the State of California. Defendant Kay is a licensed attorney in the State of California (State Bar Number 39197),

---

[4] The Project Management LLC has operated under its current name, "GSRV-VTI Management, LLC," since on or about December 19, 2014. The same entity was initially registered in 2010 as "Canton Fair West." And before "GSRV-VTI Management, LLC," the company's name was first changed to "GSRV Overseas Marketing, LLC."

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma* et al. *v. Golden State Renaissance Ventures, LLC* et al.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

practicing out of San Francisco County.  Defendant Kay is, and at all relevant times was, a member of GSRV and a controlling member and manager of GSRV Management.

26.     As explained further below, although GSRV LLC, GSRV Management, LLC and GSRV-VTI Management, LLC were nominally established as three distinct entities, in reality, no GSRV entity exists independently from the GSRV Regional Center or Defendants Chelini and Kay (Defendants Chelini and Kay may be referred to collectively as "the individual GSRV Defendants").  Plaintiffs thus contend that in fact, each and all of the GSRV Defendants have, at all relevant times, been alter egos of one another.  In this Complaint, the GSRV Defendants are therefore also referred to, collectively, simply as "GSRV."

27.     Defendant VERTEBRAL TECHNOLOGIES, INC. ("VTI") is, and at all times relevant here was, a privately held Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  VTI additionally owns and operates facilities in Santa Clara County, California.

## FACTUAL ALLEGATIONS

### I.     The EB5 Program

28.     The United States Congress created the Immigrant Investor Program, also known as the "EB-5 Program," in the 1990s to stimulate the U.S. economy through job creation and capital investment by foreign investors. The EB-5 Program is administered by the United States Citizenship and Immigration Services ("USCIS").

29.     The EB-5 Program has become the largest immigrant investor program in the world.  (Jennifer M. Roscoe, *The Changing Landscape of Immigrant Investment Programs* at 2 (CRS No. IF11344) (Oct 25, 2019), https://crsreports.congress.gov/product/pdf/IF/IF11344.) "According to the latest U.S. Commerce Department assessment (2017), an estimated 174,039 U.S. jobs were created by $16.7 billion total investment ($5.8 billion in direct EB investment capital) in FY2012 and FY2013."  (*Id.*)

30.     The Program offers EB-5 visas to foreign individuals who make an at-risk investment of at least $1 million in a new commercial enterprise — or $500,000 if the new

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma et al. v. Golden State Renaissance Ventures, LLC et al.*

commercial enterprise is located in a rural area or an area of high unemployment — that creates or preserves at least 10 full-time jobs for qualifying U.S. workers.  (*See generally* https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/about-the-eb-5-visa-classification.)

31.     For a foreign applicant, the EB-5 Program has two critical steps.  First, the applicant must submit to USCIS an "I-526 petition."  If this first petition is approved, the applicant is granted conditional permanent resident status.  The second step, when the applicant submits an "I-829 petition," determines whether the conditions of the applicant's immigration status will be removed.  At this second stage, applicants face a considerable burden. What follows are just some examples of what applicants are required to prove in order for USCIS to approve their I-828 petitions: there has been no "material change" in the business plan or business operation of the economic enterprise that received the investor's money during the first 24 months following the approval of the investor's I-526 petition; the economic enterprise created 10 full-time jobs within 24 months of the approval of the investor's I-526 petition; and the investor "sustained" his or her investment in job creating activities for at least 24 months following the approval of the investor's I-526 petition.

32.     EB-5 investments are overwhelmingly administered by entities called "regional centers," designated by USCIS to administer the EB-5 investment projects based on proposals for promoting economic growth, and through which EB-5 applicants may pool their investments. (*See, e.g.*, U.S. Government Accountability Office*, Immigrant Investor Program: Additional Actions Needed to Better Assess Fraud Risks and Report Economic Benefits* at 3 (GAO-16-431T) (Feb. 11, 2016) *[hereinafter "GAO Report"]*, https://www.gao.gov/assets/680/675138.pdf ("In fiscal year 2014, the maximum number of visas available were allocated for the EB-5 Program— approximately 10,000 annually, with about 95 percent of the investments in regional center projects.").)  A regional center is defined as "any economic unit, public or private, which is involved with the promotion of economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment." 8 C.F.R. § 204.6(e) (2015).

33. Each regional center designated by USCIS must monitor and oversee all investment offerings and activities associated with, through or under the sponsorship of the regional center. The failure of an associated "commercial enterprise" to comply with all laws and regulations related to such investment offerings and activities may result in the issuance by USCIS of a notice of intent to terminate the Regional Center designation.

34. In addition, USCIS-designated centers must comply with various reporting requirements in order to remain in good standing. Among other things, they must promptly notify USCIS of any material change in the management, administration, or structure of the regional center; any material change regarding the relevant point of contact information for the regional center; and any material change affecting any investment project that is made through, in association with, or under the sponsorship of the regional center.

35. Regional center investment vehicles are typically offered as limited partnership interests or limited liability company units, which are managed by a person or entity other than the foreign investor and acts as a general partner or managing member of the investment vehicle. The subscription price for the interests/units commonly includes various fees on top of the investor's capital contribution.

36. The volume of EB-5 applications eventually led to a severe backlog and increasing delays in USCIS's review and determinations of foreign investor applications. By 2013, this problem had become well-known and was widely considered a matter of pressing concern among EB-5 industry professionals.

37. USCIS and the U.S. Securities and Exchange Commission ("SEC") are aware of investment scams targeting foreign nationals who seek to become permanent lawful U.S. residents through the EB-5 Program. (*See, e.g.*, U.S. Securities and Exchange Commission, *Investor Alert: Investment Scams Exploit Immigrant Investor Program* (Oct. 1, 2013), https://www.sec.gov/oiea/investor-alerts-bulletins/investor-alerts-ia_immigranthtm.html.) "The amount of investment required to participate in the EB-5 Program, coupled with the fact that investors are making an investment in order to obtain an immigration benefit (i.e., green card), can create fraud risks tied to regional center operators and intermediaries." (GAO Report at 8.)

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

## II.     General Background Regarding the GSRV Regional Center

### A.     Founding

38.     GSRV LLC was founded by Eric Chelini in 2007.

39.     USCIS designated GSRV LLC as a regional center for participation in the EB-5 Program in 2009.

40.     The GSRV LLC operating agreement was amended in 2011 when several new individuals joined Defendant Chelini as its members.  Most significantly, among the new members who joined in 2011 was Defendant Steven Kay.

41.     At the same time, the new members of GSRV LLC collectively formed GSRV Management, LLC, a distinct entity that was intended to serve nominally as the manager of the original GSRV entity and to provide an additional corporate layer insulating GSRV's individual members from liability.

42.     Defendants Chelini and Kay became co-managers of the Regional Center's new "Management, LLC."

43.     At all times since GSRV Management was formed, all members of the Regional Center have been members of both companies.   Defendant Kay has at all times retained a controlling ownership interest of GSRV Management, with his ownership share in fact growing over time.

44.     Beginning in 2011, GSRV Management, and by extension, GSRV LLC, were co-managed by Defendants Kay and Chelini.

45.     *Brief Background Regarding Eric Chelini.*  As represented in the marketing materials provided to Plaintiffs, Defendant Chelini has over 20 years' experience in various backgrounds including "management in operations, accounting, finance, information technology, and legal arenas, project management, and entrepreneurial roles," and several professional designations, including "Certified Six Sigma Greenbelt," and "Certified Scrum Master." Defendant Chelini is also married to an attorney.

46.     *Brief Background Regarding Steven Kay.*  Defendant Kay is a transactional attorney licensed to practice in the state of California.  He has extensive experience with private

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

equity ventures, real estate and business transactions, and estate planning.  In addition to owning and controlling most of the GSRV operations, Defendant Kay is a Managing Partner at Urbanite Capital, LLC, which operates as a real estate private equity firm.  He is also a founding member and/or manager of multiple other real estate investment, business consulting, management, or similar LLCs.  Examples of such entities include: SK Associates #1 LLC; SK Associates #2 LLC; Steven Kay Enterprises, LLC; Steven Kay and Associates LLC; Golden Ventures Capital Management, LLC; Golden VC Management, LLC; GVC Stacked Equity Fund, LLC; Golden Wealth Management Group, LLC; Halic Capital Management, LLC; W K Investment Group; Kay Napa Investments, LLC; and KJ FF Holdings, LLC.  Furthermore, Defendant Kay is involved in various partnerships and trusts.

47.     A few years after Defendant Kay and the other new members joined GSRV (Regional Center and Management LLC), GSRV apparently underwent some changes in ownership and management overall.  To the extent relevant, those changes are discussed later in this Complaint.

### B.     The Services Provided by GSRV

48.     GSRV's Chief Executive Officer in October 2017 summed up what the Regional Center does in the following terms: "[W]e provide kind of soup to nuts services for funds or projects that are looking for EB-5 financing."

49.     Rather than promote any job-creating projects itself, the GSRV Regional Center offers to help other parties, GSRV's "project partners," who are seeking funds for labor-intensive projects; specifically, it offers to help them obtain funds sourced through the EB-5 Program.

50.     The assistance that the Regional Center purports to offers its project partners centers around a few key tasks: (1) collaborating in the development of a business proposal likely to meet USCIS's criteria for EB-5 investments; (2) identifying potential foreign investors and securing their investments; (3) carrying out all necessary steps to ensure the actual transfer of said investors' EB-5 funds, including by forming and managing an investment fund for each new commercial project; and (4) managing USCIS reporting and other compliance requirements.

51.     At the beginning of every project, GSRV's only client is its project partner.

52.     Due to GSRV's use of limited partnerships and LLCs as the investment vehicles for the projects its sponsors, however, once foreign investments have been secured, GSRV becomes a fiduciary of the project's foreign investors as a matter of law.

53.     Moreover, as a USCIS-designated regional center, GSRV is required to monitor and manage the progress of the project and report to USCIS any material changes to the project.

54.     Despite this apparent tension, GSRV's operations have continued to expand, through parallel multi-tiered structures.  To date, the Center has sponsored at least a dozen different "new commercial enterprises."

55.     Meanwhile, the Center's operations have proven quite lucrative for its members,[5] particularly considering the relatively passive role that the Regional Center plays in practice in running its many projects.

### C.     GSRV's Structure and Operations

#### 1.   A Complex, Multi-Tiered Construct

56.     GSRV generally purports to operate according to the following structure.

57.     *Central Operations.*  GSRV LLC owns and operates the regional center designated by USCIS for participation in the EB-5 Program.  GSRV LLC is managed by GSRV Management.  And GSRV Management is managed by Steven Kay and/or another of the individual members of GSRV LLC and GSRV Management.

58.     *Operations of Regional-Center-Sponsored Projects.*  For each project sponsored by the regional center:

a.     GSRV creates a distinct, limited liability entity (or, occasionally, more than one) to serve as the project's investment fund, *i.e.*, the vehicle through which EB-5 applicants will invest in the project (the "project fund," or "project investor fund").

