EXHIBIT D

RICHARD IDELL (SBN 69033)
 *richard.idell@idellfirm.com*
ORY SANDELL (SBN 233204)
 *ory.sandell@idellfirm.com*
THE IDELL FIRM, A PROFESSIONAL CORPORATION
96 Jessie Street, Third Floor
San Francisco, CA  94105
Telephone: (415) 986-2400
Facsimile:  (415) 392-9259

ROBERT H. BUNZEL (SBN 99395)
 *rbunzel@bzbm.com*
BARTKO ZANKEL BUNZEL & MILLER
A Professional Law Corporation
One Embarcadero Center, Suite 800
San Francisco, California 94111
Telephone: (415) 956-1900
Facsimile:  (415) 956-1152

Attorneys for Defendants GSRV,
GSRV MANAGEMENT, GSRV I, GSRV II,
GSRV III, SFBARC 5 and SFBARC 6

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**05/10/2019**
**Clerk of the Court**
BY: EDNALEEN ALEGRE
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| JUDY CHU,<br><br>          Plaintiff,<br><br>     v.<br><br>STEVEN KAY, GOLDEN STATE RENAISSANCE VENTURES, LLC, GSRV MANAGEMENT, LLC, GSRV I MANAGMENT, LLC, GSRV II MANAGEMENT, LLC, GSRV III MANAGEMENT, LLC, SFBARC 5 MANAGEMENT, LLC, SFBARC 6 MANAGEMENT, LLC, and DOES 1-10 inclusive,<br><br>          Defendants. | Case No. CGC-16-553982<br><br>**NOTICE OF ENTRY OF JUDGMENT CONFIRMING CONTRACTUAL ARBITRATION AWARD AND JUDGMENT**<br><br>Action Filed:     August 31, 2016<br>Trial Date:        None set. |

**PLEASE TAKE NOTICE** that on May 8, 2019, the Court entered its Judgment

Confirming Contractual Arbitration Award and Judgment.  A true and correct copy of this

Judgment is attached as Exhibit A.

DATED:  May 10, 2019                    BARTKO ZANKEL BUNZEL & MILLER
                                        A Professional Law Corporation


                                        By:      /s/ Robert H. Bunzel
                                                _____
                                                Robert H. Bunzel
                                                Attorneys for Defendants GSRV, GSRV
                                                MANAGEMENT, GSRV I, GSRV II, GSRV III,
                                                SFBARC 5 and SFBARC 6

# EXHIBIT A

1 | RICHARD IDELL (SBN 69033)
      *richard.idell@idellfirm.com*
2 | ORY SANDELL (SBN 233204)
      *ory.sandell@idellfirm.com*
3 | THE IDELL FIRM, A PROFESSIONAL CORPORATION
    96 Jessie Street, Third Floor
4 | San Francisco, CA  94105
    Telephone: (415) 986-2400
5 | Facsimile:  (415) 392-9259

6 | ROBERT H. BUNZEL (SBN 99395)
      *rbunzel@bzbm.com*
7 | BARTKO ZANKEL BUNZEL & MILLER
    A Professional Law Corporation
8 | One Embarcadero Center, Suite 800
    San Francisco, California 94111
9 | Telephone: (415) 956-1900
    Facsimile:  (415) 956-1152
10 |
    Attorneys for Petitioners GSRV,
11 | GSRV MANAGEMENT, GSRV I, GSRV II,
    GSRV III, SFBARC 5 and SFBARC 6
12 |

**F I L E D**
San Francisco County Superior Court

MAY 0 8 2019

CLERK OF THE COURT
BY: _____
              Deputy Clerk

13 |              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14 |                     COUNTY OF SAN FRANCISCO

15 |

| | |
|---|---|
| 16 JUDY CHU, | Case No. CGC-16-553982 |
| 17      Plaintiff, | |
| 18      v. | **JUDGMENT CONFIRMING CONTRACTUAL ARBITRATION AWARD AND JUDGMENT** |
| 19 STEVEN KAY, GOLDEN STATE RENAISSANCE VENTURES, LLC, GSRV | |
| 20 MANAGEMENT, LLC, GSRV I MANAGMENT, LLC, GSRV II | |
| 21 MANAGEMENT, LLC, GSRV III MANAGEMENT, LLC, SFBARC 5 | |
| 22 MANAGEMENT, LLC, SFBARC 6 MANAGEMENT, LLC, and DOES 1-10 | |
| 23 inclusive, | Action Filed:      August 31, 2016 |
| 24      Defendants. | Trial Date:         None set. |

25 |
26 |
27 |
28 |

2645.000/1400378.1

JUDGMENT CONFIRMING CONTRACTUAL ARBITRATION AWARD AND JUDGMENT

1    The Court, having granted the Petition of defendants GOLDEN STATE RENAISSANCE

2 VENTURES, LLC, GSRV MANAGEMENT, LLC, GSRV I MANAGMENT, LLC, GSRV II

3 MANAGEMENT, LLC, GSRV III MANAGEMENT, LLC, SFBARC 5 MANAGEMENT, LLC,

4 SFBARC 6 MANAGEMENT, LLC ("Defendants") for an order to Confirm Contractual

5 Arbitration Award ("Petition"), and having ordered entry of judgment as requested in said

6 Petition,

7    **IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

8    1.    The award set forth in the Final Award in *Golden State Renaissance Ventures,*

9 *LLC, et al. v. Judy Chu,* JAMS Ref. No. 1100085319, issued on December 11, 2018, and

10 incorporating earlier awards, all of which are attached hereto as Exhibit A (collectively the

11 "Award") is confirmed; and

12    2.    Judgment is entered in conformity with the terms of the Award and includes the

13 following:

14    a.    Plaintiff Judy Chu to pay Defendants the net sum of $26,730, which sum

15 Defendants acknowledge has been paid and received in full;

16    b.    The non-monetary relief set forth in Exhibit A at (i) the December 11, 2018 Final

17 Award, pp.12-13, (ii) the February 16, 2018 Partial Final Award, pp. 33-34; (iii) the March 19,

18 2018 Addendum to Partial Final Award, pp. 1-2; and (iv) the September 27, 2018 Order

19 Confirming Ms. Chu's Ownership Entitlements, etc., pp. 1-2;

20    c.    Plaintiffs' claims that initiated this action are terminated with prejudice, subject to

21 the terms of the Award and this Judgment; and

22    d.    Plaintiff, Defendants and defendant Steven Kay shall bear their own attorney's fees

23 and costs, as decided by the Award.

24

25 DATED: ____May 8____, 2019

26

27    _____
      Judge of the Superior Court

28    **ETHAN P. SCHULMAN**

2645.000/1400378.1                          2
JUDGMENT CONFIRMING CONTRACTUAL ARBITRATION AWARD AND JUDGMENT

# EXHIBIT A

**JAMS ARBITRATION**
**CASE REFERENCE NO. 1100085319**

Golden State Renaissance Ventures, LLC, et al.,

      Claimants,

                                    **FINAL AWARD**

vs.

Judy Chu,
      Respondent.

_____

      On February 16, 2018, the Arbitrator issued the Partial Final Award in this matter. The Arbitrator hereby incorporates that Partial Final Award into this Final Award, which will dispose of the remaining issues over which this Arbitrator has jurisdiction: damages, fees and costs, and Ms. Chu's petition for an accounting.

      **Except to the limited extent set forth in the Summary of Final Award and Orders at the end of this document, the issuance of this Final Award terminates this arbitration.**

      **Pursuant to Rule 24(j) of JAMS Comprehensive Arbitration Rules and Procedures, and except to the limited extent set forth in the Summary of Final Award and Orders,** *the Arbitrator's jurisdiction* **over all claims made and all defenses asserted by the parties in this matter** *will expire fourteen (14) calendar days after issuance of this Final Award* **unless, within seven days of its issuance, a party files a** "request that the Arbitrator correct any computational, typographical or other similar error in the Award."

### Damages Awarded Ms. Chu

      Claimants do not challenge Ms. Chu's claim to $1,832.40 in damages caused

1

by Claimants' breach of their duty to timely issue her distributions in 2015. **Ms. Chu is hereby Awarded $1,832.40 in damages**.

### Damages Awarded the GSRV Claimants

Respondent contends, among other things, that she is protected against any damages award by the "Exculpation" provisions in the GSRV Operating Agreements. See Sections 1.20 and 11.1.

The fatal difficulty with this contention is that, by their express terms, these clauses apply only to acts or omissions "performed or omitted in good faith *on behalf of the Company*." Ms. Chu did not engage in "willful misconduct or fraud" when she refused to execute the Amended Operating Agreements in April of 2015, but the Arbitrator finds that her objections to and her refusal to execute documents that were in historical fact properly adopted *were not acts or omissions "on behalf of the Company."* Rather, she was animated primarily in this conduct by efforts to protect her own interests.

Determining the damages award to which Claimants have proved entitlement is not a straightforward undertaking and requires the Arbitrator to exercise sound judgment in making reasonable determinations of amounts which, through no fault of any party, cannot be calculated with mathematical exactitude.

In the case at bar, Claimants have proved by a preponderance of the evidence that they have suffered economic harm as a result of Respondent's violation of her contractual duty to execute the revised Operating Agreements within ten days of those Agreements having been presented to her on April 6, 2015. See Partial Final Award, pp. 18-19. Because Claimants have proved that they actually suffered harm, California law will not bar them from recovering damages solely on the ground that the damages suffered cannot be proven with mathematical precision.

In this final stage of these proceedings, Claimants seek $52,750 in damages

2

for the breach of contract by Respondent. For the reasons set forth below, Claimants have proved entitlement only to a lower figure.

Ms. Chu was not the only original member of GSRV who refused to sign the properly Amended Operating Agreements in April of 2015. Mr. Wong also refused to do so. The evidence is sufficient to support a finding, however, that Ms. Chu spoke for Mr. Wong and that, had she agreed to terms, he also would have. See Tr. at 707, 710, and 716. It follows that Claimants have overcome a causation defense that might have been based on the fact that Mr. Wong also refused to execute or otherwise approve the Amended Agreements.

Through Mr. Mayer's Declaration, Claimants contend that they incurred at least $5,000 in "accountancy fees" that they would not have incurred if Ms. Chu and Mr. Wong had signed the Amended Operating Agreements by April 17, 2015. Mayer Decl. of September 24, 2018, at para. 12. The additional accountancy services were necessary because Claimants' tax preparing firm, Marcum, LLP, insisted that changes be made to tax filings for the SFBARC entities. See, e.g., Tr. at 556-559; 754-755.

The Arbitrator has had ample opportunity to assess Mr. Mayer's credibility and competence, both of which the Arbitrator has assessed positively. Given these assessments and taking fully into account the interest Mr. Mayer has in the subject matter and outcome of these proceedings, the Arbitrator hereby finds that Mr. Mayer's good faith estimates of the extra amounts charged for these services is sufficient to support an award in damages in favor of Claimants for this $5,000 expense.

Claimants also seek a $5,000 award for fees incurred having Ms. Puccio, their outside counsel for corporate matters, "redo the operating agreements for SFBARC5 and SFBARC6." Mayer Decl. of September 24, 2018, at para. 13. Given all the circumstances, it was reasonable for Claimants to ask outside counsel to re-frame

3

these Agreements, an undertaking that would not have been necessary if Ms. Chu and Mr. Wong had executed the properly Amended Agreements. There being no evidentiary basis for questioning Mr. Mayer's estimate that Claimants incurred at least $5,000 in attorneys' fees for this work, the Arbitrator also hereby finds that Mr. Mayer's good faith estimates of the extra amounts charged for these services is sufficient to support an additional award in damages in favor of Claimants for this $5,000 expense.

The largest component of Claimants' request for damages is based on Mr. Mayer's estimate that he spent 2.5 hours per week for 38 weeks during 2015 "dealing with matters caused by [Ms.] Chu's refusal to sign the Operating Agreements and the resultant disruptive impact on the companies." Mayer Decl. of September 24, 2018, at paragraph 14.

During the hearing on damages and fees, Mr. Mayer testified that in estimating the 2.5 hours per week figure, he made a good faith effort to *segregate hours* he committed to this work only, or at least primarily, *because of Ms. Chu's breach* of her contractual duty, *from the hours* he spent dealing with difficulties or challenges that were largely *attributable to other sources*, most notably to Mr. Chelini's mercurial pursuit of more favorable (to him) terms or of more money (e.g., in a buy-out).

The Arbitrator has seen no evidence that would tend to undermine the accuracy of Mr. Mayer's estimates of the time he devoted to trying to repair the parties' fractured relationships. Nor does the Arbitrator have a basis for questioning the accuracy, at the general level that the circumstances make necessary, Mr. Mayer's estimates of the hours per week attributable primarily to difficulties caused by Ms. Chu's refusal to execute he agreements.

The record does not support a conclusion, however, that Claimants are entitled to damages for the time Mr. Mayer committed to this work for the entirety of the

4

period from April 17, 2015 (when the 10-day period to execute the new Agreements expired), through the end of 2015.

Instead, the evidence supports findings that Ms. Chu was prepared to sign amended agreements on August 11, 2015, but that the re-revised agreements prepared at this time by Mr. Mayer were not executed because Mr. Chelini (and, perhaps, Mr. Kay) refused to agree to the terms that Mr. Mayer had proposed and that were acceptable to Ms. Chu. See Exhibits 124, 125, and 126, as well as Tr. at 812-814, 825-827. Thus, the evidence of record does not support a finding that it was a breach by Ms. Chu that caused Claimants to incur the fees paid to Mr. Mayer for working on these problems after August 11, 2015.

Because of this shortfall in Claimants' causation showing, Ms. Chu is chargeable only with the extra fees Mr. Mayer attributes to work Ms. Chu's breach caused between April 17, 2015, and August 11, 2015.

Claimants' evidence supports a finding that Mr. Mayer devoted 2.5 hours per week over this 16 and one-half week period to extra work made necessary by Ms. Chu's continuing refusal to execute the Amended Agreements or revisions thereto. Claimants' evidence also supports a finding that the $450 per hour rate at which Mr. Mayer billed Claimants for this work was reasonable -- given the length and depth of Mr. Mayer's experience and his first-hand knowledge of the details of the parties' situations.

Thus, Claimants have proved that Ms. Chu's breach of contract caused Claimants to suffer damages in the sum of $1,125 per week for sixteen and one-half weeks. It follows that Claimants have proved they are entitled to $18,562.50 in damages for the extra fees charged by Mr. Mayer's firm over this period.

**The total damages to which Claimants have established their entitlement are $28,562.50** ($5,000 in accountancy fees, plus $5,000 in legal fees for re-drafting agreements, plus $18,562.50 for the extra hours billed by Mr. Mayer's firm).

5

**Claimants' and Respondent's**
**Competing Claims for Attorneys' Fees and Costs**

Claimants[1] and Respondent/Counter-Claimant press mutually exclusive claims for attorneys' fees and costs as "prevailing" parties.

Respondent contends, in connection with this issue, that the indemnification clauses in the Operating Agreements entitle her to recover the fees and costs she has incurred in this matter. See section 1.20 and 11.2. It is generally recognized, however, that these kinds of clauses are intended to protect members and managers of LLCs from actions prosecuted against them by *outsiders*, i.e., by individuals or entities that are not members or managers of the LLCs. Ms. Chu has presented no evidence that the signatories to the applicable Operating Agreements had any other objective or purpose in mind.