---

[5] For example, by the end of April 2014, GSRV expected to "have plenty of money plus a healthy reserve to make [a] $100k equity distribution."  (**Ex. D** at 44.)

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

b.    GSRV additionally forms a separate LLC, ostensibly to manage the project fund (the "fund management LLC").

59.    Now, the members of a project's <u>fund</u> management LLC are typically also the same members who own the Regional Center and GSRV Management.

2.    <u>A Single Enterprise in Reality</u>

60.    The numerous different GSRV affiliate entities through which the Regional Center appears to operate exist only on paper.

61.    At least as to Defendants GSRV LLC and GSRV Management LLC, this conclusion is supported by the following findings, which were made in the disposition of related proceedings[6]:

> [T]he evidence indicates . . . that the formation of LLCs was a tool to try to protect members from individual liability and then, later . . . to try to bring accounting respectability and conventional accounting practices into what was, in essence, one integrated business . . . .
>
> GSRV operated in fact, as it had to, as USCIS required. None of the management LLCs had any employees. None had any separate office space or equipment None of the Fund LLCs had any employees. None owned or leased any separate office space or any equipment. Literally every shred of work that was done pursuant to GSRV's EB-5 license was done by GSRV employees, in GSRV space, and on GSRV equipment — or was outsourced, by GSRV employees to entities selected by those employees. There was no

---

[6] These findings were part of a final award order entered in the matter of *Golden State Renaissance Venture LLC, et al., v. Judy Chu* (JAMS Case Ref. No1100085319). The final award was then attached to the judgment entered in proceedings in the California Superior Court for the County of San Francisco, *Judy Chu v Steven Kay et al.* (Case No. CGC-16-553982).  [The judgment and the orders attached to the judgment are attached as **<u>Exhibit D</u>** to this Complaint.]  Both matters arose from an internal GSRV dispute.  To the extent relevant, this dispute and the related proceedings are discussed in more detail later in this Complaint.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma* et al. *v. Golden State Renaissance Ventures, LLC* et al.

functional or operational separate reality to any of the 'affiliated' entities. They existed in form only.

The centrality and exclusivity of GSRV's role in its projects was mandated by USCIS' aggressive demands that GSRV exercise complete control over, and assume full responsibility for, the activities authorized by the one license USCIS had issued. Moreover, it may well be that it was the intensity of a commitment to satisfy these demands that drove Mr. Kay to be so heavily involved — and to seek, through the amendments, the full control of the affiliated entities and their operations that fulfilling GSRV's responsibilities to USCIS seemed to require. Responsibility turns on authority.

[**Ex. D** at 41–43.]

62.     The Defendants to which the above findings do not <u>expressly</u> apply are nonetheless equally part of a single GSRV enterprise for several reasons.

63.     For example, like in the above-quoted findings, the Project Management LLC here has "no functional or operational separate reality" and operates under the Regional Center's control. The LLC's only capital or assets appear to be a $100 initial contribution from Defendant Chelini. The company, therefore, cannot operate independently. Further, the GSRV-VTI Project was, and to the best of Plaintiffs' knowledge, is still now a project administered under the USCIS designation for the GSRV Regional Center. As such, the Project must necessarily be under GSRV's centralized control and responsibility, just like any other of the Regional Center's projects.

64.     Moreover, the Regional Center and the Project-specific entities are frequently conflated in communications with third parties — including, most importantly, in communications with the Project's existing and/or potential EB-5 investors. Some examples follow:

        a.      Marketing materials provided to investors, such as those reproduced in **Exhibit C** to this Complaint, refer repeatedly "GSRV" and "the Regional Center" but

only mentions "GSRV-VTI, LP" a couple of times, and never with any
meaningful explanation.

b. The Private Offering Memorandum and Subscription Agreement provided to
potential Phase I investors stated that, upon release from escrow, investors'
capital contributions would be transferred to the <u>Investor LP</u>.  But other
documents indicated that those funds would be transferred to <u>GSRV LLC</u>.
Examples of such other documents include: the escrow instructions provided to
subscribers to the Partnership Fund; and the Escrow Agreement executed by
the designated escrow agent and by both Defendant Chelini and Defendant
Kay on behalf of GSRV LLC.

65. Ultimately, the convoluted structure under which GSRV purports to operate serves
mostly to frustrate federal immigration law and policy, as administered through the EB-5
Program; to facilitate and incentivize deceptive and fraudulent conduct by individuals who fully
own, control, and profit from the means of their fraud and deception; and accordingly to hinder
the enforcement of public laws.  Plaintiffs contend that all the GSRV Defendants are properly
treated as mere alter egos of one another and may refer to all GSRV Defendants collectively
simply as "GSRV."


### III.   The GSRV-VTI Project's Capital Raise

#### A.   The Product of Years of Collaboration Between VTI and GSRV

66. The GSRV-VTI Project, which started around 2010, was among the Center's first
projects, and USCIS approved an amendment to the Center's designation so as to cover the
GSRV-VTI Project in May 2011.

67. GSRV and VTI collaborated for several years to raise capital for the Project.
(Some years later, VTI suggested that it had not expected that it would have to wait as long as it
did for EB-5 funds to become available.)

68. Among other things, Defendants worked together to craft and later update the
Project's business proposal for USCIS.  This business proposal, which was also shared with

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

investors, was revised at least twice, once in or around September 2012, and again in or around April 2014.

69.     Marketing materials promoting the Project to potential investors drew on information from both VTI and GSRV.  In projecting GSRV-VTI's success, these materials relied in significant part on the supposedly established strengths of both VTI and GSRV, such as VTI's past financial performance and growth — including, for example, repeated references to VTI's 43% average growth in 2012 (**Ex. C** at 5, 7, 20–21) — and the credentials and experience of VTI and GSRV management.

70.     Defendants further collaborated to obtain third-party reports supporting the Project.  One example, referenced in the marketing materials, is the report prepared in 2012, and ostensibly updated in 2014, by GSRV-partner Beacon Economics, and paid for by VTI.

71.     In these and in all other documents prepared by Defendants in connection with the Project, Defendants consistently represented that investment funds would be used for the Project's asserted purpose: to develop VTI's manufacturing production capacity resources in the San Jose, California area.

### B.     The Stock Purchase Agreement

72.     Defendants also negotiated a "Series B Preferred Stock Purchase Agreement" (the "Stock Purchase Agreement"), which VTI and the Investor LP entered into as of June 28, 2013. The Stock Purchase Agreement was later amended to add the Investor LLC as an additional party.

73.     Under the Stock Purchase Agreement, VTI agreed to issue up to 6,000,000 shares of Series B Convertible Preferred VTI stock, which VTI would sell for $2.50 per share (for a total potential investment of $15 million).

74.     Because the EB-5 program requires that investors/entrepreneurs create full-time American jobs, Section 7.4 of the Stock Purchase Agreement, titled "**Use of Proceeds**" provided as follows: "[VTI] plans to use the proceeds from the sale of shares of Series B Preferred to [GSRV-VTI, LP] *to invest in manufacturing production capacity resources in the San Jose, California area*. In support of the manufacturing activity, [VTI] will also develop sales and

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma et al. v. Golden State Renaissance Ventures, LLC et al.*

marketing, as well as ancillary administrative support, to optimize manufacturing capacity. . . ." (Emphasis added.)

75.     Section 7.5, titled "**Covenant Regarding Proceeds**" further added that "[VTI] shall use the proceeds received by [VTI] from the sale of the Series B Preferred Stock in accordance with Section 7.4 hereof."

76.     Section 3.3.2 of the Stock Purchase Agreement provided that VTI's seven-member board of directors would include a "Series B Director," who would be elected by holders of VTI's Series B Preferred stock.

77.     Section 4 of the Stock Purchase Agreement contained certain representations and warranties made by VTI, including those that follow:

    a.   "There is no action, suit or proceeding . . . pending, or, to [VTI's] Knowledge, threatened against [VTI] . . . To [VTI's] Knowledge, there are no facts which may reasonably be expected to result in or form the basis for any Proceeding."

    b.   "The Disclosure Schedule lists the following material agreements to which [VTI] is a party or by which it is bound: (i) each agreement which requires future expenditures by [VTI] in excess of $100,000 . . . (iii) each agreement with any member, shareholder, officer or director of the Company . . . requiring payments to, any such person or entity; (v) any loans or indebtedness for borrowed money, including guarantees thereof . . . [and VTI] has performed all obligations required to be performed by it to date and is not in default under any such agreement or contracts;"

    c.   "[VTI] is not in violation of, or in default under any . . . agreement, instrument, commitment, [or] arrangement . . . to which it is a party or by which it is bound . . ."

    d.   "The Agreement does not contain any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which they were made, not misleading;" and

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma* et al. *v. Golden State Renaissance Ventures, LLC* et al.

e. "Except as set forth in the Disclosure Schedule, since [December 31, 2012], there has not been . . . any adverse change in the assets, liabilities, financial condition or operations of [VTI] from that reflected in the Financial Statements . . . which, individually or in the aggregate, have not had or are not expected to have a Material Adverse Effect," a "resignation or termination of employment of any key officers of [VTI]," any "material change, except in the ordinary course of business, in the contingent obligations of [VTI]" or "any debt, obligation or liability incurred, assumed or guaranteed . . . which, individually or in the aggregate, have not had or are not expected to have a Material Adverse Effect on [VTI] . . . ."

78.      Section 6.1 of the Stock Purchase Agreement further provided that, as a condition to the close on the purchase of Series B Preferred shares, "[t]he representations and warranties of [VTI] under this Agreement shall be true in all material respects as of the applicable Closing Date with the same effect as though made on and as of such date . . . ."

79.      Section 12.6 of the Stock Purchase Agreement provides that, "[s]hould suit be brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover . . . reasonable attorneys' fees to be fixed by the arbitration or the court[.]"

80.      As mentioned, following the creation of the Investor LLC, VTI entered into an "Amendment One to Series B Preferred Stock Purchase Agreement" (the "Stock Purchase Amendment") with the Project Funds, to add the Investor LLC as a party to the agreement.

81.      Nothing in the Stock Purchase Amendment changed VTI's obligations under Sections 7.4 or 7.5 of the original Stock Purchase Agreement.  VTI remained obligated to use the EB-5 investments to create jobs in the San Jose area.

### C.      Investor Payments to the Project Funds

1.      "Phase I" Investors Subscribe to GSRV-VTI, LP

82.      As mentioned, the Investor LP was originally formed in 2010.

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma* et al. *v. Golden State Renaissance Ventures, LLC* et al.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

83. But it was only in 2014 that Plaintiffs Ma, Wang, and Zhao — and, Plaintiffs believe, almost all of the Partnership's other twelve EB-5 investors[7] — subscribed to the Partnership, each paying $540,000 cash.

84. At the time, the "General Partner" of the Partnership Fund was identified as GSRV LLC itself. Around the end of 2015 or early 2016, the partnership agreement was amended to substitute the Project Management LLC as General Partner. As stated in the amended partnership agreement, this change became effective "as of January 15, 2015."