Specifically, Ms. Chu has failed to present any evidence that would tend to support a finding that these provisions were intended to confer, with respect to disputes internal to the partnerships, a right in individual members to recover fees and costs from other members, or from a fund manager or the limited partnerships themselves. Had the parties intended these indemnity provisions to confer such important entitlements, they would and should have set forth any such intention expressly. They did not.

Moreover, there are *two separate provisions* in the Operating Agreements that *explicitly address disputes among partners* and that *expressly create a right in a "prevailing party" to recover reasonable attorneys' fees and costs.* See Sections 12.6 and 12.14. Such provisions would have been at least in part redundant if Ms.

---

[1]The term "Claimants" as used here does not include Stephen Kay, who appeared as a party in this matter only as a Respondent to Counter-Claims prosecuted by Ms. Chu.

The Arbitrator addresses Mr. Kay's request for an award of his separate fees and costs as a "prevailing" counter-respondent in a subsequent section of this Final Award.

6

Chu's reading of the indemnification clause were endorsed. For these reasons, the Arbitrator concludes that Ms. Chu has failed to prove that the indemnity clauses can serve as bases for an award of fees and costs to her in this action.

Rules and principles that apply to interpreting and applying more generic "prevailing party" clauses must guide disposition of this issue in this matter.

Exercising the discretion vested in him by the law, the Arbitrator has decided that it is *not* appropriate to attach the label "prevailing party" to either Claimants or Respondent.

Claimants prevailed on most of the important contract interpretation issues[2], proved that the Amended Operating Agreements presented to Ms. Chu on April 6, 2015, had been properly adopted, and proved that Ms. Chu breached her contractual obligations when she refused to sign them. Claimants also achieved one of their most important objectives by establishing the terms under which they could lawfully proceed as limited partnerships operating under GSRV's EB-5 license.

Ms. Chu also achieved a potentially very significant objective. She proved that, as an original member of the GSRV entity to whom the government granted the EB-5 license, she was entitled to her proportionate share of future distributions from all existing GSRV entities -- and to be offered an opportunity to continue to receive substantial income (without doing substantial work) from any new entities that might be formed in the future to capitalize on the EB-5 license.

Given these outcomes, there is no principled basis for attaching the label "prevailing party" to either Claimants or Respondent. It follows that neither Claimants nor Respondent is entitled to recover attorneys' fees or costs under Section 12.6 or under Section 12.14 of the controlling Operating Agreements.

---

[2]It bears emphasis that the contract interpretation issues were quite difficult and, in some instances, relatively close calls. The Arbitrator certainly cannot conclude that, with respect to any of these challenging contract interpretation questions, either party took a position that was not supported by evidence and reasonable argument.

7

Instead, **the Arbitrator hereby finds and determines that each party must bear its or her own fees and costs.**

### Mr. Kay's Motion for Fees and Costs

Mr. Kay appeared as a party in this arbitration only as a Counter-Respondent to claims pursued by Ms. Chu. Ms. Chu's counter-claims against Mr. Kay sounded essentially in breach of fiduciary duties and fraud, but Ms. Chu failed to prove that Mr. Kay violated any duty he owed her under any legal theory.

Ms. Chu obviously cannot be deemed to have "prevailed" in her claims against Mr. Kay. Mr. Kay, not surprisingly and not without some force, contends that he is the "prevailing party" on the claims Ms. Chu prosecuted against him -- and that, as such, he is entitled to be awarded his attorneys' fees and costs.

Ms. Chu raises multiple arguments in support of her contention that Mr. Kay is not entitled to recover his attorneys' fees and costs from her. The first such argument is based on mis-readings of the "Exculpation" and "Indemnification" clauses of the Operating Agreements. Sections 11.1 and 11.2, respectively.

As noted, above, the "Exculpation" clause protects members from liability to the Company or any of its members "for any act or omission performed or omitted in good faith *on behalf of the Company* and in a manner not constituting willful misconduct or fraud." While she was not proceeding in bad faith or engaging in willful misconduct when she sued Mr. Kay, there has been no showing that Ms. Chu was prosecuting her claims against Mr. Kay "on behalf of the Company" as that phrase was intended to be understood in Section 11.1 of the Operating Agreements.

Nor does the Indemnification clause protect Ms. Chu from Mr. Kay's claim to fees and costs. This kind of provision is generally understood to be intended to protect members of LLCs only from exposure to liability based on claims pressed by persons or entities *outside* the LLCs. Ms. Chu presented no evidence that would

8

support a finding that the signatories to the subject Agreements intended the indemnification provisions to apply to disputes *between members* of the LLCs, or to disputes between members and managers, or disputes *between members and the LLCs themselves*.

Nor is there any reason to believe that the indemnification provisions were intended to displace or override the *two separate clauses* in these Agreements that *speak directly to disputes between members*: the "Enforcement" clause, Section 12.6, and the "Arbitration" clause, Section 12.14. Stated differently, there is no evidence that the indemnification provision in the subject Agreements was intended to protect members from the *independent fee shifting provisions* set forth in the Enforcement and Arbitration clauses -- provisions that expressly apply to disputes among members ("between the parties" in 12.14), or between members and the GSRV entities.

So, again, the Arbitrator is called upon to exercise the discretion given him by the law to determine whether, under generic fee shifting clauses, but in the specific circumstances here presented, it is appropriate to award fees and costs to Mr. Kay as a "prevailing party."

For the following reasons, the Arbitrator concludes that it would *not* be appropriate to award Mr. Kay his fees and costs under the fee shifting clauses here in issue. In making a determination like this, an Arbitrator is not cabined by the forms of judgments or outcomes -- and may take into account both equitable considerations and real-world circumstances.

Because of the percentage interests in the LLCs that he owned (directly and indirectly), Mr. Kay exercised control over the GSRV entities as their governing terms were re-cast in the Amended Operating Agreements that became effective in April of 2015. While under the terms of the Amended Agreements he might have enjoyed legal protections from liability or direct personal losses from some actions

9

taken by the entities he controlled, those protections do not extend into the equitable arena in which we work here.

It follows that, in exercising discretion about whether to award Mr. Kay his fees and costs as a prevailing party, it is not inappropriate to take into account Claimants' breach of Ms. Chu's contractual right to distributions during 2015. Mr. Kay bears equitable (and factual) responsibility for this breach -- as it was under his authority, with his consent, and at his direction that the entities breached their contractual obligations to Ms. Chu.

Another factor that warrants consideration in this context is Mr. Kay's refusal, at the end of August of 2015, to agree to any changes in the Amended Operating Agreements except one: a cap on dilution of existing members' financial entitlements. Earlier in that August, Ms. Chu had agreed to a set of amendments that, if approved by Mr. Kay, likely would have avoided the sustained period of uncertainty and the substantial expenses and distractions that have burdened these limited partnerships for more than three years. By refusing to accept any amendment other than the cap on dilution, Mr. Kay effectively killed any chance that all the voting members of the GSRV entities would come to terms.

It also is not clear that Mr. Kay has emerged from this proceeding with a net economic gain. The evidence supports a finding that Mr. Kay effectively controlled the positions taken and the ultimate decisions made by the GSRV entities in these proceedings. Mr. Kay would have been the primary financial beneficiary of these proceedings if Claimants had succeeded in persuading the Arbitrator that Ms. Chu was not entitled, going forward, to her percentage share of the profits generated by existing and new GSRV-sponsored projects. However, because Claimants, controlled by Mr. Kay, failed to so persuade the Arbitrator, Mr. Kay's share of the entities' profits, going forward, will be reduced by more than half of the sums paid to Ms. Chu.

10

Moreover, had Claimants secured all the relief for which they pled, the value of Mr. Kay's equity interests in these partnerships would have been greater than it is under the rulings made in these proceedings.

Given these 'real world,' substantive considerations, the **Arbitrator declines to award Mr. Kay the attorneys' fees and costs he incurred in connection with these proceedings.**

### The Accounting Sought in this Action by Ms. Chu

Respondent included in her counter-claims a request to conduct financial accountings of the GSRV entities in order to assure herself that she would receive the full distributions to which she contended she was entitled.

With two exceptions, discussed in the next paragraphs, the Arbitrator hereby finds that the GSRV entities have satisfied the accounting obligations connected with this proceeding.

The first exception relates to the financial records for 2018. As the record generated during these proceedings makes quite clear, there are financially complicated relationships between the GSRV entities. Allocations of expenses and revenues need to be made every year -- and are specific to performances for the entire year, not just for most of it. Thus, the allocations and adjustments between the GSRV entities cannot be completed until the close of the calendar year. For 2018, they remain quite incomplete.

Given this necessary state of affairs, the Arbitrator's Final Award will include an ORDER that Claimants must provide Ms. Chu copies of 2018 financial statements for all the entities of which she is or was a member in 2018 as soon as these statements have been completed, but in no event later than March 1, 2019. The Arbitrator will retain jurisdiction over this case into 2019 solely for the purpose of ensuring compliance with this Order.

11

The second and only other matter with respect to which the GSRV entities have not satisfied their accounting obligations to Ms. Chu relates to the departure of Ms. Fang. That departure was accompanied, in the end, by a settlement agreement whose terms the signatories promised to keep confidential. However, Ms. Chu, as a member of the settling GSRV entities, is entitled to know the amount paid to Ms. Fang from GSRV funds.

*The Arbitrator therefore ORDERS CLAIMANTS to disclose to Ms. Chu, no later than 10 days after issuance of this Final Award, the amount paid to Ms. Fang in connection with her departure from GSRV.*

*The Arbitrator also ORDERS MS. CHU not to disclose this amount to anyone other than her counsel in this proceeding and her tax accountant, each of whom may use the information so provided only to fulfill their professional obligations to Ms. Chu.*

### Summary of Final Award and Orders

1. The Partial Final Award as issued on February 16, 2018, is hereby incorporated into and re-endorsed in this Final Award.

2. The sum of $1,832.40 is awarded in damages in favor of Ms. Chu and against Claimants for the breach in 2015 of her contractual right to timely distributions.

Ms. Chu may offset by this amount the damages awarded herein against her and in favor of Claimants.

3. The sum of $28,562.50 is awarded in damages in favor of Claimants and against Ms. Chu on the proof made that Ms. Chu breached her duty either to execute the validly Amended Operating Agreements by April 17, 2015, or to withdraw from the GSRV entities.

Ms. Chu may offset from this damages award against her the $1,832.40 that

12

is awarded in her favor and against Claimants in paragraph 2, above.  With this offset, *Ms. Chu's net liability in this proceeding to Claimants is $26,730.10.*

*Ms. Chu must deliver payment in this amount to Claimants no later than January 10, 2019.*

4. No party to this action is entitled to an award of attorneys' fees or costs -- so each party must bear its own fees and costs.

5. Within ten calendar days of issuance of this Final Award, Claimants must disclose to Ms. Chu the amount of money (from any GSRV source) paid to Ms. Fang in connection with her departure from the GSRV groups.

Ms. Chu may not disclose this amount to anyone other than her lawyer in these proceedings and her tax accountant.

6. Claimants must provide Ms. Chu copies of the final, adjusted 2018 financial statements for all the GSRV entities of which she is a member or was a member in 2018 as soon as these statements have been completed, but in no event later than March 1, 2019.

7. The Arbitrator will retain jurisdiction over this matter until March 1, 2019, only for the purpose of assuring compliance with paragraph number 6 of this Final Award.

Except to this limited extent, the Arbitrator's jurisdiction over this matter will terminate, as will these proceedings, upon payment of the offset damages to Claimants by Ms. Chu, no later than January 10, 2019.


IT IS SO AWARDED, ADJUDGED, AND ORDERED.


Date: December 11, 2018

Hon. Wayne D. Brazil (Ret.)
Arbitrator

13

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Golden State Renaissance Ventures, LLC, et al. vs. Chu, Judy, et al.
Reference No. 1100085319

I, Aimee Hwang, not a party to the within action, hereby declare that on December 11, 2018, I
served the attached FINAL AWARD on the parties in the within action by Email and by depositing true copies
thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San
Francisco, CALIFORNIA, addressed as follows:

Alan S. Yee Esq.
Siegel, Yee & Brunner
475 14th Street
Ste. 500
Oakland, CA 94612
Phone: 510-839-1200
AlanYee@siegelyee.com
   Parties Represented:
   Judy Chu

Richard J. Idell Esq.
Ory Sandel Esq.
Idell Firm
96 Jessie Street
3rd Fl
San Francisco, CA 94105
Phone: (415) 986-2400
richard.idell@idellfirm.com
ory.sandel@idellfirm.com
   Parties Represented:
   GSRV I Management, LLC
   GSRV II Management, LLC
   GSRV III Management, LLC
   GSRV Management, LLC
   Golden State Renaissance Ventures, LLC
   SFBARC 5 Management, LLC
   SFBARC 6 Management, LLC

Wallace C. Doolittle Esq.
James P. Downs Esq.
L/O Wallace Doolittle
1260 B St.
Suite 220
Hayward, CA 94541
Phone: 510-888-0600
doolittlew@doolittlelaw.com
jdowns@doolittlelaw.com
   Parties Represented:
   Steven Kay

Robert H. Bunzel Esq.
Bartko Zankel Bunzel & Miller
One Embarcadero Center
Suite 800
San Francisco, CA 94111
Phone: 415-956-1900
rbunzel@bzbm.com
   Parties Represented:
   GSRV I Management, LLC
   GSRV II Management, LLC
   GSRV III Management, LLC
   GSRV Management, LLC
   Golden State Renaissance Ventures, LLC
   SFBARC 5 Management, LLC
   SFBARC 6 Management, LLC

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco, CALIFORNIA on December 11, 2018.

Aimee Hwang
ahwang@jamsadr.com

**JAMS ARBITRATION**
**CASE REFERENCE NO. 1100085319**

Golden State Renaissance Ventures, LLC, et al.

        Claimants,

vs.

                                  **Partial Final Award**

Chu, Judy,

        Respondent.

---

**I.**

**Context**

Between October 2, 2017, and October 6, 2017, the Arbitrator conducted a stage one evidentiary hearing during which the parties litigated the following issues:

"(1) what meaning is to be ascribed to the terms of the operative documents that are sources of the rights, duties, and authority of the parties;

(2) can apparently inconsistent provisions of the operative agreements be reconciled and, if not, which provisions trump which others;

(3) have there been breaches of any of the provisions of the operative agreements (as their meaning and relationships have been determined by the Arbitrator); has contractually rooted authority been exceeded; have contractually based rights been violated;

(4) have rights rooted in statutes or the common law been violated;

(5) is it more likely than not that any proven conduct that violated a party's rights (whether based on contract, statute, or common law), or any proven acts in excess of authority, caused compensable harm to any party or would justify some other form of relief?"

Arbitrator's Orders of July 5, 2017 and September 6, 2017.

After granting extensions of deadlines and increases in page limitations for post-hearing briefs, the matter was deemed submitted (by virtue of the simultaneous filing of Reply briefs) on December 20, 2017. Under the Order confirming extended deadlines for post-hearing briefing, the Arbitrator's opinion on the merits of the issues litigated in stage one of these proceedings was to be issued by February 15, 2018.