85. The partnership agreement for the Investor LP provided that Plaintiffs and the other limited partners had no management authority, which was entirely vested in the General Partner. Moreover, limited partners' consent was only required for decisions such as changing the identity of the General Partner, changing the General Partner's liability, or changing the limited partnership into a general partnership.

86. The agreement further provided that the partnership was not required to hold annual meetings. Meetings would thus only occur when called by the General Partner or by limited partners with a cumulative ownership interest of at least 10%. (Notably, no single limited partner owned a 10% ownership interest.[8])

87. Pursuant to the terms of the Private Offering Memorandum provided to Phase I investors, any EB-5 capital contributed by an investor through the Investor LP had to be held in escrow until that investor's I-526 petition was approved by USCIS. When the investor's capital contribution was released from escrow, the funds and the interest they had generated would be released to GSRV. At that point, GSRV ostensibly intended to use the investor's capital contribution to purchase VTI Class B Preferred stock, and keep the interest for itself.

---

[7] It would seem that one of the Phase I investors likely subscribed long before all the others.

[8] The partnership agreement additionally provided that "the General Partner will not provide any Limited Partner with the identity or address of any Limited Partner unless that Limited Partner consents to such disclosure."

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma* et al. *v. Golden State Renaissance Ventures, LLC* et al.

88.     Due to the considerable backlog previously mentioned affecting the processing of EB-5 applications, USCIS may not decide an applicant's I-526 petition until several months, or even longer, after receiving it.

2.   "Phase II" Investors Subscribe to GSRV-VTI II, LLC

89.     In an effort to make EB-5 capital available for use in the Project more quickly, GSRV formed the Project's second investment fund, *i.e.*, the Investor LLC, in December 2014.

90.     GSRV simultaneously "created" a distinct management LLC for the Project, GSRV-VTI Management LLC, by renaming (and presumably, repurposing) another affiliate LLC, which had existed under two different names before then.[9]  The Project Management LLC was designated as the Manager of the Investor LLC.

91.     Membership interests in the Investor LLC were offered for purchase to potential EB-5 investors between April 27 and July 14, 2015, when GSRV filed a related "Notice of Exempt Offering of Securities," commonly referred to as "SEC Form D," with the SEC.

92.     As a result of this offering, four additional EB-5 investors ("Phase II investors"), including Plaintiffs Liu and Zhang, entered agreements with GSRV to invest in the Project by subscribing, this time, to the Investor LLC.

93.     Unlike with Phase I investments, the LLC subscription agreements did not require that the full amount of each Phase II investor's capital contribution be held in escrow until USCIS decided his or her I-526 petition.  Instead, the agreements provided that $100,000 from each Phase II investor would be held back until the I-526 petitions of all Phase II investors had been approved[10], but that the rest of the Phase II investors' capital contributions, *i.e.*, $1.6 million, would be released immediately.

94.     The terms of the Investor LLC's operating agreement are substantively identical to those of the Investor LP's partnership agreement regarding investors' lack of management or, essentially, involvement of any kind in the operation of the Fund and the Project.

---

[9] *See* footnote 4 *supra*.

[10] The purpose of the funds in the "Holdback Escrow Account" was "to provide a source of funds with which to refund the Capital Contribution of a Denied Investing Member."

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

**D.      Close of the Stock Purchase Agreement**

95.      The Stock Purchase Agreement closed, in part, in November 2015.  At that time, GSRV purchased $4.5 million of VTI Class B Preferred shares, purportedly using $2.5 million in Phase I investor funds, *i.e.*, capital contributions from five of the twelve Phase I investors, as well as the full $2 million of capital contributions from Phase II investors.

96.      GSRV purchased an additional $3 million of VTI Class B Preferred shares between April and July 2016.[11]

**IV.      Defendants' Numerous Material Misrepresentations and Omissions**

**A.      VTI's Deteriorating Finances and Breaches of the Stock Purchase Agreement**

1.      Materially Changed Circumstances Prior to Any Phase II Investor Subscription

97.      VTI has stated that at the end of 2014, it believed that the high revenue it had enjoyed in 2014 indicated "a year of success for the company that left VTI in a strong financial position after 2014."[12]

98.      This belief was plainly misguided.  In the first quarter of 2015 alone, VTI's revenue apparently decreased by 25%, and additional losses were anticipated.

99.      The VTI board of directors purportedly attributed VTI's incorrect predictions to statements made at the end of 2014 by the company's CEO, Dr. Jeffrey C. Felt.  By March 2015, the board had voted to remove Dr. Felt as CEO.

100.      Also in March 2015, "[VTI] Management called an emergency BOD [board of directors] meeting with current cash reserves down to only $10,000 against net cash operating cash loss of over $185,000 per month in April 2015 and continued employee attrition."

101.      At this meeting, "five BOD members agreed to provide emergency short-term loans to keep the company operational and fund the company's cash shortfall . . . **predicated on**

---

[11] Plaintiffs believe that VTI received the capital contribution from one Phase I investor at some other time.

[12] All quoted excerpts in this Section IV.A are from VTI's November 6, 2017 Internal Use of Funds Memorandum, which is discussed further in Section IV.C of this Complaint.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

the **immediate** repayment upon receipt of EB-5 funds." This condition to the loan agreements with these five directors required VTI to use EB-5 funds in violation of its preexisting obligations under Sections 7.4 and 7.5 of the Stock Purchase Agreement.

102.   One of the directors who agreed to, and did, provide an emergency bridge loan to VTI was Dr. Felt — whose removal as CEO supposedly reflected the Board's "concerns about [his] leadership." Additionally, VTI already owed substantial sums to two other of these directors, Dr. Arnold Schwartz and John Graves, who had previously loaned the company roughly $2.1 million.

103.   The terms of the emergency bridge loans from all five directors were nonetheless approved by VTI's board of directors.

104.   VTI received $330,000 from these five directors in March and April 2015.

105.   When Phase II investments were first offered in or around April 27, 2015, none of the developments just described had been made known to potential investors, nor had they been disclosed to the Project's existing, Phase I investors.

### 2.   VTI's Continuing Deterioration Prior to the Stock Purchase Agreement's Initial Closing Date

106.   Beginning on or around May 1, 2015, a new CEO replaced Dr. Felt at the head of VTI's executive team.

107.   At that time, "VTI was in a severely compromised financial position with $8.4M of Notes outstanding and in default, $482,000 of uncollectable loans . . ., declining sales from consistent monthly surgeon customer loss, over 700 equity shareholders, no cash available to grow the company, and the company having just seen an employee attrition rate of 36% in the previous 9 months. Additionally, VTI had over $700k in A/P [accounts payable] owed to vendors with 58% of the outstanding balance over 90 days. The A/P balance eventually swelled to $1M by mid-July because of commitments made in 2014 and early 2015 in addition to continuing operating losses."[13]

---

[13] *See* footnote 13, *supra*.

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma* et al. *v. Golden State Renaissance Ventures, LLC* et al.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

108.  VTI's financial position worsened further over the next few months.

109.  "On 9/30/15, VTI still had no indication of whether the USCIS would be approving the I-526 petitions for the EB-5 investors and was forced to make additional spending cuts, including laying off 22% of its employees and continued delaying investing in sales and marketing, replacing lost sales personnel, and fixing the inventory shortages the company had been operating under historically."

110.  When the Stock Purchase Agreement first closed in November 2015, none of the Project's investors had been made aware of VTI's continuous decline throughout the year until then.

3.  VTI's Use of EB-5 Funds

111.  *Funds used in 2015.*  VTI purportedly placed $1 million of the investor funds it received in November 2015 in a restricted account, "to ensure the company could buy-back any of the Phase II EB-5 investors' shares if their I-526 petitions were denied."

112.  As for the other $3.5 million EB-5 capital VTI received in 2015, VTI had used nearly $2.5 million by the end of the calendar year, *i.e.*, within less than two months from receiving the money, in one of the two following ways.

a.  VTI used roughly **$1.2 million for so-called "debt clean-up payments,"** as follows:

| | |
|---|---|
| Approx. $430,000 | Payments on past-due accounts payable — including debts incurred <u>as a result of VTI's efforts to raise EB-5 capital</u>, *e.g.*, payments apparently owed to Beacon Economics; to Miller Mayer LLP, the Project's so-called "special immigration counsel;" and even to GSRV-VTI, LP |
| Over $345,000 | Repayments of the five VTI director emergency bridge loans — including over $15,000 in interest payments |
| Over $430,000 | Other loan repayments — including another $140,000 paid to VTI Directors John Graves and Dr. Arnold Schwartz in interest accrued on loans they had made to VTI <u>separately and in addition to</u> the Spring 2015 emergency bridge loans |

b.   VTI used another **$1.27 million** that year to cover **expenses related to its existing** operations.

113.   In other words, **none** of the EB-5 funds that VTI spent in 2015 went toward expanding its manufacturing capacity in the San Jose, California region.

114.   *Funds used in 2016.*  Pursuant to an operating plan and budget that was approved by the VTI board of directors on December 11, 2015, VTI spent another **$3.76 million** on operating expenses in 2016.  Only a minuscule fraction of those expenses was allocated toward manufacturing in California, where a single full-time machinist was staffed.  It is unclear whether even that money actually went to the GSRV-VTI Project and its designated San Jose area, as VTI also has facilities in Santa Clara, California.

115.   *Funds used in 2017.*  Pursuant to directives given by VTI's board of directors as early as December 2016 — directives, which ran contrary to the very purpose of the Project and the terms of the Stock Purchase Agreement, and which disregarded the "direction [that VTI] Management believed best for the company" — VTI's 2017 budget aimed to reduce capital expenditures.  Yet in 2017, VTI spent at least another **$945,000** of funds sourced from Project investor on operating expenses.

116.   Having thus spent over $7.1 million of EB-5 investor-sourced funds in two years — and almost nothing toward the GSRV-VTI Project, VTI quickly ran into financial difficulties again, such that by 2017, VTI's "Management began exploring additional financing options, including Line of Credit, Equity and Debt financing."

117.   VTI nonetheless represented that, at least around October or November 2017, it still somehow had the $1 million of EB-5 capital that it had placed in a restricted account in 2015.  Plaintiffs do not know what supposedly happened to those funds after that.

**B.   Internal GSRV Conflicts, Reorganization, and Claims of Mental Incapacity**

118.   Following the proposal by Defendant Kay of amended operating agreements for GSRV LLC, GSRV Management, and various other GSRV-related entities, an internal dispute centering around the ownership of and revenues generated by the GSRV entities erupted within

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

GSRV in early April 2015.  This dispute eventually led to the related state court and arbitration proceedings previously mentioned (collectively, the "Related Proceedings").  (*See* footnote 6, *supra*.)  The Related Proceedings opposed, on the one hand, Steven Kay, GSRV LLC, GSRV Management, and a host of other GSRV entities, and on the other hand, Judy Chu, a GSRV member with a minority ownership interest who refused to sign the amended operating agreements.  (*See id.*)

119.    To this day, no GSRV Defendant has ever directly informed Plaintiffs of, or even suggested to them, any of the facts discussed in this Section the Complaint.