The issues addressed in phase one of these proceedings are extremely difficult -- in part because the key documents, at least for the contract-based contentions, seem to have been based in

1

substantial part on poorly constructed templates. Access to the intended meaning of key provisions of these documents is compromised by lack of clarity, by apparent inconsistencies, and by multiple errors in presentation and punctuation.

In part because the meaning of and the inter-play between some of the key sections of the documents is ambiguous, in part because the early history of GSRV reflected considerable lack of institutional and documentary discipline (failing to document clearly some communications and decisions, and leaving major gaps in the companies' records), and in part because of mutually exclusive testimony about understandings and about potentially relevant communications, this arbitration has managed to yield substantial evidentiary and circumstantial support for both parties' mutually exclusive positions.

Given these circumstances, the Arbitrator has been compelled to commit a great deal of time to studying the evidence and trying to tease out its implications for findings of fact and conclusions of law.

Not all of that work is visible in this opinion, but the Arbitrator takes this opportunity to acknowledge that there are some close questions in the matters he must resolve here and to assure the parties that he has given their positions and the support for them most careful consideration.

## II.

### The Meaning and Effect of Sections 6.1, 6.1.1, 12.5, and 12.15.

The dispute between the parties that sounds in contract turns primarily on a determination of 'the amendment' issue: under the Amended and Restated Operating Agreement of GSRV, what was required in order to effect a binding amendment?

To answer this critical question, it is necessary to determine the meaning of and the play between several provisions of the Amended and Restated Operating Agreement.

The first such provision is in Article 6. Section 6.1 identifies and limits the subject-matters with respect to which the members of the limited liability company were empowered to vote. This section declares that members "shall have the right to vote solely with respect to those matters set forth immediately below and such shall require an affirmative vote as set forth below as to each such action."

Subsection 6.1.1 reads as follows: "The amendment of this Agreement, other than in connection with the admission of any Person as a Member or Substitute Member of the Company which shall require the affirmative vote of those Members owning 75% or more of the Percentage Interests owned by all Members.

Subsection 6.1.4 reads in pertinent part as follows: "Admission of new Members, which

2

shall require the affirmative vote of those Members owning 75% or more of the Percentage Interests owned by all Members ...."

Section "12.5 Further Assurances" requires members to execute documents and take other actions, as requested by the Manager, "as may be reasonably required to effectuate the terms and provisions of this Agreement provided, however, that no Member shall be obligated under this Section to execute any instrument or document which would impair its rights or enlarge its obligations hereunder."

Section "12.15 Amendments," declares that "[n]o amendment to this Agreement shall be valid or binding unless set forth in writing and duly executed by each of the parties to this Agreement."

*As a matter of objective legal determination, what is the meaning and effect of 6.1.1?*

At the outset, the Arbitrator finds that the meaning of this provision, in contractual, circumstantial, and evidentiary context, is ambiguous.

As a matter of normal understanding under standard grammatical rules, subsection 6.1.1 most likely would be read as imposing a 75% membership interest vote requirement only with respect to admission of new members, given the absence of a comma after the word "Company" in the second line. So read, this subsection would not impose a percentage membership vote requirement on amending this Operating Agreement. No other subsection speaks to or imposes a percentage vote requirement on amending this operating agreement. And in the absence of an articulated percentage vote requirement for adopting amendments, the law would interpose the default requirement for these kinds of contracts: a requirement that 100% of the voting membership interests be cast in favor of any proposed amendment. See former section 17103 of the California Corporations Code.

This reading, however, seems to be in tension with the substance of the first paragraph of section 6.1. That paragraph suggests that there will be set forth a percentage vote requirement for "each" matter on which a right to vote is preserved in each of the subsections of 6.1. In pertinent part, the first paragraph of section 6.1 states that "Members ... shall have the right to vote solely with respect to those matters set forth immediately below *and such shall require an affirmative vote as set forth below as to each action*." Emphases added.

When we examine closely each of the other sub-sections of 6.1, we note that a separate percentage voting requirement is set forth for each individual subject matter as to which the right to vote is preserved. It is only in sub-section 6.1.1 that a separate percentage requirement is not set forth for each of the two different subject matters that are addressed in this first sub-section.

3

This omission, moreover, could be explained by the fact that, as noted above, a separate subsection of 6.1, that is, subsection 6.1.4, expressly requires a vote of 75% of the membership interests in order to admit new members to this LLC.

Why it was felt necessary to refer to the admission of new members in both of these subsections is unclear. Mr. Belzer testified that the redundant reference (in 6.1.1. and 6.1.4) to admitting new members was attributable to the fact that Eric Chelini was quite concerned about preserving his powers with respect to this matter. It is not at all clear, however, how anyone could have believed that including the clause related to new members in subsection 6.1.1 could advance this interest of Mr. Chelini's if, as Claimant contends, the *only matter* as to which 6.1.1 imposed any kind of percentage vote requirement was *amending* the Agreement (not admitting new members).

When we compare the location of punctuation in the subsections of 6.1 we note that, in each of the other subsections, a comma follows *immediately* after the subject matter to which a percentage vote requirement is attached, [1]even in the one other subsection that also addresses two different subject matters (6.1.4). So it appears from the other subsections that when a percentage vote requirement is imposed on a subject matter, the comma follows immediately after the identification of the subject matter to which the percentage vote requirement was intended to be attached.

In subsection 6.1.1, the comma is located right after the first subject matter identified, "[t]he amendment of this Agreement." In contrast, no comma is inserted immediately after the subject matter that consists of admission of new members. The placement of the comma right after the "amendment" subject matter supports an argument that the 75% vote requirement in this subsection was intended to apply to the subject matter that preceded the comma, namely, amending the Agreement, and that no vote requirement was imposed, *by this specific subsection*, on admission of new members.

This interpretation is consistent with the presence of a separate provision, 6.1.4 that addresses expressly the admission of new members. That subsection follows the form that prevails, as noted above, in virtually every other subsection of 6.1: the comma that precedes the vote requirement follows immediately after the subject matter to which the vote requirement

---

[1]The lone exception is subsection 6.1.8, which reads: "The election to continue the life of the Company after an event set forth in *Section 10.1which* shall require the affirmative vote of those Members owning 75% or more of the Percentage Interests owned by all Members." Emphasis added. The inferential significance of the absence of the comma after the subject matter that is identified in this subsection is compromised by a clear error in presentation: there is no space at all between "Section 10.1" and "which" -- suggesting that the absence of the comma here is as likely to be the product of drafting sloppiness as of intent.

4

attaches: "6.1.4 Admission of new Members, which shall require the affirmative vote of those Members owning 75% or more of the Percentage Interests owned by all Members [.]"

In support of her argument that the 75% vote requirement in 6.1.1 applies only to one of the two subject matters identified in 6.1.1, i.e., admitting new members, and not to the other subject matter, amending the Agreement, Respondent asks the Arbitrator to infer that the drafters of this provision intended to incorporate by silent reference the statutorily created presumption that, when an operating agreement for an LLC fails to set forth a percentage vote requirement for a particular action, the vote of 100% of the membership interests is required to approve the action. Former California Corporations Code section 17103(a)(2).

One difficulty with this line of argument is that it has no evidentiary (direct or circumstantial) support. Mr. Belzer testified that the absence of the comma after the word "Company" was simply a scrivener's error. During the hearing, no one asked him whether the existence of the statutory default provision played any role in his drafting or thinking.

Moreover, circumstantial support for Mr. Belzer's view can be found in the operating agreements he also drafted, at about the same time, for the management LLCs of several affiliated entities. In each of these agreements, including the Agreement for the LLC that would directly manage GSRV, there is a comma not only after the phrase "amendment of this Agreement," but also after the word "Company," strengthening the inference that the percentage vote requirement set forth in the respective sections 6.1.1 of all of these early operating agreements was intended to apply to amending the Agreement, not to admitting new members.

Claimant's contentions with respect to these interpretation issues, however, also are burdened by nagging questions. The first of which is that it is possible to read the versions of subsection 6.1.1 in the operating agreements for the management LLCs, the versions that Claimant contends are not compromised by a scrivener's error, as imposing the percentage vote requirement only on the admission of new members. This view is not grammatically foreclosed -- although it appears to be less consistent (than Claimant's proposed interpretation) with the location and apparent effect of commas in the other subsections of 6.1. of the operating agreements of the management LLCs.

This leads us to address a set of related questions that are by no means self-answering: Is it likely that the signatories to these other operating agreements did not intend to impose *any* percentage vote requirement for admitting new members? If that was their intention, why didn't they just say so? Why insert any clause that refers to the admission of new members, especially if

5

the clause is followed by no other provision, in subsection 6.1 or elsewhere, that gives it any meaning, any substance, any effect?

At first blush it seems curious that, under Claimant's interpretation of section 6.1.1 of the operating agreements for the *management* LLCs, these agreements impose no percentage vote requirement at all on admitting new members. Unlike the operating agreement of GSRV, there is no separate subsection of 6.1 in these contemporaneously crafted operating agreements for the management entities that imposes a percentage vote requirement on admitting new members.

The absence of any percentage vote requirement to admit new members (as would be the case under Claimant's interpretation of the operating agreements for the management LLCs) seems counter-intuitive, at least when first considered, if one accepts Claimant's views about the relationships between the various entities involved here. Under those views, it is the members of the management companies who were entitled to receive the lion's share of the profits from the EB-5 undertakings. It follows that the original members of these management companies had the most to lose by dilution of their interests through admission of new members.

On the other hand, section 4.2 of the operating agreements of the management LLCs offered members some means to protect themselves against dilutions that could be caused by the need for additional capital contributions.

Respondent's contention that a percentage membership interest vote requirement in these clauses (of the operating agreements for the management LLCs) should be understood as applying only to the admission of new members acquires some inferential momentum from the fact that the operating agreement for the management LLC for GSRV authorizes the Manager to cause the Company "to issue such Membership Interests . . . [only] in accordance with any applicable voting right of the Agreement." 7.2.12. Somewhat similarly, the operating agreement for the management LLC for Fund One, effective the same day, authorizes the Manager to issue new membership interests "in accordance with the terms of this Agreement." These apparent limitations on the Manager's authority would be meaningless, and it would make no sense to include them, if the agreements of which they were a part contained no limitations (by vote or otherwise) on admitting new members. However, given the many errors and uncertainties that infect the agreements that were drafted in 2010 and 2011, there is more than a mere possibility that the inclusion of these references to other (apparently non-existent) provisions in the agreements was simply the product of sloppy drafting, e.g., of moving clauses or parts of clauses from the template for GSRV's operating agreement into the same structural locations of the operating agreements for the management entities.

6

Moreover, it is not insignificant that, under the terms of the operating agreements for each of the management LLCs, operating agreements signed by Ms. Chu, Mr. Kay had full control over all the consequential decision making, including control over admitting new members. He owned 51.25% of the membership interests in each of the management LLCs -- so the express imposition of a 51% membership interest voting requirement (which is the requirement that these operating agreements explicitly imposed for enumerated exercises of power by members) would not have deprived Mr. Kay of the power, acting alone, to admit new members. In addition, Mr. Kay ultimately had the power under these agreements (if a disagreement could not be resolved) to overcome any resistance Mr. Chelini, his co-manager, might mount to any action within the "manager's" broad ambit of authority. See, e.g., subsections 6.1.6 and 7.1.1 of Ex. 6.

### Section 12.15

We turn now to provisions outside of 6.1 that might be relevant to the questions we address here. Respondent contends that section 12.15 resolves the issue we address here by explicitly declaring that "No amendment to this Agreement shall be valid or binding unless set forth in writing and duly executed by *each* of the parties to this Agreement." Emphasis added. According to Respondent, the presence and content of this provision bolsters the argument that the 75% interest voting requirement in 6.1.1 was intended to apply only to the admission of new members -- and that an affirmative vote of every membership interest (100%) was required to effect any amendment to GSRV's operating agreement.

While by no means vapid, this argument ultimately is not persuasive.[2] It proceeds on the premise that 6.1.1 imposes the 75% vote requirement only on admitting new members. Under this premise, the operating agreement articulated *twice* the 75% vote requirement to admit new members *but never* articulated *any vote* requirement for amending the agreement, even though 'amending' was the first subject singled out in 6.6.1. and obviously would have been important to all signatories.

As noted, above, Respondent argues that the failure to articulate a percentage vote requirement for this important subject matter reflects the signatories unexpressed intention to incorporate the default requirement of unanimity from the Corporations Code. But this subject

---

[2]While Ms. Chu testified that she read section 12.15 before signing GSRV's amended Operating Agreement, and that she would not have signed that Agreement had section 12.15 not been included in it, there is some evidentiary support for a conclusion that in the summer of 2015 she was prepared to sign changes to GSRV's Operating Agreement under which section 12.15 would have been eliminated. See, e.g., Ex. 123 and the testimony related to it by Ms. Chu and Mr. Mayer.

7

seems too important to leave to a changeable statutory default -- and none of the other contemporaneously written operating agreements left this matter open for statutory backfilling. Each of these other operating agreements, as most persuasively interpreted, imposed a specific percentage ownership vote requirement to effect an amendment.

Section 6.1 had two principal purposes: (1) to identify the only subjects over which members could exercise power through voting, and (2) to cabin the use of this power by setting forth definite threshold voting percentage requirements. It seems highly unlikely that, given these two purposes, it was the intention of the parties to empower members to vote on amending the agreement -- but then elect to say nothing about the requirements that had to be satisfied for this important power to be exercised. And, to repeat, the parties set forth a specific percentage vote requirement for *every other subject matter* they identified as fair game for voting in this section.[3]

There are additional difficulties for Respondent's argument about the purpose and effect of 12.15 as worded in the amended GSRV Operating Agreement. A parallel section 12.15 appeared in the two operating agreements for the management LLCs that were being drafted by Mr. Belzer at about the time he was circulating for comment and approval some revisions or edits that were still being made to the Amended and Restated Operating Agreement for GSRV. See Exs. 85, 4 & 6. These two parallel section 12.15s are identically worded. Both state: "No amendment to this Agreement shall be valid or binding unless approved by *the vote required* in Section 6.1.1 and set forth in writing and certified to be correct by the Manager." These versions of 12.15 assume that Section 6.1.1 imposes a voting requirement *to amend* the agreements. These two sections of the management LLCs do *not* reflect an assumption that 6.1.1 is *silent* about the percentage vote required to amend the agreements -- or that the signatories intended to incorporate the statutory default unanimity requirement. It also bears repeating here that the versions of 6.1.1 in the two operating agreements for the management LLCs are, grammatically, more amenable to the interpretation Claimant advocates: that the 75% vote requirement was intended to apply to amending the agreements, not to matters related to admitting new members.

Worldliness considerations also cut against Respondent's contention that 12.15 of GSRV's Operating Agreement should be construed as imposing a requirement that 100% of the membership interests endorse an amendment before it could take effect. It is quite unlikely that a

---

[3]Though not especially probative in this context, it is interesting to note that subsection 6.1.7 indicates that the signatories were capable of articulating a 100% requirement when they intended to do so. Subsection 6.1.7 authorizes the members to vote on removing the Manager for cause, but expressly declares that removal on this basis "shall require the affirmative vote of those Members owning 100% of the Percentage Interests owned by all Members except for the Percentage Interest of the Manager to be removed."