120.    Several findings made in the disposition of the Related Proceedings are in fact material to <u>this</u> case.  (*See generally* **Ex. D**.)  These findings include those previously mentioned about GSRV functioning in reality as one single enterprise.  (*See* Section II.C, *supra*.)  Other material findings are discussed in the paragraphs that follow.

121.    The Related Proceedings and the underlying dispute "burdened" GSRV with "substantial expenses and distractions," "complicating relations with the tax authorities, jeopardizing new projects, and, potentially, costing GSRV both the confidence of USCIS and the license that entity had issued."  (**Ex. D** at 16, 47.)  Defendant Kay apparently considered that  the proceedings created some sort of legal impediment obstructing "potentially significant projects" from "go[ing] forward."  (**Id.** at 53.)

122.    The Related Proceedings formally began in August 2016 and, despite the dispute's disruptive effect on the Regional Center's operations, the proceedings did not fully conclude until May 2019.  (*See* **Ex. D**.)

123.    Yet extensive internal mediation efforts would most likely have led to a resolution of the dispute <u>as early as August 2015</u>, *i.e.*, a year before any formal proceedings were even initiated, <u>but for</u> the self-interested positions adopted at the time by Defendants Steven Kay and Eric Chelini.  (*See, e.g.*, **id.** at 36, 39, 42.)

124.    Defendant Chelini was not a party to the Related Proceedings.  He had signed the amended operating agreements for the GSRV entities, as proposed by Defendant Kay and without objecting, on April 8, 2015.  All the same, Defendant Chelini substantially contributed to the

inception and the prolonged duration of GSRV's internal dispute.  Besides obstructing the dispute's resolution in August 2015 with Defendant Kay as just mentioned, Eric Chelini also gave GSRV member Judy Chu reason to believe in the merits of her position that the amended operating agreements proposed by Defendant Kay were invalid.  The tribunal ultimately disagreed with Ms. Chu's position in that regard, but determined that her arguments had been reasonably raised in good faith.

> It . . . bears mentioning that there is reason to believe that in the spring or early summer of 2015 Mr. Chelini had told Ms. Chu that he did not believe that his signatures on the amended and new agreements had been lawfully secured and that, therefore, the requisite percentage of membership interests . . . had not been cast in favor of the new provisions.  ***Within a few weeks (maybe even days) after April 8th, and continuing for months thereafter, Mr. Chelini actively pressed for changes*** to the changes -- apparently attempting to acquire leverage in negotiations ***by claiming that emotional or psychological infirmities had compromised the legal effectiveness of his signatures***.  Ms. Chu's privity to all of this supports her contention that she had reasonable grounds for believing that the amendments and new agreements had not been lawfully adopted.

(**Ex. D** at 39 (emphasis added).)

125.    Defendant Chelini's claim, emphasized above, that he had not validly consented to the amended operating agreements he signed on April 8, 2015 because of "emotional or psychological infirmities [which] had compromised the legal effectiveness of his signatures" are among the more troubling revelations in the Related Proceedings.  To clarify further, **Defendant Chelini claimed that, on or around April 8, 2015, he was suffering from a "mood disorder" resulting from "a bi-polar episode," which "made his 'decision-making . . . poor,'"** and due to which not only did he "not consult with his lawyer before signing, as he normally would have," but he also did "not fully understand the new terms in the agreement."

126.   Defendant Chelini's claims concerning his inability to consent to contract were further communicated in writing to his co-manager, Defendant Kay, and to GSRV generally at the latest between August 31 and September 4, 2015 — *i.e.*, over one month before GSRV closed on the VTI Stock Purchase Agreement.  (**Ex. D** at 34.)

127.   Incredibly, none of this was ever disclosed to Plaintiffs by anyone at the GSRV Regional Center.

128.   Nor, would it seem, did the Regional Center ever take any precautionary measures as a result of Defendant Chelini's claim of temporary incapacity, even leading up to the closing date for the Stock Purchase Agreement with VTI, in November 2015.

129.   Instead, Defendants Steven Kay and Eric Chelini focused on protecting their own individual financial interests within GSRV.

130.   Following Defendant Chelini's written communications dated August 31 and September 4, 2015, GSRV entered negotiations with Defendant Chelini during the Fall of 2015. These negotiations eventually concluded in November 2015 — *i.e.*, at the same time that GSRV was buying $4.5 million of VTI stock using GSRV-VTI investor funds.

131.   In the end, GSRV agreed to pay Defendant Chelini $4 million to buy out his membership interests in GSRV LLC, GSVR Management, and multiple other GSRV entities. (**Ex. D** at 37.)  But what the outcome of the negotiations was as to the Project Management LLC, is unknown.  It seems unlikely that GSRV also bought out Defendant Chelini's sole interest in the Project Management LLC, particularly because later communications on behalf of the Project Management LLC, with Plaintiffs and with VTI, were ostensibly handled by Defendant Chelini.

132.   Regardless, to the best of Plaintiffs' knowledge, GSRV LLC remains the Project's USCIS-designated regional center, even now.  As such, GSRV has at all times been required to retain control over the Project, even after/despite Defendant Chelini's departure.  But it is entirely unclear whether or to what extent the Regional Center in fact performed these management and oversight duties pursuant to the terms of its relationship with USCIS after November 2015 (or at any time).

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma et al. v. Golden State Renaissance Ventures, LLC et al.*

133.    Plaintiffs believe that GSRV has failed to perform at least <u>some</u> of its USCIS-designation-related obligations.  For example, to the best of Plaintiffs' knowledge, GSRV has notified USCIS neither of the significant changes affecting the GSRV-VTI Project nor of Defendant Chelini's separation from the Regional Center's management.

134.    The Regional Center's USCIS designation is the cornerstone of its operations and its revenue.  (*See* U.S. Citizenship and Immigration Services, *Regional Center Terminations*, https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/eb-5-immigrant-investor-regional-centers/regional-center-terminations ("A regional center that USCIS has terminated from the EB-5 program may not solicit, generate, or promote investors or investments or otherwise participate as a designated regional center in connection with the Immigrant Investor Program.").)

135.    Notifying USCIS of the disastrous and wholly foreseeable and avoidable outcome of the GSRV-VTI Project, or of the departure of the Regional Center's founder and co-manager following an undisclosed episode of alleged mental incapacity, could jeopardize GSRV LLC's continued status as a USCIS-designated regional center.

136.    Accordingly, and especially given that GSRV has failed to alert USCIS of the above-mentioned crucial changes in circumstances for several years, Plaintiffs believe that GSRV has <u>deliberately</u> concealed this information from USCIS and from Plaintiffs.

137.    Worse, GSRV has withheld this critical information even though it knew that notifying USCIS, as it was required to do, would almost certainly have ensured that this critical information would finally reach Plaintiffs and the Project's other EB-5 investors — the foreign individuals whom the Regional Center claims to represent and assist in their immigration efforts when trying to recruit their investments.

## C.    November 6, 2017 Internal Memorandum on VTI's Use of EB-5 Funds

138.    Defendant Chelini eventually became a member of VTI's board of directors, as the "Series B Director" provided for in Section 3.3.2 of the Stock Purchase Agreement.  (Plaintiffs do not yet know when he was supposedly elected.  They likewise do not yet know whether or to

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

what extent Defendant Chelini actually participated in VTI board matters before September 28, 2017.)

139.     At a VTI board meeting on September 28, 2017, "Eric Chelini reviewed a memo he wrote to the Board requesting a detailed accounting of the Sources and Uses of funds raised through the EB-5 program."

140.     His memo apparently relied, at least in part, on a memo that VTI's CEO had sent "a year earlier."

141.     The position adopted by VTI's Chief Financial Officer ("CFO") during the meeting was that Defendant Chelini had misinterpreted the CEO's prior memo.  In any event, "[a] full accounting of how the EB-5 funds were used was requested."

142.     As a result, VTI's CFO circulated an internal memorandum, dated November 6, 2017, regarding VTI's Use of EB-5 Funds.

143.     Section IV.A. of this Complaint, *supra*, describes the contents of this memo.

**D.     GSRV Counsel's January 30, 2018 Letter to EB-5 Investors Seeking a Waiver of Conflict of Interests**

144.     The first communications Plaintiffs received as a result of Defendants' deceitful mismanagement of the Project were copies of a letter from Miller Mayer LLP, the Project's "special immigration counsel," apparently dated January 30, 2018.

145.     Far from informing Project investors about the causes or effects of the Project's mismanagement or giving any indication of the many facts concealed by Defendants, the Miller Mayer letter purported to request from investors waivers of conflicts of interest "relating to" the Project.

146.     As for the context of the request, the letter merely stated that, "we have been recently engaged by [the Project Management LLC] to solely advise [the Project Management LLC] on immigration matters related to VTI's recapitalization ('VTI Recapitalization Matter')." But no information about the "VTI Recapitalization Matter" is discernible in the letter.

147.   The meaning of substantial portions of the letter is unclear, including most significantly the parts of the letter purporting to address the scope and implications of the requested conflict (or conflicts) waiver.

148.   The letter further suggests that by consenting to the waiver, not only would investors agree that all of <u>their</u> confidential information could be shared with, at minimum, the Project Management LLC, but they would also acknowledge and consent to the fact that, on the other hand, Miller Mayer could withhold confidential information disclosed by <u>Defendants</u> from investors, no matter how important that information would otherwise be to them.

149.   The Project Management LLC and Miller Mayer would have understood that, despite the letter's unclear and ostensibly overly one-sided times, the Project's EB-5 investors would reasonably not have felt that refusing the waiver and losing their immigration counsel was a real option for them, especially Phase II investors.  On their face, subscription agreements for the Investor LLC indeed **required** that each investor "acknowledge[] and agree[] that the Company's special immigration counsel, as appointed by the Company, is the sole entity authorized to respond on behalf of the [investor] in any matter before the USCIS, the Administrative Appeals Office or other judicial body having jurisdiction over the [investor's] I-526 Petition or I-829 Petition."  (**Ex. B** at 8, § 4(q).)

### E.    VTI's Remaining Assets of Value Transferred to VTI Director(s)

150.   As a manufacturer of medical devices, a significant portion of VTI's assets is in the intellectual property associated with its products, particularly in its patents — which VTI's directors and the members of its executive team understood better than anyone.

151.   Citing the precarious financial situation VTI was finding itself in (as a result of the decisions VTI's directors improperly made), VTI directors and executives began demanding that the company convey key pieces of intellectual property to them.

152.   Directors holding notes from VTI further began threatening to "foreclose" on VTI's assets, even though they were unsecured lenders with no claim to VTI's intellectual properties.  In March 2018, VTI directors John Graves, Arnold Schwartz, and Paul Asdourian

demanded that VTI convey to them and/or other noteholders all of VTI's rights and intellectual property associated with its "InterCushion" motion-preservation technology (see Ex. C at 13), including all of the company's rights to U.S. patent No. 9,510,953 and related intellectual property.