8

sophisticated investor like Mr. Kay, who committed much more capital and, as the years passed, much more time to these related endeavors than any other member, would agree to a provision that empowered a person who held a 1% membership interest in a venture that required so much attention and patience, and that was potentially so lucrative, to veto, single handedly, changes that the people who owned 99% of the membership interests desperately wanted to make.

It bears pointing out here that it also seems unlikely that an investor like Ms. Chu, who contributed real cash capital and, in the early period, expended and intended to expend considerable time promoting the business purposes of the Regional Center, an investor who was entitled to about 11% of the profits generated by this enterprise, would knowingly endorse a provision that empowered an owner of only a 1% interest to thwart the will of and eviscerate the opportunities presented to all the other members.

Can subsection 6.1.1 and section 12.15 be reconciled? If subsection 6.1.1 is understood as imposing a percentage voting requirement on amending the operating agreement (and not purporting, on its own, to impose a percentage voting requirement on admitting new members), subsections 6.1.1 and section 12.15 can be reconciled only by construing the latter as addressing ministerial and administrative matters -- not as imposing substantive restrictions on the exercise of authority, through voting, by members of the LLCs.

The Arbitrator was quite skeptical of the viability (in reason or worldliness) of this route to reconciliation when it was first suggested by Mr. Schinner. But, as the Arbitrator has struggled through the interpretive challenges this case has presented, he has become convinced that Mr. Schinner's view of 12.15 is the more persuasive. Section 12.15 appears at the end of long lists of miscellaneous matters in these contracts. If it was intended to address something as important as changing the terms of these agreements, it is quite *unlikely* that it would have been placed in the relatively obscure place it ended up -- instead of in the section (6.1) that expressly addressed the obviously important subject of amending the agreements. After all, it was in section 6.1 that the critical questions about how, and with respect to which matters, members could restrain the exercise of the broad powers conferred by these instruments on the managers.

In sum, the Arbitrator finds that sections 12.15 of the first five operating agreements impose no substantive restrictions on the exercise of authority by other members (acting in concert) of the LLCs.

This finding is supported by the fact that so many lawyers and so many parties had versions of 6.1.1 and of 12.15 before them for so long before they were executed -- but never even hinted that they saw any tension between these two provisions, or that the latter section negated in its

9

entirety the more likely reading of section 6.1.1 as it was framed in all of the operating agreements for the management LLCs.

Taking into account all of the analytical considerations assayed above, the *Arbitrator finds that subsection 6.1.1 of the Amended and Restated Operating Agreement of GSRV imposes the 75% membership interest voting requirement on amending these agreements.* The Arbitrator further finds that it is subsection 6.1.14 that imposes the 75% membership voting requirement to admit new members, not subsection 6.1.1. In addition, the Arbitrator finds that Section 12.15 of these agreements does not increase the percentage vote required to amend these agreements by any margin, not to 100% or to any other figure above the 75% that is set forth in subsections 6.1.1.

### Section 12.5

What about section 12.5 of GSRV's Operating Agreement?

Did section 12.5 qualify or restrict the power to amend the agreements? Were the "assurances" this section provides broken, and so was this provision of the Operating Agreement violated, when the owners of 81.5% of the membership interests in the LLCs adopted the revisions to the existing operating agreements and then purported to adopt the new operating agreements for the management companies for funds five and six?

Respondent contends that section 12.5 supports her interpretation of subsection 6.1.1., and her view about the controlling effect of section 12.15 on section 6.1.1 -- thus supporting her core contention that GSRV's Operating Agreement could be amended only by affirmative vote of 100% of the membership interests.

As previously noted, section 12.5 is entitled "<u>Further Assurances.</u>" It contains two separate provisions. The first can be construed as providing an "assurance" to members who want the entity to take some action that every member will "execute and deliver any and all further instruments and documents and take all actions *as may be reasonably required to effectuate the terms and provisions of this Agreement . . . .*" Emphasis added.

The second clause of section 12.5 arguably qualifies the first by declaring: "however . . . no member shall be obligated *under this Section* to execute any instrument or document which would impair its rights or enlarge its obligations *hereunder.*" Emphases added.

The Arbitrator acknowledges, once again, that the relationship between the sections and subsections in issue here is by no means self-identifying, and that Respondent's positions cannot be dismissed summarily, because the Operating Agreement fails to spell out, definitively, the meaning and reach of, and the intended play between, sections 6.1.1, 12.5 and 12.15.

10

Nonetheless, under the Arbitrator's construction of subsection 6.1.1 (as pronounced above, after taking into account the possible implications of 12.15), the holders of 75% of the membership interests were empowered, through the process of amending the Operating Agreement, to change its terms in ways that foreseeably could have the effect of 'impairing' some members' rights or 'enlarging' some members' obligations -- subject only to any overriding constraints that might be independently imposed by public law.

It must have been obvious to all the signatories of GSRV's Amended and Restated Operating Agreement that the power to amend the Operating Agreement was of immense importance.  It also must have been obvious that this power, when wielded in conformity with the voting requirements imposed by subsection 6.6.1, could be wielded in ways that would change members' entitlements and/or obligations.  Given the Arbitrator's construction of 6.1.1, and his findings about the relationship between it and section 12.15, the Arbitrator declines to adopt the view, urged by Respondent, that the signatories to the GSRV Operating Agreement intended section 12.5[4] to displace subsection 6.1.1's 75% vote requirement to amend the Operating Agreement and to replace it, silently, with a 100% vote requirement.

The Arbitrator concludes that this matter (what is required to effect an amendment) is far too important to be left to inference from opaque declarations in the "Miscellaneous" Article. Simply put, it beggars the imagination to believe that the signatories intended to impose such a restrictive -- and foreseeably incapacitating -- condition on such an important power without expressly saying so -- or that they did not understand that subsection 6.1.1 spoke in binding terms to what was required  to exercise this foreseeably necessary authority.

What, then, might have been the purpose of the second clause of section 12.5?  In answering this question, we note first that the assurance provided here is limited to obligations arising "*under this Section [12.5]*" -- not to obligations imposed by other provisions of the Operating Agreement (note the word "*hereunder*" at the end of this provision), or from the duty to act in "good faith and fair dealing" that California law superimposes on all parties to all contracts.

_____

[4]Standing alone or in combination with section 12.15.

11

Thus, *if a duty to execute* a proffered document *arose under some other provision* of the Operating Agreement, not under section 12.5, *or if the duty arose under the legally superimposed obligation to proceed in "good faith" and to deal fairly,* section 12.5 would not entitle a member to refuse to sign a document the Manager reasonably required her to sign.[5]

At this juncture we turn back to the Arbitrator's findings about the meaning and reach of sections 6.1.1 and 12.15. These sections, as construed herein, empower the owners of 75% of the membership interests to amend the Operating Agreement. If the requisite votes were cast in favor of an amendment, and if a document reflecting that amendment were presented for signature to a minority member, the Arbitrator finds that section 12.5 would obligate that member to sign it. On the other hand, if the required 75% of the membership interests had not been cast in favor of an amendment, section 12.5 would protect a member who rightfully refused to sign a document that purported to effect the amendment. This interpretation of section 12.5 gives it real meaning -- and reconciles it with the Arbitrator's interpretation of subsection 6.1.1 and section 12.15. As so interpreted, section 12.5 does not restrict the authority to amend the Operating Agreement that is set forth in, and constrained, by subsection 6.1.1

The analysis set forth above underpins the Arbitrator's finding, here repeated: under the pertinent provisions of the GSRV Operating Agreement, as herein construed, that Operating Agreement could be amended if owners of 75% of the membership interests voted in favor of the amendments -- even, as a matter of contract law -- if the amendments would diminish the heretofore existing rights or enlarge the heretofore existing obligations of some or all of the members.

### III.

### Were the Requisite Votes Cast in April of 2015
### to Amend the Existing Operating Agreements?

The short answer to this question is "yes."

What findings underpin this answer?

The Arbitrator's determinations, set forth above, yield the conclusion that, under 6.1.1, GSRV's Operating Agreement could be amended if approved "by the affirmative vote of those Members owning 75% or more of the Percentage Interests owned by all Members."

---

[5]The Arbitrator considers in a separate section of this Opinion, Order and Interim Award the contention by Claimant that Ms. Chu had a duty to sign the documents presented to her in April of 2015 and breached that duty. Claimant further contends that the breach of this duty would have justified terminating Ms. Chu's ownership interest in GSRV for cause.

12

The Arbitrator finds that a "vote" is not necessary, under the terms of the Operating Agreement, to effect an amendment. Instead, a proposed amendment could be made binding by *written consent* to it by the persons or entities owning the requisite percentage of ownership interests. Section 6.4

There is no dispute that on April 8, 2015, 81.25% of the membership interests in GSRV were owned, in combination, by Mr. Kay, Mr. Brown, and Mr. Chelini. There also is no dispute that Mr. Kay and Mr. Brown, by written consent to the Second Amended and Restated Operating Agreement of GSRV, endorsed and approved the amendments that were incorporated in the version of the Operating Agreement that was circulated to the members as an attachment to an email on April 6, 2015.

There is a dispute about whether Mr. Chelini's apparent consent to the amendments (as evidenced by his signature on them) should be deemed legally effective. On April 8, 2015, Mr. Chelini, owner of 25% of the Membership Interests at that time, signed the amended version of the Operating Agreement in Mr. Mayer's presence and office. He testified during the hearing, however, that at the time he signed these documents he was suffering from a bi-polar episode (Tr. 337, 351), was under duress (351-353 and Ex. 104), and felt pressured to affix his signatures -- pressured by time and by Mr. Mayer allegedly stating that no distributions would be made unless Mr. Chelini signed. Tr. 352-354; Ex. 104.

Mr. Chelini also testified, however, that he signed the documents in issue here "voluntarily" and "knowingly" (Tr. 334-335), that he does not now "question the consent [he] provided . . . at the time [he] signed" the agreements (Tr. 339), and that he does not take the position, now, that "there was no valid consent to those agreements." (Tr. 347).

The backdrop against which Mr. Chelini gave this internally inconsistent testimony includes his effort on August 31, 2015, to "rescind" the signatures he affixed on April 8th (Ex, 103) -- on the grounds of "mistake" and/or "duress," citing Cal. Civ. Code section 1689(b)(1). Somewhat more specifically, Mr. Chelini's "Notice of Contract Rescission" asserts that his "mood disorder" made his "decision-making ... poor" at the time, that he did not consult with his lawyer before signing, as he normally would have, and that he did "not fully understand the new terms in the agreement." Ex. 103.

A few days later, on September 4, 2015, Mr. Chelini's lawyer sent a follow-up letter to GSRV's attorney, John Foote, repeating and elaborating these contentions. Ex. 104.

Multiple considerations, in addition to significant testimony from Mr. Chelini about these issues, as described in one of the paragraphs, above,  undermines the persuasiveness of the

13

contention by Respondent that, as a matter of objective legal determination, Mr. Chelini's signatures on April 8th should be deemed invalid.

Mr. Mayer testified credibly that for at least several weeks before April 8th he and Mr. Kay and Mr. Chelini had discussed all of the arguably significant changes that were being proposed for the various operating agreements, some in great detail, and that Mr. Chelini never communicated any objection to any of the terms as finally proposed, either before or on April 8th. (Tr. 700-7031).

Mr. Mayer also testified that he told Mr. Chelini on April 8th that the proposed revised and new operating agreements did not include anything that had not already been discussed with Mr. Chelini and that the documents, as finally crafted, were "good" -- thus at least intimating that it would be in Mr. Chelini's best interests to sign them.

Mr. Mayer went on to testify, again credibly, that Mr. Chelini did not seem out of sorts, or in any perceivable way different on April 8th than he had on the many other occasions that Mr. Mayer had interacted with him. In fact, Mr. Mayer had the impression that Mr. Chelini was happy that day[6] and pleased to have the amending process brought to a conclusion. In addition, Mr. Mayer testified that even though he had interacted with Mr. Chelini many, many times over the preceding two years, Mr. Chelini had never stated or even suggested that he suffered from a bi-polar condition or any other psychological impairment -- and that he (Mr. Mayer) had never at any time seen any sign that Mr. Chelini was suffering from any kind of emotional disability. Tr. 720-722.

It is not insignificant, in the Arbitrator's view, that Mr. Chelini produced no evidence from any mental health care professional that he has ever suffered from a bi-polar condition. Nor did Mr. Chelini proffer evidence that he had ever taken medication or received any medical or therapeutic treatment for any such condition.

Moreover, it is curious that Mr. Chelini did not purport to 'rescind' his signature until five months (about 20 weeks) after he executed the revised and new operating agreements -- even though he claims that his wife (a lawyer) was quite upset with him for signing these documents when, almost immediately after he had affixed his signature, she learned that he had done so.

Mr. Chelini also complained, again for the first time several months after allegedly feeling pressed to execute the revised and new agreements, that he had not been given time to consult with his lawyer about the matter. But there is no evidence that Mr. Mayer or Mr. Kay or anyone else purported to demand that Mr. Chelini sign on April 8th. Nor is there evidentiary support for any suggestion that Mr. Chelini did not have ample opportunity to discuss with his counsel the proposed changes in the weeks before April 8, 2015.

---

[6]And thus, by implication, not in a depressive psychological down-cycle.

14

It also bears noting that under the new operating agreements, as well as under the GSRV Operating Agreement that had been in effect for years, an Agreement whose terms Mr. Chelini is presumed to have known, each Member was explicitly given ten days to respond to any request to sign documents. See 6.4 of the GSRV Amended Agreement and 6.3 of the Second Amended Agreement. Thus, Mr. Chelini had an untrammeled legal right not to decide whether to affix his signatures until at least April 16th -- a period that would have afforded him ample time to consult counsel.

For several weeks after he signed the Second Amended and Restated Operating Agreement (well before he sent his "Notice of Contract Rescission"), Mr. Chelini was involved, on and off, in negotiations (largely through Mr. Mayer) to determine whether all of the original members of GSRV could agree on terms for the new entities and on changes to the proposed amendments of the Amended Operating Agreement. Tr. 552-554, 707-708. It is not clear to the Arbitrator what all the proposed changes during this period were -- or which members were proponents and opponents of which proposals. There is some evidence that at one point everyone (including Ms. Chu) seemed ready to sign, but Mr. Chelini insisted on additional changes. There also is some evidence that after other members had agreed on a set of revised terms, Mr. Kay blocked access to a deal by insisting that he would agree only to one change: a 2.5% dilution cap.

What is clear is that, throughout this period, Mr. Chelini had ample time to consult counsel, to escape from any 'depressive' condition he might temporarily have been suffering in early April, and to file a lawsuit seeking a judicial declaration of the invalidity of his consent. He did, in fact, consult counsel. But he filed no lawsuit -- and it took him months to decide to send his "Notice of Contract Rescission."