153.    The intellectual property rights demanded by these note-holding directors far exceeded the fair-market value of their notes from VTI, particularly given VTI's current financial position and the lack of any security interest or other rights in VTI's assets.

154.    Moreover, as explained in Section IV.A. of this Complaint, *supra*, VTI directors Graves, Schwartz, and Asdourian had already misappropriated VTI property in the past, when, in violation of the Stock Purchase Agreement, they took for themselves hundreds of thousands of dollars in EB-5 funds that had been invested in the Project.  (Paul Asdourian is also one of the five directors who made emergency bridge loans in the Spring of 2015.)

155.    On June 20, 2018, VTI nonetheless assigned its rights to U.S. patent No. 9,510,953 (along with its foreign equivalents and related pending applications) to a Minnesota LLC registered under the name "SAG, LLC."

156.    The registered address for "SAG, LLC" is a residential property owned by VTI director John E. Graves.

### F.    Long Overdue Communications to Investors and Continued Deceit

####      1.   Misleading Communications from GSRV

157.    The Project Management LLC reached out to the project's investors in a letter signed by Defendant Chelini and dated June 8, 2018.  A copy of the letter is attached as **Exhibit E** and incorporated by reference into this Complaint.

158.    This letter begins with, "We, GSRV-VTI Management, LLC, are the managers of both, GSRV-VTI I, LP and GSRV-VTI II, LLC. . . ."  (It is unclear who "we" supposedly refers to besides Defendant Chelini.)

159.    The letter then states that, "there have been some challenges arising with your investment in [VTI]."  It then elaborates as follows:

Your quest for U.S. permanent residency through your investment in VTI is potentially affected by these challenges. ***Accordingly***, we are writing to inform you of these developments and our efforts to ensure the best possible result for your U.S. immigration.

In essence, VTI has been experiencing some difficulties in their attempts to successfully attain their revenue growth as planned. ***During December of 2017***, VTI's management had indicated that the company was running out of funds to continue operations. In addition, some board members who had loaned the company nearly $8,000,000 were intent on calling in these loans, which we believe would effectively shut down the company. These noteholders thought they had the right to do this. ***<u>Since this information has been known</u>, GSRV-VTI Management has been working on solutions that would keep the company going and protect your investment***. Please know that GSRV-VTI Management and immigration counsel have also been working on preserving investors' immigration benefits.

(**<u>Ex. E</u>** at 1 (emphasis added).)

160.     The letter then proceeds to list various asserted efforts to help investors with which the Project Management LLC had "been instrumental," such as "bringing in new management" for VTI. (Through Eric Chelini in his position as VTI director, the Project Management LLC helped bring in yet another CEO for VTI, Paul Hickey, who took over in July 2018.)

161.     Nowhere does the letter suggest that the Project Management LLC, Defendant Chelini, or any other GSRV Defendant had failed the investors in any way.

162.     The Project Management LLC sent other, similarly misleading communications to investors over the next two years. For example, in communications sent to investors in or around November 2019, Defendant Chelini once again untruthfully represented that VTI's financial difficulties had existed "since the end of 2017." At the same time, among other things he also informed investors that he had retained counsel in Minnesota "as early as mid-2018" (*i.e.*, nearly

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

a year and a half earlier) "to draft a lawsuit against VTI management and board members" — thus further deflecting all responsibility and even reinforcing the notion that he and GSRV were acting as investors' fiduciaries, in their best interest.

                2.   Further Fraudulent Statements from VTI

163.    Meanwhile, in October 2018, VTI's new CEO, Paul Hickey, reached out to the Project's EB-5 investors directly (copying Defendant Chelini) to try to get more money from them through the purchase of shares of VTI's brand new "Class C" stock: "I am writing to let you know that VTI is at a critical point and I need your help.  Your help is needed now because VTI needs to secure $475,000 USD immediately to execute our top strategy . . . ."

164.    The same email further falsely represented that, "Since [Paul Hickey] became CEO in July, 2018, VTI has made great progress executing our strategies to help ensure our immigration requirements with the USCIS EB-5 program are met for all EB-5 investors."

165.    Unsurprisingly, Plaintiffs did not respond to Paul Hickey's email by giving VTI more money.  Nor would it seem did any of the Project's other investors.  Instead the EB-5 investors expressed growing concerns about the Project and its management.

166.    When sending investors a revised slide deck for VTI's purported new investment opportunity in December 2018, Paul Hickey purported to address these concerns, but his answers were highly misleading.

        a.    For example, the first questions that Mr. Hickey supposedly answered were: "Why is VTI's performance not where it should be with past EB-5 investments?  Who is accountable?"  His answer began as follows: "The simplest answer to this question is that VTI's past commercialization efforts did not address the market need and there was not enough money invested to fix product issues. . . ."  This vague statement conceals all of the material facts, and the rest of the answer did not help.

        b.    His response to the question of "What is the overall status with the EB-5 immigration process for VTI and with others in the U.S.A.?" is even more

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

troubling.  That response stated that, "My strategic plan has considered the necessary USCIS requirements to support your successful immigration.  If properly implemented, VTI's performance will be in complete alignment with USCIS requirements for permanent green cards to be obtained.  However, it is imperative that I obtain Series C funding immediately so we can grow VTI between now and 2024. . . ."  Mr. Hickey's statements would make any reasonable investor in Plaintiffs' shoes feel considerable pressure to provide more funds.  Yet his representations about investors' immigration status were highly dubious at best.

167.     Following up on this email, a few weeks later Defendant Chelini sent Project investors copies of VTI's slide deck and Mr. Hickey's resume translated into Chinese.

### 3.  Partial Truth Finally, Inadvertently Disclosed

168.     On or around July 30, 2020, investors received a copy of a draft complaint against VTI and some of its directors and officers.  The draft was created by the law firm in Minnesota that the Project Management LLC/Eric Chelini had retained in 2018 and appears to have been written around the same time.

169.     Yet Defendant Chelini only shared the document because and after he received a request to do so.  Given the contents of the draft summarized below, however, it is hardly surprising that he was not overly eager to share the complaint with Project investors.

170.     The draft complaint names as plaintiffs the Project Management LLC and the two Project Funds — thus, at first blush, suggesting aligned interests among GSRV and the Project's EB-5 investors.  (This also ostensibly gave Defendant Chelini grounds to make the Project Funds pay for any legal fees.  In November 2019, he had indeed told investors that they would each need to pay approximately $6,250 to pursue legal action against VTI/VTI managers and officers.)

171.     However, the allegations in the draft complaint *finally* let Plaintiffs on to substantial parts of what Defendants had up until then successfully concealed from them for years, including:  that VTI's finances had in fact largely been in ruin since early 2015, *i.e.*, since

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

before GSRV used their investments to purchase VTI stock and before some of them had invested at all; that before the Stock Purchase Agreement closed, VTI had improperly entered agreements for the benefit of its own directors which required that it breach its prior covenant to GSRV regarding the use of EB-5 funds; that GSRV nonetheless closed on the Stock Purchase Agreement;  that VTI did in fact immediately breach the Stock Purchase Agreement upon receiving EB-5 funds; and that afterward VTI's mismanagement and financial struggles only continued, as a result of additional poor management decisions that were also inconsistent with the Project, in further violation of the Stock Purchase Agreement.

172.    After receiving the draft complaint, Plaintiff Ma sent Defendant Chelini some questions.  In his reply, Defendant Chelini expressed concern about the impact a lawsuit might have for investors who were in the I-829 petition process.  He concluded by asserting that, "We must get better understanding on how the claim will affect [those investors' immigration status] before we commence the claim."

**V.    Plaintiffs' Largely Ignored Demands for Documents and Financial Information**

173.    In October 2020, Plaintiffs each demanded the return of their investments.

174.    Plaintiffs simultaneously requested that Defendants allow them to exercise their right to inspect and, as applicable, receive copies of various records and an accounting of the funds traceable to them.  *See* Cal. Corp. Code § 15903.04; *id.*, § 17704.10; Minn. Stat. Ann. § 302A.461.

175.    Defendants have neither returned Plaintiffs' money nor provided the documents that Plaintiffs requested.

//

//

//

//

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma* et al. *v. Golden State Renaissance Ventures, LLC* et al.

**CLAIMS FOR RELIEF**

CLAIMS ASSERTED BY PLAINTIFFS LIU AND ZHANG

**Count 1 – Fraudulent Inducement**

**(Against All Defendants)**

176.    Plaintiffs repeat and reallege each of the allegations set forth in the previous paragraphs.

177.    Defendants concealed several material developments from Plaintiffs in order to induce them into investing in the GSRV-VTI Project.

178.    First, Defendants concealed material changes regarding VTI's finances.

179.    GSRV and VTI collaborated in making representations to Plaintiffs about the state of VTI's finances, which Defendants further purported to update on at least two separate occasions.

180.    The repeated references to VTI's past financial growth in the marketing materials prepared by Defendants demonstrate that Defendants knew such information was material to potential investors.

181.    Yet, before Plaintiffs or any Phase II investor had subscribed to GSRV-VTI II, LLC, VTI's finances had materially worsened so as to make Defendants' prior representations about VTI's financial health misleading.  These changes in circumstances were known to VTI and should have been known to GSRV.

182.    Nonetheless, Defendants made no effort to inform Plaintiffs of these changes or to otherwise correct their prior representations.

183.    Second, Defendants concealed VTI's promise to use EB-5 funds in violation of the Stock Purchase Agreement and of the purpose of the Project.

184.    Defendants had jointly represented that capital contributions made by EB-5 investors would be used for the Project sponsored by the GSRV Regional Center, *i.e.,* to expand VTI's manufacturing capacity in the San Jose, California area.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

185.     Yet, before Plaintiffs or any Phase II investor had subscribed to GSRV-VTI II, LLC, VTI had taken out emergency loans from its directors and agreed to use EB-5 funds to reimburse its directors and pay them any interest accrued on those loans.

186.     Because of the requirements of the EB-5 Program — and as evidenced in the marketing materials and agreements prepared by Defendants — Defendants knew that their representations regarding the use of EB-5 funds were material to potential investors.

187.     Nonetheless, Defendants made no effort to inform Plaintiffs of these changes or to otherwise correct their prior representations.

188.     Third, Defendants represented that GSRV was an "[e]xcellent regional center," which "[i]nvestigates and identifies safe investment" and "[a]ssists" EB-5 investors by providing the "highest quality service," including by touting Defendant Chelini's personal experience.

189.     Yet Defendants failed to disclose the mental impairment allegedly experienced by Defendant Chelini at or around the same time as Plaintiffs were being offered membership interests to invest in the Project.

190.     Defendants concealed these and other facts in order to induce Plaintiffs to invest in the GSRV-VTI Project.

191.     Plaintiffs Liu and Zhang were in fact each reasonably induced into paying $540,000 in order to invest in the Project as a result of Defendants' misrepresentations.

192.     Defendants continued to conceal their misrepresentations from Plaintiffs for years, including by making partial disclosures and further misrepresentations to Plaintiffs.