It also bears mentioning that on August 16, 2016, some nine months after GSRV bought him out, Mr. Chelini signed a statement in which he declared: "In April of 2015, I signed the amended and restated operating agreements of each of the GSRV ENTITIES described in the preceding sentence [those that, by their terms, took effect, retroactively, on January 1, 2014]." Ex. 38. There is no mention in this statement of duress, pressure, or misunderstanding in connection with signing the operating agreements. During the hearing in this matter, Mr. Chelini did not testify that he was denied any opportunity to affect the wording of this statement.

In the fall of 2015, Mr. Chelini entered serious settlement negotiations with GSRV. He participated in these negotiations with the assistance of counsel. There is no evidence that he sought in these negotiations to protect or advance the interests of any other minority member of GSRV. Nor is there evidence that instead of or in addition to seeking a lucrative cash buyout for

15

himself, he pressed for changes to the amendments to the operating agreement that would increase protections for the interests of minority members.  He ended up with a four million dollar buy out. Ex. 110. Then walked away.

None of Mr. Chelini's conduct between April 8, 2015, and the end of that year inspires any confidence in the Arbitrator that Mr. Chelini's signature on the Second Amended and Restated Operating Agreement, or on any of the other documents he executed on April 8th, was the product of coercion -- or that for any other reason his signature should not be deemed binding.

The Arbitrator hereby finds that Mr. Chelini's consents to all the changes in the documents he signed on April 8, 2015, were valid and legally enforceable. The Arbitrator further finds that members of GSRV holding 81.25% of the membership interests gave their legally binding consents to the amendments to the operating agreements that were presented to the members on April 6, 2015 -- as well as to the operating agreements for the new entities.  Thus, the Second Amended and Restated Operating Agreement of GSRV became a binding contract on April 8, 2015, when Mr. Chelini committed his 25% membership interest. The same finding attaches to the other operating agreements to which members owning 81.25 % of the membership interests had consented in writing by April 8, 2015.[7]  Under their terms, the 'effective date' of the revised and new operating agreements was retroactively fixed as January 1, 2014.

*Given all of the findings made above, the Arbitrator concludes and holds that Respondent has failed to prove that the adoption of the amendments to the existing operating agreements, and/or the adoption of the operating agreements for the new entities, violated subsection 6.1.1, section 12.5, or section 12.15 of GSRV's Amended and Restated Operating Agreement -- or any like provision of any of the other operating agreements that Ms. Chu had signed years earlier.*

## V.

### Did Ms. Chu Violate Contractual and/or Common Law Obligations
### by Refusing to Sign the Amended and New Agreements?

As set forth above, the Arbitrator has determined, after the fact and only with considerable difficulty, that the subject agreements were validly amended.  Because they were lawfully adopted, Ms. Chu had a duty to sign the amended and new agreements under sections 12.5 and 6.4 of the Amended and Restated Operating Agreement of Golden State Renaissance Ventures, LLC.  Under

---

[7]The operating agreements that acquired the status of binding contracts on April 8, 2015, are for GSRV, for GSRV Management LLC, for GSRV I Management LLC, for GSRV II Management LLC, for GSRV III Management LLC, for SFBARC 5 Management LLC, and for SFBARC 6 Management LLC.

16

section 6.4 of the Amended and Restated Operating Agreement (signed several years earlier by Ms. Chu), and under section 6.3 of the Second Amended and Restated Operating Agreement, Ms. Chu had 10 days to sign the amended and new agreements after they were presented to her on April 6, 2017. She elected not to do so. Because the amended and new operating agreements were lawfully adopted, however, Ms. Chu was legally bound by the terms of these contracts -- whether she signed them or not.

For the reasons set forth below, the Arbitrator has concluded that by not signing the valid agreements that were presented to her, Ms. Chu violated duties arising out of the written terms of the contracts -- but did not violate the legally super-imposed duty of good faith and fair dealing.

Scienter is not a necessary element of a cause of action for breach of contract. Thus, a claim sounding in breach of contract cannot be defeated by a showing that the breach was not accompanied or informed by scienter, or was the product of a sincere but mistaken belief that the contractual obligation in issue was not enforceable -- even when such a belief is supported by understandable considerations and plausible reasoning from evidence or known facts.

Ms. Chu has not contended that some physical or mental impairment prevented her from executing the documents in question, or that some other force beyond her control excused her failure to sign. Rather, apparently in full command of her faculties, and with ample opportunity to consult independent counsel and others, she considered the terms presented and knowingly rejected them. By doing so without legal excuse, she violated the Agreement she signed several years earlier and the amended version of that agreement that GSRV asked her to sign, pursuant to section 12.5, on April 6, 2015.

This is a finding that has been difficult to make, not as a matter of legal reasoning, but because there were so many bases for Ms. Chu to believe (wrongly, as it turns out) that the amended and new agreements were not lawfully adopted. The Arbitrator's finding that the subject agreements became enforceable contracts on April 8, 2015 was the product of extensive litigation over issues whose disposition, in advance, was far from clear. Resolving the contract interpretation issues has been very challenging for the Arbitrator -- and some of the outcomes have been close. To repeat, the inaccessibility of ready answers to many of the questions posed in these proceedings is attributable in large part to the lack of clarity in, and the apparent inconsistency between, many key provisions in the pertinent contracts. The agreements, as originally signed and as revised, reflected sloppy drafting and inattention to form and detail -- a sloppiness and inattention to detail that yielded disputes in which competing views could be reasonably held.

17

Reasonable people, including Ms. Chu, who were looking at the situation in the spring and summer of 2015, rather than through the morning-after lens that much litigation has produced, could have believed that the amendments and new terms that were proposed on April 8th were *not* contractually authorized and that they would, unlawfully, impair the rights of minority members of all of the affiliated LLCs.

It also bears mentioning that there is reason to believe that in the spring or early summer of 2015 Mr. Chelini had told Ms. Chu that he did not believe that his signatures on the amended and new agreements had been lawfully secured and that, therefore, the requisite percentage of membership interests (even if only 75%) had not been cast in favor of the new provisions. Within a few weeks[8] (maybe even days) after April 8th, and continuing for months thereafter, Mr. Chelini actively pressed for changes to the changes -- apparently attempting to acquire leverage in negotiations by claiming that emotional or psychological infirmities had compromised the legal effectiveness of his signatures. Ms. Chu's privity to all of this supports her contention that she had reasonable grounds for believing that the amendments and new agreements had not been lawfully adopted and that, therefore, she was not obligated by section 12.5 to sign any of them.

During the summer and fall of 2015 she and other members of GSRV attempted, on numerous occasions and through multiple communications, to reach mutually acceptable understandings about what the amendments and the new agreements should entail. As indicated earlier, there is evidence that Ms. Chu at one point, or perhaps at two points, agreed (in oral or email communications) to terms that had been generated through mediations conducted by Mr. Mayer,[9] but that positions thereafter taken by others, perhaps Mr. Chelini, perhaps Mr. Kay, perhaps by both, prevented the consummation of a deal.[10] It also appears that, contrary to Claimant's contentions, Ms. Chu in fact did articulate specific objections to the changes in the operating agreements. While there also is reason to infer that the substance of her objections was not completely consistent, the evidence does not support a finding that she violated any duty, contractual or otherwise, by failing to communicate her positions to GSRV.

The evidence, facts, and factors just reviewed inform the Arbitrator's finding that, in refusing to sign the agreements, Ms. Chu did not violate the duty of good faith and fair dealing. However, the facts and considerations that support this determination by the Arbitrator do not

---

[8]Mr. Mayer seems to have begun trying to 'mediate' toward a consensual resolution of the members' disagreement shortly after Ms. Chu refused to sign the revised and new documents. It appears that a mediation he hosted for this purpose occurred in late April or early May of 2015.

[9]See, e.g., Exs. 101, 102, 123 and 126.

[10]See, e.g., Exs. 125 and 126.

18

justify or excuse Ms. Chu's failure to perform a contractually mandated duty. She had a contractually mandated and enforceable duty to sign the amended and new agreements on or before April 17, 2015. By refusing to do so, she breached this duty. This breach exposes Ms. Chu to the possibility of being found liable for damages proximately caused by this breach.

### Did GSRV Violate Ms. Chu's Contractual Rights
### By Denying Her Membership in the Management Entities
### for Funds Five, Six and Beyond?

The record reflects that GSRV management initially assumed that Ms. Chu would be a member of the management entities for funds five and six and identified her in some governmentally required filings as a member. It also appears that GSRV assumed that Ms. Chu would become a member of the management entities of funds thereafter established under the authority of GSRV's EB-5 license. The record further reflects that after the multi-month effort to persuade Ms. Chu to sign the revised and new operating agreements failed, GSRV decided that Ms. Chu would not be a member of the management LLCs for funds five or six, or for any other management entities that thereafter might be established.

Did these decisions violate Ms. Chu's contractual rights?

The only provisions of the GSRV Operating Agreement itself that Respondent has identified as supporting this theory are 2.3.1, 5.1.1, and 12.5. The Arbitrator cannot see how Section 12.5 serves in any way to support this breach of contract theory. Sections 2.3.1 and 5.1.1 allude generally to the "business" of the Center and the "operations of the Company," but shed no clear light on the implications of the use of these phrases.

There is, however, considerable circumstantial support for the contention that GSRV was originally conceived, and then operated for many years, as one business enterprise -- and that its original members intended to establish one integrated company that would sponsor and promote multiple projects under one EB-5 license, projects that would generate profits in which the founding members of GSRV would share in proportion to their membership interests.

Claimant contends that the legal form under which the Center's projects were managed and through which they were funded (i.e., sets of formally separated LLCs) precludes a finding that any of the original members of GSRV had any entitlement, in law or equity, to receive any share of any profits that might be generated in the future by EB-5 loans to developers of new projects that USCIS approved under GSRV's EB-5 license.

19

The Arbitrator declines to adopt Claimant's theories in this arena. Purely as a matter of form, Claimant's theories have some heft. But not all legal outcomes turn on form. Both contractual and equitable entitlements can be real and enforceable even when they are not supported by matters of form and cannot clearly trace their roots to words in written instruments. Reality, i.e., real world conduct and communications, can be legally sufficient sources of both contractual and equitable rights. For example, legally enforceable rights can be established through sustained courses of conduct, or by proving actual shared intentions and reasonable, communicated expectations of signatories to documents.

The evidence shows that the Center used the establishment of multiple LLCs as the legal vehicles for conducting its business -- but that the choice of this type of vehicle for moving the Center's business forward was driven by a desire to insulate members from liability[11] and was not the product of a conscious, communicated set of decisions about how access to the profits generated by the various investment activities that the Center pursued, secured, and managed could be changed from project to project going forward.

For individual projects, the Regional Center was permitted to sub-license[12] authorizations that had been granted by the USCIS only to the Regional Center. No evidence of the existence or execution of any such sub-license was presented during these proceedings. There was documentary and testimonial support for the contention that MOUs were used in lieu of formal licenses, at least after the first few of years of informal and somewhat sloppy administration of the Regional Center's existence, but MOUs were not produced for all of the many projects that proceeded under Regional Center sponsorship. Moreover, the evidence indicates, as noted, that the formation of LLCs was a tool to try to protect members from individual liability and then, later, after Mr. Mayer arrived on the scene, to try to bring accounting respectability and conventional accounting practices into what was, in essence, one integrated business, a business in which completely controlled 'affiliates' were formally the recipients of the lion's share of profit (that being derived from the spread between interest paid by borrowers and interest paid to foreign investors), but in which, in reality, the profits were funneled (through parallel memberships in LLCs) to the members of the Regional Center.

Thus, in the case at bar, realities inform and flesh out contractual (and equitable) rights. It is not clear that any single one of these 'realities,' standing alone, would be sufficient to support a finding of entitlements that are not clearly set forth in the language of the operating agreements

---

[11]Tr. 117.

[12]Section 7.2.20 of the Amended and Restated Operating Agreement of GSRV, Ex. 2.

20

and/or reflected in the formalized membership status of LLCs. But, in combination, the confluence of so many real world and legal considerations supports a finding, hereby made, that Ms. Chu was entitled to be offered an opportunity to become a member of the management LLCs for funds five and six -- and that, unless and until either she voluntarily relinquished her membership in GSRV, or that membership was terminated rightfully for cause,[13] her right remained intact to decide whether to become a member of management LLCs for future projects secured under the authority of the EB-5 license the government had granted only to GSRV.

It is quite clear that USCIS vested all the legal power to secure and administer EB-5 projects, and all the legal responsibility for their compliance with EB-5 requirements, solely in the Regional Center. See Exs 34-37. Official communications from USCIS stated that it was "the Regional Center" that would "engage in the following economic activities: equity funding of or third party loans to enterprises engaged in real estate construction . . ." USCIS made the Center responsible for administering, managing, overseeing, and monitoring all aspects of every project. USCIS required "alien capital" to be "invested *through your Regional Center*," and demanded specified levels of "jobs creation" by alien investments *"through your Regional Center."* Emphasis added. In specified circumstances, USCIS required the Regional Center to report "a specific plan . . . to actively promote *your* Regional Center program" and "a strategy to invest into job creating enterprises and/or investment activities *within* the Regional Center." See Exs. 34 - 37. Emphasis added.

---

[13]GSRV does not contend that it went through the process that the contracts required in order to try to terminate Ms. Chu for cause, or that GSRV ever purported to communicate to Ms. Chu that she had been or was being terminated for cause. Under the Amended and Restated Operating Agreement, the "manager" was vested with the power to terminate for cause, but only after justifiably making one of the findings enumerated in section 6.5. Even after the revisions made to the pertinent operating agreements in early April of 2015, Mr. Chelini (through the management LLC) remained a co-manager of GSRV. It was not until November of 2015 (after the buyout of Mr. Chelini's interests, and pursuant to section 6.1.5 of Ex. 5, that Mr. Kay could exercise essentially unfettered control over the process of terminating a member. Mr. Kay never terminated Mr. Chelini as a manager or a member of any of the LLCs for cause.

More directly to the more immediate point, Claimant never even tried to begin the process that could have led to the termination of Ms. Chu's interests.

It also bears emphasis that the Arbitrator has not made findings that would equitably justify terminating Ms. Chu's membership in the GSRV entities for cause. Whether any such termination would have been justified is unclear -- in part because there is evidence that in August of 2015 Ms. Chu was prepared to sign the revised and new operating agreements (see Ex. 126 and Tr. at pp. 825-834), and that the failure to consummate a deal that would have prevented all this litigation might have been caused either by Mr. Chelini's mobile insistence on additional changes, by Mr. Kay finally losing patience with the whole negotiation process (digging in his heels and taking the position that the only change to which he would agree was the 2.5% dilution cap), or both. See, e.g., Exs. 123 & 124.

21

USCIS anticipated that it would be under the Regional Center's "sponsorship" that all projects and "all investment activities" would proceed. Ex. 36. It was the Regional Center that was to identify "investment opportunities" and to administer and manage "investment activities" within approved categories of industry and within approved counties. Ex. 37. When USCIS extended its legally essential authorization for business plans for "actual projects," it indicated that it was "the Regional Center" to which it was granting approvals. For example, when the Regional Center sought USCIS authorization to proceed with the first two stages of the Hunters Point project, USCIS stated that "The San Francisco Bay Area *Regional Center will invest* $27 million into Series A and $60 million into Series B." Ex. 37 Emphasis added. Then USCIS confirmed the authorizations it extended were to 'designated' investment activities "as approved Capital Investment *Projects for the San Francisco Bay Area Regional Center." Id.* Emphasis added.