193.     Because Plaintiffs' subscription agreements with GSRV-VTI II, LLC were induced by fraud, those agreements are void and unenforceable, and Plaintiffs are entitled to restitution of the full $540,000 contract price that they paid.

194.     In committing their fraudulent conduct, Defendants acted despicably, in conscious disregard for Plaintiffs' rights and with oppression and malice toward Plaintiffs, and subjected Plaintiffs to cruel and unjust hardship.  Plaintiffs are therefore entitled to an award of punitive damages, in an amount to be determined at trial, sufficient to make an example of Defendants.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

## Count 2 – Breach of Fiduciary Duties Owed by LLC Managers

*(Cal. Corp. Code § 17704.09)*

**(Against GSRV-VTI Management LLC;**

**Against All Other GSRV Defendants as Alter Egos)**

195. Plaintiffs repeat and reallege each of the allegations set forth in the previous paragraphs.

196. GSRV-VTI II, LLC was formed in December 2014.

197. California LLCs formed on or after January 1, 2014 are governed by the California Revised Uniform Limited Liability Company Act ("RULLCA"), Cal. Corp. Code § 17701.01 *et seq.*

198. RULLCA provides that LLC managers owe the LLC they manage and the LLC's members certain fiduciary duties that cannot be eliminated or unreasonably diminished by contract. *See* Cal. Corp. Code §§ 17701.10, 17704.09. As a matter of public law, LLC managers thus owe the LLC's non-managing members a duty of loyalty and a duty of care, which LLC managers must further discharge "consistent with the obligation of good faith and fair dealing." Cal. Corp. Code § 17704.09.

199. The manager of GSRV-VTI II, LLC, *i.e.*, GSRV-VTI Management, LLC and its alter egos (collectively, "the Manager"), repeatedly breached the duties of care and loyalty that the Manager has owed to the Plaintiffs at all relevant times.

200. The Manager failed to take reasonable steps to confirm, before closing on the Stock Purchase Agreement, that no material changes had impacted VTI, particularly considering that much of the relevant information would likely have been apparent upon reviewing the minutes of VTI's board meetings beginning in 2015.

201. The Manager failed to perform — or ensure that some GSRV entity or individual performed — the oversight, management, and control duties over the Project, as required for all projects sponsored by USCIS-designated regional centers. Even though the Stock Purchase Agreement provided for the creation of a VTI director position to represent the holders of VTI Class B Preferred Shares, *i.e.*, the Project Funds, the Manager seemingly failed to monitor the

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

1   Project's progress, and even failed to monitor how VTI was using the EB-5 funds sourced from

2   Plaintiffs and the Project's other investors, until roughly two years after the Stock Purchase

3   Agreement initially closed.  The Manager's initial inquiry into VTI's use of its EB-5 funds

4   referenced a VTI memorandum that had been circulated a year earlier.

5           202.    The Manager breached the terms of the LLC's subscription agreements by

6   releasing the full $2 million corresponding to Phase II investors' capital contributions in

7   November 2015, before USCIS had issued a determination as to all — or, likely, any — of the

8   Phase II investors' I-526 petitions.

9           203.    The Manager failed to disclose the mental impairment allegedly suffered by

10  Defendant Chelini, the manager and sole member of GSRV-VTI Management, LLC, at a critical

11  time leading up to the close of the Stock Purchase Agreement.

12          204.    The Manager allowed internal GSRV disputes to take priority over any attempt to

13  discharge its duties to Plaintiffs and the Project's other investors in a manner consistent with its

14  obligation of good faith and fair dealing.

15          205.    To the extent that the Manager's relationship with the GSRV Regional Center was

16  materially altered as a result of the GSRV internal disputes that began in April 2015 — or as a

17  result of the subsequent buy-out of Defendant Chelini's membership interests from GSRV LLC

18  and most other GSRV related entities — the Manager failed to inform USCIS, Plaintiffs, and the

19  Project's other investors of this change.

20          206.    Upon learning that VTI had used investor funds in violation of the Stock Purchase

21  Agreement, instead of and without informing Plaintiffs and the project's other investors of VTI's

22  breach, the Manager sought to protect itself at the expense of the LLC's members by

23  "requesting," through counsel, that the LLC members consent to a waiver of future conflicts of

24  interest, which allowed the Manager to retain access to all confidential information provided by

25  the LLC members while ensuring that the LLC members would have no access to information

26  disclosed by the Manager.  In presenting the LLC members with this so-called "request," the

27  Manager and its counsel understood that the LLC members would have felt compelled to consent

28  to the waiver.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

207.     When the Manager learned that VTI had immediately used Project investor funds in violation of the Stock Purchase Agreement, the Manager withheld this information from Plaintiffs.  Even when the Manager finally began disclosing certain facts to the LLC members, it misrepresented the gravity of the situation and the relevant timeline, in an apparent attempt to conceal its own responsibility.

208.     The numerous breaches of the Manager's fiduciary duties caused Plaintiffs and the other members of the LLC significant harm, including by depriving them of information likely to have led to the Manager's replacement at junctures when Plaintiffs' investment could have been salvaged.

209.     As a result of the breaches of fiduciary duties committed by GSRV-VTI Management, LLC and its alter egos, Plaintiffs have been harmed in an amount of no less than $540,000 each, subject to proof at trial.

210.     In breaching the fiduciary duties owed to the Plaintiffs, Defendants acted despicably, in conscious disregard for Plaintiffs' rights and with oppression and malice toward Plaintiffs, and subjected Plaintiffs to cruel and unjust hardship.  Plaintiffs are therefore entitled to an award of punitive damages, in an amount to be determined at trial, sufficient to make an example of Defendants.

**Count 3 – Aiding and Abetting Breaches of Fiduciary Duties**

*(Cal. Corp. Code § 17704.09)*

**(Against GSRV LLC; GSRV Management, LLC; and the Individual GSRV Defendants)**

211.     Plaintiffs repeat and reallege each of the allegations set forth in the previous paragraphs.

212.     GSRV-VTI Management, LLC breached the fiduciary duties it owed Plaintiffs as the designated manager of GSRV-VTI II, LLC, as previously discussed.

213.     All other GSRV Defendants knew of at least some of these breaches.

214.     Defendants provided substantial assistance or encouragement toward these breaches, including by engaging in and prolonging internal GSRV disputes, which obstructed the

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

normal functioning of the Regional Center; by failing to disclose the mental impairment allegedly suffered by Defendant Chelini for some time around April 2015; by failing to ensure that the Regional Center performed its oversight duties over the Project as required pursuant to its USCIS designation; and, if any material alteration of the relationship between GSRV LLC and GSRV-VTI Management, LLC supposedly occurred as a result of the GSRV internal disputes that began in April 2015 — or as a result of the subsequent buy-out of Defendant Chelini's membership interests from GSRV LLC and most other GSRV related entities, by failing to disclose this change to USCIS and to the Project's investors.

215.    Defendants' acts and omissions were substantial factors in causing Plaintiffs' harm, as previously discussed.

216.    In aiding and abetting the breaches of fiduciary duties owed to the Plaintiffs, Defendants acted despicably, in conscious disregard for Plaintiffs' rights and with oppression and malice toward Plaintiffs, and subjected Plaintiffs to cruel and unjust hardship.  Plaintiffs are therefore entitled to an award of punitive damages, in an amount to be determined at trial, sufficient to make an example of Defendants.

### Count 4 – Aiding and Abetting Breaches of Fiduciary Duties

*(Cal. Corp. Code § 17704.09)*

**(Against VTI)**

217.    Plaintiffs repeat and reallege each of the allegations set forth in the previous paragraphs.

218.    GSRV-VTI Management, LLC breached the fiduciary duties it owed Plaintiffs as the designated manager of GSRV-VTI II, LLC, as previously discussed.

219.    VTI knew of at least some of these breaches.

220.    VTI substantially contributed to these breaches of fiduciary duties, including by failing to disclose the material changes in its financial situation prior to closing on the Stock Purchase Agreement, by using the funds it received from Plaintiffs and the Project's other

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma et al. v. Golden State Renaissance Ventures, LLC et al.*

investors in violation of the Stock Purchase Agreement, and by improperly transferring its assets to its directors.

221.    VTI's conduct was a substantial factor in causing Plaintiffs' harm as previously discussed.

222.    In aiding and abetting the breaches of fiduciary duties owed to the Plaintiffs, VTI acted despicably, in conscious disregard for Plaintiffs' rights and with oppression and malice toward Plaintiffs, and subjected Plaintiffs to cruel and unjust hardship.  Plaintiffs are therefore entitled to an award of punitive damages, in an amount to be determined at trial, sufficient to make an example of VTI.

<u>CLAIMS ASSERTED BY PLAINTIFFS MA, WANG, AND ZHAO</u>

**<u>Count 5 – Breach of Fiduciary Duties Owed by General Partners</u>**

*(Cal. Corp. Code § 15904.08)*

**(Against GSRV LLC and GSRV-VTI Management LLC;**

**Against All Other GSRV Defendants as Alter Egos)**

223.    Plaintiffs repeat and reallege each of the allegations set forth in the previous paragraphs.

224.    California law provides that general partners owe the limited partnership they manage and the partnership's other partners certain fiduciary duties that cannot be eliminated or unreasonably diminished by contract.  *See* Cal. Corp. Code § 15904.08.  As a matter of public law, general partners thus owe the limited partners of a limited partnership a duty of loyalty and a duty of care, which general partners must further discharge "consistent with the obligation of good faith and fair dealing."   Cal. Corp. Code § 15904.08.

225.    The general partner of GSRV-VTI, LP, *i.e.*, GSRV LLC, GSRV-VTI Management, LLC, and their alter egos (collectively, "the General Partner"), repeatedly breached the duties of care and loyalty that the General Partner has owed to the Plaintiffs at all relevant times.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

226.     The General Partner failed to take reasonable steps to confirm, before closing on the Stock Purchase Agreement, that no material changes had impacted VTI, particularly considering that much of the relevant information would likely have been apparent upon reviewing the minutes of VTI's board meetings beginning in 2015.

227.     The General Partner failed to perform — or ensure that some GSRV entity or individual performed — the oversight, management, and control duties over the Project, as required for all projects sponsored by USCIS-designated regional centers. Even though the Stock Purchase Agreement provided for the creation of a VTI director position to represent the holders of VTI Class B Preferred Shares, *i.e.*, the Project Funds, the General Partner seemingly failed to monitor the Project's progress, and even failed to monitor how VTI was using the EB-5 funds sourced from Plaintiffs and the Project's other investors, until roughly two years after the Stock Purchase Agreement initially closed.  The General Partner's initial inquiry into VTI's use of its EB-5 funds referenced a VTI memorandum that had been circulated a year earlier.

228.     The General Partner failed to disclose the mental impairment allegedly suffered by Defendant Chelini — co-manager of GSRV LLC until around November 2015, and at all times the manager and sole member of GSRV-VTI Management, LLC — at a critical time leading up to the close of the Stock Purchase Agreement.