GSRV operated in fact, as it had to, as USCIS required. None of the management LLCs had any employees. None had any separate office space or equipment. None of the Fund LLCs had any employees. None owned or leased any separate office space or any equipment. Literally every shred of work that was done pursuant to GSRV's EB-5 license was done by GSRV employees, in GSRV space, and on GSRV equipment -- or was outsourced, by GSRV employees to entities selected by those employees. There was no functional or operational separate reality to any of the 'affiliated' entities. They existed in form only.

The centrality and exclusivity of GSRV's role in its projects was mandated by USCIS' aggressive demands that GSRV exercise complete control over, and assume full responsibility for, the activities authorized by the one license USCIS had issued. Moreover, it may well be that it was the intensity of a commitment to satisfy these demands that drove Mr. Kay to be so heavily involved -- and to seek, through the amendments, the full control of the affiliated entities and their operations that fulfilling GSRV's responsibilities to USCIS seemed to require. Responsibility turns on authority.

Additional evidence that the operations of the Regional Center proceeded in fact along the responsibility lines required by USCIS can be found in the Center's March 2015 "Proposal relating to a prospective EB-5 loan (the 'EB-5 Loan') for the Sacramento Entertainment and Sports Center Mixed Use Development." Ex. 99. This proposal was presented on stationery that prominently identified the sender as "golden gate global EB-5 Investment Fund." Note the singular "EB-5 Investment Fund."[14] The proposal expresses *"golden gate global's"* excitement about the prospect

---

[14] This same form of prominent and singular institutional self-identification appears on agendas for meetings of GSRV principals and investors. Ex. 97 and Ex. 98.

22

of "working with JMA Ventures (JMA) on EB-5 financing for the Sacramento Entertainment and Sports Center." This document also declares that *"Golden Gate Global (GGG)* would like to work with JMA, as the Mixed Use program's master developer . . . ." It goes on to promise that *GGG [not some separate LLC]* would *"Manage all ongoing EB-5 compliance," "procure investors"* and provide those investors with "regular updates." In addition, *GGG* "would expect the following from the Borrower . . . Borrower would proactively work with GGG* to provide the necessary information to successfully implement a USCIS compliant EB-5 Program." Toward the end of this proposal, GGG urges *"Borrower and GGG* [to] agree to enter into an *Exclusive Negotiation Period . . .* during which *Borrower shall deal exclusively* and in good faith *with GG relating to financing through the EB-5 Immigration Investor Program . . . ."* Ex. 99, all emphases added.

Additional documentary evidence, and considerable testimony presented during the hearing, provide further support for the conclusion toward which the expectations of and communication from USCIS point: that GSRV and its "affiliates" formed one integrated business entity, one "group" whose components were in fact, and in the expectations and intentions of both the members and the government, indivisible and inseparable. See, for example, Exhibits 19 and 81 (note use of word "Affiliate"); Ex. 21, contemplating "projects in which the Company invests" and the Company becoming "a member" of the LLCs that the Company forms; Ex. 88, referring to "Our first project," "our start-up capital," requesting capital contributions "based upon percentage of *ownership in the firm,"* and reporting that, "additionally (and *more importantly), the spread that we get* from the $87,000,000 loan to Lennar and partners *is a fair amount of money ($2,610,00) going to the regional center* each year for the next 5 years [emphasis added];" Ex. 92, referring to "intercompany accounts [not inter-company accounts];" Ex. 93 [April 24, 2014], in which Mr. Mayer asks Mr. Kay to sign multiple checks "to clear all of the intercompany accounts" and *assures Mr. Kay that "All funds [will] stay internal"* meaning that *no money goes outside of the group;"* Ex. 94, where Mayer seeks approval to transfer $200,000 from the management LLCs for Funds I and III to GSRV, pointing out that *"these amounts are a portion of the interest earned* on the loans by these funds to projects and that "[t]his will be a *monthly entry where we basically sweep the interest earned by the management company to GSRV* to help cover GSRV's operating expenses . . . .The $100k right now gives *GSRV working capital . . .* when April [sic; 2014] is closed we will have plenty of money *plus a healthy reserve to make the $100k equity distribution* that we want to make;" Ex. 45, a "Cost Sharing Agreement between GSRV "and the Various Management Companies that support the Golden Gate Global Regional Center (CCG)" declares that "GSRV is the operating company that provides management support to *the Management Companies and the Investor Funds that are part*

23

*of GGG*." In his testimony, Mr. Mayer repeatedly referred to regularizing, for accounting purposes, the movement of money between "intercompany accounts."

It also is quite significant that all members and senior staff of GSRV knew where the bulk of the profits were to come from, where they in fact came from, and where they in fact went. After all the internal ("intercompany") movement of monies for administrative expenses and accounting purposes had been completed, and after other "cost allocations" had been made, everyone understood that the real money, the real profit, would be generated by the spread between the interest rate at which money was lent to developers and the interest rate paid to the foreign investors. Without this significant potential source of revenue and profit, all the work that had to be devoted to undertakings through the EB-5 program clearly would not have been worth it. So, all of GSRV's members expected to make the 'real' money on their investments, their investments both of capital and of time, from the interest rate spread.

And this is how things worked over the years -- including the years when significant profit finally started to move through the affiliated entities ("the group") to the members. Thus, before the dispute arose between GSRV and Ms. Chu in the spring of 2015 over the proposed amendments to the operating agreements, a consistent 'course of conduct' by all parties evidences their intentions and expectations. Under that 'course of conduct,' the members had a reasonable expectation that GSRV would form LLCs to manage the new project funds, that the members of GSRV would become members of each management LLC as it was formally created, and that the profits from the management/administrative fees, the loan fees, and, most importantly, from the spread between the interest receipts and the interest payouts would flow back through the affiliated entities to the members.

It also seems telling (though certainly not dispositive of any issue) that GSRV devoted so much time and so much strained energy to trying to get Ms. Chu to sign the amended and new agreements. This fact, standing alone, proves nothing -- but it suggests the possibility that the controlling members of the LLCs and their legal advisors understood that neutral minds might conclude that the intent of the original signatories to GSRV's Amended and Restated Operating Agreement was to form one integrated company and that GSRV was obligated, pursuant to that intent, to offer each of those original signatories an opportunity to profit from each new project that could be undertaken only under GSRV's one EB-5 licence and for which GSRV was required to be responsible in fact and in law -- regardless of the forms used.

What follows from these findings is the legal determination, hereby made, that as a matter of objective determination of the parties' intentions, GSRV was one, integrated business enterprise

24

and was contractually obligated to offer each of the original signatories to its Operating Agreement an opportunity to own a proportionate membership interest in each new management LLC for each new project that was to proceed under the GSRV license.

The Arbitrator hastens to add, however, that it does not follow, as concluded in an earlier section of this Opinion, that the terms fixed for all new management LLCs would have to be the same -- or that the terms of GSRV's operating agreement were fixed for eternity. By membership vote or consent in compliance with the terms of the extant operating agreements, GSRV could change (amend) the terms under which the LLC conducted its business and allocated profits to its members. But original members of GSRV who had not resigned, or whose membership had not justifiably been terminated for cause, had to be given an opportunity to execute the revised documents, remain members of GSRV, become members of the new LLCs, and receive their proportionate share of distributions from the profits of new EB-5 loans or projects.

### Did Withholding Delivery of Ms. Chu's Distribution Checks
### for Several Months During 2015
### Violate Ms. Chu's Rights under Any of the Enforceable Agreements?

By the summer of 2015, for several years Ms. Chu had been a member in good standing of GSRV and of the management entities for it and for Funds I, II, and III. Section 5.1.1 of each of these agreements entitled her to a percentage of distributable cash equal to her percentage ownership interest in these entities. Section 1.15 of each of these agreements invested the manager of the funds with essentially unfettered discretion to determine how much, if any, "distributable cash" was available at any given time. None of the operating agreements purported to promise members that distributions would be made at any particular time, or at specified intervals, or, for that matter, ever.

Ms. Chu contends that the course of conduct by GSRV in the spring and summer of 2015 (i.e., making distributions to other members) proved that GSRV's management had properly determined, under the relevant operating agreements, that cash was available for distribution, that this determination entitled her to her proportionate share of the distributions then made, and that GSRV violated her contractual rights when it delayed sending to her the distributions to which she was entitled.

GSRV admits that in the spring and summer of 2015 it distributed checks to members who had signed the amended and new operating agreements -- but that it delayed, for several months, delivering checks to Ms. Chu. GSRV does not concede, however, that in doing so it violated Ms. Chu's contractual, common law, or statutory rights.

25

Rather, GSRV contends that by refusing to sign the revised and the new agreements that were presented to her on April 8th, Ms. Chu violated her obligation, under section 12.5 of the Operating Agreement, to execute validly adopted documents that the manager presented to her. GSRV further contends that by refusing to sign these documents, and by allegedly failing to communicate the basis for her objections, Ms. Chu also violated the duty the law independently imposed on her to honor contractual obligations in good faith and through fair dealing. According to GSRV, Ms. Chu's violations of these multi-sourced duties justified delaying the delivery of her distributions.

As set forth in a previous section of the Opinion, Order, and Interim Award, the Arbitrator has determined (formally found) that Ms. Chu violated her contractual obligations when she refused to sign, within ten days, the lawfully adopted amended and new operating agreements that were presented to her in April of 2015. The question here presented is whether that breach of her contractual obligations justified the decision by GSRV to withhold her spring and summer distributions until October 28, 2015.

The answer to this question is not self-evident, but is 'no.'

The evidence reviewed earlier in this Opinion, Order, and Interim Award, and the circumstances GRSV confronted in the spring and summer of 2015, support the view that it was not unreasonable for GSRV to believe, between mid-April and late October of that year, that Ms. Chu was violating her contractually imposed obligations by refusing to sign the documents presented to her in April of that year. It also bears noting that, by not signing the agreements, GSRV alleges that Ms. Chu was creating considerable stress for other members -- complicating relations with the tax authorities, jeopardizing new projects, and, potentially, costing GSRV both the confidence of USCIS and the license that entity had issued.

These circumstances, some proved and some only alleged, kinds of considerations, are not sufficient to justify dishonoring a contractual right that GSRV had not purported to extinguish.

Under the findings made in the preceding section about the intent of the parties to the Amended and Restated Operating Agreement of GSRV, Ms. Chu had a presumptively valid contractual right to share in the distributable profits generated by any of the projects undertaken pursuant to GSRV's EB-5 license.

Does the after-the-fact determination by this Arbitrator that, in April of 2015, Ms. Chu violated her contractual duty to sign the amended and new agreements have the effect, as an inevitable matter of law, unaccompanied and unaided by any other action, of terminating what would otherwise be Ms. Chu's entitlements under the contracts that she had signed?

26

Though not without some uncertainty, the Arbitrator answers this question in the negative.

The considerations that support this answer include the following. The Arbitrator has found, as explained in an earlier part of this Opinion, Order, and Interim Award, that Ms. Chu did not violate her duty of good faith and fair dealing when she declined to sign the amended and new agreements. Because Ms. Chu did not violate that legally super-imposed obligation, the issue of whether she had lost her contractual entitlements by the summer of 2015 turns on construction of contractual terms.

Under the terms of the relevant contracts, a member's alleged violation of a contractual duty could, but did not automatically, result in termination of membership status or the rights attached thereto. Instead, the relevant provisions of the agreements[15] clearly permitted the 'Manager' not to take any action in response to a perceived breach of a contractual duty -- or to waive, expressly or by inaction, the power management otherwise would have to launch the process that could lead to termination. Under the pertinent agreements, until the end of October of 2015, the 'Manager' of GSRV and of the related management LLCs consisted of both Mr. Kay and Mr. Chelini. See sections 1.21 in these documents. There is no evidence that Mr. Chelini ever agreed to take steps toward terminating Ms. Chu's membership. In fact, the evidence indicates that Mr. Chelini believed, and still believes, that Ms. Chu had "never broken any company policies" and "should get her distributions." Ex. 102. See also Exs. 100 and 101.

Notably, Mr. Chelini's status as a manager remained in effect until he executed the settlement agreement with GSRV on October 29, 2015 -- the day after GSRV sent the distribution checks to Ms. Chu. See sections 1.21 and Ex. 110.

In the end, GSRV never purported to terminate Ms. Chu's interests, for cause or otherwise, in any of the LLC's of which she was a member. Not having purported to terminate her membership interests in GSRV or in any of the management LLCs, and not having purported to go through the process of making determinations that would support any such termination, GSRV has failed to establish a contractual basis for refusing to make the distributions to which Ms. Chu presumptively remained entitled as a member of GSRV and of the management entities for Funds I, II, and III.

The Arbitrator therefore finds that GSRV violated Ms. Chu's rights by not making distributions to her when it made distributions to Mr. Kay and Mr. Brown in the spring and summer of 2015. GSRV is liable for any damages that Ms. Chu can prove she suffered as a proximate result of this breach by GSRV of her contractual rights.

---

[15]Section 6.5 of the Amended and Restated Operating Agreement of GSRV; section 6.4 of the Second Amended and Restated Operating Agreement of GSRV.

27

**Has Ms. Chu Proved that Mr. Kay Violated Fiduciary Duties**
**He Owed to Her?**

Ms. Chu contends that Mr. Kay violated his fiduciary duties in multiple ways: (1) by implementing changes well before submitting them for approval by members; (2) by endorsing and orchestrating the process, in early 2015, for amending extant operating agreements and adopting new agreements for new managements LLCs; (3) by inserting provisions in the new versions of the agreements that were substantively and procedurally unfair to minority members; (4) by withholding Ms. Chu's distributions in the spring and summer of 2015; and (5) by denying her membership in any of the LLCs that were formed to manage new projects -- SFBARC 5, SFBARC 6, and any future undertakings under GSRV's EB-5 license.

Ms. Chu has not produced evidence that would support a finding that Mr. Kay had GSRV implement the changes to which she objects before obtaining (on April 8th) the requisite consents of members.

Nor has Ms. Chu proved that Mr. Kay violated fiduciary duties through the process by which the extant operating agreements were amended and the new agreements were adopted. Ms. Chu did not introduce persuasive evidence that Mr. Kay used, or attempted to use, misrepresentations, threats, or pressure to secure needed consents.

There is evidence that tends to support an inference that neither Mr. Kay, Mr. Mayer, nor Mr. Chelini disclosed clearly or definitely to Ms. Chu, before April 6th, what the amendments would consist of and what the new agreements would contain. See, e.g., Ex. 115, which does not identify all of the arguably significant changes that would be effected by the amendments, and the testimony related thereto, including Mr. Mayer's inability to remember whether he had communicated the proposed changes to Ms. Chu or whether she attended a meeting during which Mr. Mayer, Mr., Kay, and Mr. Chelini discussed the changes at some length.