229.     The General Partner allowed internal GSRV disputes to take priority over any attempt to discharge its duties to Plaintiffs and the Project's other investors in a manner consistent with its obligation of good faith and fair dealing.

230.     To the extent that the General Partner's relationship with the GSRV Regional Center was materially altered as a result of the GSRV internal disputes that began in April 2015 — or as a result of the subsequent buy-out of Defendant Chelini's membership interests from GSRV LLC and most other GSRV related entities — the General Partner failed to inform USCIS, Plaintiffs, and the Project's other investors of this change.

231.     Upon learning that VTI had used investor funds in violation of the Stock Purchase Agreement, instead of and without informing Plaintiffs and the project's other investors of VTI's breach, the Manager sought to protect itself at the expense of the Investor LP's limited partners

by "requesting," through counsel, that the limited partners consent to a waiver of future conflicts of interest, which allowed the General Partner to retain access to all confidential information provided by the limited partners while ensuring that the limited partners would have no access to information disclosed by the General Partner.  In presenting the limited partners with this so-called "request," the General Partner and its counsel understood that the limited partners would have felt compelled to consent to the waiver.

232.    When the General Partner learned that VTI had immediately used Project investor funds in violation of the Stock Purchase Agreement, the General Partner withheld this information from Plaintiffs.  Even when the General Partner finally began disclosing certain facts to the limited partners, it misrepresented the gravity of the situation and the relevant timeline, in an apparent attempt to conceal its own responsibility.

233.    The numerous breaches of the General Partner's fiduciary duties caused Plaintiffs and the Investor LP's other limited partners significant harm, including by depriving them of information likely to have led to the General Partner's replacement at junctures when Plaintiffs' investment could have been salvaged.

234.    As a result of the breaches of fiduciary duties committed by GSRV LLC, GSRV-VTI Management, LLC, and their alter egos, Plaintiffs have been harmed in an amount of no less than $540,000 each, subject to proof at trial.

235.    In breaching the fiduciary duties owed to the Plaintiffs, Defendants acted despicably, in conscious disregard for Plaintiffs' rights and with oppression and malice toward Plaintiffs, and subjected Plaintiffs to cruel and unjust hardship.  Plaintiffs are therefore entitled to an award of punitive damages, in an amount to be determined at trial, sufficient to make an example of Defendants.

//

//

//

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma* et al. *v. Golden State Renaissance Ventures, LLC* et al.

1

**Count 6 – Aiding and Abetting Breaches of Fiduciary Duties**

2

*(Cal. Corp. Code § 15904.08)*

3

**(Against GSRV LLC; GSRV Management, LLC; and the Individual GSRV Defendants)**

4          236.    Plaintiffs repeat and reallege each of the allegations set forth in the previous

5    paragraphs.

6          237.    GSRV LLC and GSRV-VTI Management, LLC breached the fiduciary duties they

7    owed Plaintiffs as the successive general partners of GSRV-VTI, LP, as previously discussed.

8          238.    All other GSRV Defendants knew of at least some of these breaches.

9          239.    Defendants provided substantial assistance or encouragement toward these

10   breaches, including by engaging in and prolonging internal GSRV disputes, which obstructed the

11   normal functioning of the Regional Center; by failing to disclose the mental impairment allegedly

12   suffered by Defendant Chelini for some time around April 2015; by failing to ensure that the

13   Regional Center performed its oversight duties over the Project as required pursuant to its USCIS

14   designation; and, if any material alteration of the relationship between GSRV LLC and GSRV-

15   VTI Management, LLC supposedly occurred as a result of the GSRV internal disputes that began

16   in April 2015 — or as a result of the subsequent buy-out of Defendant Chelini's membership

17   interests from GSRV LLC and most other GSRV related entities, by failing to disclose this

18   change to USCIS and to the Project's investors.

19         240.    Defendants' acts and omissions were substantial factors in causing Plaintiffs'

20   harm, as previously discussed.

21         241.    In aiding and abetting the breaches of fiduciary duties owed to the Plaintiffs,

22   Defendants acted despicably, in conscious disregard for Plaintiffs' rights and with oppression and

23   malice toward Plaintiffs, and subjected Plaintiffs to cruel and unjust hardship.  Plaintiffs are

24   therefore entitled to an award of punitive damages, in an amount to be determined at trial,

25   sufficient to make an example of Defendants.

26         //

27      //

28

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma et al. v. Golden State Renaissance Ventures, LLC et al.*

1

**Count 7 – Aiding and Abetting Breaches of Fiduciary Duties**

2

*(Cal. Corp. Code § 15904.08)*

3

**(Against VTI)**

4       242.      Plaintiffs repeat and reallege each of the allegations set forth in the previous

5  paragraphs.

6       243.      GSRV LLC and GSRV-VTI Management, LLC breached the fiduciary duties they

7  owed Plaintiffs as the successive general partners of GSRV-VTI, LP, as previously discussed.

8       244.      VTI knew of at least some of these breaches.

9       245.      VTI substantially contributed to these breaches of fiduciary duties, including by

10  failing to disclose the material changes in its financial situation prior to closing on the Stock

11  Purchase Agreement, by using the funds it received from Plaintiffs and the Project's other

12  investors in violation of the Stock Purchase Agreement, and by improperly transferring its assets

13  to its directors.

14       246.      VTI's conduct was a substantial factor in causing Plaintiffs' harm as previously

15  discussed.

16       247.      In aiding and abetting the breaches of fiduciary duties owed to the Plaintiffs, VTI

17  acted despicably, in conscious disregard for Plaintiffs' rights and with oppression and malice

18  toward Plaintiffs, and subjected Plaintiffs to cruel and unjust hardship.  Plaintiffs are therefore

19  entitled to an award of punitive damages, in an amount to be determined at trial, sufficient to

20  make an example of VTI.

21

22                    CLAIMS ASSERTED BY ALL PLAINTIFFS

23                    **Count 8 – Constructive Fraud**

24                    **(Against GSRV LLC and GSRV-VTI Management LLC;**

25                    **Against All Other GSRV Defendants as Alter Egos)**

26       248.      Plaintiffs repeat and reallege each of the allegations set forth in the previous

27  paragraphs.

28

249.    GSRV Management, LLC and GSRV LLC — and all other GSRV Defendants as their alter egos — became Plaintiffs' fiduciaries once Plaintiffs subscribed to the Project Funds.

250.    In the course of the fiduciary relationship, the GSRV Defendants repeatedly failed to disclose material facts to Plaintiffs, which caused Plaintiffs harm, as previously discussed.

1.    Plaintiffs have suffered damages in an amount of at least $2,700,000 plus any applicable interest, as well as other appropriate damages according to proof.

2.    In withholding material information from Plaintiffs in violation of their fiduciary duties to the Plaintiffs, Defendants acted despicably, in conscious disregard for Plaintiffs' rights and with oppression and malice toward Plaintiffs, and subjected Plaintiffs to cruel and unjust hardship.  Plaintiffs are therefore entitled to an award of punitive damages, in an amount to be determined at trial, sufficient to make an example of Defendants.

## **Count 9 – Fraudulent Concealment**

**(Against GSRV LLC; GSRV Management, LLC; the Individual GSRV Defendants; and Against VTI)**

251.    Plaintiffs repeat and reallege each of the allegations set forth in the previous paragraphs.

252.    As previously explained, Defendants failed to disclose to the Plaintiffs various information which Defendants were required to disclose in order to correct or clarify otherwise misleading representations that Defendants had previously made to the Plaintiffs, directly or indirectly.

253.    Defendants knowingly concealed this information from Plaintiffs, to prevent Plaintiffs from acting upon this information to protect their interests in ways that would be detrimental to Defendants, such as by preventing the close of the Stock Purchase Agreement or drawing attention to the GSRV's failure to perform its duties under federal law as a USCIS-designated regional center.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

- 47 -

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma* et al. *v. Golden State Renaissance Ventures, LLC* et al.

254.     In justifiable reliance on Defendants' prior representations to Plaintiffs, Plaintiffs in fact did not act to protect their interests, including in ways that would have been detrimental to Defendants, and suffered harm as previously explained.

255.     In fraudulently concealing material facts from Plaintiffs for their own benefit, Defendants acted despicably, in conscious disregard for Plaintiffs' rights and with oppression and malice toward Plaintiffs, and subjected Plaintiffs to cruel and unjust hardship.  Plaintiffs are therefore entitled to an award of punitive damages, in an amount to be determined at trial, sufficient to make an example of Defendants.

**Count 10 – Conversion**

**(Against All Defendants)**

256.     Plaintiffs repeat and reallege each of the allegations set forth in the previous paragraphs.

257.     Defendants improperly took and retained Plaintiffs' investment funds, and accompanying fee payments.  Defendants have, without authorization, asserted dominion and control over the funds which are specifically identifiable property of Plaintiffs, and are owned by and payable to Plaintiffs.

258.     This conversion is inconsistent with Plaintiffs' rights and ownership to property.

259.     The payments and property wrongfully converted by Defendants are specific and identifiable.

260.     Plaintiffs have demanded the return of their property, but the funds have not been returned.

261.     To the extent any Defendants did not directly convert Plaintiffs' property, those Defendants substantially assisted others with acts of conversion, and exercised dominion and control over Plaintiffs' property while those Defendants either knew or should have known that Plaintiffs' property was misappropriated.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

262.     As a direct result of Defendants' misappropriation and conversion, Plaintiffs have suffered damages in the amount of at least $2,700,000 plus any applicable interest, as well as other appropriate damages according to proof.

263.     Defendants acted despicably, in conscious disregard for Plaintiffs' rights and with oppression and malice toward Plaintiffs, and subjected Plaintiffs to cruel and unjust hardship. Plaintiffs are therefore entitled to an award of punitive damages, in an amount to be determined at trial, sufficient to make an example of Defendants.

## **Count 11 – Voidable Transfers in Violation of Minn. Stats. Ann. §§ 513.44–513.45**

### **(Against VTI)**

264.     Plaintiffs repeat and reallege each of the allegations set forth in the previous paragraphs.

265.     Under the Minnesota Uniform Fraudulent Transfer Act, certain transactions by debtors are deemed voidable and entitle a creditor to avoid the transfer, obtain judgment against the transferee, or receive other relief provided by statute.

266.     On account of VTI's breach of the Stock Purchase Agreement and misrepresentations and omissions outlined above, Plaintiffs have valid claims against VTI and thus constitute "creditors" of VTI.

267.     VTI's payments and transfers of intellectual property to VTI Directors John Graves, Dr. Paul Asdourian, and Dr. Arnold Schwartz constitute voidable transfers under Minn. Stat. § 513.44 because they were made with an actual intent to hinder, delay, or defraud Plaintiffs and because VTI intended to incur, or reasonably believed that it would incur, debts beyond its ability to pay them as they became due.