But the evidence that supports the contention that Ms. Chu was not fully apprised of the content of the amendments before April 6th falls far short of proving that Mr. Kay (or anyone else) made material misrepresentations in connection with this process. The significant point is not what Ms. Chu learned before April 6th, but what was presented to her on that date. She has not shown that the agreements she was asked to sign at that juncture contained trick clauses or that their drafters intended to disguise untoward objectives or to conceal the implications of proposed terms. Nor has Ms. Chu shown that she asked for and was denied the 10 days to which she was entitled after April 6th -- 10 days during which she was free to consult counsel and study the proposals carefully.

28

Finally, the Arbitrator repeats his finding, set forth above, that neither Mr. Chelini nor Ms. Chu has proved that Mr. Kay (through Mr. Mayer or otherwise) secured Mr. Chelini's signatures by deceit, threat, coercion, pressure, or any other unlawful means. Rather, after considering all the direct and circumstantial evidence, it is the Arbitrator's finding that Mr. Chelini's April 8th signatures were lawfully secured.

In sum, Ms. Chu has not proved that Mr. Kay violated fiduciary duties to her through the process by which the existing agreements were amended and the new agreements executed.

Ms. Chu also alleges that, in multiple respects, the content of the amendments and the new agreements exposes and entails multiple breaches of fiduciary duties by Mr. Kay. There are numerous difficulties with this contention, the first of which is the failure to prove that it is Mr. Kay, and not Mr. Mayer or Mr. Chelini (or, for that matter, Mr. Belzer, Ms. Fang, Mr. Jorgenson, or someone else) on whom responsibility should be fixed for any particular amendment or new provision. It is possible, of course, that Mr. Kay crafted all of the changes to which Ms. Chu has taken exception -- but possibility is not proof.

Moreover, there is reason to believe that both Mr. Mayer and Mr. Chelini played significant roles in suggesting, crafting, and/or affecting the contents of the new terms. Given this circumstance, it would hardly be fair to *assume* that Mr. Kay bears responsibility for any particular change -- especially since none of the changes could have been effected without Mr. Chelini's affirmative vote.

A second difficulty with this claim against Mr. Kay is that it is not clear, under California law, that a cause of action for breach of fiduciary duty can be based on terms of an LLC's operating agreement that were effectively adopted through a process that was lawful. Counsel for Ms. Chu has not directed the Arbitrator's attention to any California authority that so holds. And on the surface, at least, it would seem strange to hold a member liable for breach of fiduciary duties on the ground that he or she joined with other members (in the requisite numbers) in endorsing and adopting an agreement through a process that offended no legal norms.

There are additional difficulties with the contention that the substance of some of the provisions in the amended and the new operating agreements evidences a breach of fiduciary duties by Mr. Kay. Taking all the evidence into account, the Arbitrator cannot conclude that Ms. Chu has proved that she clearly is, or certainly will be, worse off under the changed provisions than she was under the earlier operating agreements. She has shown that changes that appear significant were made, but she has not shown that these revisions materially change her circumstances.

29

Ms. Chu failed to prove, for example, that the grant of economic equity (not voting rights) to Mr. Mayer, Ms. Fang, and Mr. Jorgenson was unjustified, unlawful, or accomplished for commercially unreasonable purposes. Similarly, she failed to prove that increasing Mr. Kay's economic interest in the GSRV entities by 4.43% was not justified -- given the unparalleled investments of time and money Mr. Kay had made in this enterprise, as well as the incontestable fact that his network of contacts and professional credibility had been and likely would continue to be absolutely critical to the survival and success of the company. The Arbitrator also notes that Claimant adduced quite substantial evidence that the net result of the changes that would be triggered upon the death of a member would increase, rather than decrease, the net flow of economic benefits to the heirs or estate of a deceased member.

What about Ms. Chu's claim that the re-allocation of voting power that amendments and the new agreements reflect constitutes a breach of a fiduciary duty Mr. Kay owed her? Like the other changes about which Ms. Chu complains, the persuasiveness of this claim is undermined by Ms. Chu's failure to prove that Mr. Kay is legally responsible for these changes, that they were made through a legally compromised process, or that the votes cast in their favor were insufficient or non-binding.

Under all the agreements, before and after amendment, Ms. Chu always was, and will remain, a minority member. Given the Arbitrator's findings, above, about the meaning of and interplay between sections 6.1, 6.1.1, 12.5, and 12.15, Ms. Chu never had the power, on her own, to block the adoption of amendments or the admission of new members. She never had the power, by exercising her right to vote, to prevent dilution of her membership interest. So it is far from clear that giving Mr. Kay more power over such matters, by itself, caused Ms. Chu any cognizable harm.

Ms. Chu also complains, with some initially appealing moral force, that the changes wrought in April of 2015 empower Mr. Kay, as manager of the management entities, to make decisions without regard to fiduciary duties, based solely on his own interests, and without giving "any consideration to any interest or factors affecting the Members." See, e.g., Ex 5, section 7.1.4.

It is not clear to the Arbitrator by how much these provisions actually enlarged the power Mr. Kay already could exercise under the former operating agreements. Carefully read, for example, those agreements gave Mr. Kay the power to control management decisions (by being able to override objections by Mr. Chelini if the two managers could not agree on some course of action). But, assuming that the amendments would in fact increase Mr. Kay's power (as manager and voting member), and would purport to authorize him to attend only to his own interests and to ignore or attack the interests of other members, does the adoption and existence of these provisions, without

30

more, constitute a breach of a fiduciary duty?

The answer is no.

Section 7.1.4 limits the power it confirms by permitting the exercise of that power only "to the fullest extent permitted by applicable law." But even without the express inclusion of any such limitation, the operating agreements always would have remained subject to "applicable" public law. The Beverly-Killea LLC Act governed GSRV's earlier operating agreements, and RULLCA governs operating agreements adopted from the first of January, 2014, as well as acts after that date by members or managers of LLCs. Thus, RULLCA governs the agreements that became binding contracts on April 8, 2015. RULLCA (and in some less clear measure its predecessor statute) imposes limits on the extent to which operating agreements can liberate members and managers from fiduciary duties, the duty of loyalty, the duty of care, and/or the duty to act in good faith and to deal fairly with members. Sec. 17704.09 of the Corp. Code. See also *Feresi v. The Livery, LLC*, 232 Cal.App. 4th 419 (2014). So, regardless of any language in operating agreements, the California Corporations Code protects minority members of LLCs from the ill-effects of some kinds of conduct that would violate traditionally framed fiduciary duties.

Respondent has failed to persuade the Arbitrator that the mere existence of provisions that purport to set forth powers that public laws would cabin in some factual circumstances (as yet not existing) constitutes a breach of a duty by the promulgator of the subject provisions (assuming, without proof, that the "promulgator" was Mr. Kay). Creating an opportunity for a breach is not a breach. The law would recognize a cause of action only if someone in fact took advantage of an apparently expansive opportunity by taking action that actually caused injury. The mere possibility that a wrong might be committed in the future cannot support the intervention of the law. There will be time enough in the future for corrective legal action if, at some point down the road, Mr., Kay, purporting to rely on powers that public laws arguably deny him, takes action that causes measurable harm to Ms. Chu -- or to any other member of GSRV.

We turn next to Ms. Chu's contention that Mr. Kay violated his fiduciary duties by delaying the delivery of the member distributions she should have received in the spring and summer of 2015. As explained in an earlier section of this opinion, the Arbitrator has concluded that it was not unreasonable for Mr. Kay and his colleagues at GSRV to believe that Ms. Chu's refusal to sign the amended operating agreements violated her contractually imposed duty under section 12.5 and, at least arguably, constituted grounds for terminating her membership in the LLCs for cause under clauses (d) or (h) of section 6.5. It would not be proper, under the law, to ground a finding of liability for breach of a fiduciary duty on beliefs reasonably held -- especially when, after the fact, a

31

neutral mind concludes that the conduct that was the target of those beliefs constituted a breach of contract.

Did Mr. Kay violate his fiduciary duties by purporting to deny Ms. Chu membership in SFBARC 5 and SFBARC 6, as well as any management LLCs that would be formed in the future in connection with new projects authorized under GSRV's EB-5 license? If somewhat less clearly, the answer, again, is no. As explained in a previous section, the Arbitrator has made a finding that, as a matter of 'objective legal fact,' Ms. Chu had and continues to have a contractually-based right to be given the opportunity to participate in new ventures undertaken through GSRV pursuant to the license issued to it by the federal government. This post-hoc legal determination, however, was not sufficiently foreseeable to support a finding that action inconsistent with it violated a fiduciary duty. The Arbitrator's disposition of this difficult issue is a 'legal factum' that emerged from a protracted, complicated adversarial process through which a great deal of evidence was generated -- all of which was the target of sustained after-the-fact analysis by sophisticated lawyers. In 2015, Mr. Kay had access to only a fraction of the information that has been presented to the Arbitrator and to relatively little of the analytical leverage on this issue that has been produced through the hearing process by the sharp inter-play of competing, well-informed minds.

As the observations just made suggest, there was (and remains) not inconsiderable support (in reason and evidence) for the positions and actions taken by Mr. Kay. His lawyers' arguments about the independence of the management and the fund LLCs are well made and not without force. And, to repeat, reason also could support a conviction that by refusing to sign the amended and new agreements Ms. Chu was violating the "Conduct Clause" of both the existing and the amended operating agreements In addition, there were grounds (ultimately unpersuasive, but not baseless) for concluding that the way Ms. Chu was participating in the on-and-off-again negotiations during the summer and fall of 2015 violated her obligation to meet her contractual obligations in good faith and through fair dealing.

It also is relevant to disposition of this issue that Mr. Kay was under substantial, time-sensitive pressure to try to clear the legal decks so potentially significant projects might go forward.

Given all the relevant considerations and circumstances, there is insufficient justification (i.e., insufficient proof by Ms. Chu) to make a finding that Mr. Kay breached a fiduciary duty when he directed that Ms. Chu's membership in the management LLCs for funds five and six be withdrawn, or when he purported to deny her an opportunity to become a member of management LLCs for future projects.

32

### Summary of Findings and Interim Award

For the reasons explained in detail above, the Arbitrator's Findings of Fact and Conclusions of Law include the following:

1. The Second Amended and Restated Operating Agreement of Golden State Renaissance Ventures, LLC, was duly adopted by the required vote of membership interests and became an enforceable contract on April 8, 2015.

2. The Amended and Restated Operating Agreements of GSRV Management, LLC, of GSRV I Management, LLC, of GSRV II Management LLC, and of GSRV III Management LLC, were duly adopted and became enforceable contracts on April 8, 215.

3. The Operating Agreements of SFBARC 5 Management LLC and of SFBARC 6 Management LLC were duly adopted and became enforceable contracts on April 8, 2015.

4. GSRV duly launched SFBARC 5 and SFBARC 6 and, in April of 2015, offered Ms. Chu an opportunity to become a member of either or both of the duly established management LLCs for these projects, but because Ms. Chu refused to timely sign the operating agreement for either of these lawfully formed entities, Ms. Chu is not entitled to a membership proportionate share of any distributions that may already have been made to the members of these management entities who did sign these operating agreements.

5. Ms. Chu violated her contractual obligations to GSRV by not signing, within ten days of their presentment to her, the amended and new operating agreements for GSRV and its affiliated entities. Ms. Chu is liable to GSRV for any damages that GSRV can prove were proximately caused by Ms. Chu's breach of these contractual obligations.

6. GSRV violated Ms. Chu's contractual rights by not making timely distributions to her in the spring and summer of 2015 from the management LLCs for Funds I, II, and III. GSRV is liable to Ms. Chu for any damages that she can prove were proximately caused by GSRV's failure to deliver to her the distributions from these management LLCs on the dates in the spring and summer of 2015 that GSRV delivered distributions to Mr. Kay and/or Mr. Brown.

7. At this juncture, Ms. Chu has a right, under the Arbitrator's binding findings about the intent of the parties to the Amended and Restated Operating Agreement of Golden State Renaissance Ventures, LLC, to be offered an opportunity to sign, without change, the Second Amended and Restated Operating Agreement of Golden State Renaissance Ventures, LLC.

8. Ms. Chu also has a right, at this juncture, to be offered an opportunity to sign the Amended and Restated Operating Agreement of GSRV Management, LLC., as adopted on April 8, 2015.

33

9. At this juncture, if Ms. Chu signs the Second Amended and Restated Operating Agreement of GSRV, LLC, as adopted as of April 8, 2015, and the Amended and Restated Operating Agreement for GSRV Management, LLC, as adopted that same day, she will become a member of both of these LLCs -- on the proportionate membership share basis that is set forth in the attachments to these amended operating agreements and that is hereby found accurate and binding.

10. If Ms. Chu declines to sign the Second Amended and Restated Operating Agreement of GSRV (April 8, 2015), or the Amended and Restated Operating Agreement of GSRV Management, LLC, or the Amended and Restated Operating Agreements of GSRV I Management LLC, GSRV II Management LLC, or GSRV III Management LLC, (all adopted April 8, 2016), Ms. Chu will not be entitled, going forward, to receive distributions from or through these entities.

11. As things now stand, if Ms. Chu signs GSRV's Second Amended and Restated Operating Agreement as duly adopted on April 8, 2015, she will be entitled to be offered an opportunity to become a member, going forward, of the management LLCs of SFBARC 5 and SFBARC 6, on the terms (without change) set forth therein on April 8, 2015, including the binding proportionate share determinations set forth in the attachments thereto.

12. If Ms. Chu signs the operating agreements of SFBARC5 Management LLC and SFBARC 6 Management LLC, within ten days of their presentation to her, she will be entitled, going forward, to her membership interest proportionate share of any distributions that either of these management entities makes in the future.

13. As things now stand, if Ms. Chu signs GSRV's Second Amended and Restated Operating Agreement as duly adopted on April 8, 2015, she will be entitled to be offered an opportunity to become a member of any management LLCs that are duly formed in the future to manage or monitor projects in which GSRV becomes involved under authority of the EB-5 license granted to GSRV by the United States government.

14. Ms. Chu failed to prove that Mr. Kay violated any fiduciary duties he owed her -- or any duties that might arise, variously, under the duty loyalty, the duty of care, or the duty of good faith and fair dealing. Having failed to prove a breach of any fiduciary duty by Mr. Kay, Ms. Chu is not entitled to any damages under this claim.

34

### Order re Phase Two

The Findings and Conclusions set forth immediately above conclude Phase One of these proceedings.

The parties and the Arbitrator agreed that Phase Two would be devoted to litigating disputes related to damages and/or to costs and attorneys' fees that the parties are unable to resolve by mutual agreement (settle).

The Arbitrator **ORDERS the parties to meet and confer, by the end of February, to consider again the possibility of settling this case and to discuss what should be included in Phase Two of these proceedings.**

The Arbitrator further orders the parties to serve and file, by March 1, 2018, statements setting forth their positions about what Stage Two of these proceedings should consist of, as well as how the components of Stage Two proceedings should be scheduled.

In addition, the Arbitrator orders counsel for the parties to appear (by phone) at 4:00 p.m. on March 12, 2018 to participate in a case management and scheduling conference.

IT IS SO ORDERED, FOUND, AND ADJUDGED.

Date: February 16, 2018.