268.     VTI's payments and transfers of intellectual property to VTI directors John Graves, Dr. Paul Asdourian, and Dr. Arnold Schwartz also constitute voidable transfers under Minn. Stat. § 513.45(b) because Plaintiffs' claims arose before the date of the transfers and because VTI directors John Graves, Dr. Paul Asdourian, and Dr. Arnold Schwartz constitute "insiders" as defined by Minnesota Statute, received the transfer to satisfy an antecedent debt,

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

1   received the transfer at a time when VTI was insolvent, and had reasonable cause to believe that

2   VTI was insolvent.

3       269.    Based on the foregoing, Plaintiffs are entitled to judgment against VTI for the

4   amount of the transfers to its directors, plus interest, in an amount to be determined at trial.

5

6                   **Count 12 – Unfair Competition**

7               *(Cal. Bus. & Prof. Code Section § 17200 et seq.)*

8                   **(Against All GSRV Defendants)**

9       270.    Plaintiffs repeat and reallege each of the allegations set forth in the previous

10  paragraphs.

11      271.    Plaintiffs assert this Claim against the GRSV Defendants for all aspects of their

12  unlawful, unfair, and fraudulent business practices, as those terms are defined in California

13  Business & Professions Code § 17200, *et seq.*, commonly known as "California's Unfair

14  Competition Law" ("UCL").

15      272.    Plaintiffs are "persons" under the UCL.  Cal. Bus. & Prof. Code § 17201.

16      273.    By reason of GRSV's previously described wrongful actions, inactions and

17  omissions, the GRSV Defendants have engaged in unlawful, unfair, and fraudulent practices

18  within the meaning of the UCL.

19      274.    The GRSV Defendants' conduct is "unfair" within the meaning of the UCL, as it is

20  offensive to established public policy, immoral, unscrupulous, unethical, oppressive, and

21  substantially injurious to foreign investors attempting to avail themselves of lawful immigration

22  channels by investing in U.S. regions that need such resources.

23      275.    The GRSV Defendants' practices are "unlawful" because, as discussed, these

24  practices amount to violations of GSRV's fiduciary duties towards Plaintiffs and GSRV's other

25  EB-5 investors under California Code of Corporations § 16404 and § 17704.09, and/or to aiding

26  and abetting the same.  Moreover, GSRV's practices are also unlawful because they violate

27  California's Securities Law Act of 1968, *see* Cal. Corp. Code §§ 25401, 25504.1, and federal law

28  governing the EB-5 Program.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

276.    GRSV's practices are "fraudulent" because they are likely to deceive reasonable persons in Plaintiffs' positions into believing that the material aspects of an investment in the GSRV-VTI Projects were, at minimum, <u>consistent</u> with the facts as represented by Defendants.

277.    Defendants, collectively, contracted with each other, regarding all aspects of the functioning of the Regional Center.  They collaborated in the creation of a project for USCIS approval and in the creation marketing materials for the project.  They represented the risks of their projects based on past indicators of financial strength and growth but failed to give any indication of changed circumstances.  They negotiated agreements on behalf of those investors supposed to restrict the permissible uses of investor funds and presented as such to potential investors.

278.    By withholding material information and by failing to correct or clarify their own statements despite changed circumstances making those statements misleading, Defendants collectively violated the UCL.

279.    The inclusion of one-sided and self-serving provisions in GSRV's own form agreements, such as provisions purporting to disclaim Plaintiffs' reliance on any representations made by GSRV (or any other Defendant), amounts to further violations of the UCL.  These provisions were drafted, in English, by GRSV, *i.e.*, the party with the superior understanding of the EB-5 Program and with the superior access to information.[14]  Meanwhile, GSRV's subscription agreements simultaneously provide that, unlike their individual investors, the <u>GSRV Defendants</u> were entitled to and did in fact rely on all of Plaintiffs' representations.

280.    These excessively one-sided terms, imposed in form agreements presented to individual foreign citizens trying to immigrate to the United States, are both substantively and procedurally unconscionable.  Such unconscionable contract terms are unenforceable.  *See* California Civil Code § 1670.5.

281.    Moreover, "[a]ll contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property

---

[14] It can be particularly challenging to conduct a comprehensive investigation from China, which only allows limited Internet access.

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma* et al. *v. Golden State Renaissance Ventures, LLC* et al.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

1  of another, or violation of law, whether willful or negligent, are against the policy of the law."

2  Cal. Civ. Code § 1668.

3  282. Many of Defendants' practices that violate the UCL are ongoing, as Defendants

4  have still not disclosed many of the material facts they have concealed from Plaintiffs. Because

5  some of these facts only just came to light in the course of preparing this action, Plaintiffs do not

6  know whether, even now, they have discovered the full scope of the Defendants' deceit.

7  283. Plaintiffs have been, and continue to be, injured as a direct and proximate result of

8  the GRSV Defendants' violations of the UCL.

9  284. Plaintiffs are entitled to pursue a claim against the GRSV Defendants pursuant to

10  Business & Professions Code Sections 17203 and 17205 for restitution, equitable, and injunctive

11  relief to remedy the unlawful, unfair, fraudulent practices of the GRSV Defendants. Plaintiffs are

12  additionally entitled to move under California Code of Civil Procedure Section 1021.5 for an

13  award of reasonable costs and attorney fees.

14

15  **Count 13 – Failure to Disclose**

16  *(Cal. Corp. Code § 15903.04, § 17704.10)*

17  **(Against GSRV-VTI Management, LLC)**

18  285. Plaintiffs repeat and reallege each of the allegations set forth in the previous

19  paragraphs.

20  286. In October 2020, Plaintiffs sent GSRV-VTI Management, LLC a letter demanding

21  access to certain information and records to which they are entitled under California Corporations

22  Code Section 15903.04 and Section 17704.10.

23  287. While counsel for GSRV-VTI Management, LLC promptly replied, the contents of

24  the reply were limited to disputing the merits of Plaintiffs' claims. The letter was not

25  accompanied by any of the information or records that Plaintiffs requested, nor did it offer to

26  make arrangements for access to such information or records otherwise.

27  288. GSRV-VTI Management, LLC has not provided the information or records that

28  Plaintiffs have demanded at any point prior to the filing of this Complaint.

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma et al. v. Golden State Renaissance Ventures, LLC et al.*

289.    Plaintiffs are entitled to an order enjoining GSRV-VTI Management, LLC to provide access with the information and records they have demanded.  Because GSRV-VTI Management, LLC's failure to comply with these statutory obligations is without justification, Plaintiffs are additionally entitled to an award of reasonable costs and attorney fees incurred in connection with this claim under California Corporations Code Section 17704.10(g).

## Count 14 – Failure to Disclose

*(Minn. Stat. Ann. § 302A.461)*

**(Against VTI)**

290.    Plaintiffs repeat and reallege each of the allegations set forth in the previous paragraphs.

291.    In October 2020, Plaintiffs sent VTI a letter demanding access to certain information and records to which they are entitled under Minn. Stat. Ann. § 302A.461 as the principals of VTI Class B Preferred stock shareholders, the Project Funds.

292.    VTI has never replied to Plaintiffs' letter, much less complied with their demand. VTI has not offered Plaintiffs any proposed justification for its refusal to comply with their demands.

293.    Plaintiffs are entitled to an order enjoining VTI to give them access to the information and records that they have demanded.  Under Minn. Stat. Ann. § 302A.467, Plaintiffs are additionally entitled to any other equitable relief the Court deems just and reasonable in the circumstances, and Plaintiffs respectfully request that the Court award them reasonable expenses in connection with this claim, including attorney fees and, as applicable, disbursements.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court enter judgment against Defendants:

a.      Awarding Plaintiffs actual and compensatory damages, subject to proof at trial, in an amount of no less than $2,700,000, and interest as allowed by law;

b.      Awarding Plaintiffs punitive and exemplary damages;

DGW KRAMER LLP
ONE ROCKEFELLER PLAZA
NEW YORK, NY 10020

1    c.    Ordering Defendants to pay Plaintiffs restitution and/or to disgorge all their ill-

2    gotten gains;

3    d.    Awarding Plaintiffs actual and reasonable attorney fees and costs of suit under

4    California Code of Civil Procedure Section 1021.5, California Corporations Code Section

5    17704.10(g), Minn. Stat. Ann. § 302A.461, and as allowed under the parties' agreements;

6    e.    Enjoining Defendants to provide Plaintiffs with an accounting, and establishing a

7    constructive trust on all property held by Defendants and rightfully owned by Plaintiffs;

8    f.    Appropriate declaratory relief;

9    g.    Enjoining Defendants from further fraudulent transfers under Minnesota Law and

10    from further acts of unfair competition under California law;

11    h.    Imposing statutory fines and penalties;

12    i.    Imposing any appropriate multipliers of damages, fines, or penalties; and

13    j.    For such other and further relief as the Court may deem just and proper.

14

15    DATED:  February 2, 2021              By:    DGW KRAMER LLP

16                                                  /s/ Olivia M. Goetsch
                                                   Olivia M. Goetsch
17                                                 7545 Irvine Center Drive
                                                   Suite 200
18                                                 Irvine, CA 92618
                                                   T: (949) 266-6311
19                                                 F: (917) 630-6183
                                                   ogoetsch@dgwllp.com
20
                                                   Katherine Burghardt Kramer (*pro
21                                                 hac vice* forthcoming)
                                                   Rongping Wu (*pro hac vice*
22                                                 forthcoming)
                                                   One Rockefeller Plaza
23                                                 Suite 1060
                                                   New York, NY 10020
24                                                 T: (917) 688-2585
                                                   F: (917) 630-6183
25                                                 lwu@dgwllp.com
                                                   kkramer@dgwllp.com
26
27                                                 *Counsel for Plaintiffs Hui MA,
                                                   Ailing ZHAO, Xi LIU, Yixuan
28                                                 WANG, and Rui ZHANG*

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma et al. v. Golden State Renaissance Ventures, LLC et al.*

1

## **DEMAND FOR JURY TRIAL**

2      Pursuant to Seventh Amendment to the United States Constitution and Rule 38 of the

3  Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

4

5  DATED:  February 2, 2021                 By:      DGW KRAMER LLP

6                                                    /s/ Olivia M. Goetsch
                                                    Olivia M. Goetsch
7                                                    7545 Irvine Center Drive
                                                    Suite 200
8                                                    Irvine, CA 92618
                                                    T: (949) 266-6311
9                                                    F: (917) 630-6183
                                                    ogoetsch@dgwllp.com
10
                                                    Katherine Burghardt Kramer (*pro*
11                                                   *hac vice* forthcoming )
                                                    Rongping Wu (*pro hac vice*
12                                                   forthcoming)
                                                    One Rockefeller Plaza
13                                                   Suite 1060
                                                    New York, NY 10020
14                                                   T: (917) 688-2585
                                                    F: (917) 630-6183
15                                                   lwu@dgwllp.com
                                                    kkramer@dgwllp.com
16
                                                    *Counsel for Plaintiffs Hui MA,*
17                                                   *Ailing ZHAO, Xi LIU, Yixuan*
                                                    *WANG, and Rui ZHANG*
18

19

20

21

22

23

24

25

26

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL
*Ma et al. v. Golden State Renaissance Ventures, LLC et al.*