Hon. Wayne D. Brazil (Ret.)
Arbitrator

35

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Golden State Renaissance Ventures, LLC, et al. vs. Chu, Judy, et al.
Reference No. 1100085319

I, Aimee Hwang, not a party to the within action, hereby declare that on February 16, 2018, I served

the attached PARTIAL FINAL AWARD on the parties in the within action by Email and by depositing true

copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San

Francisco, CALIFORNIA, addressed as follows:

Alan S. Yee Esq.
Siegel, Yee & Brunner
475 14th Street
Ste. 500
Oakland, CA  94612
Phone: 510-839-1200
AlanYee@siegelyee.com
    Parties Represented:
    Judy Chu

Richard J. Idell Esq.
Ory Sandel Esq.
Idell Firm
465 California St.
Ste. 500
San Francisco, CA  94104
Phone: (415) 986-2400
richard.idell@idellfirm.com
ory.sandel@idellfirm.com
    Parties Represented:
    GSRV I Management, LLC
    GSRV II Management, LLC
    GSRV III Management, LLC
    GSRV Management, LLC
    Golden State Renaissance Ventures, LLC
    SFBARC 5 Management, LLC
    SFBARC 6 Management, LLC

Wallace C. Doolittle Esq.
James P. Downs Esq.
L/O Wallace Doolittle
1260 B St.
Suite 220
Hayward, CA  94541
Phone: 510-888-0600
doolittlew@doolittlelaw.com
jdowns@doolittlelaw.com
    Parties Represented:
    Steven Kay

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco, CALIFORNIA on  February 16, 2018.

Aimee Hwang
ahwang@jamsadr.com

**JAMS ARBITRATION**
**CASE REFERENCE NO. 1100085319**

Golden State Renaissance Ventures, LLC, et al.

        Claimants,

vs.

Chu, Judy,

        Respondent.

**Addendum to Partial Final Award of February 16, 2018 and Order Adjusting Deadlines Set in Prior Order**

On March 16, 2018, the Arbitrator conducted a conference with counsel (by phone) to consider disagreements and uncertainties about forthcoming obligations and deadlines. Mr. Idell and Mr. Sandel appeared on behalf of the GSRV entities. Mr. Doolittle appeared on behalf of Mr. Kay. Mr. Yee appeared on behalf of Ms. Chu.

The need for this conference arose after Claimants' counsel submitted a letter (1) seeking extensions of deadlines set in the Arbitrator's Order of March 13, 2018, and (2) expressing uncertainty about the meaning and concern about the implications of that same Order. Counsel for Ms. Chu wrote, responsively, that he perceived no uncertainties and objected to the request for extensions of deadlines.

After considering the parties' written and oral submissions, and the illumination of some of the pertinent circumstances that the discussion during the phone conference yielded, the Arbitrator enters the following Addendum to his Partial Final Award and issues the Orders set forth, below, that vacate or modify some of the obligations and deadlines that were imposed in his Order of March 13, 2018.

**Addendum to Partial Final Award**

1. Unless the parties agree otherwise in a settlement contract, if Ms. Chu timely executes (see paragraphs 2 and 3, below) the relevant Operating Agreements, she is entitled to receive, **from April 1, 2018, going forward,** her pro rata share of distributions made to members of

1

GSRV, as well as her pro rata share of distributions made to members of any and every management LLC formed for any fund or project under authority of the EB-5 license that the government issued to GSRV.

2. If the parties have not already settled their claims and cross-claims, then, by May 21, 2018, the GSRV entities must present to Ms. Chu, for her signature, the amended *Operating Agreements* for all of the LLCs that have been established under authority of the EB-5 license that was issued to GSRV.

3. Ms. Chu will become a proportionate share member of each subject LLC whose Operating Agreement she signs by June 4, 2018. As stated in paragraph 1, above, Ms. Chu's entitlement to distributions will run, retroactively, from April 1, 2018, forward.    Ms. Chu will not become a member of any of the subject LLCs whose Operating Agreement she does not sign within the ten business day period prescribed here (if she has been duly provided the ten business day opportunity to sign as herein ordered).

ORDER

1. The Arbitrator hereby extends until May 7, 2018, the period during which the parties are to attempt to reach a settlement of their claims and cross-claims.

2. The GSRV entities must begin now the process of re-drafting all the relevant Operating Agreements so that appropriately amended agreements can be circulated among all members and can be presented to Ms. Chu for her signature within ten business days after May 7, 2018, i.e., by May 21, 2018.

3. If the parties have not already settled their claims and cross-claims, the Arbitrator will conduct a case management and scheduling conference at noon on May 11, 2018, for the purpose of establishing a comprehensive case development plan for Phase Two of these proceedings (damages, fees, and costs).

2

4. The case management conference that was previously scheduled for 4:00 p.m. on April 30, 2018, is hereby canceled.

IT IS SO ADJUDGED AND ORDERED.

Date: March 19, 2018.

Hon. Wayne D. Brazil (Ret.)
Arbitrator

3

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Golden State Renaissance Ventures, LLC, et al. vs. Chu, Judy, et al.
Reference No. 1100085319

I, Aimee Hwang, not a party to the within action, hereby declare that on  March 19, 2018, I served the attached Addendum to Partial Final Award of February 16, 2018, and Order Adjusting Deadlines Set in Prior Order on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San Francisco, CALIFORNIA, addressed as follows:

Alan S. Yee Esq.
Siegel, Yee & Brunner
475 14th Street
Ste. 500
Oakland, CA   94612
Phone: 510-839-1200
AlanYee@siegelyee.com
    Parties Represented:
    Judy Chu

Richard J. Idell Esq.
Ory Sandel Esq.
Idell Firm
96 Jessie Street
3rd Fl
San Francisco, CA   94105
Phone: (415) 986-2400
richard.idell@idellfirm.com
ory.sandel@idellfirm.com
    Parties Represented:
    GSRV I Management, LLC
    GSRV II Management, LLC
    GSRV III Management, LLC
    GSRV Management, LLC
    Golden State Renaissance Ventures, LLC
    SFBARC 5 Management, LLC
    SFBARC 6 Management, LLC

Wallace C. Doolittle Esq.
James P. Downs Esq.
L/O Wallace Doolittle
1260 B St.
Suite 220
Hayward, CA   94541
Phone: 510-888-0600
doolittlew@doolittlelaw.com
jdowns@doolittlelaw.com
    Parties Represented:
    Steven Kay

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco, CALIFORNIA on  March 19, 2018.

Aimee Hwang
ahwang@jamsadr.com

JAMS ARBITRATION
CASE REFERENCE NO. 1100085319

Golden State Renaissance Ventures, LLC, et al.

Claimants,

vs.

ORDER CONFIRMING MS.CHU'S OWNERSHIP
ENTITLEMENTS, FIXING SIGNATURE DEADLINE,
AND CLARIFYING PROCEDURES RE PHASE TWO

Chu, Judy,

Respondent.

On September 26, 2018, the Arbitrator conducted a case management conference and held a hearing to consider the parties' disagreement about the magnitude of Ms. Chu's entitlement, under the Arbitrator's Partial Final Award, to ownership interests in the GSRV entities formed subsequent to the establishment of Fund 3.

Claimants were represented during this hearing and case management conference by Mr. Idell, Mr. Bunzel, Mr. Sandel, and Mr. Mayer. Mr. Yee appeared on behalf of Ms. Chu, who also was present during the conference call.

Having considered the parties' written and oral submissions, the Arbitrator enters the following ORDERS.

1. The Arbitrator's Partial Final Award entitles Ms. Chu to no less than a 9.216% ownership interest in every GSRV management entity.

2. The Arbitrator's Partial Final Award does not purport to fix the percentage ownership interests of other persons or entities in the GSRV entities.

3. The Partial Final Award included no finding that the fact that Ms. Chu may have a larger ownership interest in the original GSRV LLC or its management entity, standing alone, entitles her to an ownership interest in any subsequently formed management entity that exceeds 9.216%.

4. Any contention or claim by Ms. Chu that she is entitled to an ownership interest greater than 9.216% in any GSRV entity that was formed after Fund 3 was established is not now and has never been within the scope of this arbitration proceeding.

In part because Mr. Chelini's sizeable ownership interests were bought out long ago, Ms. Chu had ample opportunity earlier in this proceeding to assert and to present evidence sufficient to support claims to higher percentage ownership interests -- but she did not do so.

1

5. Ms. Chu will become a member of each management entity for which she signs the amended operating agreement by October 3, 2018. Her ownership interest in each entity may be no less than 9.216%.

6. The hearing on October 23, 2018, will address the damages issues only.

Direct testimony about damages issues will be presented by declarations -- which may be accompanied by documentary evidence.

The Declarants will be subject to cross-examination during the hearing.

If a party concludes that it needs documents not in its possession to conduct adequate cross-examination of a Declarant, that party may request production from another party of a well-defined set of documents for this purpose.

Any such requests for documents must be made in writing no later than October 3, 2018. Responses to any such document requests must be served by no later than October 9, 2018.

7. At this juncture, the dispute about entitlements (if any) to reimbursement for attorneys' fees and costs, as well as fees paid to JAMS, will be limited to a determination about whether either party is 'the prevailing party' and/or what percentage share responsibility will be assigned to each party for fees and costs.

At this juncture, the Arbitrator will not attempt to determine whether any fees claimed or costs incurred are reasonable. If necessary, the Arbitrator will hear challenges to the reasonableness of fees billed or costs incurred (rates, time claimed, etc.) after the Arbitrator has resolved the disputes about whether (or in what percentage) any party is entitled to an award of fees and costs.

No party is required, at this juncture, to submit time sheets or declarations in support of a claim for fees or costs or of a contention that the fees and costs claimed are reasonable.

IT IS SO ORDERED.

Date: September 27, 2018.

_Wayne D. Brazil_
Hon. Wayne D. Brazil (Ret.)
Arbitrator

2

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Golden State Renaissance Ventures, LLC, et al. vs. Chu, Judy, et al.
Reference No. 1100085319

I, Aimee Hwang, not a party to the within action, hereby declare that on September 27, 2018, I served the attached ORDER CONFIRMING MS.CHU'S OWNERSHIP ENTITLEMENTS, FIXING SIGNATURE DEADLINE, AND CLARIFYING PROCEDURES RE PHASE TWO on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San Francisco, CALIFORNIA, addressed as follows:

Alan S. Yee Esq.
Siegel, Yee & Brunner
475 14th Street
Ste. 500
Oakland, CA  94612
Tel: 510-839-1200
Email: AlanYee@siegelyee.com
   Parties Represented:
   Judy Chu

Richard J. Idell Esq.
Ory Sandel Esq.
Idell Firm
96 Jessie Street
3rd Fl
San Francisco, CA  94105
Tel: 415-494-8053
Email: richard.idell@idellfirm.com
ory.sandel@idellfirm.com
   Parties Represented:
   GSRV I Management, LLC
   GSRV II Management, LLC
   GSRV III Management, LLC
   GSRV Management, LLC
   Golden State Renaissance Ventures, LLC
   SFBARC 5 Management, LLC
   SFBARC 6 Management, LLC

Wallace C. Doolittle Esq.
James P. Downs Esq.
L/O Wallace Doolittle
1260 B St.
Suite 220
Hayward, CA  94541
Tel: 510-888-0603
Email: doolittlew@doolittlelaw.com
jdowns@doolittlelaw.com
   Parties Represented:
   Steven Kay

Robert H. Bunzel Esq.
Bartko Zankel Bunzel & Miller
One Embarcadero Center
Suite 800
San Francisco, CA  94111
Tel: 415-956-1900
Email: rbunzel@bzbm.com
   Parties Represented:
   GSRV I Management, LLC
   GSRV II Management, LLC
   GSRV III Management, LLC
   GSRV Management, LLC
   Golden State Renaissance Ventures, LLC
   SFBARC 5 Management, LLC
   SFBARC 6 Management, LLC

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco, CALIFORNIA on September 27, 2018.

Aimee Hwang
ahwang@jamsadr.com

1                       **PROOF OF SERVICE**

2                **Judy Chu v. Steven Kay, et al.**
                  **Case No. CGC-16-553982**

3

      At the time of service, I was over 18 years of age and not a party to this action. My

4  business address is One Embarcadero Center, Suite 800, San Francisco, CA 94111.

5         On May 10, 2019, I served a true copy of the following document(s) described as
**NOTICE OF ENTRY OF JUDGMENT CONFIRMING CONTRACTUAL ARBITRATION**

6  **AWARD AND JUDGMENT** on the interested parties in this action as follows:

7                **SEE ATTACHED SERVICE LIST**

8        **BY ELECTRONIC SERVICE:** I electronically served the document(s) described above
via File & ServeXpress, on the recipients designated on the Transaction Receipt located on the

9  File & ServeXpress website (https://secure.fileandservexpress.com) pursuant to the Court Order
establishing the case website and authorizing service of documents.

10

      I declare under penalty of perjury under the laws of the State of California that the

11  foregoing is true and correct.

12     Executed on May 10, 2019, at San Francisco, California.

13

14

15               Barbara Sage

16

17

18

19

20

21

22

23

24

25

26

27

28

                           3
NOTICE OF ENTRY OF JUDGMENT CONFIRMING CONTRACTUAL ARBITRATION AWARD
AND JUDGMENT

**SERVICE LIST**
**Judy Chu v. Steven Kay, et al.**
**Case No. CGC-16-553982**

Alan S. Yee, Esq.
   alanyee@siegelyee.com
SIEGEL, YEE & BRUNNER
475 14th Street, Suite 50
Oakland, CA  94612
Tel:    (510) 839-1200
Fax:    (510) 444-6698

*Attorneys for Plaintiff JUDY CHU*

Richard Idell, Esq.
   richard.idell@idellfirm.com
Ory Sandell, Esq.
   ory.sandell@idellfirm.com
THE IDELL FIRM, A PROFESSIONAL
CORPORATION
18900 Carriger Road
Sonoma, CA  95476
Tel:    (707) 938-7763
Fax:    (77) 938-7764

*Attorneys for Defendants*
GOLDEN STATE RENAISSANCE
VENTURES, LLC; GSRV
MANAGEMENT, LLC; GSRV I
MANAGEMENT, LLC; GSRV II
MANAGEMENT, LLC; GSRV III
MANAGEMENT, LLC; SFBARC 5
MANAGEMENT, LLC; and SFBARC 6
MANAGEMENT, LLC

Wallace C. Doolittle, Esq.
   doolittlew@doolittlelaw.com
LAW OFFICES OF WALLACE C. DOOLITTLE
580 California Street, 12th Floor
San Francisco, CA  94014
Tel:    (415) 568-2249

*Attorneys for Defendant STEVEN KAY*

Frank F. Sommers, Esq.
   ffs@sommersschwartz.com
SOMMERS & SCHWARTZ, LLP
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Tel:    (415) 955-0925
Fax:    (415) 955-0927

*Attorneys Specially Appearing for Petitioners*
3G FUND 7 MANAGEMENT, LLC; 3G FUND 8K
MANAGEMENT, LLC; and 3G FUND CP
MANAGEMENT, LLC

2645.000/1401282.1

4

NOTICE OF ENTRY OF JUDGMENT CONFIRMING CONTRACTUAL ARBITRATION AWARD
AND JUDGMENT