HANSON BRIDGETT LLP
LAWRENCE M. CIRELLI, SBN 114710
lcirelli@hansonbridgett.com
KAYLEN KADOTANI, SBN 294114
kkadotani@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:     (415) 777-3200
Facsimile:     (415) 541-9366

Attorneys for Defendants
ERIC CHELINI and GSRV-VTI
MANAGEMENT, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| HUI MA, AILING ZHAO, XI LIU, YIXUAN WANG, and RUI ZHANG,<br><br>Plaintiffs,<br><br>v.<br><br>GOLDEN STATE RENAISSANCE VENTURES, LLC, dba Golden Gate Global, a California Limited Liability Company; GSRV MANAGEMENT, LLC, a California Limited Liability Company; GSRV-VTI MANAGEMENT, LLC, a California Limited Liability Company; ERIC CHELINI, an individual; STEVEN KAY, an individual; and VERTEBRAL TECHNOLOGIES, INC., a Minnesota corporation,<br><br>Defendants. | Case No. 3:21-cv-00856-WHO<br><br>**DECLARATION OF ERIC CHELINI IN SUPPORT OF DEFENDANTS ERIC CHELINI AND GSRV-VTI MANAGEMENT, LLC'S MOTION TO COMPEL ARBITRATION AND DISMISS OR, ALTERNATIVELY, STAY PROCEEDINGS**<br><br>Date: May 26, 2021<br>Time: 2:00 PM<br>Ctrm: 2<br>Judge: the Hon. William H. Orrick |

I, Eric Chelini,  declare as follows:

1. I am a Defendant in this case, as well as the managing member of Defendant GSRV-VTI Management, LLC, a position I have held at all times relevant to the facts disclosed herein.  I am also a former member of Golden State Renaissance Ventures, LLC.  I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify to the matters stated herein.

2. In response to a Private Offering Memorandum, which explained and offered to foreign investors the opportunity to invest in Vertebral Technologies, Inc. ("VTI") through the EB-5 program, Plaintiffs Hui Ma, Ailing Zhao, and Yixuan Wang (the "LP Plaintiffs") executed GSRV-VTI, LP's Subscription Agreement for Limited Partnership Interest Unit ("LP Subscription Agreement").  True and correct copies of the LP Plaintiffs' executed LP Subscription Agreements are attached hereto as *Exhibits A-C*.[1]

3. Pursuant to the terms of the LP Subscription Agreements, it was understood and intended that the LP Plaintiffs also agreed to the terms and conditions of the Limited Partnership Agreement of GSRV-VTI, LP" ("Partnership Agreement").

4. The Partnership Agreement was entered into by and among GSRV-VTI Management, LLC, as its general partner, and the limited partners, i.e., the investors whose LP Subscription Agreements had been accepted by the General Partner. I executed this agreement on behalf of GSRV-VTI Management, LLC. A true and correct copy of the Partnership Agreement is attached hereto as *Exhibit D*.

5. Like the LP Plaintiffs, Plaintiffs Xi Liu and Rui Zhang (the "LLC Plaintiffs") also executed a Subscription Agreement ("LLC Subscription Agreement") to acquire interests in the second investment entity, GSRV-VTI II, LLC, for the purposes of investing in VTI through the

---

[1] Certain personal and/or confidential information has been redacted from the Exhibits filed with this Declaration out of an abundance of caution since the parties have not yet entered a protective order with respect to the exchange of information in this matter.

DECLARATION OF ERIC CHELINI IN SUPPORT OF DEFENDANTS ERIC CHELINI AND GSRV-VTI MANAGEMENT, LLC'S MOTION TO COMPEL ARBITRATION

17461250.1

1  EB-5 Program. True and correct copies of the LLC Plaintiffs' executed LLC Subscription

2  Agreements are attached hereto as *Exhibits E-F*.

3        6.     The LLC Subscription Agreements required each subscriber to also accept and

4  execute the Amended and Restated Operating Agreement of GSRV-VTI II, LLC ("LLC Operating

5  Agreement") to complete the subscription process.

6        7.     The LLC Operating Agreements were entered into by and among GSRV-VTI

7  Management, LLC, as the Manager of the LLC, and the investors (i.e., LLC Plaintiffs), as

8  Members of the LLC. I executed the agreements on behalf of GSRV-VTI Management, LLC.

9  True and correct copies of the executed LLC Operating Agreements are attached hereto as

10  *Exhibits G-H*.

11       I declare under penalty of perjury under the laws of the United States of America that the

12  foregoing is true and correct.

13       Executed on this 20th day of April, 2021, at Oakland, California.

14

15  Eric Chelini     Digitally signed by Eric Chelini
                             Date: 2021.04.19
                             15:04:46 -07'00'

16  Eric Chelini

17

18

19

20

21

22

23

24

25

26

27

28

-2-           Case No. 3:21-cv-00856-WHO

DECLARATION OF ERIC CHELINI IN SUPPORT OF DEFENDANTS ERIC CHELINI AND GSRV-VTI MANAGEMENT, LLC'S MOTION TO COMPEL ARBITRATION

# EXHIBIT A

# EXHIBIT A

# GSRV-VTI, LP
# SUBSCRIPTION AGREEMENT
# FOR LIMITED PARTNERSHIP INTEREST UNIT

Mr. Eric Chelini
Golden State Renaissance Ventures, LLC
One California Street
Suite 2708
San Francisco, CA 94111


Mr. Chelini:

This Subscription Agreement is entered into in conjunction with, incorporates by reference, that certain Private Offering Memorandum of GSVR-VTI, LP, dated _____, 2014 ("Memorandum").

The undersigned subscribing investor (the "undersigned"), in connection with a prospective investment of capital to purchase a unit of Limited Partnership interests (a "Unit") in GSVR-VTI, LP, a California limited partnership (the "Company"), hereby agrees as follows:

### 1.    SUBSCRIPTION.

(a)    The undersigned hereby irrevocably subscribes (the "Subscription") for one (1) Unit, at the price of Five Hundred Thousand Dollars ($500,000) plus Forty Thousand Dollars ($40,000) per Unit as a Syndication Fee, in accordance with the terms and conditions described herein and in the Limited Partnership Agreement of GSVR-VTI, LP (the "Partnership Agreement").

(b)    The undersigned acknowledges and agrees that the undersigned is not entitled to cancel, terminate or revoke this Subscription, any agreements of the undersigned hereunder or the power of attorney granted hereby, except as otherwise set forth in this Section 1 (b), and such Subscription, agreements and power of attorney shall survive (i) changes in the transaction, documents and instruments described in the information furnished to the undersigned ("Information") which in the aggregate are not material or which are contemplated by such Information; and (ii) the death or disability of the undersigned; provided, however, that if the Company shall not accept this Subscription, then this Subscription, all agreements of the undersigned hereunder and the power of attorney granted hereby shall be cancelled and revoked, and this Subscription Agreement will be of no force and effect.

(c)    The undersigned hereby irrevocably appoints Eric Chelini, the managing member of the Company's general partner, Golden State Renaissance Ventures, LLC ("General Partner"), acting individually, as the undersigned's true and lawful representative and attorney in fact in the undersigned's name, place and stead, (i) to receive and pay over to the Company on behalf of the undersigned, to the extent set forth in this Subscription Agreement, all funds received hereunder; (ii) to complete or correct, on behalf of the undersigned, all documents to be executed by the undersigned in connection with the undersigned's subscription for the Unit, including, without limitation, filling in or amending amounts, dates, and other pertinent information; and

(iii) to execute, acknowledge, swear to and file, in the name and on behalf of the undersigned: (A) the Partnership Agreement, to be entered into pursuant to this Subscription Agreement and any amendments to which the undersigned is a signatory; (B) any subsequent amendments to any such amendments as provided in the Partnership Agreement; (C) any agreements or other documents of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, as limited and defined in the Partnership Agreement; (D) any certificates of the Company required by law and all amendments thereto; (E) all certificates and other instruments necessary to qualify, or continue the qualification of, the Company in the states where it may be doing business; (F) all assignments, conveyances or other instruments or documents necessary to effect the dissolution of the Company; and (G) all other filings with agencies of the federal government, of any state or local government, or of any other jurisdiction, which General Partner considers necessary or desirable to carry out the purposes of this Subscription Agreement, the Partnership Agreement and any amendments thereto and the business of the Company. This power of attorney shall be deemed coupled with an interest, shall be irrevocable, shall survive the transfer of the undersigned's Unit and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of the undersigned.

(d)     If the U.S. Citizenship and Immigration Service ("USCIS") denies the undersigned's "Immigrant Petition by Alien Entrepreneur," the undersigned may, within thirty (30) days after issuance of notice of such denial by USCIS, request the repurchase of the undersigned's Units by the Company and a refund of the Syndication Fee, less any applicable wire transfer fees. The repurchase price and refund of the Syndication Fee shall be payable within ninety (90) days after receipt of the repurchase request.

2.     **PAYMENT**.

(a)     The undersigned shall either enclose herewith a certified or official bank check payable to GSRV-VTI, LP. The check will be deposited with the Escrow Agent East West BAnk, as described in the Escrow Agreement of even date herewith.

(b)     In the alternative, you may wire your capital contribution to the Escrow Agent:

> East West Bank
> Swift Code: ■■■■■■■■
> Routing No. ■■■■■■■■
> East West Bank
> 135 N. Los Robles Ave., Suite 600
> Pasadena, CA 91101
> Account <u>GSRV-VTI, LP</u>
> Account No. ■■■■■■■■
> For Benefit of __MA Hui_____

3.     **ACCEPTANCE OF SUBSCRIPTION**. The undersigned understands and agrees that the Company in its sole and absolute discretion reserves the right to accept or reject this or any other subscription in whole or in part or to cancel the offering. If this Subscription is rejected by the Company in whole or in part, or if the offering is cancelled,

the Company shall promptly return all or part of the funds received from the undersigned, less any applicable wire transfer fees, as the case may be, and this Subscription Agreement shall thereafter be for the amount accepted, or of no further force or effect if the subscription is rejected in full, or the offering is cancelled.

      **4.**    **REPRESENTATIONS AND WARRANTIES.**  The undersigned hereby acknowledges, represents and warrants to, and agrees with, the Company as follows:

*[Note that item (b)(i) or (ii), item (c), and item (d) below must be initialed for this Subscription Agreement to be accepted.]*

      **(a)**    The undersigned understands that the offering and sale of the Units are intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act") and/or regulations thereunder and exempt from registration or qualification under any state law, and in accordance therewith and in furtherance thereof, the undersigned for the undersigned and the undersigned's heirs, personal representatives, successors and assigns represents and warrants and agrees as follows:

      **(i)**    The undersigned and/or the undersigned's advisor(s) has/have received the Information and has/have carefully reviewed it and understand(s) the information contained therein;

      **(ii)**    The undersigned acknowledges that all documents and records pertaining to this investment (including, without limitation, the Information) that the undersigned believes necessary for consideration and evaluation of the investment have been made available for inspection by the undersigned and the undersigned's attorney(ies), accountant(s) or advisor(s);

      **(iii)**    The undersigned and/or the undersigned's advisor(s) has/have had a reasonable opportunity to ask questions of and receive answers from a person or persons on behalf of the Company concerning the terms and conditions of the offering of the Units, and all such questions have been answered to the full satisfaction of the undersigned and/or the undersigned's advisors, and the undersigned has/have had the opportunity to obtain any additional Information which the Company possesses or can acquire without unreasonable effort or expense that is necessary to verify the accuracy of the Information or any other information furnished in connection with the investment;

      **(iv)**    No oral or written representations have been made other than as stated, or in addition to those stated, in the Information, and no oral or written information furnished to the undersigned or the undersigned's advisors in connection with the offering of the Units were in any way inconsistent with the information stated in the Information;

      **(v)**    The undersigned is not subscribing for the Unit as a result of or subsequent to any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio, or presented at any seminar or meeting, or any solicitation of a subscription by a person other than a representative of the Company;

(vi)   The undersigned has reached the age of majority in the country in which the undersigned resides;

(vii)   The undersigned has adequate means of providing for the undersigned's current financial needs and contingencies, is able to bear the substantial economic risks of an investment in the Unit for an indefinite period of time, has no need for liquidity in such investment, and, at the present time, could afford a complete loss of such investment;

(viii)   The undersigned or the undersigned's purchaser representative (including the undersigned's professional advisor(s), who is unaffiliated with and is not compensated by the Company or any affiliate or agent of the Company, as the case may be) has such knowledge and experience in financial, tax and business matters so as to enable the undersigned to evaluate the merits and risks of an investment in the Company, to protect the undersigned's own interests in connection with the investment, and to make an informed investment decision with respect thereto;

(ix)   The undersigned is not relying on the Company with respect to the tax and other economic considerations of an investment;

(x)   The undersigned understands and acknowledges that the Units have not been registered under the Securities Act or any state securities law, that transferability of the Unit is restricted under such laws and that consequently the undersigned must bear the economic risks of investment for an indefinite period.  The undersigned will not sell or otherwise transfer the Unit without registration under the Securities Act or applicable state securities laws or an exemption therefrom.  The undersigned represents that the undersigned is purchasing the Unit for the undersigned's own account, for investment and not with a view to or in connection with resale or distribution except in compliance with the Securities Act and applicable state law;

(xi)   The undersigned recognizes that investment in the Company involves substantial risks, including loss of the entire amount of such investment, and has taken full cognizance of and understands all of the risks related to the purchase of the Unit; and

(xii)   The undersigned maintains the undersigned's domicile, and is not merely a transient or temporary resident, at the residence address shown on the signature page of this Subscription Agreement.

(b)   The undersigned represents and warrants as follows:

(i)   *(If applicable, Initial)* _____ My individual net worth, or my joint net worth with my spouse, exceeds US$1,000,000; or

(ii)   *(If applicable, Initial)* _____ My individual income was in excess of Two Hundred Thousand Dollars (US$200,000) in each of the two (2) most recent years, or my joint income with my spouse was in excess of Three Hundred Thousand Dollars (US$300,000) in each of the two (2) most recent years; and has a reasonable expectation of reaching the same income level in the current year.

(c)   *(Initial)* _____ The undersigned represents and warrants that the

undersigned is not a resident in the United States.

   **(d)** *(Initial)* _____ The undersigned hereby agrees to provide such information and to execute and deliver such documents as may reasonably be necessary to comply with any and all laws and ordinances that the Company is subject to, including without limitation, such additional information as the Company may deem appropriate with regard to the undersigned's suitability to invest in the Company.

   **(e)** The undersigned acknowledges:

    **(i)** In making an investment decision the undersigned has relied on the undersigned's own examination of the Company and the terms of the Offering, including the merits and risks involved. THESE UNITS HAVE NOT BEEN RECOMMENDED OR APPROVED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE INFORMATION IN THIS DOCUMENT OR ANY OTHER INFORMATION FURNISHED TO THE UNDERSIGNED. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

    **(ii)** The representations, warranties and agreements of the undersigned contained herein and in any other writing delivered in connection with the transactions contemplated hereby are made with the intent that they be relied on by the Company and its General Partner in determining the undersigned's suitability as a purchaser of a Unit, shall be true and correct in all respects on and as of the date of the acceptance of the subscription, as if made on and as of such date, and shall survive the execution and delivery of this Subscription Agreement and the purchase of the Unit.

   **(f)** Upon the Company's acceptance of this Subscription by admitting the undersigned to the Company and receipt of the minimum subscriptions, the undersigned's contribution to the Company deposited herewith may be transferred to the Company.

   **5.** **INDEMNIFICATION.** The undersigned agrees to indemnify and hold harmless the Company, its General Partner, and their agents against any and all loss, liability, claim, damage and expense whatsoever (including, without limitation, any and all expenses including attorneys' fees reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon any false representation or warranty or breach or failure by the undersigned to comply with any covenant or agreement made by the undersigned herein or in any other document furnished by the undersigned to any of the foregoing in connection with this transaction, including, without limitation, arising as a result of the sale or distribution of the Unit by the undersigned in violation of the Securities Act or other applicable law.

   **6.** **IRREVOCABILITY, BINDING EFFECT, ENTIRE AGREEMENT.** The undersigned hereby acknowledges and agrees that this Subscription is irrevocable by the undersigned, that, except as required by law, the undersigned is not entitled to cancel, terminate or revoke this Subscription Agreement or any agreements of the undersigned hereunder and that this Subscription Agreement and such other agreements shall survive

the death or disability of the undersigned and shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives and permitted assigns. This Subscription Agreement, the Memorandum, and the Company's Limited Partnership Agreement sets forth the entire agreement and understanding among the parties hereto with respect to the transactions contemplated hereby and supersedes any and all prior agreements and understandings relating to the subject matter hereof.

**7.     MODIFICATION**. Neither this Subscription Agreement nor any provision hereof shall be waived, modified, discharged or terminated except by an instrument in writing signed by the party against whom any such waiver, modification, discharge or termination is sought.

**8.     NOTICES**. Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be mailed by certified mail, return receipt requested, sent by reputable overnight delivery service, or be personally delivered to the party to whom it is to be given (a) if to the Company, at the address set forth above; or (b) if to the undersigned, at the address set forth on the signature page hereof (or, in either case, to such other address as the party shall have furnished in writing in accordance with the provision of this Section 8). Any notice or other communication given by certified mail shall be deemed given two (2) business days after deposit in the mail, one (1) business day after deposit with a reputable overnight delivery service, or on personal delivery, except for a notice changing a party's address, which shall be deemed given at the time of receipt thereof.

**9.     ASSIGNABILITY**. This Subscription Agreement and the rights and obligations hereunder are not transferable or assignable by the undersigned.

**10.     APPLICABLE LAW**. This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of California as applied to residents of California executing contracts wholly to be performed in California.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement.

MA Hui
Subscriber Name (Please Print)

Fill in Mailing Address only if different
from Resident Address:

Subscriber Name (Please Print)
[If more than one]

Resident Address

City, State, Country, Zip Code

State in which Subscription Agreement signed
if other than state of residence:

State and date of organization, if entity:

Mailing Address

City, State, Zip Code

Signature of Investor(s) (individual)

Signature of Investor(s) (individual), [if more
than one]

**Total Amount of Investment:**

$   500,000.00

Number of Units: One (1)

**SUBSCRIPTION ACCEPTANCE**

The forgoing subscription is accepted for One (1) Unit of Limited Partnership Interest for a total aggregate purchase price of $ 500,000.00 , effective as of January 15, 2014.

GSRV-VTI, LP

By:   Golden State Renaissance
      Ventures, LLC
      its General Partner

By:
      Eric Chelini
      its Managing Member

015001.0002\1479856.1

# EXHIBIT B

# EXHIBIT B

**GSRV-VTI, LP**
**SUBSCRIPTION AGREEMENT**
**FOR LIMITED PARTNERSHIP INTEREST UNIT**

Mr. Eric Chelini
Golden State Renaissance Ventures, LLC
One California Street
Suite 2708
San Francisco, CA 94111

Mr. Chelini:

This Subscription Agreement is entered into in conjunction with, incorporates by reference, that certain Private Offering Memorandum of GSVR-VTI, LP, dated October 9, 2013 ("Memorandum").

The undersigned subscribing investor (the "undersigned"), in connection with a prospective investment of capital to purchase a unit of Limited Partnership interests (a "Unit") in GSVR-VTI, LP, a California limited partnership (the "Company"), hereby agrees as follows:

## 1.   SUBSCRIPTION.

**(a)**   The undersigned hereby irrevocably subscribes (the "Subscription") for one (1) Unit, at the price of Five Hundred Thousand Dollars ($500,000) plus Forty Thousand Dollars ($40,000) per Unit as a Syndication Fee, in accordance with the terms and conditions described herein and in the Limited Partnership Agreement of GSVR-VTI, LP (the "Partnership Agreement").

**(b)**   The undersigned acknowledges and agrees that the undersigned is not entitled to cancel, terminate or revoke this Subscription, any agreements of the undersigned hereunder or the power of attorney granted hereby, except as otherwise set forth in this Section 1 (b), and such Subscription, agreements and power of attorney shall survive (i) changes in the transaction, documents and instruments described in the information furnished to the undersigned ("Information") which in the aggregate are not material or which are contemplated by such Information; and (ii) the death or disability of the undersigned; provided, however, that if the Company shall not accept this Subscription, then this Subscription, all agreements of the undersigned hereunder and the power of attorney granted hereby shall be cancelled and revoked, and this Subscription Agreement will be of no force and effect.

**(c)**   The undersigned hereby irrevocably appoints Eric Chelini, the managing member of the Company's general partner, Golden State Renaissance Ventures, LLC ("General Partner"), acting individually, as the undersigned's true and lawful representative and attorney in fact in the undersigned's name, place and stead, (i) to receive and pay over to the Company on behalf of the undersigned, to the extent set forth in this Subscription Agreement, all funds received hereunder; (ii) to complete or correct, on behalf of the undersigned, all documents to be executed by the undersigned in connection with the undersigned's subscription for the Unit, including, without limitation, filling in or amending amounts, dates, and other pertinent information; and

(iii) to execute, acknowledge, swear to and file, in the name and on behalf of the undersigned: (A) the Partnership Agreement, to be entered into pursuant to this Subscription Agreement and any amendments to which the undersigned is a signatory; (B) any subsequent amendments to any such amendments as provided in the Partnership Agreement; (C) any agreements or other documents of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, as limited and defined in the Partnership Agreement; (D) any certificates of the Company required by law and all amendments thereto; (E) all certificates and other instruments necessary to qualify, or continue the qualification of, the Company in the states where it may be doing business; (F) all assignments, conveyances or other instruments or documents necessary to effect the dissolution of the Company; and (G) all other filings with agencies of the federal government, of any state or local government, or of any other jurisdiction, which General Partner considers necessary or desirable to carry out the purposes of this Subscription Agreement, the Partnership Agreement and any amendments thereto and the business of the Company. This power of attorney shall be deemed coupled with an interest, shall be irrevocable, shall survive the transfer of the undersigned's Unit and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of the undersigned.

**(d)** If the U.S. Citizenship and Immigration Service ("USCIS") denies the undersigned's "Immigrant Petition by Alien Entrepreneur," the undersigned may, within thirty (30) days after issuance of notice of such denial by USCIS, request the repurchase of the undersigned's Units by the Company and a refund of the Syndication Fee, less any applicable wire transfer fees. The repurchase price and refund of the Syndication Fee shall be payable within ninety (90) days after receipt of the repurchase request.

**2.**    **PAYMENT**.

**(a)** The undersigned shall either enclose herewith a certified or official bank check payable to GSRV-VTI, LP. The check will be deposited with the Escrow Agent East West Bank, as described in the Escrow Agreement of even date herewith.

**(b)** In the alternative, you may wire your capital contribution to the Escrow Agent:

> East West Bank
> Swift Code: ███████████
> Routing No. ███████████
> East West Bank
> 135 N. Los Robles Ave., Suite 600
> Pasadena, CA 91101
> Account GSRV-VTI, LP
> Account No. ███████████
> For Benefit of _Ailing ZHAO_____ [your name].

**3.**    **ACCEPTANCE OF SUBSCRIPTION**. The undersigned understands and agrees that the Company in its sole and absolute discretion reserves the right to accept or reject this or any other subscription in whole or in part or to cancel the offering. If this

Subscription is rejected by the Company in whole or in part, or if the offering is cancelled, the Company shall promptly return all or part of the funds received from the undersigned, less any applicable wire transfer fees, as the case may be, and this Subscription Agreement shall thereafter be for the amount accepted, or of no further force or effect if the subscription is rejected in full, or the offering is cancelled.

4.    **REPRESENTATIONS AND WARRANTIES**.  The undersigned hereby acknowledges, represents and warrants to, and agrees with, the Company as follows:

*[Note that item (b)(i) or (ii), item (c), and item (d) below must be initialed for this Subscription Agreement to be accepted.]*

(a)    The undersigned understands that the offering and sale of the Units are intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act") and/or regulations thereunder and exempt from registration or qualification under any state law, and in accordance therewith and in furtherance thereof, the undersigned for the undersigned and the undersigned's heirs, personal representatives, successors and assigns represents and warrants and agrees as follows:

(i)    The undersigned and/or the undersigned's advisor(s) has/have received the Information and has/have carefully reviewed it and understand(s) the information contained therein;

(ii)    The undersigned acknowledges that all documents and records pertaining to this investment (including, without limitation, the Information) that the undersigned believes necessary for consideration and evaluation of the investment have been made available for inspection by the undersigned and the undersigned's attorney(ies), accountant(s) or advisor(s);

(iii)    The undersigned and/or the undersigned's advisor(s) has/have had a reasonable opportunity to ask questions of and receive answers from a person or persons on behalf of the Company concerning the terms and conditions of the offering of the Units, and all such questions have been answered to the full satisfaction of the undersigned and/or the undersigned's advisors, and the undersigned has/have had the opportunity to obtain any additional Information which the Company possesses or can acquire without unreasonable effort or expense that is necessary to verify the accuracy of the Information or any other information furnished in connection with the investment;

(iv)    No oral or written representations have been made other than as stated, or in addition to those stated, in the Information, and no oral or written information furnished to the undersigned or the undersigned's advisors in connection with the offering of the Units were in any way inconsistent with the information stated in the Information;

(v)    The undersigned is not subscribing for the Unit as a result of or subsequent to any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio, or presented at any seminar or meeting, or any solicitation of a subscription by a person other than a representative of the Company;

(vi)     The undersigned has reached the age of majority in the country in which the undersigned resides;

(vii)    The undersigned has adequate means of providing for the undersigned's current financial needs and contingencies, is able to bear the substantial economic risks of an investment in the Unit for an indefinite period of time, has no need for liquidity in such investment, and, at the present time, could afford a complete loss of such investment;

(viii)   The undersigned or the undersigned's purchaser representative (including the undersigned's professional advisor(s), who is unaffiliated with and is not compensated by the Company or any affiliate or agent of the Company, as the case may be) has such knowledge and experience in financial, tax and business matters so as to enable the undersigned to evaluate the merits and risks of an investment in the Company, to protect the undersigned's own interests in connection with the investment, and to make an informed investment decision with respect thereto;

(ix)     The undersigned is not relying on the Company with respect to the tax and other economic considerations of an investment;

(x)      The undersigned understands and acknowledges that the Units have not been registered under the Securities Act or any state securities law, that transferability of the Unit is restricted under such laws and that consequently the undersigned must bear the economic risks of investment for an indefinite period. The undersigned will not sell or otherwise transfer the Unit without registration under the Securities Act or applicable state securities laws or an exemption therefrom. The undersigned represents that the undersigned is purchasing the Unit for the undersigned's own account, for investment and not with a view to or in connection with resale or distribution except in compliance with the Securities Act and applicable state law;

(xi)     The undersigned recognizes that investment in the Company involves substantial risks, including loss of the entire amount of such investment, and has taken full cognizance of and understands all of the risks related to the purchase of the Unit; and

(xii)    The undersigned maintains the undersigned's domicile, and is not merely a transient or temporary resident, at the residence address shown on the signature page of this Subscription Agreement.

(b)      The undersigned represents and warrants as follows:

(i)      *(If applicable, Initial)* Z.A.         My individual net worth, or my joint net worth with my spouse, exceeds US$1,000,000; or

(ii)     *(If applicable, Initial)* Z.A.         My individual income was in excess of Two Hundred Thousand Dollars (US$200,000) in each of the two (2) most recent years, or my joint income with my spouse was in excess of Three Hundred Thousand Dollars (US$300,000) in each of the two (2) most recent years; and has a reasonable expectation of reaching the same income level in the current year.

(c)      *(Initial)*         The undersigned represents and warrants that the

4

undersigned is not a resident in the United States.

        **(d)**    *(Initial)* $Z.A$. The undersigned hereby agrees to provide such information and to execute and deliver such documents as may reasonably be necessary to comply with any and all laws and ordinances that the Company is subject to, including without limitation, such additional information as the Company may deem appropriate with regard to the undersigned's suitability to invest in the Company.

        **(e)**    The undersigned acknowledges:

        **(i)**    In making an investment decision the undersigned has relied on the undersigned's own examination of the Company and the terms of the Offering, including the merits and risks involved. THESE UNITS HAVE NOT BEEN RECOMMENDED OR APPROVED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE INFORMATION IN THIS DOCUMENT OR ANY OTHER INFORMATION FURNISHED TO THE UNDERSIGNED. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

        **(ii)**    The representations, warranties and agreements of the undersigned contained herein and in any other writing delivered in connection with the transactions contemplated hereby are made with the intent that they be relied on by the Company and its General Partner in determining the undersigned's suitability as a purchaser of a Unit, shall be true and correct in all respects on and as of the date of the acceptance of the subscription, as if made on and as of such date, and shall survive the execution and delivery of this Subscription Agreement and the purchase of the Unit.

        **(f)**    Upon the Company's acceptance of this Subscription by admitting the undersigned to the Company and receipt of the minimum subscriptions, the undersigned's contribution to the Company deposited herewith may be transferred to the Company.

        **5.**    **INDEMNIFICATION.** The undersigned agrees to indemnify and hold harmless the Company, its General Partner, and their agents against any and all loss, liability, claim, damage and expense whatsoever (including, without limitation, any and all expenses including attorneys' fees reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon any false representation or warranty or breach or failure by the undersigned to comply with any covenant or agreement made by the undersigned herein or in any other document furnished by the undersigned to any of the foregoing in connection with this transaction, including, without limitation, arising as a result of the sale or distribution of the Unit by the undersigned in violation of the Securities Act or other applicable law.

        **6.**    **IRREVOCABILITY, BINDING EFFECT, ENTIRE AGREEMENT.** The undersigned hereby acknowledges and agrees that this Subscription is irrevocable by the undersigned, that, except as required by law, the undersigned is not entitled to cancel, terminate or revoke this Subscription Agreement or any agreements of the undersigned hereunder and that this Subscription Agreement and such other agreements shall survive

the death or disability of the undersigned and shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives and permitted assigns. This Subscription Agreement, the Memorandum, and the Company's Limited Partnership Agreement sets forth the entire agreement and understanding among the parties hereto with respect to the transactions contemplated hereby and supersedes any and all prior agreements and understandings relating to the subject matter hereof.

      7.     **MODIFICATION**. Neither this Subscription Agreement nor any provision hereof shall be waived, modified, discharged or terminated except by an instrument in writing signed by the party against whom any such waiver, modification, discharge or termination is sought.

      8.     **NOTICES**. Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be mailed by certified mail, return receipt requested, sent by reputable overnight delivery service, or be personally delivered to the party to whom it is to be given (a) if to the Company, at the address set forth above; or (b) if to the undersigned, at the address set forth on the signature page hereof (or, in either case, to such other address as the party shall have furnished in writing in accordance with the provision of this Section 8). Any notice or other communication given by certified mail shall be deemed given two (2) business days after deposit in the mail, one (1) business day after deposit with a reputable overnight delivery service, or on personal delivery, except for a notice changing a party's address, which shall be deemed given at the time of receipt thereof.

      9.     **ASSIGNABILITY**. This Subscription Agreement and the rights and obligations hereunder are not transferable or assignable by the undersigned.

      10.     **APPLICABLE LAW**. This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of California as applied to residents of California executing contracts wholly to be performed in California.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement.

Ailing ZHAO
Subscriber Name (Please Print)

_____
Subscriber Name (Please Print)
[If more than one]

█████████████████████████
Resident Address

█████████████
City, State, Country, Zip Code

State in which Subscription Agreement signed
if other than state of residence:
_____
State and date of organization, if entity:
_____
_____

Fill in Mailing Address only if different
from Resident Address:

Same as residential address
Mailing Address

_____
City, State, Zip Code

_____
Signature of Investor(s) (individual)

_____
Signature of Investor(s) (individual), [if more
than one]

**Total Amount of Investment:**

$   500,000.00

Number of Units: One (1)

## SUBSCRIPTION ACCEPTANCE

The forgoing subscription is accepted for One (1) Unit of Limited Partnership Interest for a total aggregate purchase price of $ 500,000.00 , effective as of April 18, 2014.   .

GSRV-VTI, LP

By:   Golden State Renaissance
Ventures, LLC
its General Partner

By:

Eric Chelini
its Managing Member

015001.0002\1479856.1 Ailing ZHAO

# EXHIBIT C


# EXHIBIT C

**GSRV-VTI, LP**
**SUBSCRIPTION AGREEMENT**
**FOR LIMITED PARTNERSHIP INTEREST UNIT**

Mr. Eric Chelini
Golden State Renaissance Ventures, LLC
One California Street
Suite 2708
San Francisco, CA 94111

Mr. Chelini:

This Subscription Agreement is entered into in conjunction with, incorporates by reference, that certain Private Offering Memorandum of GSVR-VTI, LP, dated                  , 2011 ("Memorandum").

The undersigned subscribing investor (the "undersigned"), in connection with a prospective investment of capital to purchase a unit of Limited Partnership interests (a "Unit") in GSVR-VTI, LP, a California limited partnership (the "Company"), hereby agrees as follows:

      1.    **SUBSCRIPTION**.

      **(a)**    The undersigned hereby irrevocably subscribes (the "Subscription") for one (1) Unit, at the price of Five Hundred Thousand Dollars ($500,000) plus Thirty Nine Thousand Dollars ($39,000) per Unit as a Syndication Fee, in accordance with the terms and conditions described herein and in the Limited Partnership Agreement of GSVR-VTI, LP (the "Partnership Agreement").

      **(b)**    The undersigned acknowledges and agrees that the undersigned is not entitled to cancel, terminate or revoke this Subscription, any agreements of the undersigned hereunder or the power of attorney granted hereby, except as otherwise set forth in this Section l (b), and such Subscription, agreements and power of attorney shall survive (i) changes in the transaction, documents and instruments described in the information furnished to the undersigned ("Information") which in the aggregate are not material or which are contemplated by such Information; and (ii) the death or disability of the undersigned; provided, however, that if the Company shall not accept this Subscription, then this Subscription, all agreements of the undersigned hereunder and the power of attorney granted hereby shall be cancelled and revoked, and this Subscription Agreement will be of no force and effect.

      **(c)**    The undersigned hereby irrevocably appoints Eric Chelini, the managing member of the Company's general partner, Golden State Renaissance Ventures, LLC ("General Partner"), acting individually, as the undersigned's true and lawful representative and attorney in fact in the undersigned's name, place and stead, (i) to receive and pay over to the Company on behalf of the undersigned, to the extent set forth in this Subscription Agreement, all funds received hereunder; (ii) to complete or correct, on behalf of the undersigned, all documents to be executed by the undersigned in connection with the undersigned's subscription for the Unit, including,

      1

without limitation, filling in or amending amounts, dates, and other pertinent information; and (iii) to execute, acknowledge, swear to and file, in the name and on behalf of the undersigned: (A) the Partnership Agreement, to be entered into pursuant to this Subscription Agreement and any amendments to which the undersigned is a signatory; (B) any subsequent amendments to any such amendments as provided in the Partnership Agreement; (C) any agreements or other documents of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, as limited and defined in the Partnership Agreement; (D) any certificates of the Company required by law and all amendments thereto; (E) all certificates and other instruments necessary to qualify, or continue the qualification of, the Company in the states where it may be doing business; (F) all assignments, conveyances or other instruments or documents necessary to effect the dissolution of the Company; and (G) all other filings with agencies of the federal government, of any state or local government, or of any other jurisdiction, which General Partner considers necessary or desirable to carry out the purposes of this Subscription Agreement, the Partnership Agreement and any amendments thereto and the business of the Company.  This power of attorney shall be deemed coupled with an interest, shall be irrevocable, shall survive the transfer of the undersigned's Unit and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of the undersigned.

        **(d)**      If the U.S. Citizenship and Immigration Service ("USCIS") denies the undersigned's "Immigrant Petition by Alien Entrepreneur," the undersigned may, within thirty (30) days after issuance of notice of such denial by USCIS, request the repurchase of the undersigned's Units by the Company and a refund of the Syndication Fee, less any applicable wire transfer fees. The repurchase price and refund of the Syndication Fee shall be payable within ninety (90) days after receipt of the repurchase request.

        **2.**      **PAYMENT**.

        **(a)**      The undersigned shall either enclose herewith a certified or official bank check payable to GSRV-VTI, LP.  The check will be deposited with the Escrow Agent East West BAnk, as described in the Escrow Agreement of even date herewith.

        **(b)**      In the alternative, you may wire your capital contribution to the Escrow Agent:

        East West Bank
        Swift Code: ▮▮▮▮▮▮▮▮▮
        Routing No. ▮▮▮▮▮▮▮▮▮▮▮▮▮_____
        East West Bank
        135 N. Los Robles Ave., Suite 600
        Pasadena, CA 91101
        Account _____
        Account No. _____
        For Benefit of _____ [your name].

3.     **ACCEPTANCE OF SUBSCRIPTION**.  The undersigned understands and agrees that the Company in its sole and absolute discretion reserves the right to accept or reject this or any other subscription in whole or in part or to cancel the offering.  If this Subscription is rejected by the Company in whole or in part, or if the offering is cancelled, the Company shall promptly return all or part of the funds received from the undersigned, less any applicable wire transfer fees, as the case may be, and this Subscription Agreement shall thereafter be for the amount accepted, or of no further force or effect if the subscription is rejected in full, or the offering is cancelled.

4.     **REPRESENTATIONS AND WARRANTIES**.  The undersigned hereby acknowledges, represents and warrants to, and agrees with, the Company as follows:

*[Note that item (b)(i) or (ii), item (c), and item (d) below must be initialed for this Subscription Agreement to be accepted.]*

**(a)**     The undersigned understands that the offering and sale of the Units are intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act") and/or regulations thereunder and exempt from registration or qualification under any state law, and in accordance therewith and in furtherance thereof, the undersigned for the undersigned and the undersigned's heirs, personal representatives, successors and assigns represents and warrants and agrees as follows:

**(i)**     The undersigned and/or the undersigned's advisor(s) has/have received the Information and has/have carefully reviewed it and understand(s) the information contained therein;

**(ii)**     The undersigned acknowledges that all documents and records pertaining to this investment (including, without limitation, the Information) that the undersigned believes necessary for consideration and evaluation of the investment have been made available for inspection by the undersigned and the undersigned's attorney(ies), accountant(s) or advisor(s);

**(iii)**     The undersigned and/or the undersigned's advisor(s) has/have had a reasonable opportunity to ask questions of and receive answers from a person or persons on behalf of the Company concerning the terms and conditions of the offering of the Units, and all such questions have been answered to the full satisfaction of the undersigned and/or the undersigned's advisors, and the undersigned has/have had the opportunity to obtain any additional Information which the Company possesses or can acquire without unreasonable effort or expense that is necessary to verify the accuracy of the Information or any other information furnished in connection with the investment;

**(iv)**     No oral or written representations have been made other than as stated, or in addition to those stated, in the Information, and no oral or written information furnished to the undersigned or the undersigned's advisors in connection with the offering of the Units were in any way inconsistent with the information stated in the Information;

**(v)**     The undersigned is not subscribing for the Unit as a result of or subsequent to any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio, or presented at any

seminar or meeting, or any solicitation of a subscription by a person other than a representative of the Company;

(vi)     The undersigned has reached the age of majority in the country in which the undersigned resides;

(vii)     The undersigned has adequate means of providing for the undersigned's current financial needs and contingencies, is able to bear the substantial economic risks of an investment in the Unit for an indefinite period of time, has no need for liquidity in such investment, and, at the present time, could afford a complete loss of such investment;

(viii)     The undersigned or the undersigned's purchaser representative (including the undersigned's professional advisor(s), who is unaffiliated with and is not compensated by the Company or any affiliate or agent of the Company, as the case may be) has such knowledge and experience in financial, tax and business matters so as to enable the undersigned to evaluate the merits and risks of an investment in the Company, to protect the undersigned's own interests in connection with the investment, and to make an informed investment decision with respect thereto;

(ix)     The undersigned is not relying on the Company with respect to the tax and other economic considerations of an investment;

(x)     The undersigned understands and acknowledges that the Units have not been registered under the Securities Act or any state securities law, that transferability of the Unit is restricted under such laws and that consequently the undersigned must bear the economic risks of investment for an indefinite period.  The undersigned will not sell or otherwise transfer the Unit without registration under the Securities Act or applicable state securities laws or an exemption therefrom.  The undersigned represents that the undersigned is purchasing the Unit for the undersigned's own account, for investment and not with a view to or in connection with resale or distribution except in compliance with the Securities Act and applicable state law;

(xi)     The undersigned recognizes that investment in the Company involves substantial risks, including loss of the entire amount of such investment, and has taken full cognizance of and understands all of the risks related to the purchase of the Unit; and

(xii)     The undersigned maintains the undersigned's domicile, and is not merely a transient or temporary resident, at the residence address shown on the signature page of this Subscription Agreement.

(b)     The undersigned represents and warrants as follows:

(i)     *(If applicable, Initial)* _____ My individual net worth, or my joint net worth with my spouse, exceeds US$1,000,000; or

(ii)     *(If applicable, Initial)* _____ My individual income was in excess of Two Hundred Thousand Dollars (US$200,000) in each of the two (2) most recent years, or my joint income with my spouse was in excess of Three Hundred Thousand Dollars

(US$300,000) in each of the two (2) most recent years; and has a reasonable expectation of reaching the same income level in the current year.

      (c)    *(Initial)* _____ The undersigned represents and warrants that the undersigned is not a resident in the United States.

      (d)    *(Initial)* _____ The undersigned hereby agrees to provide such information and to execute and deliver such documents as may reasonably be necessary to comply with any and all laws and ordinances that the Company is subject to, including without limitation, such additional information as the Company may deem appropriate with regard to the undersigned's suitability to invest in the Company.

      (e)    The undersigned acknowledges:

      (i)    In making an investment decision the undersigned has relied on the undersigned's own examination of the Company and the terms of the Offering, including the merits and risks involved.  THESE UNITS HAVE NOT BEEN RECOMMENDED OR APPROVED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.  FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE INFORMATION IN THIS DOCUMENT OR ANY OTHER INFORMATION FURNISHED TO THE UNDERSIGNED.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

      (ii)    The representations, warranties and agreements of the undersigned contained herein and in any other writing delivered in connection with the transactions contemplated hereby are made with the intent that they be relied on by the Company and its General Partner in determining the undersigned's suitability as a purchaser of a Unit, shall be true and correct in all respects on and as of the date of the acceptance of the subscription, as if made on and as of such date, and shall survive the execution and delivery of this Subscription Agreement and the purchase of the Unit.

      (f)    Upon the Company's acceptance of this Subscription by admitting the undersigned to the Company and receipt of the minimum subscriptions, the undersigned's contribution to the Company deposited herewith may be transferred to the Company.

      **5.**    **INDEMNIFICATION**.  The undersigned agrees to indemnify and hold harmless the Company, its General Partner, and their agents against any and all loss, liability, claim, damage and expense whatsoever (including, without limitation, any and all expenses including attorneys' fees reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon any false representation or warranty or breach or failure by the undersigned to comply with any covenant or agreement made by the undersigned herein or in any other document furnished by the undersigned to any of the foregoing in connection with this transaction, including, without limitation, arising as a result of the sale or distribution of the Unit by the undersigned in violation of the Securities Act or other applicable law.

      **6.**    **IRREVOCABILITY, BINDING EFFECT, ENTIRE AGREEMENT**.  The undersigned hereby acknowledges and agrees that this Subscription is irrevocable by the

undersigned, that, except as required by law, the undersigned is not entitled to cancel, terminate or revoke this Subscription Agreement or any agreements of the undersigned hereunder and that this Subscription Agreement and such other agreements shall survive the death or disability of the undersigned and shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives and permitted assigns.  This Subscription Agreement, the Memorandum, and the Company's Limited Partnership Agreement sets forth the entire agreement and understanding among the parties hereto with respect to the transactions contemplated hereby and supersedes any and all prior agreements and understandings relating to the subject matter hereof.

7.      **MODIFICATION**.  Neither this Subscription Agreement nor any provision hereof shall be waived, modified, discharged or terminated except by an instrument in writing signed by the party against whom any such waiver, modification, discharge or termination is sought.

8.      **NOTICES**.  Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be mailed by certified mail, return receipt requested, sent by reputable overnight delivery service, or be personally delivered to the party to whom it is to be given (a) if to the Company, at the address set forth above; or (b) if to the undersigned, at the address set forth on the signature page hereof (or, in either case, to such other address as the party shall have furnished in writing in accordance with the provision of this Section 8).  Any notice or other communication given by certified mail shall be deemed given two (2) business days after deposit in the mail, one (1) business day after deposit with a reputable overnight delivery service, or on personal delivery, except for a notice changing a party's address, which shall be deemed given at the time of receipt thereof.

9.      **ASSIGNABILITY**.  This Subscription Agreement and the rights and obligations hereunder are not transferable or assignable by the undersigned.

10.     **APPLICABLE LAW**.  This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of California as applied to residents of California executing contracts wholly to be performed in California.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement.

__Yixuan WANG__
Subscriber Name (Please Print)

_____
Subscriber Name (Please Print)
[If more than one]

Fill in Mailing Address only if different
from Resident Address:

█████████████████
Resident Address

Same as residential address
Mailing Address

█████████████████
City, State, Country, Zip Code

_____
City, State, Zip Code

State in which Subscription Agreement signed
if other than state of residence:

_____

王奕骢
Signature of Investor(s) (individual)

State and date of organization, if entity:

_____

_____
Signature of Investor(s) (individual), [if more
than one]

**Total Amount of Investment:**

$   500,000.00

Number of Units: One (1)

## SUBSCRIPTION ACCEPTANCE

The forgoing subscription is accepted for One (1) Unit of Limited Partnership Interest for a total aggregate purchase price of $500,000.00, effective as of April 18, 2014.

GSRV-VTI, LP

By:    Golden State Renaissance
       Ventures, LLC
       its General Partner

By:   _____
       Eric Chelini
       its Managing Member

015001.0002\1479856.1   Yixuan WANG

# EXHIBIT D

# EXHIBIT D

**LIMITED PARTNERSHIP AGREEMENT**
**OF**
**GSRV-VTI, LP**

*A California Limited Partnership*

This Limited Partnership Agreement is entered into as of [January 15th, 2015], by and among the parties described in Section 1.1, as listed in **Schedule A** hereto.

1.    <u>Parties and Formation</u>

      1.1    <u>Parties</u>.  The parties to this Agreement and the partners of the Partnership are:

General Partner:    GSRV-VTI Management LLC, a California limited liability company;

Limited Partners:    Those persons who have received, reviewed and completed the Investment Documents, and whose Subscription Agreements with the Partnership have been accepted by the General Partner on behalf of the Partnership (each of such persons having executed a counterpart of this Agreement personally) for a subscription amount of Five Hundred Thousand Dollars ($500,000), all as reflected in the records of the Partnership (such persons being herein sometimes called, collectively, "Limited Partners" and, individually, a "Limited Partner").  The Limited Partners are at times collectively referred to as the "Limited Partners."  In addition, the General Partner, and the Limited Partner(s) are at times collectively referred to as the "Partners."

      1.2    <u>Formation</u>.  The General Partner has formed a limited partnership (the "Partnership") under the Act by filing a certificate of limited partnership of the Partnership.  The Partners agree that the General Partner shall file or record any additional, supplemental or amended certificates of limited partnership and like documents as the General Partner may deem necessary or advisable in accordance herewith.  The Partners agree further that they shall comply with the requirements and provisions of the Act, which shall govern the rights and liabilities of the Partners, except as otherwise provided in this Agreement.

2.    <u>Name</u>.  The name of the Partnership shall be, and its business shall be conducted under the name, GSRV-VTI, LP.

3.    <u>Term</u>.  The Partnership began on the date a certificate of limited partnership of the Partnership was first filed in the Office of the Secretary of State of the State of California, and shall continue until indefinitely or until terminated in accordance with this Agreement.

- 1 -

4.      Addresses.

4.1      Partnership and General Partner.  The principal place of business and principal executive office of the Partnership shall be the office of the General Partner at set forth at the end of this Agreement, or such other place or places as the General Partner may from time to time designate by notice to each Limited Partner.  The Partnership may also maintain such other offices at such other places as the General Partner may deem advisable.  Notwithstanding the foregoing provisions of this section 4.1, the Partnership shall continuously maintain an office in California at which shall be kept the records required by section 10.

4.2      Limited Partners.  The address of each Limited Partner is set forth in such Limited Partner's Subscription Agreement.  A Limited Partner may change such address by notice to the General Partner, which notice shall become effective on receipt or such later time as such notice may specify.

4.3      Agent for Service of Process.  The agent for service of process of the Partnership shall be the General Partner, whose address is set forth at the end of this Agreement.  The General Partner may change such agent for service of process or such address from time to time in the manner provided by applicable law; provided that the Partnership shall continuously maintain in California an agent for service of process on the Partnership.

5.      Certain Definitions.  Any terms used in this Agreement, which are not defined in this section 5 or elsewhere herein, shall have the meanings assigned to them in the Investment Documents.  As used in this Agreement, the following terms shall have the meanings indicated:

5.1      "Act" means the California Uniform Limited Partnership Act of 2008, as amended.

5.2      "Affiliate" means, with reference to a specified person, any person directly or indirectly controlling, controlled by or under common control with the specified person, a person owning or controlling ten (10%) percent or more of the outstanding voting securities of the specified person, a person ten (10%) percent or more of whose outstanding voting securities are owned or controlled by the specified person, any officer, director or general partner or trustee of the specified person, and if the specified person is an officer, director, general partner or trustee, any corporation, partnership or trust for which the specified person acts in any such capacity.

5.3      "Asset Management Fee" means the compensation payable to the General Partner for its services in managing the assets, business and affairs of the Partnership as set forth in section 12.1.

5.4      "Asset(s)" are described and defined in section 6 of this Agreement.

5.5      "Capital Account" means the Capital Account established as provided in Section 10.3(a) as may be adjusted from time to time pursuant to Section 10.3:

5.6 "Capital Contribution" means a cash investment in, services, or assets contributed to the Partnership by a Partner, whether initially contributed or subsequently contributed as permitted herein, but excluding loans designated as such.

5.7 "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

5.8 "Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable under the Code with respect to an asset for such Fiscal Year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis.

5.9 "Expenses" shall be those costs set forth in section 11.3, and for the purposes of this definition shall include the Asset Management Fee payable to the General Partner.

5.10 "Fiscal Quarter" means the period commencing on the date the Partnership commences business and ending on the succeeding March 31, June 30, September 30 or December 31, as the case may be, each period thereafter of three calendar months ending on any March 31, June 30, September 30 or December 31, or the period from the January 1, April 1, July 1 or October 1, as the case may be, preceding the date of dissolution and termination of the Partnership and ending on the date of dissolution and termination of the Partnership.

5.11 "Fiscal Year" means the period commencing on the date the Partnership commences business or commencing on any subsequent January 1, and ending on the succeeding December 31, or, if earlier, ending on the date of dissolution and termination of the Partnership.

5.12 "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a) The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, determined as provided in section 10.6;

(b) The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, determined as provided in section 10.6, as of the following times: (i) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership property, unless all Partners receive simultaneous distributions of undivided interests in the distributed property in proportion to their respective Ownership Percentages; (iii) the last day of each Fiscal Quarter; and (iv) a liquidation within the meaning of Regulations section 1.704-1(b)(2) (ii)(g);

(c)     The Gross Asset Value of any Partnership property distributed to any Partner shall be the gross fair market value of such Partnership property, determined as provided in section 10.6, on the date of distribution;

(d)     The Gross Asset Value of any Partnership property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such Partnership property pursuant to Code section 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this section 5.12(d) to the extent that the General Partner determines that an adjustment pursuant to section 5.12(b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this section 5.12(d); and

(e)     If the Gross Asset Value of an asset has been determined or adjusted pursuant hereto, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses, and Capital Accounts shall be adjusted in accordance with Regulations section 1.704-1(b)(2)(iv)(g) and the Partners' distributive shares of depreciation, depletion, amortization, gains and Losses for tax purposes with respect to such property shall be determined to take account of the variation between the adjusted tax basis and the Gross Asset Value of such property in the same manner as under Code section 704(c).

5.13     "ICA" means the United States Investment Company Act of 1940, as amended.

5.14     "Investment Documents" means those documents, which were submitted by the General Partner to the Limited Partners for the purpose of evaluating the prospect of investing in this Partnership, including (without limitation) that certain Subscription Agreement (see section 5.25), Private Offering Memorandum, and this Agreement.

5.15     "Majority in interest of the Limited Partners" means Limited Partners whose Ownership Percentages, on the first day of the Fiscal Quarter during which such majority is to be determined, aggregate more than fifty (50%) percent of the Ownership Percentages on such date of all Limited Partners.

5.16     "Management Company" means a company, which the General Partner may hire to assist in managing the Assets, or the business of the Partnership.

5.17     "Outside Accountants" means the independent public accountants regularly engaged by the Partnership to compile, review or audit its financial statements or prepare its tax returns.

5.18     The "Ownership Percentage" of a Partner at any date means the percentage computed by dividing that Partner's Capital Account balance at that date by the aggregate of all Partners' Capital Account balances at that date.

5.19     "Priority Return" means, with respect to each Partner, a sum equal to ten percent (10%) of each Partner's Capital Contribution.

- 4 -

5.20     "Profit Allocation" means the Profit Allocation as defined in section 10.4(b).

5.21     "Profits" and "Losses" mean for each Fiscal Year, Fiscal Quarter or other period, an amount equal to the Partnership's taxable income or loss for such Fiscal Year, Fiscal Quarter or other period, determined in accordance with Code section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Partnership that is exempt from Federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this section 5.21 shall be added to such taxable income or loss;

(b)     Any expenditures of the Partnership described in Code section 703(a)(2)(b) or treated as Code section 705(a)(2)(b) expenditures  pursuant to Regulations section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits and Losses pursuant to this section 5.21 shall be subtracted from such taxable income or loss;

(c)     If the Gross Asset Value of any Partnership asset is adjusted pursuant to section 5.12(b) or 5.12(d), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

(d)     Gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Partnership property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with section 5.8; and

(f)     Notwithstanding any other provision of this section 5.21, any items that are specially allocated pursuant to section 10.5(b) shall not be taken into account in computing Profits and Losses.

5.22     "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

5.23     "Securities" means securities, repurchase agreements and other intangible investment instruments and vehicles of every kind and nature, whether publicly or non-publicly traded, including, without limitation, stocks, notes, bills, bonds, debentures, subscriptions, options, rights, warrants, certificates of deposit, trust receipts, American Depositary Receipts, International Depositary Receipts, equipment trust certificates, interests in partnerships, certificates of interest or participation in any profit-sharing agreement, collateral trust certificates, bankruptcy claims, investment contracts, evidences of indebtedness and derivatives.

5.24    "Subpartnership" means any partnership, limited liability company or other similar entity in which the Partnership has an interest, which will generally be used to acquire an Asset.

5.25    "Subscription Agreement" means any subscription agreement prescribed by the General Partner as a condition precedent to becoming a Limited Partner.

5.26    "Tax Matters Partner" means the tax matters partner appointed by the General Partner for the Partnership, as such term is defined in Code section 6231(a)(7).

5.27    The "Unrecouped Losses" of a Limited Partner shall be all Losses allocated to such Limited Partner reduced (but not below zero) by all Profits allocated to that Limited Partner in the same Fiscal Year that the Losses are so allocated or allocated to such Limited Partner in any subsequent Fiscal Year; provided, however, that if a Limited Partner withdraws capital from the Partnership, such Limited Partner's Unrecouped Losses shall be reduced by multiplying those Unrecouped Losses by a fraction, the numerator of which is the balance of the withdrawing Limited Partner's Capital Account immediately after the withdrawal and the denominator of which is the balance of the withdrawing Limited Partner's Capital Account immediately before the withdrawal.

5.28    "Unreturned Capital" on any date means, as to any Partner, an amount equal to the excess, if any, of (i) the aggregate Capital Contributions of such Partner as of such date, over (ii) the aggregate distributions made to such Partner pursuant to section 9.3 of this Agreement as of such date.

6.    <u>Investment Activities of the Partnership</u>.  The primary objectives of the Partnership are to invest in Vertebral Technologies, Inc. ("VTI") by acquiring shares of common and/or preferred stock of VTI ("Asset"); advance the strict social criteria of the East Bay Regional Center; and assist in the qualification of the Limited Partners seeking lawful conditional and permanent residence ("Green Card") in the United States through the U.S. Citizenship and Immigration Service's ("USCIS") "EB-5 Immigrant Investor" visa program (the "EB-5 Program"), in accordance with the confidential Private Offering Memorandum of the Partnership dated _____, 2012, and all exhibits and supplements, if any, thereto (the "Memorandum").  To these ends, the Partnership may enter into, make and perform all contracts, agreements and other undertakings and engage in all activities and transactions, as the General Partner may consider necessary or advisable to carry out the foregoing objectives and purposes.

7.    <u>Other Activities</u>.  The General Partner shall directly, or through the Management Company, devote to the Partnership such time as may be necessary for the proper performance of its duties hereunder, and the Partners acknowledge that the General Partner and its Affiliates currently engage other various for profit activities and will continue to engage in such activities including, without limitation, acquisition, financing, development and management activities. Such for profit business activities may include the formation of other similar private equity projects.  Any Partner and such Partner's Affiliates may engage in any activities, whether or not related to the business of the Partnership, and the Partners specifically recognize that some or all of them and their Affiliates are engaged in various aspects of a for-profit business.  Such Partners may continue, or initiate further, such activities.  Each Partner agrees that any Partner and any

- 6 -

Affiliate of any Partner (a) may engage in or possess an interest, direct or indirect, in any business venture of any nature or description for such Partner's own account, independently or with others, including, without limitation, any business, industry or activity in which the Partnership may be interested in investing or may also have investments and (b) may do so without any obligation to report the same to the Partnership or any Partner or to afford the Partnership or any Partner any opportunity to participate therein. Neither the Partnership nor any Partner shall have any right in or to any such independent venture or investment or the revenues or profits derived therefrom.

8. <u>Waiver of Conflicts</u>. The fact that any Partner, or any Affiliate of any Partner, or a member of such Partner's family, is employed by, or is directly or indirectly interested in or connected with, any person or entity employed or engaged by the Partnership to render or perform a service, or from whom the Partnership may make any purchase, or to whom the Partnership may make any sale, or from or to whom the Partnership may obtain or make any loan or enter into any lease or other arrangement, shall not prohibit the Partnership from engaging in any transaction with such person or entity, or create any additional duty of legal justification by such Partner or such person or entity beyond that of an unrelated party, and neither the Partnership nor any other Partner shall have any right in or to any revenues or profits derived from such transaction by such Partner, Affiliate, person or entity.

9. <u>Capital</u>.

9.1 <u>Limited Partners' Contributions</u>. The Partnership is authorized to offer and sell a limited number of limited partner interests in the Partnership (consistent with the Memorandum, in which such interests are defined as "Units"). Each Limited Partner has made a Capital Contribution in the amount set forth in such Limited Partner's Subscription Agreement, as of the date such Subscription Agreement was accepted by the General Partner on behalf of the Partnership. The General Partner may establish such minimum initial and additional Capital Contribution as it deems appropriate and that minimum may thereafter be waived or changed in the exclusive discretion of the General Partner. As of the first day of any Fiscal Quarter, any Limited Partner may, with the consent of the General Partner, make an additional Capital Contribution in an amount deemed appropriate by the General Partner. With the consent of the General Partner, a Limited Partner may make additional Capital Contributions at times and in amounts other than those set forth above and, in such cases, the General Partner shall, with the advice of the Outside Accountants, cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement. Initial or additional Capital Contributions by a Limited Partner pursuant to this section 9.1 shall not require any consent or approval of any other Limited Partner. The General Partner shall have the sole authority to accept a Subscription Agreement or an additional Capital Contribution as of a date prior to the date the Capital Contribution is actually made, if the General Partner determines that deeming such Capital Contribution to have been made as of an earlier date will not have a material adverse effect on the Limited Partners generally.

9.2 <u>General Partner's Contributions</u>. The General Partner shall contribute additional Capital Contributions, or not, in its sole discretion.

- 7 -

      9.3     <u>Withdrawal, Distributions, and Return of Capital</u>.

      (a)     <u>Withdrawals</u>.  Although the Partnership may make distributions to the Partners during the term of the Partnership in return of their Capital Contributions, no Partner, in such Partner's capacity as such, shall have the right to withdraw or to demand a return of any of such Partner's Capital Contribution or Capital Account without the consent of the General Partner (and, in the case of the General Partner, without the consent of a Majority in interest of the Limited Partners (excluding for such purposes any Limited Partner who is an Affiliate of the General Partner)), except upon dissolution and winding up of the Partnership; provided, however, that a termination and reconstitution of the Partnership under Section 708 of the Code and related Treasury Regulations shall not be considered a dissolution or winding up of the Partnership for purposes of this section 9.3.  Except to the extent otherwise provided herein, any return of such Capital Contribution or Capital Account shall be made solely from the assets of the Partnership (including the Capital Contributions of the Partners) and only in accordance with the terms of this Agreement, and no Partner shall have personal liability for the return of any other Partner's capital under this Agreement. Under circumstances requiring a return of any Capital Contribution, no Partner shall have the right to receive property other than cash except as may be specifically provided in this Agreement and, to the extent any monies which any Partner is entitled to receive pursuant to this Agreement or the Act, would constitute a return of capital, each of the Partners consents to the withdrawal of such capital.

      (b)     <u>Distributions</u>.  The General Partner, in its exclusive discretion, shall determine the amount, timing, and means of all distributions by the Partnership. Except as otherwise provided in 9.3(c) below, and elsewhere in this Agreement, all distributions shall be made in proportion to the Partners' respective Ownership Percentages as of the end of the Fiscal Quarter preceding the date of the distribution.  Any distributions in kind shall be made at valuations determined as provided in section 10.6.

      (c)     <u>Distributions to Limited Partners Upon Dissolution</u>.  The provisions of section 9.3(b) notwithstanding, in the event of dissolution as set forth in section 17, the General Partner shall make distributions to the Limited Partners in an amount equal to their respective Unreturned Capital Account(s) as of the Fiscal Period (as defined in section 10.4) prior to making any other distributions pursuant to the liquidation of the Assets or distribution of any Partnership assets under section 17.2.

      (d)     <u>Withholding Distributions</u>.  Each Partner acknowledges and agrees that the Partnership may be required to deduct and withhold tax or to fulfill other obligations of such Partner on any distribution under this section 9.3.  All amounts withheld with respect to distribution to a Partner shall be treated as amounts distributed to such Partner for all purposes under this Agreement as of the effective date of any distribution.

      (e)     <u>Restrictions on Withdrawals and Distributions</u>.  The foregoing provisions of this section 9.3 notwithstanding, no distribution shall be made (i) if such distribution would violate any contract or agreement to which the Partnership is then a party or any law then applicable to the Partnership, including without limitation, U.S. immigration laws, regulations and USCIS interpretations relating to the EB-5 Program, or (ii) to the extent that the General Partner, in its exclusive discretion, determines that it is necessary or advisable for the

015001.0002\1479857.3

Partnership to retain any amount otherwise distributable to pay, or to establish a reserve for the payment of, any liability or obligation of the Partnership, whether known or unknown, liquidated, fixed, contingent or other.

9.4     Deposit of Contributions.  Anything in this Agreement to the contrary notwithstanding, all Capital Contributions shall be paid into the Partnership's assets in a manner designated by the General Partner (in its exclusive discretion), and shall not be paid to the General Partner.  Any such payment may be made by check payable to the Partnership's account or by wire transfer to the Partnership's account according to wire transfer instructions furnished by such custodian.

9.5     Partnership Records of Capital Contributions, Withdrawals and Distributions.  On each contribution, withdrawal or distribution of capital as contemplated by this Agreement, the General Partner shall cause the Partnership's records to reflect accurately such contribution, withdrawal or distribution.

9.6     No Interest.  No Partner shall be entitled to receive from the Partnership payment of any interest on any Capital Contribution.

9.7     No Other Contributions.  Without the consent of all Partners, no Partner shall contribute any funds or other property to the capital of the Partnership except as is expressly required or permitted by this Agreement.

9.8     Additional Limited Partners.  After the date hereof, the General Partner may admit any additional person or entity to the Partnership as a Limited Partner as provided in section 9.1 and no consent of any other Limited Partner shall be required for such admission.

9.9     Repurchase of Limited Partnership Interests.  If the USCIS denies a Limited Partner's Form I-526 Petition, the Limited Partner may, within thirty (30) days after issuance of Notice of such denial, request the repurchase of his or her Limited Partnership Interest by the Company at the amount of the original Capital Contribution, less any wire transfer fees.  The repurchase price shall be payable within ninety (90) days after receipt of the repurchase request.

10.     Profits and Losses.

10.1     Books.  The General Partner shall maintain complete and accurate accounts in proper books of all transactions of or on behalf of the Partnership and shall enter or cause to be entered therein a full and accurate account of all transactions on behalf of the Partnership.  The Partnership's books and accounting records shall be kept in accordance with such accounting principles (which shall be consistently applied throughout each accounting period) as the General Partner may determine to be convenient and advisable.

10.2     Accountings.  As soon as is reasonably practicable after the close of each Fiscal Year, and in any event within ninety (90) days after the end of such Fiscal Year, the General Partner shall make or cause to be made a full and accurate inventory and accounting of the affairs of the Partnership as of the close of that Fiscal Year and shall prepare or cause the Outside Accountants to prepare a balance sheet as at the end of such Fiscal Year, a profit and

- 9 -

loss statement for that Fiscal Year and a statement of Partners' equity showing the respective Capital Accounts of the Partners as of the close of such Fiscal Year and the distributions, if any, to Partners during such Fiscal Year, and any other statements and information necessary for a complete and fair presentation of the financial condition of the Partnership, all of which the General Partner shall furnish to each Partner requesting the same.  In addition, the General Partner shall furnish to each Partner information regarding the Partnership necessary for such Partner to complete such Partner's Federal and state income tax returns, including a copy of the Partnership's tax returns and K-1 (including a balance sheet of the Company as of the last day of the applicable period), a statement of income or loss for the Company for such period, and a statement of the Company's cash flow for such period.  On such accounting being made, Profits and Losses during such Fiscal Year shall be ascertained and credited or debited, as the case may be, in the books of account of the Partnership to the respective Partners as herein provided.

10.3   Capital Accounts.  An individual Capital Account shall be established for each Partner and maintained in accordance with the provisions following.

10.4   Allocations.  After giving effect to the special allocations set forth in section 10.5, Profits and Losses shall be allocated to the Partners as of the following measuring periods: (w) the Fiscal Year end; (x) the period ending on the date of the closing of any additional Capital Contributions; (y) the period ending on the date of any distribution to any Partner(s); and (z) the period ending on any other date deemed appropriate by the General Partner (each such period a "Fiscal Period") as set forth below.

(a)   In the case of Losses, such Losses for each Fiscal Period shall be allocated to the Partners in proportion to their respective Ownership Percentages as of the first day of such Fiscal Period.

(b)   In the case of Profits, such Profits in each Fiscal Period shall be allocated as follows (the "Profit Allocation"): (i) first, to the Partners, in an amount sufficient to reverse the amount of any then outstanding Unrecouped Losses allocated to the Partners in the current and prior fiscal years; (ii) second, to the Partners in proportion to their Priority Returns, until the amount allocated pursuant to this section 10.4(b)(ii) is equal to the Priority Returns for all Partners; and (iii) third, (a) thirty percent (30%) to the General Partner and (b) seventy percent (70%) pro rata to the Partners based on their Ownership Percentages as of the first day of the Fiscal Period.

(c)   Anything herein to the contrary notwithstanding, any recapture under applicable tax laws shall be allocated to the Partners in the same proportions as the item generating the recapture shall have been allocated.  The General Partner, in its discretion, may waive all or any portion of the Profit Allocation with respect to any Limited Partner in any Fiscal Year.

(d)   The allocations under this section 10.4 shall be adjusted accordingly and consistent with the terms set forth in section 10 where: (i) there is a distribution to Limited Partners under section 9.3(c), and (ii) the total value of the combined unpaid Capital Accounts of the Partners plus the unpaid Asset Management Fee exceeds the total dissolution proceeds as set forth in section 17.2.

- 10 -

10.5    Special Allocations.  Notwithstanding the allocation provisions of section 10.4, the following special allocations shall be made in allocating Profits and Losses in the following order:

(a)    Section 704(b) Allocations.  Any special allocations necessary to comply with the requirements set forth in section 704(b) of the Code and the corresponding Regulations shall be made, including the qualified income offset and minimum gain chargeback provisions contained therein.

(b)    Tax Allocations.

(i)    Subject to section 10.5(c)(ii) below, in each Fiscal Year, items of income, deduction, gain, loss or credit that are recognized for income tax purposes shall be allocated among the Partners, General and Limited, in such manner as to reflect equitably amounts credited to or debited against the Capital Account of each Partner, whether in such Fiscal Year or in prior Fiscal Years.  To this end, the Partnership shall establish and maintain records that shall show the extent to which the Capital Account of each Partner shall, as of the last day of each Fiscal Year, be comprised of amounts that have not been reflected in the taxable income of such Partner.  To the extent deemed by the General Partner to be feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits.

(ii)    Notwithstanding any of the foregoing provisions to the contrary, if a Partner withdraws capital during a Fiscal Year, the General Partner, in its exclusive discretion, may elect to make allocations of taxable income and loss as follows:

(A)    Taxable income may first be allocated to each Partner who has withdrawn all or part of such Partner's Capital Account in that Fiscal Year, to the extent that such withdrawal exceeds such Partner's adjusted tax basis in such Partner's interest in the Partnership immediately prior to such withdrawal.  If more than one Capital Account has been so withdrawn in full or in part, such allocations, if made, shall be made to the extent of and in proportion to such differences;

(B)    Taxable loss may first be allocated to each Partner who has withdrawn all of such Partner's Capital Account in that Fiscal Year, to the extent that such Partner's adjusted tax basis in such Partner's interest in the Partnership exceeds that Capital Account immediately prior to such withdrawal.  If more than one Capital Account has been so withdrawn, such allocations, if made, shall be made to the extent of and in proportion to such differences; and

(C)    Taxable income and loss may thereafter be allocated as provided in section 10.5(c)(i).

The General Partner, in its sole discretion, may cause the Partnership to make the election to adjust the basis of Partnership property under Code section 754.  In any year in which the Code section 754 election is in effect, this section 10.5(b)(ii) shall be null and void.

(iii)     Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this section 10.5(c) are solely for purposes of Federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Capital Account or share of Profits, Losses or other items of any Partner, or distributions to any Partner, pursuant to any provision of this Agreement.

(c)     <u>Other Allocation Rules</u>.

(i)     Generally, all Profits and Losses shall be allocated among the Partners as provided in section 10.4 and this section 10.5.  If Partners are admitted to the Partnership on different dates during any Fiscal Year, the Profits (or Losses) allocated among the Partners for each such Fiscal Year shall be allocated in proportion to their respective Capital Accounts from time to time during such Fiscal Year in accordance with Code section 706, using any convention permitted by law and selected by the General Partner.

(ii)     For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the General Partner using any permissible method under Code section 706 and the Regulations thereunder.

(iii)     The Partners are aware of the income tax consequences of the allocations made by section 10.4 and this section 10.5 and hereby agree to be bound by section 10.4 and this section 10.5 in reporting their shares of Profits and Losses for income tax purposes.

(iv)     Notwithstanding any of the foregoing provisions to the contrary, if taxable gain to be allocated includes income resulting from the sale or disposition of Partnership property or property of a limited partnership or joint venture in which the Partnership owns an interest that is treated as ordinary income, such gain so treated as ordinary income shall be allocated to and reported by each Partner in proportion to allocations to that Partner of the items that gave rise to such ordinary income, and the Partnership shall keep records of such allocations.  In the event of the subsequent admission of any new Partner, any item that would constitute "unrealized receivables" under Code section 751 and the Regulations thereunder shall not be shared by the newly admitted Partners, but rather shall remain allocated to existing Partners.

(d)     <u>Provisional Allocation</u>.  If any amount claimed by the Partnership to constitute a deductible expense in any Fiscal Year is treated by any federal, state or local taxing authority as a payment made to a Partner in such Partner's capacity as a member of the Partnership for income tax purposes, with regard to such authority, items of income and gain of the Partnership for such Fiscal Year shall first be allocated to such Partner to the extent of such payment.

10.6   <u>Valuation</u>.  The value of any assets or liabilities of the Partnership shall be determined in good faith by the General Partner, and such determination shall be conclusive and binding on all of the Partners and all parties claiming through or under them.

10.7    Bank and Other Accounts.  All funds of the Partnership shall be deposited and maintained in one or more accounts in the name of the Partnership at such bank or banks or other financial institutions (including, without limitation, money market mutual funds and securities brokerage firms) as may from time to time be selected by the General Partner.  Subject to section 11.3, withdrawals from any such account or accounts shall be made only by written instrument signed by or on behalf of the General Partner.

11.    General Partner's Asset Based Management Fee, Acquisition Fees and Expenses. No fee or expense referenced in this Section 11 shall be paid from any Capital Contribution made by a Limited Partner who is also an EB-5 Investor.  Such fees and expenses shall be payable from available cash flows and/or from any other lawful source, at the General Partner's discretion.

11.1    Asset Based Management Fee.  As compensation for its services in managing the assets, business and affairs of the Partnership, the General Partner is entitled to receive from the Partnership an Asset Management Fee of five percent (5%) (1.25% per Fiscal Quarter) of the Capital of the Partnership per year.  The Asset Management Fee described above, shall be calculated from the aggregate Capital Account balances of the Partners as of the last day of the preceding Fiscal Quarter, and may be accrued without interest when Partnership funds are not available for its payment.  Each quarterly payment shall be equal to one fourth of the above stated Asset Management Fee.  The measuring period for the payment of the Asset Management Fee shall begin for each Partner as of the date such Partner's Subscription Agreement was accepted by the General Partner on behalf of the Partnership, or upon the date that a Partner makes a Capital Contribution, whichever is later.

11.2    Acquisition Fees.  The General Partner is expressly authorized for, in the name of and on behalf of the Partnership, to pay to the General Partner an acquisition fee equal to (x) one percent (1%) of the total purchase price paid by the Partnership for the purchase of any Assets and (y) one percent (1%) of the purchase price paid by any Subpartnership for the purchase of any Assets multiplied by the Partnership's direct or indirect interest in such Subpartnership (the "Acquisition Fee").

11.3    Expenses.

(a)    Normal Operating Expenses of General Partner.  Except as set forth below, the General Partner shall bear all routine, normal operating expenses associated with duties and services of its operations on the terms and conditions herein set forth.  Routine, normal operating expenses include compensation and expenses of the officers and employees of the General Partner and of members of the General Partner including salaries and benefits of any officers and employees and members of the General Partner, and fees and expenses for administrative, bookkeeping, clerical and related support services, insurance, office space and facilities, utilities, telephone, copy and costs of the General Partner.

(b)    Expenses of the Partnership.  The Partnership shall pay or reimburse the General Partner for all costs and expenses incurred by or on behalf of the Partnership or for its benefit, including, without limitation, any sales or other taxes which may be assessed against the Partnership; the costs and expenses, including, without limitation,

- 13 -

reasonable travel and out-of-pocket travel related expenses, commissions, brokerage fees, closing costs, fees and expenses of appraisers, accountants, engineers, architects, specialists, lawyers and other service providers, investment banking fees or similar charges, or interest expense for borrowed money (if any); any indemnification expenses and costs pursuant to section 12.4 hereof; liquidation expenses of the Partnership; expenses attributable to normal and extraordinary investment banking, accounting, appraisal, legal, custodial, and registration services provided to the Partnership, including services with respect to the proposed purchase or sale of Assets by the Partnership (whether or not any such purchase or sale is consummated); the costs of appropriate insurance coverage for the Partnership including, without limitation, premiums for liability insurance to protect the Partnership, the General Partner, and the members and Affiliates of the General Partner in connection with the performance of Partnership activities; interest and taxes related to the purchase, holding or sale by the Partnership of any Asset; costs incurred in registering (or obtaining exemptions from registration for) securities owned by the Partnership with the Securities and Exchange Commission, and any securities exchange or any other similar authority; costs incurred in qualifying and maintaining qualifications of such securities under applicable state "Blue Sky" laws; reports to governmental authorities; the preparation of any audits of the Partnership, and other reports to the Limited Partners; and all other expenses properly chargeable to the activities of the Partnership, including fees payable to third parties in connection with the selection, identification, analysis or evaluation of prospective or consummated investments of the Partnership.

12.   The General Partner.

12.1   Management.  Subject only to the rights of the Limited Partners to consent on specific matters as herein provided, the General Partner shall have full, exclusive and complete authority in the management and control of the business of the Partnership for the purposes herein stated and shall make all decisions affecting the Partnership.  The powers of the General Partner on behalf and at the expense of the Partnership include, but are not limited to:

(a)   Acquisition of any Asset or interest in any Asset, whether the interest of the Partnership is direct or indirect (and including any acquisition of an interest in any Subpartnership or other entity which directly or indirectly owns an interest in any Asset);

(b)   Any sale, lease or other transfer or disposition of any Asset or interest in any Asset, whether the interest of the Partnership is direct or indirect (and including any sale or other transfer or disposition of an interest in any Subpartnership or other entity which directly or indirectly owns an interest in any Asset), or any other material Partnership Assets;

(c)   Any borrowing, lending or other loan transaction, and entering into any material agreement, contract or other obligation; provided that any borrowing by the Partnership or by any Subpartnership shall be nonrecourse to the Partners (except for customary carve-outs, including without limitation, carve-outs making the General Partner liable personally in the event of fraud or waste);

(d)   The adjustment, settlement or compromise of any claim, obligation, debt, demand, suit or judgment against the Partnership;

- 14 -

(e)     The retention of key employees and the selection of any consultant or law or accounting firm to act on behalf of or provide services to the Partnership;

(f)     The establishment of, and the withdrawal from, commercially reasonable reserves;

(g)     Any other decision or action that under this Agreement is required, advisable, or in the best interests of the Partnership;

(h)     Monitoring the ongoing performance of the Partnership's investments, and providing to the Partners material information and reports referencing such investments;

(i)     Subject to clause (c) above, executing, in furtherance of any or all decisions of the General Partner, any mortgage, deed of trust, security agreement, deed, lease, promissory note, bill of sale, contract or other instrument purporting to convey or encumber the real or personal property of the Partnership, including without limitation the encumbering of Partnership property to secure loans made to any partnership, joint venture or other entity in which the Partnership has an interest;

(j)     Carrying out contracts necessary to, in connection with, or incidental to the accomplishment of the purposes of the Partnership, to the fullest extent as may be lawfully carried on or performed by a partnership under the laws of each state in which the Partnership is then formed or qualified.

12.2    <u>Exceptions</u>.  Notwithstanding anything to the contrary in section 12.1, the General Partner shall only take direct possession or custody of Securities held for the account of the Partnership following the favorable opinion of counsel to the General Partner, or other legal counsel and/or financial adviser, as appropriate.

12.3    <u>Power to Bind</u>.  The General Partner shall have exclusive authority to bind the Partnership in making contracts and incurring obligations in the name and on the credit of the Partnership in the ordinary course of the Partnership's business and otherwise within the scope of authority as herein provided.

12.4    <u>Indemnity and Limitation of Liability</u>.  The General Partner, any Affiliate of the General Partner and any person acting on the behalf of the General Partner or such Affiliate (an "indemnified person") (a) shall be held harmless, defended and indemnified by the Partnership for any cost, claim, judgment, amounts expended in settlement, liability or loss (including attorneys' fees and expenses) suffered by an indemnified person solely by virtue of such indemnified person's acting as or on behalf of the General Partner for the Partnership in connection with the Partnership's activities and (b) shall not be liable to the Partnership for any cost, claim, judgment, amounts expended in settlement, liability or loss suffered in connection with the Partnership's activities; provided that, if such cost, claim, judgment, amounts expended in settlement, liability or loss arises out of any action or inaction of any such indemnified person, such indemnified person must have determined at the time of such action or inaction, in good faith, that such course of conduct was in the interests of the Partnership, and such course of conduct must not have constituted fraud, bad faith or willful misconduct by such indemnified

- 15 -

person, and provided further that such indemnification or amounts recoverable under the foregoing agreement to hold harmless shall only be recoverable out of the assets of the Partnership and not from the Limited Partners.  The Partnership shall advance funds for legal expenses and other costs incurred by an indemnified person acting at such indemnified person's request as a result of a legal action if the following conditions are satisfied:  (a) the legal action relates to the performance of duties or services by such indemnified person; and (b) the indemnified person that is requesting such advance undertakes to repay the advanced funds to the Partnership in cases in which that indemnified person would not be entitled to indemnification under this section 12.4.  The rights granted under this section 12.4 shall not be affected by, and shall survive, any dissolution or termination of the Partnership and the death, disability, incapacity, withdrawal, insolvency or dissolution of any Partner.

    12.5 <u>Tax Matters Partner</u>.  The General Partner is hereby appointed as the Tax Matters Partner of the Partnership.  The General Partner may, in its exclusive discretion, remove and replace the Tax Matters Partner from time to time.

   13. <u>Rights of Limited Partners</u>.

    13.1 <u>Limited Liability</u>.  No Limited Partner shall be subject to assessment, nor except as may be otherwise required under the Act, shall any Limited Partner be personally liable for any of the debts or liabilities of the Partnership or any of the losses thereof in excess of such Limited Partner's Capital Contributions and any undistributed income attributable to such Limited Partner.

    13.2 <u>Management</u>.  No Limited Partner, as such, shall take part in the management of the business of, or transact any business for, the Partnership or have power to sign for or bind the Partnership to any agreement, oral or written, or any instrument or other document.  Notwithstanding anything herein to the contrary, unless approved by the consent of a Majority in interest of the Limited Partners (subject to the penultimate sentence of this section 13.2), the Partnership shall not:

      (a) Dissolve and wind up, except as provided in section 17.1;

      (b) Merge or consolidate with any other partnership, corporation or other entity;

      (c) Elect to continue the Partnership's business other than under the circumstances described in section 13.2(f);

      (d) Amend this Agreement except as provided in section 19;

      (e) Admit a General Partner to the Partnership other than as provided in section 16 unless the General Partner is admitted under the circumstances described in section 13.2(f); or

      (f) Without the additional consent of all other Limited Partners, admit a General Partner to the Partnership or elect to continue the Partnership's business after the

- 16 -

General Partner ceases to be the General Partner of the Partnership where there is no remaining or surviving General Partner of the Partnership.

Notwithstanding the foregoing provisions of this section 13.2, the General Partner's vote or consent for any of the actions contemplated by section 13.2(a) through section 13.2(e) shall also be required prior to the taking of such action.  The Limited Partners shall not have any voting rights other than as expressly provided in this Agreement.

13.3    Limited Partner Advisory Committee.  The Limited Partners may, upon affirmative vote of the Majority in interest of the Limited Partners, form the Limited Partner Advisory Committee, which committee shall have only such powers as provided under the Act and as are not inconsistent with the express provisions of this Agreement, to consult with and advise the General Partner with respect to policy matters relating to the business of the Partnership.  Such vote shall be held at a meeting of the Limited Partners called by the General Partner in accordance with section 13.9.  Upon formation of the Limited Partner Advisory Committee, the majority of the Limited Partners present at such meeting may then vote to elect an Executive Committee, to be composed of a Chair, one or more Vice Chairs, and up to three (3) at-large members who shall thereafter serve, without compensation, to represent the Limited Partners to the General Partner.  The members of the Executive Committee shall serve for terms of two (2) years, unless they resign or are replaced by vote of a majority of the Limited Partners prior to the end of their terms.  A majority of the Executive Committee may vote to establish procedures and policies of the Limited Partner Advisory Committee and its Executive Committee, and to replace any member of the Executive Committee who resigns with any Limited Partner willing to serve out the term of such person.  Any recommendation, advice or resolution given to the General Partner by the Executive Committee on behalf of the Limited Partner Advisory Committee shall be non-binding and shall not limit or otherwise affect the rights and powers of the General Partner or the Partnership as enumerated herein or under the Act.

13.4    Removal of General Partner.  By affirmative vote of a majority of all Partners determining that the General Partner is in default under this agreement and has failed to cure the default, the General Partner may be removed.  A General Partner may only be in default of this Agreement on the occurrence of any of the following events:

(a)    The Partnership incurs material losses or damages that are attributable to the General Partner's willful misconduct, fraud, gross negligence or intentional and knowing violation of any law;

(b)    The General Partner commits criminal or tortuous embezzlement of funds of the Partnership; or

(c)    The General Partner commits a material and ongoing default of its obligations under this Agreement which is not cured in a timely manner.

(d)    Prior to voting to remove the General Partner, a majority of the Limited Partners must determine that a default as specified herein has occurred, must notify the General Partner in writing of such default and provide the General Partner a reasonable amount

of time to cure the default.  If the General Partner cures the stated default within a reasonable period of time, the General Partner may not be removed.  If a General Partner is removed pursuant to this section, the General Partner's interest in the Limited Partnership shall be deemed to be that of a Limited Partner.

      13.5   <u>Written Consent</u>.  All votes or consents required or permitted to be taken by the Limited Partners shall be taken by a consent in writing, setting forth the action so taken, signed by Partners having not less than the minimum number of votes that would be necessary to authorize or take that action.

      13.6   <u>Records</u>.  The General Partner shall maintain and preserve during the term of the Partnership and for six (6) years thereafter all accounts, books, records and other relevant Partnership documents, including, without limitation, all of the same required by applicable law to be maintained and preserved.  The Partnership shall keep at its office in California all of the same, including, without limitation, all of the following:

      (a)   A copy of the certificate of limited partnership of the Partnership and all certificates of amendment thereto, together with executed copies of any powers of attorney pursuant to which any certificate has been executed;

      (b)   Copies of the Partnership's federal, state and local income tax or information returns and reports, if any, for the five (5) most recent taxable years;

      (c)   Copies of this Agreement and all amendments hereto;

      (d)   Financial statements of the Partnership for the six (6) most recent calendar years; and

      (e)   The Partnership's books and records for at least the current and past three (3) calendar years.

      13.7   <u>Inspection</u>.  On the request of a Limited Partner, the General Partner shall promptly deliver to the Limited Partner, at the expense of the Partnership, a copy of the information required to be maintained by Section 13.6.  Each Limited Partner has the right on reasonable request to inspect and copy, personally or by such Limited Partner's agents or representatives, during normal business hours, any of the Partnership's accounts, books, records and other documents required to be maintained by section 13 and to obtain from the General Partner, promptly after becoming available, copies of the Partnership's federal, state and local income tax or information returns for each year.  The General Partner, however, has the right to keep confidential from Limited Partners for such periods of time as the General Partner deems reasonable any information the disclosure of which the General Partner in good faith believes is not in the best interests of the Partnership or could damage the Partnership or its business, or that the Partnership is required by law or agreement with a third party to keep confidential.  Notwithstanding anything to the contrary in this Agreement or the Act, to the fullest extent permitted by the Act, the General Partner will not provide any Limited Partner with the identity or address of any Limited Partner unless that Limited Partner consents to such disclosure.  The purpose of this provision is to protect the privacy of the Limited Partner.

13.8     Confidentiality of Partnership Information.  The financial statements and other information of the Partnership and other information provided to Limited Partners under this section 13 shall be used by Limited Partners in furtherance of their interests as Limited Partners only and, subject to disclosures required by applicable law, each Limited Partner hereby agrees to maintain the confidentiality of such financial statements and other information provided to such Limited Partner by the Partnership or the General Partner with respect to the Partnership, including, without limitation, the information provided to the Limited Partners by the General Partner (including the financial statements referred to in section 13). Notwithstanding the foregoing, the General Partner understands and acknowledges that certain of the Limited Partners may have fiduciary or other similar obligations to clients or other persons similarly situated and hereby consents to the provision of such information to such persons provided that the Limited Partner providing any information to such persons requires such persons to maintain the confidentiality of such information in accordance with the provisions hereof.  Notwithstanding anything in this Agreement or any other written or oral understanding or agreement to which the parties hereto are parties or by which they are bound, either party (or its representatives, agents or employees) (i) may consult any tax advisor regarding the tax treatment and tax structure of the transaction contemplated by the Memorandum and (ii) may at any time disclose to any person, without limitation of any kind, the tax treatment and tax structure of such transaction and all materials of any kind (including opinions or other tax analyses) that are provided relating to such tax treatment or tax structure.

13.9     Meetings.  No annual or other scheduled periodic meetings are required. However, meetings of the Limited Partners may be called by the General Partner or by not less than ten percent (10%) in interest of the Limited Partners for any matters on which Limited Partners may vote or for which Limited Partner approval or consent is required.  Such meeting shall be called upon not fewer than 10 nor more than 30 days' prior written notice to the Partners, specifying the time, place and purpose of the meeting, or in any other manner consented to by the Limited Partners.  Unless expressly provided otherwise by this Agreement or by the Act, any act or decision done or made at the meeting shall be by the affirmative vote of the Majority in interest of the Limited Partners.

13.10    Amendments.  The General Partner shall promptly furnish to a Limited Partner a copy of any amendment to this Agreement executed by the General Partner pursuant to a power of attorney from the Limited Partner or pursuant to section 19.2.

14.     Nature of Limited Partners' Liabilities for Claims Against the Partnership.  In furtherance of the intent of the parties that each Limited Partner shall be liable to creditors only for such Limited Partner's Capital Contributions and undistributed Profits, (a) the General Partner shall arrange to prosecute, defend, settle or compromise actions at law or in equity at the expense of the Partnership as it may consider necessary to enforce or protect the interests of the Partnership and (b) the General Partner shall satisfy any judgment, decree, decision or settlement under the terms of which the Partnership (or the General Partner, or any Affiliate of the General Partner, on behalf of the Partnership) is obligated to pay any amounts, first, out of available proceeds of any insurance of which the Partnership is the beneficiary, next, and finally out of Partnership assets and income.

15.     Costs of Special Services.  Any costs incurred in connection with special services requested by a Limited Partner will be required to be paid by that Limited Partner.  Such services would include, for example, those that would benefit the Limited Partner but would not benefit the Partnership, such as a special evaluation or financial accounting for the purposes of estate valuation.

16.     Withdrawal of General Partner; Additional and Successor General Partner.

16.1     Withdrawal, Etc.  A person shall cease to be a General Partner on the happening of any of the following events:

(a)     Such person withdraws as a General Partner by notice to the Partnership;

(b)     An order for relief against such person is entered under Chapter 7, Chapter 11 or Chapter 13 of federal bankruptcy law, or such person makes a general assignment for the benefit of creditors, files a voluntary petition under federal bankruptcy law, files a petition or answer seeking for such person any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such person in any proceeding of this nature, or seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of such person or all or any substantial part of such person's properties;

(c)     Sixty (60) days after the commencement of any proceeding against such person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, the proceeding has not been dismissed or if within sixty (60) days after the appointment with such person's consent or acquiescence of a trustee, receiver or liquidator of such person or of all or any substantial part of such person's properties, the appointment is not vacated or stayed or within sixty (60) days after the expiration of any stay, the appointment is not vacated;

(d)     If such person is a corporation, partnership or limited liability company, the dissolution of such person; or

(e)     If such person is a natural person, either his death or the entry by a court of competent jurisdiction of an order adjudicating him incompetent to manage his person or estate.

Notwithstanding the foregoing provisions of this section 16.1, a person who ceases to be a General Partner shall be deemed to be acting as a General Partner with respect to a third party doing business with the Partnership, until an amended certificate of limited partnership of the Partnership is filed under the Act.

16.2     New General Partner.  Except as otherwise provided in section 13.2, with the consent of a Majority in interest of the Limited Partners and the concurrence of the General Partner, an additional or successor General Partner or Partners may be appointed and will become a General Partner or Partners on accepting such appointment and agreeing to act as a

- 20 -

General Partner or Partners, to become a party or parties to this Agreement and to assume all the obligations and responsibilities of a General Partner hereunder.  If the Partnership shall have two or more General Partners, they shall be jointly and severally liable for performance of all of the duties and obligations of the General Partner hereunder, and they shall determine between them how to share the Asset Management Fee and the interest of the General Partners in Profits, Losses and distributions.

16.3    Procedure.  If a person ceases to be a General Partner or if a General Partner is so admitted or succeeded, this Agreement and the Partnership's certificate of limited partnership shall be amended, by the remaining General Partner or Partners without the necessity of any further consent of any of the Limited Partners, to name the new or successor General Partner or Partners.

16.4    Conversion of Interest.  A person who ceases to be a General Partner for any reason shall:

(a)    Retain only the interest in such person's Capital Account, Profits, Losses and distributions as such person would have had if such person had been admitted to the Partnership as a Limited Partner at the date such person ceases to be a General Partner, and such interest shall be that of a Limited Partner;

(b)    Not be personally liable for Partnership debts incurred after such person ceases to be a General Partner, other than any debts incurred by reason of such person's being deemed to be acting as a General Partner pursuant to section of the Act;

(c)    Be entitled to consent as a Limited Partner on all matters; and

(d)    Have such retained interest in Profits, Losses and distributions reduced pro rata with all other Partners to provide compensation, or an interest in the Partnership, or both, to the person admitted to the Partnership to serve as the successor to such person as a General Partner.

17.    Dissolution and Termination.

17.1    Events of Dissolution.  The Partnership shall continue until terminated and dissolved (i) in accordance with the consent required by section 13.2, (ii) when a sole General Partner ceases to be a General Partner, if a successor General Partner has not then been appointed as and become the General Partner as provided in section 16, (iii) on the sale or other disposition of all or substantially all of the Assets (unless the General Partner elects within thirty (30) days, by written notice to the Partnership, to continue the Partnership), (iv) when the General Partner elects, by written notice to the Partnership, to dissolve the Partnership, the issuance of a judicial decree of dissolution by a court of competent jurisdiction, or (vi) upon the withdrawal or removal of the General Partner unless the Limited Partners appoint a new General Partner as provided in section 13.2.  Subject to the preceding sentence, the Partnership shall not be dissolved and its business shall continue so long as there is at least one General Partner, and the remaining General Partner or Partners shall continue the business of the Partnership, notwithstanding that any person shall cease to be a General Partner for any reason.  The Partnership shall not be dissolved or terminated by the expulsion, retirement, withdrawal, death,

- 21 -

insanity, adjudication of bankruptcy, insolvency or dissolution of any Limited Partner, or by the assignment by any Limited Partner of such Limited Partner's interest in the Partnership or the admission of new Partners as provided herein.

      17.2   <u>Liquidating Person; Winding Up</u>.  In the event of dissolution and termination of the Partnership, the remaining General Partner shall wind up the affairs of the Partnership, provided that if there is no remaining General Partner, the affairs of the Partnership shall be wound up by the person or persons previously designated by the General Partner to liquidate the Partnership's assets or, if the General Partner has made no such designation, by the person or persons designated by a Majority in interest of the Limited Partners, such Partners or persons being referred to herein as the "Liquidating Persons."  The Liquidating Persons shall liquidate at least as much of the Assets and the Partnership's other assets as may be required to make, and shall make, a distribution to the Preferred Limited Partner(s) consistent with sections 9.3(c), and 10.4(d) (which accord certain preferences to the Preferred Limited Partners under this section 17), and to the extent possible pay all other liabilities (including without limitation all costs of dissolution and winding up and any payment the General Partner has agreed to make to the Liquidating Persons for their services in connection with the dissolution and loans to the Partnership by any Partner), establish a reserve for contingent liabilities and distribute the Assets, and any of the Partnership's remaining assets (in cash or in kind or partly in cash and partly in kind, as the Liquidating Persons may determine in their absolute discretion).  On any distribution of assets to the Partners pursuant to this section 17.2, after making the distributions described above, any such assets shall be distributed in proportion to and to the extent of the Partners' respective Capital Account balances consistent with section 10.  After a reasonable period of time has passed, any balance remaining in any reserve established shall be distributed to the Partners as provided in this section 17.2.  If the Partnership's assets are insufficient to satisfy its liabilities, each Partner shall, to the extent required by the Act, within 30 days after receiving notice thereof from the General Partner, return in cash such part or all of the distributions made to such Partner pursuant to this section 17.2 or section 9.3(d) as may be required to make up the shortage, with each Partner making returns in proportion to such Partner's share in any such distributions.

      17.3   <u>Legal Authority</u>.  The winding up of the affairs of the Partnership and the distribution of its assets shall be conducted exclusively by the Liquidating Persons, who are authorized, subject to sections 12 and 17.2, to do any and all acts and things authorized by law for those purposes.

      17.4   <u>No Recourse Against Partners</u>.  Each Partner shall look solely to the assets of the Partnership for the return of such Partner's Capital Contributions, and, if the Partnership property remaining after the payment or discharge of the debts and liabilities of the Partnership is insufficient to return the Capital Contributions of each Partner, such Partner shall have no recourse against any other Partner.

    18.   <u>Assignments</u>.

      18.1   <u>Personal Property</u>.  An interest of a Partner in the Partnership is personal property and a Partner shall have no interest in specific Partnership property.

18.2     General Partner.  Except as otherwise expressly provided in this Agreement, without the consent of a Majority in interest of the Limited Partners, no General Partner shall sell, assign, transfer, pledge, encumber, hypothecate or otherwise dispose of all or any part of its interest as a General Partner or in this Agreement, and any attempted or purported sale, assignment, transfer, pledge, encumbrance, hypothecation or other disposition thereof in violation of this section 18.2 shall be void.

18.3     Transfer of Limited Partnership Interests.

(a)     In General.  A Limited Partner may assign an interest in the Partnership only with the express written consent of General Partner, which may be granted or withheld in the General Partner's sole and absolute discretion, subject to compliance at such Limited Partner's expense with Federal and state securities laws, the applicable securities laws of any foreign country having jurisdiction over the Limited Partnership interest, and this section 18.3(a).  To assure such compliance, (i) the Limited Partner shall furnish the Partnership with a detailed explanation of the proposed disposition and applicable Investment Documents completed by the intended assignee, (ii) the Limited Partner shall furnish the Partnership with an opinion of the Limited Partner's counsel in form and substance satisfactory to the Partnership to the effect that the proposed transfer (1) complies with applicable provisions of the Securities Act of 1933, as amended and any applicable blue sky laws and the applicable securities laws of any foreign country having jurisdiction over the Limited Partnership interest, (2) will not result in the Partnership having to register as an investment company under the ICA, (3) will not render the Profit Allocation illegal under Federal law or applicable laws of any state, and (4) will not result in the termination of the Partnership for Federal income tax purposes, and (iii) counsel for the General Partner shall have concurred in such opinion and the General Partner shall have advised the Limited Partner of such concurrence.  Any attempted or purported assignment without such compliance shall be void.  Any permitted assignment shall be effective as of midnight of the last day of the calendar month in which it is made and no such assignment shall relieve the assignor of such assignor's responsibility for any expenses, obligations or liabilities, whether accruing prior or subsequent to the assignment.  Unless and until an assignee is admitted to the Partnership as a substituted Limited Partner as hereinafter provided, such assignee shall be entitled only to receive distributions from the Partnership attributable to the assigned interest from and after the effective date thereof; provided that the General Partner and the Partnership shall be entitled to treat the assigning Limited Partner as the absolute owner of such assignor's interest in the Partnership and shall incur no liability for distributions made in good faith to such assignor until the effective date of the assignment and until appropriate documents of assignment have been delivered to the General Partner and recorded on the Partnership's books.  A limited partner assigning an interest in the Partnership in accordance with this Section acknowledges that any EB-5 related immigration benefit related to such an interest may be withdrawn, denied, or foreclosed as a result of such assignment.

(b)     Substitution.  An assignee of any interest of a Limited Partner in the Partnership may become a substituted Limited Partner only with the consent of the General Partner, which can be withheld in the General Partner's sole and absolute discretion, and in compliance with this section 18.3.  This Agreement and the Partnership's certificate of limited partnership may be amended by the General Partner, without the necessity of the consent of any of the Limited Partners, to effect such admission not later than the last day of the calendar month

- 23 -

following receipt of notice of the assignment and such appropriate documentation of the assignment and substitution as the General Partner may reasonably require; provided that no such assignee shall become a substituted Limited Partner of the Partnership unless the assignee shall have consented in writing, in form satisfactory to the General Partner, to be bound by the terms of this Agreement and the Partnership's certificate of limited partnership in the place and stead of the assigning Limited Partner.

19.   Amendments.

19.1   With Limited Partner Approval.  Amendments to this Agreement may be proposed by the General Partner or by Limited Partners whose Ownership Percentages aggregate ten percent or more of the Ownership Percentages of all Limited Partners.  The General Partner shall submit to the Limited Partners a verbatim statement of any amendment so proposed.  The General Partner shall include in any such submission its recommendation as to the proposed amendment.  The amendment shall become effective only with the consent of the General Partner and a Majority in interest of the Limited Partners; provided that, for purposes of obtaining a written consent on a proposed amendment, the General Partner may require a response within a specified reasonable time (which shall not be less than fifteen (15) days) and failure to respond shall constitute a consent in accordance with the General Partner's recommendation as to the proposed amendment.

19.2   Without Limited Partner Approval.  Notwithstanding anything in section 19 to the contrary, the General Partner may amend this Agreement without any vote, consent, approval, authorization or other action of any Limited Partner and without notice to any Limited Partner to: (i) add to the representations, duties or obligations of the General Partner or its Affiliates or surrender any right or power granted to the General Partner or its Affiliates in this Agreement for the benefit of any one or more of the Limited Partners; (ii) cure any ambiguity, correct or supplement any provision in this Agreement that may be inconsistent with any other provision in this Agreement, or correct any printing, stenographic, or clerical errors or omissions, or make any other provisions with respect to matters or questions arising under this Agreement that will not be inconsistent with the intent of this Agreement; (iii) delete or add any provision of this Agreement required to be so deleted or added by the staff of the Securities and Exchange Commission or by a state securities law administrator or other governmental, quasi-governmental or self regulatory organization official, which addition or deletion is deemed by such official to be for the benefit or protection of the Limited Partners; (iv) reflect the withdrawal, expulsion, addition or substitution of Limited Partners; (v) reflect the proposal, promulgation or amendment of Regulations under Code section 704, or otherwise, to preserve the uniformity of interests in the Partnership issued or sold from time to time, if, in the opinion of the General Partner, the amendment does not have a material adverse effect on the Limited Partners generally; (vi) elect for the Partnership to be bound by any successor statute to the Act, if in the opinion of the General Partner, the amendment does not have a material adverse effect on the Limited Partners generally; (vii) conform this Agreement to changes in the Act or interpretations thereof which the General Partner believes appropriate, necessary or desirable, if in the General Partner's reasonable opinion such amendment does not have a material adverse effect on the Limited Partners generally or the Partnership; (viii) change the name of the Partnership; (ix) make any change that the General Partner determines is advisable to qualify or to continue the qualification of the Partnership as an entity that is taxed as a limited partnership

- 24 -

under the laws of any state or that the General Partner determines is necessary or advisable so that the Partnership will not be treated as an association taxable as a corporation for federal income tax purposes; (x) make any change that the General Partner deems advisable to comply with any law or regulation provided that a Majority in interest of the Limited Partners adversely affected by such amendment consent thereto; (xi) create any new class of interests in the Partnership provided such class does not have rights or preferences superior to those of any existing class of interests; and (xii) make any other amendment provided such amendment does not become effective until after such affected Limited Partners have been given prior written notice of such change and have had the right following receipt of such notice to request the redemption of their interests and such withdrawal shall have become effective.

19.3    Amendments Requiring Unanimous Consent.  Anything in section 19.1 or 19.2 to the contrary notwithstanding, without the unanimous vote or consent of all of the Partners, no amendment shall (a) change the Partnership to a general partnership, (b) change the liability of the General Partner as such or the limited liability of the Limited Partners as such, or (c) change sections 13.2(e), 13.2(f), or 16.2.

20.    Tax Elections.  The General Partner shall make or cause the Partnership to make such elections as the General Partner may consider advisable and in the interests of the Partnership under any applicable tax law of the United States, including, without limitation, any elections under Code section 754.

21.    Power of Attorney.  Each of the Limited Partners irrevocably constitutes and appoints the General Partner, with full power of substitution and resubstitution, such Limited Partner's true and lawful attorney, for such Limited Partner and in such Limited Partner's name, place and stead, and for such Limited Partner's use and benefit, to sign, execute, deliver, certify, acknowledge, swear to, file, record and publish (i) the Partnership's certificate of limited partnership and any amendment thereto or to this Agreement as provided herein, (ii) any other certificates, instruments, agreements and documents necessary to qualify or continue the Partnership as a limited partnership or a partnership wherein Limited Partners have limited liability in the states or other jurisdictions where the General Partner deems necessary or desirable, (iii) all conveyances, assignments, documents of transfer or other instruments and documents necessary to effect the assignment of an interest in the Partnership, the substitution of a Limited Partner or the dissolution and termination of the Partnership in accordance with this Agreement and (iv) all filings and submissions pursuant to any applicable law, regulation, rule, order, decree or judgment which, in the opinion of the General Partner may be necessary or advisable in connection with the business of the Partnership.

The power of attorney granted herein is coupled with an interest, shall be irrevocable, shall survive the death, disability or incapacity of any Limited Partner, shall be deemed given by each and every assignee and successor of each Limited Partner and may be exercised by the General Partner by listing, or attaching a list of, any or all of the names of the Limited Partners and executing such amendments, certificates, instruments and other documents with the signature by the General Partner, as attorney-in-fact for all of the persons whose names are so listed.

015001.0002\1479857.3

22.     Arbitration.  The Partners waive their right to seek remedies in court, including any right to a jury trial.  The Partners agree that in the event of any dispute arising between the parties, such dispute shall be settled by arbitration to be conducted in the county and state of the principal office of the General Partner at the time of such dispute in accordance with the rules of the Judicial Arbitration and Mediation Service ("JAMS") applying the laws of California.  Disputes will not be resolved in any other forum or venue.  The Partners agree that such arbitration shall be conducted by one or more mutually-agreeable arbitrators or, if no agreement can be reached, by a panel of arbitrators consisting of one arbitrator chosen by each of the participating parties, plus an additional arbitrator chosen by the arbitrators.  Pre-arbitration discovery shall be limited to the greatest extent provided by the rules of JAMS, the arbitration award will not include factual findings or conclusions of law, and no punitive damages shall be awarded.  The Partners understand that any party's right to appeal or to seek modification of rulings in an arbitration is severely limited.  Any award rendered by the arbitrators shall be final and binding and judgment may be entered upon it in any court of competent jurisdiction in the county and state of the principal office of the General Partner at the time such award is rendered.  The Partners consent to conducting any arbitration under this Agreement at a location and facility recommended by the arbitrator, which shall not be located more than twenty (20) miles from the address of the General Partner.

23.     Notices.  Except as otherwise expressly provided herein, any notice, consent, authorization or other communication to be given hereunder shall be in writing and shall be deemed duly given and received on the day of personal delivery, on the day of facsimile transmission or receipt of electronic mail, three (3) business days after being mailed by first class mail, or one (1) business day after being sent by a nationally recognized overnight delivery service, charges and postage prepaid, properly addressed to the party to receive such notice at the last address furnished for such purpose by such party in such party's Subscription Agreement or by subsequent notice hereunder.

24.     Severability.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held to be invalid or unenforceable, shall not be affected thereby.

25.     Governing Law.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of California.

26.     Binding Effect.  Subject to section 18, this Agreement shall bind and inure to the benefit of the parties and their respective successors, assigns, heirs, devisees, legatees, legal representatives, executors and administrators.

27.     [Intentionally omitted.]

28.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

29.     Entire Agreement.  This Agreement contains the entire agreement of the parties and supersedes all prior negotiations, correspondence, understandings and agreements between or among the parties regarding the subject matter hereof, other than any and all subscription agreements of the Limited Partners subscribing for interests in the Partnership and any and all amendments and supplements thereto, all of which subscription agreements, amendments and supplements shall continue in full force and effect.

30.     Further Assurances.  Each Partner shall provide such further information with respect to the Partner and any of its beneficial owners as the General Partner may request, and shall execute such other and further certificates, instruments and other documents, as may be necessary and proper to implement, complete and perfect the transactions contemplated by this Agreement.

31.     Headings; Gender; Number; References.  The headings at the beginning of the sections hereof are solely for convenience of reference and are not part of this Agreement.  As used herein, each gender includes each other gender, and the singular includes the plural and vice versa, as the context may require.  All references to sections are intended to refer to sections of this Agreement, except as otherwise indicated.

IN WITNESS WHEREOF, this Limited Partnership Agreement has been duly executed by or on behalf of the parties hereto as of the date first above written.

GENERAL PARTNER:                    LIMITED PARTNERS:

GSRV-VTI, LP                        (See Schedule A Attached)

By:     GSRV-VTI Management, LLC

        its General Partner

By:     _____
        Eric Chelini
        Its Managing Member

- 27 -

# EXHIBIT E

# EXHIBIT E

Name of Subscriber:  Xi LIU
**NON-U.S. PURCHASER**

THE MEMBERSHIP INTERESTS REFERENCED IN THIS AGREEMENT WILL BE ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY STATE SECURITIES ACT, PURSUANT TO APPLICABLE EXEMPTIONS.  WITHOUT SUCH REGISTRATION, SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND THE COMPANY'S COUNSEL THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE COMPANY'S COUNSEL TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER.  ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF MEMBERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS AS SET FORTH IN THE COMPANY'S OPERATING AGREEMENT.

**GSRV-VTI II, LLC**

**SUBSCRIPTION AGREEMENT**

THIS SUBSCRIPTION AGREEMENT (this "**Agreement**") is made and entered into as of the date shown on the signature page hereof by the undersigned person identified on the signature page of this Agreement (the "**Subscriber**") in favor of **GSRV-VTI II, LLC**, a California limited liability company (the "**Company**"), **GSRV-VTI MANAGEMENT, LLC**, a California limited liability company (the "**Manager**"), **GOLDEN STATE RENAISSANCE VENTURES, LLC**, a California limited liability company **DBA GOLDEN GATE GLOBAL** (the "**Regional Center**") and if accepted by the Company in writing in accordance with the terms hereof, then this Agreement shall be by and between the Subscriber and the Company.

**THE MEMBERSHIP INTERESTS IN THE COMPANY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT AND ARE BEING OFFERED PURSUANT TO A TRANSACTION EXEMPTION AFFORDED BY REGULATION S PROMULGATED UNDER THE SECURITIES ACT SOLELY OUTSIDE OF THE UNITED STATES AND SOLELY TO NON-U.S. PERSONS AND IN SPECIFIC RELIANCE UPON THE REPRESENTATIONS BY EACH SUBSCRIBER THAT (1) AT THE TIME OF THE OFFER AND SALE OF THE MEMBERSHIP INTEREST TO THE SUBSCRIBER, THE SUBSCRIBER WAS NOT A U.S. PERSON AS DEFINED IN REGULATION S, AND (2) AT THE TIME OF THE OFFER AND SALE OF THE MEMBERSHIP INTEREST TO THE SUBSCRIBER AND, AS OF THE DATE OF THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE OPERATING AGREEMENT BY THE SUBSCRIBER, THE SUBSCRIBER WAS OUTSIDE OF THE UNITED STATES.  THE MEMBERSHIP INTEREST MAY NOT BE OFFERED OR**

1

SOLD IN THE UNITED STATES OR TO U.S. PERSONS (AS DEFINED IN REGULATION S) UNLESS THE SECURITIES ARE REGISTERED UNDER THE SECURITIES ACT, OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT IS AVAILABLE.   HEDGING TRANSACTIONS IN THESE SECURITIES MAY NOT BE CONDUCTED EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT.

NO PARTY EXCEPT THE COMPANY IS RESPONSIBLE FOR THE CONTENTS OF THE MEMORANDUM, AND NO OTHER PARTY EXCEPT SALES AGENTS, INCLUDING OFFSHORE MIGRATION BROKERS, AUTHORIZED BY THE COMPANY WILL BE INVOLVED IN THE OFFERING OF UNITS UNDER THE MEMORANDUM OR THE ACCEPTANCE OF SUBSCRIPTIONS FROM SUBSCRIBERS.

## RECITALS

A.      The Company is offering (the "**Offering**") for investment pursuant to a Private Offering Memorandum dated as of April 27, 2015 (as amended and supplemented from time to time, the "**Memorandum**") to a limited number of individual investors who are not "U.S. Persons" (as such term is defined in Rule 902(k) of the Securities Act) on a limited and private basis, a maximum of Seven Million Dollars Five Hundred Thousand ($7,500,000) (the "**Maximum Offering Amount**") and a minimum of Five Hundred Thousand Dollars ($500,000) (the "**Minimum Offering Amount**") of membership interests in the Company (the "**Membership Interests**") (excluding the sum of $40,000 per Subscriber (the "**Processing and Marketing Expense**")), as such Membership Interests shall be described in the Operating Agreement of the Company to be entered into by and among the Company, the Manager and each of the Subscribers for Membership Interests whose subscriptions are accepted by the Company (the "**Operating Agreement**").  Any capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed in the Operating Agreement or the Memorandum.

B.      The Offering of the Membership Interests is limited to only individual persons (not any legal entities) who are "Accredited Investors," as such term is defined in Rule 501(a) under the Securities Act.  To subscribe hereunder, the Subscriber must pay Five Hundred Forty Thousand Dollars ($540,000.00), consisting of $500,000 for the Subscriber's Capital Contribution and $40,000 for the Subscriber's Processing and Marketing Expense (collectively, the "**Total Subscription Payment**"), all as more particularly described herein.  The Subscriber will be issued a Membership Interest based upon the Capital Contribution to the Company made by the Subscriber.

C.      The Regional Center has obtained approval from the United States Citizenship and Immigration Services ("**USCIS**") to participate as a regional center under the EB-5 program (the "**EB-5 Program**").

D.      The Company will be administered by its Manager, which is wholly-owned by one of the members of the Regional Center.

E.      The Company has been organized to invest in Vertebral Technologies, Inc. ("**VTI**") to allow VTI to expand its development, manufacturing, and distribution resources at its San Jose, California facility (the "**EB-5 Investment**").

F.      The Offering has been structured so that each Subscriber, by becoming an Investing Member in the Company, will have made an investment that may be a qualifying investment entitling the Subscriber, assuming the Subscriber otherwise satisfies the non-investment criteria for permanent residency, to seek permanent residency in the United States. The Subscribers will need to separately retain immigration counsel to file their I-526 Petitions.  It is anticipated that the USCIS will act on each I-526 Petition within fourteen (14) months after the I-526 Petition is filed.  If a Subscriber receives I-526 Petition Approval, the Subscriber will become a permanent Investing Member of the Company.  Each Subscriber acknowledges that, even if such Subscriber receives I-526 Petition Approval, there is no assurance that such Subscriber will ultimately receive conditional or unconditional lawful permanent residency status.  See Memorandum- Immigration Risk Factors.

G.      In addition to executing this Agreement and paying the Total Subscription Payment for subscribed Membership Interests to the Company as described herein, the Subscriber will also need to execute the Company's Amended and Restated Operating Agreement ("**Operating Agreement**"), and deliver the executed Operating Agreement to the Company in order to complete its subscription.  ***Please review the Operating Agreement in its entirety***.

H.      The period for the Offering has commenced and will end on October 27, 2015, unless extended by the Company until not later than April 27, 2016, or otherwise extended so that the Company can attempt to obtain Substitute Investing Members (if one or more Investing Members receives an I-526 Petition Denial (the "**Offering Period**").  The Total Subscription Payment shall be contributed by Subscriber directly to the Company in one (1) installment simultaneously with the execution of this Agreement.

I.      Upon subscription, the Subscriber shall no longer have the right to cancel, terminate or revoke his or her subscription and request a refund of his or her investment.  Subject to the terms of the Operating Agreement, the Subscriber hereby irrevocably commits the Subscriber's Capital Contribution to the Company.

J.      The Total Subscription Payment will be made directly to the Company. The Company will only facilitate the acquisition of up to 3,000,000 shares of Series B Convertible Preferred Stock of Vertebral Technologies, Inc. following receipt and approval of the following reports:  (i) the Vertebral Technologies, Inc. Business Plan and (ii); and the Economic and Job Creation Impacts Report commissioned by the Company. It is anticipated that both reports will be available for review on or before May 15, 2015.

**AGREEMENT**

**NOW, THEREFORE**, the Subscriber hereby agrees as follows:

1.     Subscription.   The Subscriber hereby irrevocably subscribes for and agrees to purchase the Membership Interest indicated on the signature page of this Agreement:

(a)     **By wire transfer to:**

Wells Fargo Bank
420 Montgomery Street
San Francisco, CA 94104
ABA#: ▮
Beneficiary: First Clearing Corporation Acct#: ▮
Further Credit to the following:
A/C Name: GSRV-VTI II, LLC Account #: ▮

(b)     **By check**: In the alternative, the Subscriber shall enclose herewith a certified or official bank check payable to "GSRV-VTI II, LLC".  The above referenced subscription payments shall be made in one (1) payment of $540,000 upon subscription.

2.     Acceptance of Subscription.   The Subscriber understands and agrees that its subscription may be rejected by the Company at any time in its sole discretion.  If Subscriber's subscription is accepted, the Company will notify Subscriber of same.  If the Subscription is rejected, all funds received from the Subscriber will be returned without interest, as described above, and thereafter this Agreement shall be of no further force or effect.

3.     Subscriber's Acknowledgment of Restrictions on Transfer; No Right to Require Registration.   THE SUBSCRIBER UNDERSTANDS THE OFFER AND SALE OF THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, ANY STATE SECURITIES OR "BLUE SKY" LAWS, OR ANY RULES OR REGULATIONS PROMULGATED THEREUNDER (COLLECTIVELY, "**SECURITIES LAWS**"), PURSUANT TO APPLICABLE EXEMPTIONS.  WITHOUT SUCH REGISTRATION, SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED AT ANY TIME WHATSOEVER, AND SUCH MEMBERSHIP INTERESTS MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES OR TO A U.S. PERSON, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND/OR THE COMPANY'S COUNSEL THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE COMPANY AND/OR THE COMPANY'S COUNSEL TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES LAWS.   NO HEDGING TRANSACTIONS INVOLVING THE MEMBERSHIP INTERESTS MAY BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT OF 1933, AS AMENDED.

4

ADDITIONALLY, THE SUBSCRIBER ACKNOWLEDGES THAT NEITHER THE COMPANY NOR ITS MANAGER IS OBLIGATED TO REGISTER THE MEMBERSHIP INTERESTS UNDER THE SECURITIES LAWS.   THE SUBSCRIBER FURTHER UNDERSTANDS THAT THE TRANSFER OF THE MEMBERSHIP INTERESTS MAY BE SUBSTANTIALLY RESTRICTED BY THE SECURITIES LAWS AND BY THE ABSENCE OF A TRADING MARKET THEREFOR, AND THE TRANSFER OF THE MEMBERSHIP INTERESTS IS ADDITIONALLY RESTRICTED BY THE TERMS OF THE OPERATING AGREEMENT; THAT NO TRADING MARKET FOR THE MEMBERSHIP INTERESTS EXISTS AND NONE IS EXPECTED TO DEVELOP, AND THAT ANY SALE OR OTHER DISPOSITION OF THE MEMBERSHIP INTERESTS MAY RESULT IN UNFAVORABLE TAX CONSEQUENCES TO THE SUBSCRIBER.  THE SUBSCRIBER ACKNOWLEDGES THAT THE RESTRICTIONS ON THE TRANSFERABILITY OF THE MEMBERSHIP INTERESTS ARE SUBSTANTIAL AND MAY REQUIRE THE SUBSCRIBER TO HOLD THE MEMBERSHIP INTERESTS INDEFINITELY.

THE SUBSCRIBER HEREBY REPRESENTS AND WARRANTS THAT THE SUBSCRIBER HAS ADEQUATE MEANS OF PROVIDING FOR THE SUBSCRIBER'S CURRENT AND FUTURE NEEDS AND POSSIBLE PERSONAL CONTINGENCIES AND HAS NO NEED FOR LIQUIDITY OF THE MEMBERSHIP INTERESTS.

4.    Subscriber's Additional Representations and Warranties.   The Subscriber additionally represents and warrants to the Company, the Manager, the Regional Center and VTI as follows:

(a)    The Subscriber understands that the Company has been formed in connection with the EB-5 Investment and has no operating history; that VTI is in its early stages of development, and its future profitability cannot be assured.

(b)    The Subscriber understands that: (i) his or her subscription for Membership Interests is irrevocable (unless the Company otherwise consents in writing in its sole and absolute discretion); (ii) an investment in the Membership Interests is a speculative investment that involves a high degree of risk, including the risk of loss of the entire investment of the Subscriber in the Company; (iii) no federal or state agency has passed upon the adequacy or accuracy of the information made available to the Subscriber, or made any finding or determination as to the fairness for investment, or any recommendation or endorsement of the Membership Interests as an investment; (iv) there will be restrictions on the transferability the Membership Interests under the Securities Laws and the Operating Agreement and there will be no public market for the Membership Interests, and, accordingly, it may not be possible for the Subscriber to liquidate his or her investment in the Membership Interests; (v) any anticipated federal and/or state income tax benefits applicable to the Membership Interests may be lost through changes in, or adverse interpretations of, existing laws and regulations; and (vi) there is no assurance that VTI will ever be profitable, or that the Subscriber's investment in the Membership Interests will ever be recoverable.

(c)    The Subscriber acknowledges that there is no assurance that his or her I-526 Petition will be approved or, if it is, that Subscriber will ultimately be approved for

conditional or unconditional lawful permanent residence in the U.S. or be able to become a U.S. citizen. Neither the Regional Center, the Company, the Manager, VTI, nor the selected immigration counsel have made any effort to pre-determine Subscriber's personal qualifications and circumstances and whether Subscriber is likely or not likely to obtain favorable action on his or her I-526 Petition or Immigrant Visa and that there are numerous reasons that will result in Subscribers being denied residency in the United States, including, without limitation, the Project failing to qualify for the EB-5 Program.

(d)     The Subscriber hereby acknowledges that the Subscription Amount will be deposited directly with the Company. Both the Minimum Offering Amount and the Processing and Marketing Expense will be credited to the Subscriber's Capital Account. The Processing and Marketing Expense will be paid from the Subscribers Capital Account to the Manager upon USCIS approval of Subscriber's I-526 Petition. Interest will not accrue on the Subscription Amount.

(e)     The Subscriber hereby acknowledges that there will be no escrow account holding a Subscriber's Subscription Amount or Processing and Marketing Expense pending an Investor's I-526 application submittal to or approval from USCIS.

(f)     The Subscriber hereby acknowledges that VTI has a need for the immediate investment of funds to commence its operations and that following the Company's receipt of the VTI Business Plan and the econometric report commissioned by the Company, the Capital Contribution of each Member will be utilized to acquire up to 3,000,000 shares of Series B Convertible Preferred Stock of Vertebral Technologies, Inc.

(g)     The Subscriber hereby acknowledges that it is likely that the Company will utilize each Member's Capital Contribution to acquire up to 3,000,000 shares of Series B Convertible Preferred Stock of Vertebral Technologies, Inc. prior to an Subscriber's submittal of his or her I-526 Petition to the USCIS.

(h)     The Subscriber has been provided with a copy of the Memorandum, including, as exhibits thereto, the Operating Agreement, and this Agreement, and has reviewed same, has had the opportunity to ask questions of the Manager and the Regional Center, has received answers adequate to Subscriber with respect to same, and has no further questions regarding the Regional Center, the Manager, the Company, the Project or VTI. The Subscriber is aware that, pursuant to the Operating Agreement, the Manager will receive certain fees and benefits related to the EB-5 Investment.

(i)     The Subscriber hereby acknowledges that: (i) the risks inherent to this investment have been fully considered; (ii) the Manager will have substantial and exclusive authority to conduct the operation of the Company; (iii) the Company will be relying on outside agents to manage certain aspects of its operations; and (iv) an investment in the Membership Interests has neither been approved nor disapproved by the United States Securities and Exchange Commission or the Securities Division of the Department of Banking and Finance of the State of California or any other department or agency of any other jurisdiction, and such

authorities have not passed upon the adequacy or accuracy of the disclosure provided to investors in connection with an investment in the Membership Interests.

(j)       The Subscriber acknowledges that the Regional Center, the Company, the Manager, nor any representative of the Company, the Manager or the Regional Center has made any representations or warranties in respect of VTI's business or profitability.  Without limiting the generality of the foregoing, the undersigned acknowledges and agrees that information, including any business plan or financial projections or forecasts or other information contained in written materials provided or made available to the undersigned, and any oral, visual or other presentations made by the Company, the Manager or the Regional Center or their respective representatives to the Subscriber shall not be deemed a representation or warranty in respect of the matters therein.  The Subscriber acknowledges that the Memorandum contains information that the Company, the Manager and the Regional Center believe is accurate and data that VTI has represented to the Company is true and correct; however, as an accredited, experienced and sophisticated investor, the Subscriber is aware that there are many foreseeable and unforeseeable events that could cause the assumptions underlying the Project to not materialize, and the results of same may cause material adverse consequences to the financial results of VTI and/or the Company.

(k)       The Subscriber acknowledges that in the event a Subscriber's I-526 Petition is denied by USCIS or the Subscriber withdraws his or her I-526 Petition once the I-526 Petition is filed, that the Subscriber shall have no right to withdraw from the Company and the Company shall have no obligation to return such Subscriber, his or her Capital Contribution or Processing and Marketing Expense.

(l)       The Subscriber is acquiring the Membership Interests solely for the account of the Subscriber for investment purposes only and not for distribution or resale to others.  The Subscriber will not resell or offer to resell the Membership Interests except in strict compliance with all applicable Securities Laws, including, without limitation, Regulation S of the Securities Act, and the Operating Agreement.  The Subscriber will not engage in any hedging transactions involving the Membership Interests, except in compliance with the Securities Laws.

(m)       The Subscriber's financial condition is such that it has no need for liquidity with respect to his or her investment to satisfy any existing or contemplated undertaking or indebtedness and is able to bear the economic risk of his or her investment for an indefinite period of time, including the risk of losing all of his or her investment.

(n)       The Subscriber acknowledges that the offer and sale of the Membership Interests is not taking place within the United States, but rather in an offshore transaction. "United States" means the United States of America, its territories and possessions, any state of the United States and the District of Columbia.

(o)       The Subscriber acknowledges that the Membership Interests have not been registered under the Securities Act and therefore cannot be offered and sold in the United States or to U.S. Persons, unless the Membership Interests are registered under the Securities Act or an exemption from the registration requirements of the Securities Act is available.  The Subscriber

is not a U.S. Person and is not acquiring the Membership Interests for the account or benefit of any U.S. Person.

(p)     The Subscriber is in compliance with all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA Patriot Act**"), the U.S. Bank Secrecy Act (the "**BSA**") and all other anti-money laundering laws and applicable regulations adopted to implement the provisions of such laws, including policies and procedures that can be reasonably expected to detect and cause the reporting of transactions under Section 5318 of the BSA.  The Subscriber is not and shall not be a person: (i) acting, directly or indirectly, on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any of the U.S. Office of Foreign Assets Control ("**OFAC**") lists; (ii) listed on, residing in or having a place of business in a country or territory named on any of such lists or which is designated as a Non-Cooperative Jurisdiction by the Financial Action Task Force on Money Laundering ("**FATF**"), or whose funds are from or through such a jurisdiction; (iii) that is a "Foreign Shell bank" within the meaning of the USA Patriot Act; or (iv) residing in or organized under the laws of a jurisdiction designated by the U.S. Secretary of the Treasury under Sections 311 or 312 of the USA Patriot Act as warranting special measures due to money-laundering concerns.

(q)     The undersigned acknowledges and agrees that the Company's special immigration counsel, as appointed by the Company, is the sole entity authorized to respond on behalf of the undersigned in any matter before the USCIS, the Administrative Appeals Office or other judicial body having jurisdiction over the undersigned's I-526 Petition or I-829 Petition. The undersigned, upon the instructions of the Company, agrees to supply a Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, appointing such special immigration counsel as the undersigned's immigration counsel to facilitate such response. The undersigned further agrees to provide the Company and special immigration counsel with a complete copy of any prior immigration filings and / or relevant immigration or other documents necessary to facilitate such response.  The undersigned further authorizes the Company and its special immigration counsel to have complete access to the undersigned's immigration history, record and status and the undersigned agrees to execute a G-28 or other document authorizing such access by the Company and its special immigration counsel. The Company agrees to maintain confidentiality with respect to the undersigned's immigration history, record, and status.

5.     _Access to Information_.  The Subscriber hereby acknowledges and confirms that the Subscriber has been given complete access to all documents, records, contracts and books of or relating to Regional Center, the Company and the Membership Interests now existing, the Manager, VTI, and all other information to the extent the Company or the Regional Center possesses such information or can acquire it without unreasonable effort or expense, and that the Subscriber has engaged in a complete examination of all such documents, records, contracts and books to the extent deemed necessary by the Subscriber in reaching the Subscriber's decision to invest in the Company.  The Subscriber hereby further acknowledges and confirms that the Subscriber has had an opportunity to ask questions of and receive answers from the Regional Center, the Company, the Manager and VTI, concerning the Membership Interests, the

prospective contemplated business and purpose of VTI, and with respect to any other matter the Subscriber has deemed relevant, and all such inquiries have been answered to the Subscriber's satisfaction. In addition, the Subscriber acknowledges that it has had and may have, at any reasonable hour, after reasonable prior notice, access to the financial and other records of the Company which the Company can obtain without unreasonable effort or expense, and further acknowledges that Subscriber has obtained, in Subscriber's judgment, sufficient information from these parties to evaluate the merits and risks of an investment in the Company.

6.  <u>No Advertising or Reliance</u>.  The Subscriber represents and warrants that in making the decision to purchase the Membership Interests herein subscribed for, the Subscriber has relied solely upon independent investigations made by Subscriber, and the Subscriber further represents and warrants that the Subscriber is not acquiring the Membership Interests as a result of any advertisement, article, notice or other communication published in any newspaper, magazine or similar media distributed in the United States, any seminar in the United States or any solicitation by a person in the United States not previously known to the Subscriber, and that Subscriber is not aware of any general solicitation within the United States or general advertising within the United States regarding the purchase or sale of the Membership Interests. The Subscriber acknowledges and confirms that it is not relying upon any statement, representation or warranty made by the Regional Center or its respective representatives in making a decision to subscribe for the Membership Interests. The Subscriber must rely solely on the terms of the Operating Agreement for the terms of Subscriber's participation in the Company and the rights and responsibilities of owning its Membership Interests.

7.  <u>Residence</u>.  The Subscriber represents and warrants that the Subscriber is a bona fide resident of the country set forth in his or her address below, and the undersigned agrees that if his or her principal residence changes prior to his/her purchase of the Membership Interests, he/she will promptly notify the Company. The Subscriber represents and warrants that the Subscriber is not a U.S. Person, is not a citizen or resident alien of the United States, and did not receive an offer to purchase the Membership Interests or the Memorandum in the United States and did not execute this Agreement and pay the Total Subscription Payment from within the United States. The Subscriber further agrees to execute and deliver to the Company an IRS Form W-8 certifying that he or she is a Non-Resident Alien. Such IRS Form W-8 is attached hereto.

8.  <u>Reliance on Representations</u>.  The Subscriber understands that the Company, the Regional Center, the Manager and VTI will be relying on the accuracy and completeness of all matters set forth in this Agreement, and the Subscriber represents and warrants to the Company, the Manager, the Regional Center, VTI and each of their respective affiliates that the information, representations, warranties, acknowledgments and all other matters set forth herein with respect to the Subscriber are complete, true and correct and do not fail to include any material fact necessary to make the facts stated, in light of the circumstances in which they are made, not misleading, and may be relied upon by the Company in determining whether the offer and sale of the Membership Interests to the Subscriber is exempt from registration under the Securities Laws, and the Subscriber will notify the Company immediately of any change in any

statement made herein that occurs prior to the consummation of the purchase of the Membership Interests hereunder.

9.   Accredited Investor Status.   The undersigned represents and warrants that Subscriber is an "Accredited Investor" and has accurately completed the Accredited Investor Status section of the signature page hereto in order to evidence same.  The Subscriber is also a "sophisticated person" in that Subscriber has such knowledge and experience in financial and business matters that individually and/or with the aid of advisers, it is capable of evaluating the merits and risks of an investment in the Company by making an informed investment decision with respect thereto.

10.   Withholding Tax.   The Subscriber acknowledges that in the event the Internal Revenue Service determines that the Subscriber's country of residence does not exchange adequate tax information with the United States, pursuant to Internal Revenue Code Sections 871(h)(6) or Section 881(c)(6), then the Company will be obligated to withhold United States income taxes and remit such taxes to the Internal Revenue Service, pursuant to applicable law, and the Subscriber consents to such withholding, pursuant to the terms of the Operating Agreement, there may be other grounds for withholding.

11.   Confirmation.  All information that the Subscriber has provided anywhere in this Agreement concerning the Subscriber and the Subscriber's financial position is correct and complete as of the date set forth below, and if there should be any material change in such information prior to the acceptance of the Subscriber's subscription for the Membership Interests that are being purchased, the Subscriber will immediately provide such information to the Company and Company's counsel.

12.   Consultation with Independent Counsel and Tax Advisor.   The Subscriber's investment in the Membership Interests is an investment in equity of a California limited liability company, which confers certain rights and liabilities upon the Subscriber pursuant to California law and the Company's Operating Agreement.  The Subscriber has been advised that Subscriber should consult with his or her own legal and tax advisors prior to executing this Agreement, acquiring any Membership Interests or consummating the transactions contemplated hereby.  The Subscriber understands that the law firm for the Company, the Regional Center and the Manager represent only these entities in connection with the transactions contemplated by this Agreement, but does not represent the Subscriber, and such law firm makes no representation regarding the Regional Center, the Company or the Manager or the Subscriber's investment in Membership Interests.

13.   Indemnification.   The Subscriber hereby agrees to indemnify and hold harmless the Regional Center, the Company, the Manager, VTI and their respective affiliates, the other Members, and the respective employees, agents and attorneys of each of them against any and all losses, claims, demands, liabilities and expenses (including reasonable legal or other expenses) incurred by any such person or entity in connection with any claims or liabilities, whether or not resulting in any liability to such person or entity, to which any such indemnified party may become subject under the Securities Laws, under any other statute, at common law or otherwise, insofar as such losses, claims, demands, liabilities or expenses (a) arise out of or are based upon

any untrue statement or alleged untrue statement of a material fact made by Subscriber and contained in this Agreement, or (b) arise out of or are based upon any breach of any representation, warranty or agreement of Subscriber contained herein.

14.     Cooperation.   The Subscriber hereby agrees to provide such information and to execute and deliver such documents as may reasonably be necessary to comply with any and all laws and ordinances that the Company is subject to, including without limitation, such additional information as the Company may deem appropriate with regard to the undersigned's suitability to invest in the Company.

15.     Attorney In Fact.   The undersigned hereby irrevocably appoints Eric Chelini, the managing member of the Company's managing member, GSRV-VTI Management, LLC ("Manager"), acting individually, as the undersigned's true and lawful representative and attorney in fact in the undersigned's name, place and stead, (i) to receive and pay over to the Company on behalf of the undersigned, to the extent set forth in this Subscription Agreement, all funds received hereunder; (ii) to complete or correct, on behalf of the undersigned, all documents to be executed by the undersigned in connection with the undersigned's subscription for the Unit, including, without limitation, filling in or amending amounts, dates, and other pertinent information; and (iii) to execute, acknowledge, swear to and file, in the name and on behalf of the undersigned:   (A) the Operating Agreement, to be entered into pursuant to this Subscription Agreement and any amendments to which the undersigned is a signatory; (B) any subsequent amendments to any such amendments as provided in the Operating Agreement; (C) any agreements or other documents of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, as limited and defined in the Operating Agreement; (D) any certificates of the Company required by law and all amendments thereto; (E) all certificates and other instruments necessary to qualify, or continue the qualification of, the Company in the states where it may be doing business; (F) all assignments, conveyances or other instruments or documents necessary to effect the dissolution of the Company; and (G) all other filings with agencies of the federal government, of any state or local government, or of any other jurisdiction, which Manager considers necessary or desirable to carry out the purposes of this Subscription Agreement, the Operating Agreement and any amendments thereto and the business of the Company.   This power of attorney shall be deemed coupled with an interest, shall be irrevocable, shall survive the transfer of the undersigned's Unit and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of the undersigned.

16.     Miscellaneous.

(a)     Severability.   In the event any portions of this Agreement are found to be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby, and such invalidity, illegality or unenforceability in one jurisdiction shall not affect the validity, legality or enforceability of any portions of this Agreement in any other jurisdiction.

(b)     Entire Agreement; Amendment; Waiver.   This Agreement constitutes the entire Agreement between the parties and supersedes all prior oral and written agreements

between the parties hereto with respect to the subject matter hereof.  Neither this Agreement nor any provision hereof may be amended, modified, changed, waived, discharged or terminated orally, except by a statement in writing signed by the party or parties against which enforcement or the change, waiver, discharge or termination is sought.  No waiver of any provision of this Agreement shall be effective unless it is in writing and signed by the party against whom it is asserted, and any such written waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver.

(c)    Governing Law; Venue; Jurisdiction.  This Agreement and any dispute, disagreement, or issue of construction or interpretation arising hereunder whether relating to its execution, its validity, the obligations provided therein or performance thereof shall be governed or interpreted according to the laws of the State of California, without giving effect to the conflict of laws provisions thereof.  Any litigation arising under this Agreement shall be prosecuted exclusively in the state or federal courts residing in San Francisco, California and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein or for lack of personal jurisdiction.  Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

(d)    Notices.  All notices, offers, acceptance and any other acts under this Agreement (except payment) shall be in writing, and shall be sufficiently given if delivered to the addressee in person, by Federal Express or similar receipted delivery, or if mailed, postage prepaid, by certified mail, return receipt requested, as follows:

The Subscriber:      At the address designated on the
                     signature page of this Agreement.

The Company:         GSRV-VTI MANAGEMENT, LLC
                     Attention: Eric Chelini
                     One Sansome Street
                     Suite 2080
                     San Francisco, CA 94104
                     Telephone:  (415) 423-1223
                     Email:  echelini@3gfund.com

or to such other address as either of them, by notice to the other may designate from time to time.

(e)    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  The execution of this Agreement may be by actual or facsimile signature.

(f)    Survival of Representations, Warranties and Agreements.  The representations, warranties and agreements contained herein shall survive the delivery of, and payment for, the Membership Interest.

12

(g)     <u>Assignability</u>.  This Agreement and the rights and obligations hereunder are not transferable or assignable by the Subscriber without the prior written consent of the Company.  Any such transfer or assignment shall be made, if at all, only in connection with, and subject to the conditions of, an assignment or transfer or Membership Interests under the Operating Agreement.  Any attempted transfer or assignment in violation of the foregoing shall be void *ab initio*.  The Subscriber acknowledges and agrees that as a condition of any such consent, the Company may require a proposed assignee to take certain actions and execute certain documents, including, without limitation, executing a separate subscription agreement, as it may reasonably determine, all as more particularly set forth in the Operating Agreement.

(h)     <u>Benefit</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their legal representatives, successors, and assigns.

(i)     <u>English Language</u>.  The English language text of this Agreement has been translated to a language in which each of the Members are competent and each Member understands all of the provisions of this Agreement.  The English language text and American usage thereof shall control the interpretation and construction of this Agreement and all other writings between the parties.

(*Signatures are on the following page*)

13

**IN WITNESS WHEREOF**, the undersigned Subscriber has executed this Agreement as of the date set forth below.

**SUBSCRIBER:**

_____          ___Xi LIU_____
[Social Security Number or FEI Number] (if any)          Print Exact Name of Subscriber

___April. 03, 2015_____          刘 菲
Date of Subscriber's Execution          Signature of Subscriber

*Total Subscription Amount:* $540,000.00          ██████████████████████████

*Number of units:* 1          Principal Residential Street Address

China_____
Country of Residence

███████████

Telephone Number

N/A_____
Fax Number

N/A_____
E-mail Address

14

## ACCREDITED INVESTOR STATUS

Please indicate with an "X" the category or categories that accurately describe undersigned and qualify him or her as an "accredited investor" pursuant to Regulation D promulgated under the United States Securities Act of 1933, as amended and in effect as of the date hereof (the "Act"):

_____   (i)      a natural person whose individual net worth [1](or joint net worth with such person's spouse) exceeds $1,000,000;[2] or

_____   (ii)      a natural person who had an individual income[3] in excess of $200,000 in each of the two most recent years and who reasonably expects to have an individual income in excess of $200,000 in the current year, or who had joint income[4] in excess of $300,000 in each of the two most recent years and who reasonably expects to have joint income in excess of $300,000 in the current year.

---

[1]      For purposes of this item, "net worth" means the excess of total assets at fair market value, including any owned personal property, over total liabilities.  The value of your home is EXCLUDED from this calculation of your net worth. In addition, if the mortgage debt on the home exceeds the fair market value of the home, that excess amount must be treated as a liability for the purpose of this calculation.

[2]      Recent legislation also authorizes the SEC to make further adjustments to the net worth test on and after 2014.  Investors who qualify to acquire an interest in the Company will be allowed to continue to hold that interest even if qualifying standards increase.

[3]      For purposes of this item, "individual income" means adjusted gross income as reported for U.S. federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (but not including any amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any interest income received which is tax-exempt under Section 103 of the United States Internal Revenue Code of 1986, as amended (the "Code"), (ii) the amount of losses claimed as a limited partner in a limited partnership (as reported on Schedule E of Form 1040), (iii) any deduction claimed for depletion under Section 611 et seq. of the Code, and (iv) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Code prior to its repeal by the Tax Reform Act of 1986.

[4]      For purposes of this item, "joint income" means adjusted gross income as reported for U.S. federal income tax purposes, including any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (including any amounts attributable to a spouse or to property owned by a spouse):  (i) the amount of any interest income received which is tax-exempt under Section 103 of the Code, (ii) the amount of losses claimed as a limited partner in a limited partnership (as reported on Schedule E of Form 1040), (iii) any deduction claimed for depletion under Section 611 et seq. of the Code, and (iv) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Code prior to its repeal by the Tax Reform Act of 1986.

## ACCEPTANCE

By signing below, the undersigned accepts the foregoing subscription in GSRV-VTI II, LLC, in accordance with the terms hereof, for.

Subscriber Name:_ Xi LIU _____ ._ _____ __: _____

GSRV-VTI II, LLC,
a California limited liability company

By:   **GSRV-VTI MANAGEMENT, LLC,** a
    California limited liability company,
    Its Manager

By: _____
Name: Eric Chebini
Title: Manager

Dated: _03 - 09 - 15_____

16

# INVESTOR INFORMATION FORM

## Participant

| | |
|---|---|
| NAME: Xi LIU | ☑ Person   ☐ Entity |
| DATE OF BIRTH: ▉  PARTICIPANT ROLE: ▉ | NOTE: See below for the appropriate participant role code. |
| MAILING ADDRESS: ▉ | CITY: ▉   STATE: |
| PROVINCE/COUNTY/SUBDIVISION: ▉ | COUNTRY: China   ZIP/POSTAL CODE: |
| TELEPHONE NUMBER: (Day) ▉   (Evening) | E-MAIL: |
| UNEXPIRED PHOTO GOVERNMENT ID NUMBER: | TYPE OF UNEXPIRED PHOTO GOVERNMENT ID: |
| ISSUANCE DATE: | EXPIRATION DATE: |
| COUNTY OF GOVERNMENT IDENTIFICATION: | STATE/PROVINCE SUBDIVISION OF GOVERNMENT IDENTIFICATION: |
| UNEXPIRED PHOTO GOVERNMENT ID NUMBER: | TYPE OF UNEXPIRED PHOTO GOVERNMENT ID: |
| ISSUANCE DATE: | EXPIRATION DATE: |
| COUNTRY OF GOVERNMENT IDENTIFICATION: | STATE/PROVINCE SUBDIVISION OF GOVERNMENT IDENTIFICATION: |

NOTE: Unexpired Photo Government Identification should be provided for all nonresidential aliens, along with an IRS Form W-8BEN

| | |
|---|---|
| CORPORATE/BUSINESS ID NUMBER (IF APPLICABLE): | FORMATION DATE OF CORPORATION/BUSINESS: |
| STATE/PROVINCE OF CORPORATION/BUSINESS: | COUNTRY OF CORPORATION/BUSINESS: |

## SIGNATURE

Please review your information above and the Subscription Agreement in its entirety, and sign below.  THE UNDERSIGNED REPRESENTS AND WARRANTS THAT THE INFORMATION PROVIDED IN THIS INVESTOR INFORMATION FORM IS TRUE, COMPLETE AND ACCURATE.

SIGNATURE: 刘曦                    DATE:

## Participant Information

The legal address **MUST** be a street address.  A post office box is not acceptable for a legal address.  A legal address is the person's permanent residence address or, in the case of an entity, the place where it maintains a physical presence.  For those investments by nonresident aliens and foreign entities, the legal address must be the same as the permanent residence address listed on IRS Form W-8BEN.

**NOTE:** To help the government fight the funding of terrorism and money laundering activities, federal law requires certain "financial institutions" to obtain, verify, and record information that identifies each investor.  When you invest, we will ask for your name, address, date of birth, and other information that will allow us to identify you.  We may also ask you to provide a copy of your driver's license or other identifying documents.  The information you provide in this form may be used to perform a credit check and verify your identity by using internal sources and third party vendors.  If additional space is needed, please attach a separate sheet.

## Participant Roles

The codes below designate the participant role for each participant in the investment.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ADMN | Administrator | DRTR | Director | LPAR | Limited Partner | PATN | Power of Attorney |
| AGNT | Agent | EXEC | Executor | MNGR | Manager | PRM | Primary Investors |
| BENF | Beneficiary | GPMM | General Member/General Member | MMBR | Member | RIND | Responsible Individual |
| BORW | Borrower | GRNT | Grantor | MINR | Minor | SEC | Secondary Investors |
| CONS | Conservator | GRDN | Guardian | OFCR | Officer | STLR | Settlor |
| CUST | Custodian | IPTY | Interested Party | PTNR | Partners | SHLR | Shareholder |
| DECD | Deceased | IMGR | Investment Manager | PREP | Personal Representative | SPSR | Sponsor |
| DPTR | Depositor | LHLD | Lien Holder | PLAD | Plan Administrator | TSTE | Trustee |

17

Form **W-8BEN**
(Rev. February 2006)
Department of the Treasury
Internal Revenue Service

### Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding
▶ Section references are to the Internal Revenue Code.   ▶ See separate instructions.
▶ Give this form to the withholding agent or payer. Do not send to the IRS.

OMB No. 1545-1621

**Do not use this form for:**

**Instead, use Form:**

- A U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . . . . . . . . W-9
- A person claiming that income is effectively connected with the conduct
  of a trade or business in the United States . . . . . . . . . . . . . . . . . . . . . . W-8ECI
- A foreign partnership, a foreign simple trust, or a foreign grantor trust (see instructions for exceptions) . . . . . . W-8ECI or W-8IMY
- A foreign government, international organization, foreign central bank of issue, foreign tax-exempt organization,
  foreign private foundation, or government of a U.S. possession that received effectively connected income or that is
  claiming the applicability of section(s) 115(2), 501(c), 892, 895, or 1443(b) (see instructions) . . . . . . . . . W-8ECI or W-8EXP

**Note:** *These entities should use Form W-8BEN if they are claiming treaty benefits or are providing the form only to claim they are a foreign person exempt from backup withholding.*

- A person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . . . . . W-8IMY

**Note:** *See instructions for additional exceptions.*

| Part I | Identification of Beneficial Owner (See instructions.) |
|---|---|

**1** Name of individual or organization that is the beneficial owner
Xi LIU

**2** Country of incorporation or organization

**3** Type of beneficial owner:  ☑ Individual  ☐ Corporation  ☐ Disregarded entity  ☐ Partnership  ☐ Simple trust
☐ Grantor trust  ☐ Complex trust  ☐ Estate  ☐ Government  ☐ International organization
☐ Central bank of issue  ☐ Tax-exempt organization  ☐ Private foundation

**4** Permanent residence address (street, apt. or suite no., or rural route). **Do not use a P.O. box or in-care-of address.**
█████████████

City or town, state or province. Include postal code where appropriate.
█████████

Country (do not abbreviate)
China

**5** Mailing address (if different from above)

City or town, state or province. Include postal code where appropriate.

Country (do not abbreviate)

**6** U.S. taxpayer identification number, if required (see instructions)
☐ SSN or ITIN   ☐ EIN

**7** Foreign tax identifying number, if any (optional)

**8** Reference number(s) (see instructions)

| Part II | Claim of Tax Treaty Benefits (if applicable) |
|---|---|

**9** I certify that (check all that apply):

**a** ☐ The beneficial owner is a resident of . . . . . . . . . . . . . . . . . . . . . . . . .within the meaning of the income tax treaty between the United States and that country.

**b** ☐ If required, the U.S. taxpayer identification number is stated on line 6 (see instructions).

**c** ☐ The beneficial owner is not an individual, derives the item (or items) of income for which the treaty benefits are claimed, and, if applicable, meets the requirements of the treaty provision dealing with limitation on benefits (see instructions).

**d** ☐ The beneficial owner is not an individual, is claiming treaty benefits for dividends received from a foreign corporation or interest from a U.S. trade or business of a foreign corporation, and meets qualified resident status (see instructions).

**e** ☐ The beneficial owner is related to the person obligated to pay the income within the meaning of section 267(b) or 707(b), and will file Form 8833 if the amount subject to withholding received during a calendar year exceeds, in the aggregate, $500,000.

**10** Special rates and conditions (if applicable—see instructions): The beneficial owner is claiming the provisions of Article . . . . . . . . . . . . of the treaty identified on line 9a above to claim a . . . . . . . . . . . . % rate of withholding on (specify type of income): . . . . . . . . . . . . . . . . . . . . . .

Explain the reasons the beneficial owner meets the terms of the treaty article: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| Part III | Notional Principal Contracts |
|---|---|

**11** ☐ I have provided or will provide a statement that identifies those notional principal contracts from which the income is **not** effectively connected with the conduct of a trade or business in the United States. I agree to update this statement as required.

| Part IV | Certification |
|---|---|

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:
1 I am the beneficial owner (or am authorized to sign for the beneficial owner) of all the income to which this form relates,
2 The beneficial owner is not a U.S. person,
3 The income to which this form relates is (a) not effectively connected with the conduct of a trade or business in the United States, (b) effectively connected but is not subject to tax under an income tax treaty, or (c) the partner's share of a partnership's effectively connected income, **and**
4 For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.
Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

**Sign Here** ▶ *[signature]*

Signature of beneficial owner (or individual authorized to sign for beneficial owner)   Date (MM-DD-YYYY)   Capacity in which acting

**For Paperwork Reduction Act Notice, see separate instructions.**

Cat. No. 25047Z

Form **W-8BEN** (Rev. 2-2006)

♻ *Printed on Recycled Paper*

# EXHIBIT F

# EXHIBIT F

Name of Subscriber: <u>Rui ZHANG</u>

**NON-U.S. PURCHASER**

THE MEMBERSHIP INTERESTS REFERENCED IN THIS AGREEMENT WILL BE ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY STATE SECURITIES ACT, PURSUANT TO APPLICABLE EXEMPTIONS.  WITHOUT SUCH REGISTRATION, SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND THE COMPANY'S COUNSEL THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE COMPANY'S COUNSEL TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER.  ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF MEMBERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS AS SET FORTH IN THE COMPANY'S OPERATING AGREEMENT.

**GSRV-VTI II, LLC**

**SUBSCRIPTION AGREEMENT**

THIS SUBSCRIPTION AGREEMENT (this "**Agreement**") is made and entered into as of the date shown on the signature page hereof by the undersigned person identified on the signature page of this Agreement (the "**Subscriber**") in favor of **GSRV-VTI II, LLC**, a California limited liability company (the "**Company**"), **GSRV-VTI MANAGEMENT, LLC**, a California limited liability company (the "**Manager**"), **GOLDEN STATE RENAISSANCE VENTURES, LLC**, a California limited liability company **DBA GOLDEN GATE GLOBAL** (the "**Regional Center**") and if accepted by the Company in writing in accordance with the terms hereof, then this Agreement shall be by and between the Subscriber and the Company.

**THE MEMBERSHIP INTERESTS IN THE COMPANY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT AND ARE BEING OFFERED PURSUANT TO A TRANSACTION EXEMPTION AFFORDED BY REGULATION S PROMULGATED UNDER THE SECURITIES ACT SOLELY OUTSIDE OF THE UNITED STATES AND SOLELY TO NON-U.S. PERSONS AND IN SPECIFIC RELIANCE UPON THE REPRESENTATIONS BY EACH SUBSCRIBER THAT (1) AT THE TIME OF THE OFFER AND SALE OF THE MEMBERSHIP INTEREST TO THE SUBSCRIBER, THE SUBSCRIBER WAS NOT A U.S. PERSON AS DEFINED IN REGULATION S, AND (2) AT THE TIME OF THE OFFER AND SALE OF THE MEMBERSHIP INTEREST TO THE SUBSCRIBER AND, AS OF THE DATE OF THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE OPERATING AGREEMENT BY THE SUBSCRIBER, THE SUBSCRIBER WAS OUTSIDE OF THE UNITED STATES.  THE MEMBERSHIP INTEREST MAY NOT BE OFFERED OR**

**SOLD IN THE UNITED STATES OR TO U.S. PERSONS (AS DEFINED IN REGULATION S) UNLESS THE SECURITIES ARE REGISTERED UNDER THE SECURITIES ACT, OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT IS AVAILABLE. HEDGING TRANSACTIONS IN THESE SECURITIES MAY NOT BE CONDUCTED EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT.**

**NO PARTY EXCEPT THE COMPANY IS RESPONSIBLE FOR THE CONTENTS OF THE MEMORANDUM, AND NO OTHER PARTY EXCEPT SALES AGENTS, INCLUDING OFFSHORE MIGRATION BROKERS, AUTHORIZED BY THE COMPANY WILL BE INVOLVED IN THE OFFERING OF UNITS UNDER THE MEMORANDUM OR THE ACCEPTANCE OF SUBSCRIPTIONS FROM SUBSCRIBERS.**

## RECITALS

A.     The Company is offering (the "**Offering**") for investment pursuant to a Private Offering Memorandum dated as of April 27, 2015 (as amended and supplemented from time to time, the "**Memorandum**") to a limited number of individual investors who are not "U.S. Persons" (as such term is defined in Rule 902(k) of the Securities Act) on a limited and private basis, a maximum of Seven Million Dollars Five Hundred Thousand ($7,500,000) (the "**Maximum Offering Amount**") and a minimum of Five Hundred Thousand Dollars ($500,000) (the "**Minimum Offering Amount**") of membership interests in the Company (the "**Membership Interests**") (excluding the sum of $40,000 per Subscriber (the "**Processing and Marketing Expense**")), as such Membership Interests shall be described in the Operating Agreement of the Company to be entered into by and among the Company, the Manager and each of the Subscribers for Membership Interests whose subscriptions are accepted by the Company (the "**Operating Agreement**"). Any capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed in the Operating Agreement or the Memorandum.

B.     The Offering of the Membership Interests is limited to only individual persons (not any legal entities) who are "Accredited Investors," as such term is defined in Rule 501(a) under the Securities Act. To subscribe hereunder, the Subscriber must pay Five Hundred Forty Thousand Dollars ($540,000.00), consisting of $500,000 for the Subscriber's Capital Contribution and $40,000 for the Subscriber's Processing and Marketing Expense (collectively, the "**Total Subscription Payment**"), all as more particularly described herein. The Subscriber will be issued a Membership Interest based upon the Capital Contribution to the Company made by the Subscriber.

C.     The Regional Center has obtained approval from the United States Citizenship and Immigration Services ("**USCIS**") to participate as a regional center under the EB-5 program (the "**EB-5 Program**").

D.     The Company will be administered by its Manager, which is wholly-owned by one of the members of the Regional Center.

2

E.      The Company has been organized to invest in Vertebral Technologies, Inc. ("**VTI**") to allow VTI to expand its development, manufacturing, and distribution resources at its San Jose, California facility (the "**EB-5 Investment**").

F.      The Offering has been structured so that each Subscriber, by becoming an Investing Member in the Company, will have made an investment that may be a qualifying investment entitling the Subscriber, assuming the Subscriber otherwise satisfies the non-investment criteria for permanent residency, to seek permanent residency in the United States. The Subscribers will need to separately retain immigration counsel to file their I-526 Petitions.  It is anticipated that the USCIS will act on each I-526 Petition within fourteen (14) months after the I-526 Petition is filed.  If a Subscriber receives I-526 Petition Approval, the Subscriber will become a permanent Investing Member of the Company.  Each Subscriber acknowledges that, even if such Subscriber receives I-526 Petition Approval, there is no assurance that such Subscriber will ultimately receive conditional or unconditional lawful permanent residency status.  See Memorandum- Immigration Risk Factors.

G.      In addition to executing this Agreement and paying the Total Subscription Payment for subscribed Membership Interests to the Company as described herein, the Subscriber will also need to execute the Company's Amended and Restated Operating Agreement ("**Operating Agreement**"), and deliver the executed Operating Agreement to the Company in order to complete its subscription.  ***Please review the Operating Agreement in its entirety***.

H.      The period for the Offering has commenced and will end on October 27, 2015, unless extended by the Company until not later than April 27, 2016, or otherwise extended so that the Company can attempt to obtain Substitute Investing Members (if one or more Investing Members receives an I-526 Petition Denial (the "**Offering Period**").  The Total Subscription Payment shall be contributed by Subscriber directly to the Company in one (1) installment simultaneously with the execution of this Agreement.

I.      Upon subscription, the Subscriber shall no longer have the right to cancel, terminate or revoke his or her subscription and request a refund of his or her investment.  Subject to the terms of the Operating Agreement, the Subscriber hereby irrevocably commits the Subscriber's Capital Contribution to the Company.

J.      The Total Subscription Payment will be made directly to the Company. The Company will only facilitate the acquisition of up to 3,000,000 shares of Series B Convertible Preferred Stock of Vertebral Technologies, Inc. following receipt and approval of the following reports:  (i) the Vertebral Technologies, Inc. Business Plan and (ii); and the Economic and Job Creation Impacts Report commissioned by the Company. It is anticipated that both reports will be available for review on or before May 15, 2015.

3

## AGREEMENT

**NOW, THEREFORE**, the Subscriber hereby agrees as follows:

1.      <u>Subscription</u>.   The Subscriber hereby irrevocably subscribes for and agrees to purchase the Membership Interest indicated on the signature page of this Agreement:

(a)      **By wire transfer to:**

Wells Fargo Bank
420 Montgomery Street
San Francisco, CA 94104
ABA#: █████████
Beneficiary: First Clearing Corporation Acct#: █████████ 
Further Credit to the following:
A/C Name: GSRV-VTI II, LLC Account #: █████████

(b)      **By check**: In the alternative, the Subscriber shall enclose herewith a certified or official bank check payable to "GSRV-VTI II, LLC".   The above referenced subscription payments shall be made in one (1) payment of $540,000 upon subscription.

2.      <u>Acceptance of Subscription</u>.   The Subscriber understands and agrees that its subscription may be rejected by the Company at any time in its sole discretion.   If Subscriber's subscription is accepted, the Company will notify Subscriber of same.   If the Subscription is rejected, all funds received from the Subscriber will be returned without interest, as described above, and thereafter this Agreement shall be of no further force or effect.

3.      <u>Subscriber's Acknowledgment of Restrictions on Transfer; No Right to Require Registration</u>.   THE SUBSCRIBER UNDERSTANDS THE OFFER AND SALE OF THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, ANY STATE SECURITIES OR "BLUE SKY" LAWS, OR ANY RULES OR REGULATIONS PROMULGATED THEREUNDER (COLLECTIVELY, "**SECURITIES LAWS**"), PURSUANT TO APPLICABLE EXEMPTIONS.   WITHOUT SUCH REGISTRATION, SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED AT ANY TIME WHATSOEVER, AND SUCH MEMBERSHIP INTERESTS MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES OR TO A U.S. PERSON, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND/OR THE COMPANY'S COUNSEL THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE COMPANY AND/OR THE COMPANY'S COUNSEL TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES LAWS.   NO HEDGING TRANSACTIONS INVOLVING THE MEMBERSHIP INTERESTS MAY BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT OF 1933, AS AMENDED.

ADDITIONALLY, THE SUBSCRIBER ACKNOWLEDGES THAT NEITHER THE COMPANY NOR ITS MANAGER IS OBLIGATED TO REGISTER THE MEMBERSHIP INTERESTS UNDER THE SECURITIES LAWS.   THE SUBSCRIBER FURTHER UNDERSTANDS THAT THE TRANSFER OF THE MEMBERSHIP INTERESTS MAY BE SUBSTANTIALLY RESTRICTED BY THE SECURITIES LAWS AND BY THE ABSENCE OF A TRADING MARKET THEREFOR, AND THE TRANSFER OF THE MEMBERSHIP INTERESTS IS ADDITIONALLY RESTRICTED BY THE TERMS OF THE OPERATING AGREEMENT; THAT NO TRADING MARKET FOR THE MEMBERSHIP INTERESTS EXISTS AND NONE IS EXPECTED TO DEVELOP, AND THAT ANY SALE OR OTHER DISPOSITION OF THE MEMBERSHIP INTERESTS MAY RESULT IN UNFAVORABLE TAX CONSEQUENCES TO THE SUBSCRIBER.  THE SUBSCRIBER ACKNOWLEDGES THAT THE RESTRICTIONS ON THE TRANSFERABILITY OF THE MEMBERSHIP INTERESTS ARE SUBSTANTIAL AND MAY REQUIRE THE SUBSCRIBER TO HOLD THE MEMBERSHIP INTERESTS INDEFINITELY.

THE SUBSCRIBER HEREBY REPRESENTS AND WARRANTS THAT THE SUBSCRIBER HAS ADEQUATE MEANS OF PROVIDING FOR THE SUBSCRIBER'S CURRENT AND FUTURE NEEDS AND POSSIBLE PERSONAL CONTINGENCIES AND HAS NO NEED FOR LIQUIDITY OF THE MEMBERSHIP INTERESTS.

4.     Subscriber's Additional Representations and Warranties.   The Subscriber additionally represents and warrants to the Company, the Manager, the Regional Center and VTI as follows:

(a)     The Subscriber understands that the Company has been formed in connection with the EB-5 Investment and has no operating history; that VTI is in its early stages of development, and its future profitability cannot be assured.

(b)     The Subscriber understands that: (i) his or her subscription for Membership Interests is irrevocable (unless the Company otherwise consents in writing in its sole and absolute discretion); (ii) an investment in the Membership Interests is a speculative investment that involves a high degree of risk, including the risk of loss of the entire investment of the Subscriber in the Company; (iii) no federal or state agency has passed upon the adequacy or accuracy of the information made available to the Subscriber, or made any finding or determination as to the fairness for investment, or any recommendation or endorsement of the Membership Interests as an investment; (iv) there will be restrictions on the transferability the Membership Interests under the Securities Laws and the Operating Agreement and there will be no public market for the Membership Interests, and, accordingly, it may not be possible for the Subscriber to liquidate his or her investment in the Membership Interests; (v) any anticipated federal and/or state income tax benefits applicable to the Membership Interests may be lost through changes in, or adverse interpretations of, existing laws and regulations; and (vi) there is no assurance that VTI will ever be profitable, or that the Subscriber's investment in the Membership Interests will ever be recoverable.

(c)     The Subscriber acknowledges that there is no assurance that his or her I-526 Petition will be approved or, if it is, that Subscriber will ultimately be approved for

conditional or unconditional lawful permanent residence in the U.S. or be able to become a U.S. citizen.  Neither the Regional Center, the Company, the Manager, VTI, nor the selected immigration counsel have made any effort to pre-determine Subscriber's personal qualifications and circumstances and whether Subscriber is likely or not likely to obtain favorable action on his or her I-526 Petition or Immigrant Visa and that there are numerous reasons that will result in Subscribers being denied residency in the United States, including, without limitation, the Project failing to qualify for the EB-5 Program.

        (d)     The Subscriber hereby acknowledges that the Subscription Amount will be deposited directly with the Company. Both the Minimum Offering Amount and the Processing and Marketing Expense will be credited to the Subscriber's Capital Account.  The Processing and Marketing Expense will be paid from the Subscribers Capital Account to the Manager upon USCIS approval of Subscriber's I-526 Petition.  Interest will not accrue on the Subscription Amount.

        (e)     The Subscriber hereby acknowledges that there will be no escrow account holding a Subscriber's Subscription Amount or Processing and Marketing Expense pending an Investor's I-526 application submittal to or approval from USCIS.

        (f)     The Subscriber hereby acknowledges that VTI has a need for the immediate investment of funds to commence its operations and that following the Company's receipt of the VTI Business Plan and the econometric report commissioned by the Company, the Capital Contribution of each Member will be utilized to acquire up to 3,000,000 shares of Series B Convertible Preferred Stock of Vertebral Technologies, Inc.

        (g)     The Subscriber hereby acknowledges that it is likely that the Company will utilize each Member's Capital Contribution to acquire up to 3,000,000 shares of Series B Convertible Preferred Stock of Vertebral Technologies, Inc. prior to an Subscriber's submittal of his or her I-526 Petition to the USCIS.

        (h)     The Subscriber has been provided with a copy of the Memorandum, including, as exhibits thereto, the Operating Agreement, and this Agreement, and has reviewed same, has had the opportunity to ask questions of the Manager and the Regional Center, has received answers adequate to Subscriber with respect to same, and has no further questions regarding the Regional Center, the Manager, the Company, the Project or VTI.  The Subscriber is aware that, pursuant to the Operating Agreement, the Manager will receive certain fees and benefits related to the EB-5 Investment.

        (i)     The Subscriber hereby acknowledges that: (i) the risks inherent to this investment have been fully considered; (ii) the Manager will have substantial and exclusive authority to conduct the operation of the Company; (iii) the Company will be relying on outside agents to manage certain aspects of its operations; and (iv) an investment in the Membership Interests has neither been approved nor disapproved by the United States Securities and Exchange Commission or the Securities Division of the Department of Banking and Finance of the State of California or any other department or agency of any other jurisdiction, and such

authorities have not passed upon the adequacy or accuracy of the disclosure provided to investors in connection with an investment in the Membership Interests.

(j)     The Subscriber acknowledges that the Regional Center, the Company, the Manager, nor any representative of the Company, the Manager or the Regional Center has made any representations or warranties in respect of VTI's business or profitability.  Without limiting the generality of the foregoing, the undersigned acknowledges and agrees that information, including any business plan or financial projections or forecasts or other information contained in written materials provided or made available to the undersigned, and any oral, visual or other presentations made by the Company, the Manager or the Regional Center or their respective representatives to the Subscriber shall not be deemed a representation or warranty in respect of the matters therein.  The Subscriber acknowledges that the Memorandum contains information that the Company, the Manager and the Regional Center believe is accurate and data that VTI has represented to the Company is true and correct; however, as an accredited, experienced and sophisticated investor, the Subscriber is aware that there are many foreseeable and unforeseeable events that could cause the assumptions underlying the Project to not materialize, and the results of same may cause material adverse consequences to the financial results of VTI and/or the Company.

(k)     The Subscriber acknowledges that in the event a Subscriber's I-526 Petition is denied by USCIS or the Subscriber withdraws his or her I-526 Petition once the I-526 Petition is filed, that the Subscriber shall have no right to withdraw from the Company and the Company shall have no obligation to return such Subscriber, his or her Capital Contribution or Processing and Marketing Expense.

(l)     The Subscriber is acquiring the Membership Interests solely for the account of the Subscriber for investment purposes only and not for distribution or resale to others.  The Subscriber will not resell or offer to resell the Membership Interests except in strict compliance with all applicable Securities Laws, including, without limitation, Regulation S of the Securities Act, and the Operating Agreement.  The Subscriber will not engage in any hedging transactions involving the Membership Interests, except in compliance with the Securities Laws.

(m)     The Subscriber's financial condition is such that it has no need for liquidity with respect to his or her investment to satisfy any existing or contemplated undertaking or indebtedness and is able to bear the economic risk of his or her investment for an indefinite period of time, including the risk of losing all of his or her investment.

(n)     The Subscriber acknowledges that the offer and sale of the Membership Interests is not taking place within the United States, but rather in an offshore transaction. "United States" means the United States of America, its territories and possessions, any state of the United States and the District of Columbia.

(o)     The Subscriber acknowledges that the Membership Interests have not been registered under the Securities Act and therefore cannot be offered and sold in the United States or to U.S. Persons, unless the Membership Interests are registered under the Securities Act or an exemption from the registration requirements of the Securities Act is available.  The Subscriber

is not a U.S. Person and is not acquiring the Membership Interests for the account or benefit of any U.S. Person.

(p)     The Subscriber is in compliance with all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA Patriot Act**"), the U.S. Bank Secrecy Act (the "**BSA**") and all other anti-money laundering laws and applicable regulations adopted to implement the provisions of such laws, including policies and procedures that can be reasonably expected to detect and cause the reporting of transactions under Section 5318 of the BSA.  The Subscriber is not and shall not be a person: (i) acting, directly or indirectly, on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any of the U.S. Office of Foreign Assets Control ("**OFAC**") lists; (ii) listed on, residing in or having a place of business in a country or territory named on any of such lists or which is designated as a Non-Cooperative Jurisdiction by the Financial Action Task Force on Money Laundering ("**FATF**"), or whose funds are from or through such a jurisdiction; (iii) that is a "Foreign Shell bank" within the meaning of the USA Patriot Act; or (iv) residing in or organized under the laws of a jurisdiction designated by the U.S. Secretary of the Treasury under Sections 311 or 312 of the USA Patriot Act as warranting special measures due to money-laundering concerns.

(q)     The undersigned acknowledges and agrees that the Company's special immigration counsel, as appointed by the Company, is the sole entity authorized to respond on behalf of the undersigned in any matter before the USCIS, the Administrative Appeals Office or other judicial body having jurisdiction over the undersigned's I-526 Petition or I-829 Petition. The undersigned, upon the instructions of the Company, agrees to supply a Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, appointing such special immigration counsel as the undersigned's immigration counsel to facilitate such response. The undersigned further agrees to provide the Company and special immigration counsel with a complete copy of any prior immigration filings and / or relevant immigration or other documents necessary to facilitate such response.  The undersigned further authorizes the Company and its special immigration counsel to have complete access to the undersigned's immigration history, record and status and the undersigned agrees to execute a G-28 or other document authorizing such access by the Company and its special immigration counsel. The Company agrees to maintain confidentiality with respect to the undersigned's immigration history, record, and status.

5.     <u>Access to Information</u>.  The Subscriber hereby acknowledges and confirms that the Subscriber has been given complete access to all documents, records, contracts and books of or relating to Regional Center, the Company and the Membership Interests now existing, the Manager, VTI, and all other information to the extent the Company or the Regional Center possesses such information or can acquire it without unreasonable effort or expense, and that the Subscriber has engaged in a complete examination of all such documents, records, contracts and books to the extent deemed necessary by the Subscriber in reaching the Subscriber's decision to invest in the Company.  The Subscriber hereby further acknowledges and confirms that the Subscriber has had an opportunity to ask questions of and receive answers from the Regional Center, the Company, the Manager and VTI, concerning the Membership Interests, the

prospective contemplated business and purpose of VTI, and with respect to any other matter the Subscriber has deemed relevant, and all such inquiries have been answered to the Subscriber's satisfaction.  In addition, the Subscriber acknowledges that it has had and may have, at any reasonable hour, after reasonable prior notice, access to the financial and other records of the Company which the Company can obtain without unreasonable effort or expense, and further acknowledges that Subscriber has obtained, in Subscriber's judgment, sufficient information from these parties to evaluate the merits and risks of an investment in the Company.

6.    <u>No Advertising or Reliance</u>.  The Subscriber represents and warrants that in making the decision to purchase the Membership Interests herein subscribed for, the Subscriber has relied solely upon independent investigations made by Subscriber, and the Subscriber further represents and warrants that the Subscriber is not acquiring the Membership Interests as a result of any advertisement, article, notice or other communication published in any newspaper, magazine or similar media distributed in the United States, any seminar in the United States or any solicitation by a person in the United States not previously known to the Subscriber, and that Subscriber is not aware of any general solicitation within the United States or general advertising within the United States regarding the purchase or sale of the Membership Interests.  The Subscriber acknowledges and confirms that it is not relying upon any statement, representation or warranty made by the Regional Center or its respective representatives in making a decision to subscribe for the Membership Interests.  The Subscriber must rely solely on the terms of the Operating Agreement for the terms of Subscriber's participation in the Company and the rights and responsibilities of owning its Membership Interests.

7.    <u>Residence</u>.  The Subscriber represents and warrants that the Subscriber is a bona fide resident of the country set forth in his or her address below, and the undersigned agrees that if his or her principal residence changes prior to his/her purchase of the Membership Interests, he/she will promptly notify the Company.  The Subscriber represents and warrants that the Subscriber is not a U.S. Person, is not a citizen or resident alien of the United States, and did not receive an offer to purchase the Membership Interests or the Memorandum in the United States and did not execute this Agreement and pay the Total Subscription Payment from within the United States.  The Subscriber further agrees to execute and deliver to the Company an IRS Form W-8 certifying that he or she is a Non-Resident Alien.  Such IRS Form W-8 is attached hereto.

8.    <u>Reliance on Representations</u>.  The Subscriber understands that the Company, the Regional Center, the Manager and VTI will be relying on the accuracy and completeness of all matters set forth in this Agreement, and the Subscriber represents and warrants to the Company, the Manager, the Regional Center, VTI and each of their respective affiliates that the information, representations, warranties, acknowledgments and all other matters set forth herein with respect to the Subscriber are complete, true and correct and do not fail to include any material fact necessary to make the facts stated, in light of the circumstances in which they are made, not misleading, and may be relied upon by the Company in determining whether the offer and sale of the Membership Interests to the Subscriber is exempt from registration under the Securities Laws, and the Subscriber will notify the Company immediately of any change in any

statement made herein that occurs prior to the consummation of the purchase of the Membership Interests hereunder.

9.     Accredited Investor Status.   The undersigned represents and warrants that Subscriber is an "Accredited Investor" and has accurately completed the Accredited Investor Status section of the signature page hereto in order to evidence same.  The Subscriber is also a "sophisticated person" in that Subscriber has such knowledge and experience in financial and business matters that individually and/or with the aid of advisers, it is capable of evaluating the merits and risks of an investment in the Company by making an informed investment decision with respect thereto.

10.     Withholding Tax.   The Subscriber acknowledges that in the event the Internal Revenue Service determines that the Subscriber's country of residence does not exchange adequate tax information with the United States, pursuant to Internal Revenue Code Sections 871(h)(6) or Section 881(c)(6), then the Company will be obligated to withhold United States income taxes and remit such taxes to the Internal Revenue Service, pursuant to applicable law, and the Subscriber consents to such withholding, pursuant to the terms of the Operating Agreement, there may be other grounds for withholding.

11.     Confirmation.  All information that the Subscriber has provided anywhere in this Agreement concerning the Subscriber and the Subscriber's financial position is correct and complete as of the date set forth below, and if there should be any material change in such information prior to the acceptance of the Subscriber's subscription for the Membership Interests that are being purchased, the Subscriber will immediately provide such information to the Company and Company's counsel.

12.     Consultation with Independent Counsel and Tax Advisor.   The Subscriber's investment in the Membership Interests is an investment in equity of a California limited liability company, which confers certain rights and liabilities upon the Subscriber pursuant to California law and the Company's Operating Agreement.  The Subscriber has been advised that Subscriber should consult with his or her own legal and tax advisors prior to executing this Agreement, acquiring any Membership Interests or consummating the transactions contemplated hereby. The Subscriber understands that the law firm for the Company, the Regional Center and the Manager represent only these entities in connection with the transactions contemplated by this Agreement, but does not represent the Subscriber, and such law firm makes no representation regarding the Regional Center, the Company or the Manager or the Subscriber's investment in Membership Interests.

13.     Indemnification.   The Subscriber hereby agrees to indemnify and hold harmless the Regional Center, the Company, the Manager, VTI and their respective affiliates, the other Members, and the respective employees, agents and attorneys of each of them against any and all losses, claims, demands, liabilities and expenses (including reasonable legal or other expenses) incurred by any such person or entity in connection with any claims or liabilities, whether or not resulting in any liability to such person or entity, to which any such indemnified party may become subject under the Securities Laws, under any other statute, at common law or otherwise, insofar as such losses, claims, demands, liabilities or expenses (a) arise out of or are based upon

any untrue statement or alleged untrue statement of a material fact made by Subscriber and contained in this Agreement, or (b) arise out of or are based upon any breach of any representation, warranty or agreement of Subscriber contained herein.

14.    <u>Cooperation.</u>  The Subscriber hereby agrees to provide such information and to execute and deliver such documents as may reasonably be necessary to comply with any and all laws and ordinances that the Company is subject to, including without limitation, such additional information as the Company may deem appropriate with regard to the undersigned's suitability to invest in the Company.

15.    <u>Attorney In Fact.</u>  The undersigned hereby irrevocably appoints Eric Chelini, the managing member of the Company's managing member, GSRV-VTI Management, LLC ("Manager"), acting individually, as the undersigned's true and lawful representative and attorney in fact in the undersigned's name, place and stead, (i) to receive and pay over to the Company on behalf of the undersigned, to the extent set forth in this Subscription Agreement, all funds received hereunder; (ii) to complete or correct, on behalf of the undersigned, all documents to be executed by the undersigned in connection with the undersigned's subscription for the Unit, including, without limitation, filling in or amending amounts, dates, and other pertinent information; and (iii) to execute, acknowledge, swear to and file, in the name and on behalf of the undersigned:  (A) the Operating Agreement, to be entered into pursuant to this Subscription Agreement and any amendments to which the undersigned is a signatory; (B) any subsequent amendments to any such amendments as provided in the Operating Agreement; (C) any agreements or other documents of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, as limited and defined in the Operating Agreement; (D) any certificates of the Company required by law and all amendments thereto; (E) all certificates and other instruments necessary to qualify, or continue the qualification of, the Company in the states where it may be doing business; (F) all assignments, conveyances or other instruments or documents necessary to effect the dissolution of the Company; and (G) all other filings with agencies of the federal government, of any state or local government, or of any other jurisdiction, which Manager considers necessary or desirable to carry out the purposes of this Subscription Agreement, the Operating Agreement and any amendments thereto and the business of the Company.  This power of attorney shall be deemed coupled with an interest, shall be irrevocable, shall survive the transfer of the undersigned's Unit and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of the undersigned.

16.    <u>Miscellaneous</u>.

(a)    <u>Severability</u>.  In the event any portions of this Agreement are found to be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby, and such invalidity, illegality or unenforceability in one jurisdiction shall not affect the validity, legality or enforceability of any portions of this Agreement in any other jurisdiction.

(b)    <u>Entire Agreement; Amendment; Waiver</u>.  This Agreement constitutes the entire Agreement between the parties and supersedes all prior oral and written agreements

11

between the parties hereto with respect to the subject matter hereof.  Neither this Agreement nor any provision hereof may be amended, modified, changed, waived, discharged or terminated orally, except by a statement in writing signed by the party or parties against which enforcement or the change, waiver, discharge or termination is sought.  No waiver of any provision of this Agreement shall be effective unless it is in writing and signed by the party against whom it is asserted, and any such written waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver.

(c)     Governing Law; Venue; Jurisdiction.  This Agreement and any dispute, disagreement, or issue of construction or interpretation arising hereunder whether relating to its execution, its validity, the obligations provided therein or performance thereof shall be governed or interpreted according to the laws of the State of California, without giving effect to the conflict of laws provisions thereof.  Any litigation arising under this Agreement shall be prosecuted exclusively in the state or federal courts residing in San Francisco, California and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein or for lack of personal jurisdiction.  Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

(d)     Notices.  All notices, offers, acceptance and any other acts under this Agreement (except payment) shall be in writing, and shall be sufficiently given if delivered to the addressee in person, by Federal Express or similar receipted delivery, or if mailed, postage prepaid, by certified mail, return receipt requested, as follows:

> The Subscriber:     At the address designated on the
>                     signature page of this Agreement.
>
> The Company:        GSRV-VTI MANAGEMENT, LLC
>                     Attention: Eric Chelini
>                     One Sansome Street
>                     Suite 2080
>                     San Francisco, CA 94104
>                     Telephone:  (415) 423-1223
>                     Email:  echelini@3gfund.com

or to such other address as either of them, by notice to the other may designate from time to time.

(e)     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  The execution of this Agreement may be by actual or facsimile signature.

(f)     Survival of Representations, Warranties and Agreements.  The representations, warranties and agreements contained herein shall survive the delivery of, and payment for, the Membership Interest.

(g)     <u>Assignability</u>.  This Agreement and the rights and obligations hereunder are not transferable or assignable by the Subscriber without the prior written consent of the Company.  Any such transfer or assignment shall be made, if at all, only in connection with, and subject to the conditions of, an assignment or transfer or Membership Interests under the Operating Agreement.  Any attempted transfer or assignment in violation of the foregoing shall be void *ab initio*.  The Subscriber acknowledges and agrees that as a condition of any such consent, the Company may require a proposed assignee to take certain actions and execute certain documents, including, without limitation, executing a separate subscription agreement, as it may reasonably determine, all as more particularly set forth in the Operating Agreement.

(h)     <u>Benefit</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their legal representatives, successors, and assigns.

(i)     <u>English Language</u>.  The English language text of this Agreement has been translated to a language in which each of the Members are competent and each Member understands all of the provisions of this Agreement.  The English language text and American usage thereof shall control the interpretation and construction of this Agreement and all other writings between the parties.

(*Signatures are on the following page*)

**IN WITNESS WHEREOF**, the undersigned Subscriber has executed this Agreement as of the date set forth below.

**SUBSCRIBER:**

_____       Rui ZHANG_____
[Social Security Number or FEI Number] (if any)     Print Exact Name of Subscriber

_____Feb. 06, 2015_____     张中凌 ._____
Date of Subscriber's Execution     Signature of Subscriber

_Total Subscription Amount:_ $540,000.00     ████████████████████████

_Number of units:_ 1     Principal Residential Street Address

China_____
Country of Residence

████████████     _____
Telephone Number

N/A_____
Fax Number

████████████████     _____
E-mail Address

14

## ACCREDITED INVESTOR STATUS

Please indicate with an "X" the category or categories that accurately describe undersigned and qualify him or her as an "accredited investor" pursuant to Regulation D promulgated under the United States Securities Act of 1933, as amended and in effect as of the date hereof (the "Act"):

__X__ (i)    a natural person whose individual net worth [1] (or joint net worth with such person's spouse) exceeds $1,000,000;[2] or

____ (ii)    a natural person who had an individual income[3] in excess of $200,000 in each of the two most recent years and who reasonably expects to have an individual income in excess of $200,000 in the current year, or who had joint income[4] in excess of $300,000 in each of the two most recent years and who reasonably expects to have joint income in excess of $300,000 in the current year.

---

[1]    For purposes of this item, "net worth" means the excess of total assets at fair market value, including any owned personal property, over total liabilities. The value of your home is EXCLUDED from this calculation of your net worth. In addition, if the mortgage debt on the home exceeds the fair market value of the home, that excess amount must be treated as a liability for the purpose of this calculation.

[2]    Recent legislation also authorizes the SEC to make further adjustments to the net worth test on and after 2014. Investors who qualify to acquire an interest in the Company will be allowed to continue to hold that interest even if qualifying standards increase.

[3]    For purposes of this item, "individual income" means adjusted gross income as reported for U.S. federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (but not including any amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any interest income received which is tax-exempt under Section 103 of the United States Internal Revenue Code of 1986, as amended (the "Code"), (ii) the amount of losses claimed as a limited partner in a limited partnership (as reported on Schedule E of Form 1040), (iii) any deduction claimed for depletion under Section 611 et seq. of the Code, and (iv) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Code prior to its repeal by the Tax Reform Act of 1986.

[4]    For purposes of this item, "joint income" means adjusted gross income as reported for U.S. federal income tax purposes, including any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (including any amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any interest income received which is tax-exempt under Section 103 of the Code, (ii) the amount of losses claimed as a limited partner in a limited partnership (as reported on Schedule E of Form 1040), (iii) any deduction claimed for depletion under Section 611 et seq. of the Code, and (iv) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Code prior to its repeal by the Tax Reform Act of 1986.

## ACCEPTANCE

By signing below, the undersigned accepts the foregoing subscription in **GSRV-VTI II, LLC,** in accordance with the terms hereof, for:

Subscriber Name: _Rui, ZHANG_

**GSRV-VTI II, LLC,**
a California limited liability company

**By:**   **GSRV-VTI MANAGEMENT, LLC,** a
California limited liability company,
Its Manager

By:

Name: Eric Chelini
Title:   Manager

**Dated:** _July 9, 2015_

16

# INVESTOR INFORMATION FORM

## Participant

| | | | |
|---|---|---|---|
| NAME: RUI ZHANG | | ☑ Person | ☐ Entity |
| DATE OF BIRTH: ▮▮▮▮ | PARTICIPANT ROLE: | NOTE: See below for the appropriate participant role code. | |
| MAILING ADDRESS: ▮▮▮▮ | | CITY: ▮▮▮▮ | STATE: |
| PROVINCE/COUNTY/SUBDIVISION: ▮▮▮▮ | | COUNTRY: China | ZIP/POSTAL CODE: |
| TELEPHONE NUMBER: (Day) ▮▮▮▮ | (Evening) | E-MAIL: | |

| | |
|---|---|
| UNEXPIRED PHOTO GOVERNMENT ID NUMBER: | TYPE OF UNEXPIRED PHOTO GOVERNMENT ID: |
| ISSUANCE DATE: | EXPIRATION DATE: |
| COUNTY OF GOVERNMENT IDENTIFICATION: | STATE/PROVINCE SUBDIVISION OF GOVERNMENT IDENTIFICATION: |
| UNEXPIRED PHOTO GOVERNMENT ID NUMBER: | TYPE OF UNEXPIRED PHOTO GOVERNMENT ID: |
| ISSUANCE DATE: | EXPIRATION DATE: |
| COUNTRY OF GOVERNMENT IDENTIFICATION: | STATE/PROVINCE SUBDIVISION OF GOVERNMENT IDENTIFICATION: |

NOTE: Unexpired Photo Government Identification should be provided for all nonresidential aliens, along with an IRS Form W-8BEN

| | |
|---|---|
| CORPORATE/BUSINESS ID NUMBER (IF APPLICABLE): | FORMATION DATE OF CORPORATION/BUSINESS: |
| STATE/PROVINCE OF CORPORATION/BUSINESS: | COUNTRY OF CORPORATION/BUSINESS: |

## SIGNATURE

Please review your information above and the Subscription Agreement in its entirety, and sign below. THE UNDERSIGNED REPRESENTS AND WARRANTS THAT THE INFORMATION PROVIDED IN THIS INVESTOR INFORMATION FORM IS TRUE, COMPLETE AND ACCURATE.

SIGNATURE: *[signature]*                    DATE: 2015. 2. 6

## Participant Information

The legal address MUST be a street address. A post office box is not acceptable for a legal address. A legal address is the person's permanent residence address or, in the case of an entity, the place where it maintains a physical presence. For those investments by nonresident aliens and foreign entities, the legal address must be the same as the permanent residence address listed on IRS Form W-8BEN.

NOTE: To help the government fight the funding of terrorism and money laundering activities, federal law requires certain "financial institutions" to obtain, verify, and record information that identifies each investor. When you invest, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask you to provide a copy of your driver's license or other identifying documents. The information you provide in this form may be used to perform a credit check and verify your identity by using internal sources and third party vendors. If additional space is needed, please attach a separate sheet.

## Participant Roles

The codes below designate the participant role for each participant in the investment.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ADMN | Administrator | DRTR | Director | LPAR | Limited Partner | PATN | Power of Attorney |
| AGNT | Agent | EXEC | Executor | MNGR | Manager | PRM | Primary Investors |
| BENF | Beneficiary | GPMM | General Member/General Member | MMBR | Member | RIND | Responsible Individual |
| BORW | Borrower | GRNT | Grantor | MINR | Minor | SEC | Secondary Investors |
| CONS | Conservator | GRDN | Guardian | OFCR | Officer | STLR | Settlor |
| CUST | Custodian | IPTY | Interested Party | PTNR | Partners | SHLR | Shareholder |
| DECD | Deceased | IMGR | Investment Manager | PREP | Personal Representative | SPSR | Sponsor |
| DPTR | Depositor | LHLD | Lien Holder | PLAD | Plan Administrator | TSTE | Trustee |

17

Form **W-8BEN**

(Rev. February 2006)

Department of the Treasury
Internal Revenue Service

## Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding

▶ Section references are to the Internal Revenue Code.   ▶ See separate instructions.
▶ Give this form to the withholding agent or payer. Do not send to the IRS.

OMB No. 1545-1621

| Do not use this form for: | Instead, use Form: |
|---|---|
| • A U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . | W-9 |
| • A person claiming that income is effectively connected with the conduct of a trade or business in the United States . . . . . . . . . . . . . . . . . . . . . . . | W-8ECI |
| • A foreign partnership, a foreign simple trust, or a foreign grantor trust (see instructions for exceptions) . . . . . . | W-8ECI or W-8IMY |
| • A foreign government, international organization, foreign central bank of issue, foreign tax-exempt organization, foreign private foundation, or government of a U.S. possession that received effectively connected income or that is claiming the applicability of section(s) 115(2), 501(c), 892, 895, or 1443(b) (see instructions) . . . . . . | W-8ECI or W-8EXP |

**Note:** *These entities should use Form W-8BEN if they are claiming treaty benefits or are providing the form only to claim they are a foreign person exempt from backup withholding.*

| • A person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . . | W-8IMY |

**Note:** *See instructions for additional exceptions.*

### Part I   Identification of Beneficial Owner (See instructions.)

| 1   Name of individual or organization that is the beneficial owner | 2   Country of incorporation or organization |
|---|---|
| Rui ZHANG | |

3   Type of beneficial owner:   ☑ Individual   ☐ Corporation   ☐ Disregarded entity   ☐ Partnership   ☐ Simple trust

☐ Grantor trust   ☐ Complex trust   ☐ Estate   ☐ Government   ☐ International organization

☐ Central bank of issue   ☐ Tax-exempt organization   ☐ Private foundation

4   Permanent residence address (street, apt. or suite no., or rural route). **Do not use a P.O. box or in-care-of address.**

▇▇▇▇▇▇▇▇▇

| City or town, state or province. Include postal code where appropriate. | Country (do not abbreviate) |
|---|---|
| ▇▇▇▇▇▇ | China |

5   Mailing address (if different from above)

| City or town, state or province. Include postal code where appropriate. | Country (do not abbreviate) |
|---|---|
| | |

| 6   U.S. taxpayer identification number, if required (see instructions) | 7   Foreign tax identifying number, if any (optional) |
|---|---|
| ☐ SSN or ITIN   ☐ EIN | |

8   Reference number(s) (see instructions)

### Part II   Claim of Tax Treaty Benefits (if applicable)

9   I certify that (check all that apply):

a ☐  The beneficial owner is a resident of ............................................ within the meaning of the income tax treaty between the United States and that country.

b ☐  If required, the U.S. taxpayer identification number is stated on line 6 (see instructions).

c ☐  The beneficial owner is not an individual, derives the item (or items) of income for which the treaty benefits are claimed, and, if applicable, meets the requirements of the treaty provision dealing with limitation on benefits (see instructions).

d ☐  The beneficial owner is not an individual, is claiming treaty benefits for dividends received from a foreign corporation or interest from a U.S. trade or business of a foreign corporation, and meets qualified resident status (see instructions).

e ☐  The beneficial owner is related to the person obligated to pay the income within the meaning of section 267(b) or 707(b), and will file Form 8833 if the amount subject to withholding received during a calendar year exceeds, in the aggregate, $500,000.

10   **Special rates and conditions** (if applicable—see instructions): The beneficial owner is claiming the provisions of Article .............. of the treaty identified on line 9a above to claim a .............. % rate of withholding on (specify type of income): ............................. .

Explain the reasons the beneficial owner meets the terms of the treaty article: ............................................................

............................................................................................................

### Part III   Notional Principal Contracts

11   ☐  I have provided or will provide a statement that identifies those notional principal contracts from which the income is **not** effectively connected with the conduct of a trade or business in the United States. I agree to update this statement as required.

### Part IV   Certification

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:

1 I am the beneficial owner (or am authorized to sign for the beneficial owner) of all the income to which this form relates,

2 The beneficial owner is not a U.S. person,

3 The income to which this form relates is (a) not effectively connected with the conduct of a trade or business in the United States, (b) effectively connected but is not subject to tax under an income tax treaty, or (c) the partner's share of a partnership's effectively connected income, **and**

4 For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.

Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

**Sign Here** ▶

_____   _____   _____
Signature of beneficial owner (or individual authorized to sign for beneficial owner)   Date (MM-DD-YYYY)   Capacity in which acting

For Paperwork Reduction Act Notice, see separate instructions.   Cat. No. 25047Z   Form **W-8BEN** (Rev. 2-2006)

Printed on Recycled Paper

# EXHIBIT G

# EXHIBIT G

# AMENDED AND RESTATED OPERATING AGREEMENT

## OF

# GSRV-VTI II, LLC

1.    **DEFINITIONS.** ..................................................................................................... 3

2.    **FORMATION.** ...................................................................................................... 8

3.    **NAME AND PLACE OF BUSINESS.** ................................................................. 9

4.    **PURPOSE AND SCOPE OF COMPANY.** .......................................................... 9

5.    **TITLE.** ................................................................................................................ 9

6.    **COMMENCEMENT; TERM.** ........................................................................... 9

7.    **CAPITAL CONTRIBUTIONS.** ....................................................................... 10

8.    **RIGHTS AND DUTIES OF THE MANAGER.** ............................................... 11

9.    **FEES, SALARIES AND EXPENSES.** .............................................................. 14

10.   **PROFITS, LOSSES, DISTRIBUTIONS AND JOB CREATION
      ALLOCATION.** ................................................................................................ 16

11.   **DISSOLUTUTION AND DISTRIBUTIONS.** ................................................. 20

12.   **INVESTING MEMBERS.** ............................................................................... 21

13.   **RESTRICTIONS ON TRANSFER OF MEMBERSHIP INTERESTS.** ......... 23

14.   **MISCELLANEOUS FINANCIAL AND ACCOUNTING MATTERS.** ......... 24

15.   **AMENDMENTS.** ............................................................................................. 26

16.   **POWER OF ATTORNEY** ............................................................................... 26

17.   **MEETINGS; MEANS OF VOTING.** .............................................................. 27

18.   **INTENTIONALLY OMITTED.** ..................................................................... 28

19.   **REPRESENTATIONS OF THE MEMBERS.** ................................................ 28

20.   **MISCELLANEOUS.** ....................................................................................... 31

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS, EITHER PURSUANT TO APPLICABLE EXEMPTIONS OR BECAUSE THE MEMBERSHIP INTERESTS ARE NOT SECURITIES. WITHOUT SUCH REGISTRATION, THE MEMBERSHIP INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE MANAGER OF THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE MANAGER TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR OTHER APPLICABLE STATE OR FEDERAL SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER.  ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THE MEMBERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS THAT ARE SET FORTH IN THIS AGREEMENT.

**NO PARTY EXCEPT THE COMPANY IS RESPONSIBLE FOR THE CONTENTS OF THE OFFERING MEMORANDUM, AND NO OTHER PARTY EXCEPT SALES AGENTS, INCLUDING OFFSHORE MIGRATION BROKERS, AUTHORIZED BY THE COMPANY WILL BE INVOLVED IN THE OFFERING OF UNITS UNDER THE OFFERING MEMORANDUM OR THE ACCEPTANCE OF SUBSCRIPTIONS FROM SUBSCRIBERS.**

# AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## GSRV-VTI II, LLC

**THIS AMENDED AND RESTATED OPERATING AGREEMENT OF GSRV-VTI II, LLC** (as further amended from time to time, this "**Agreement**"), dated as of April 27, 2015, is made by and among Manager and such persons as hereafter become members (more particularly defined below as the "**Members**" and "**Investing Members**") in accordance with the provisions of this Agreement and the Limited Liability Company Act, as amended, by executing or causing to be executed a signature page in the form attached hereto.

### BACKGROUND INFORMATION

The Articles of Organization for the Company have been prepared, executed and filed with the California Secretary of State and the Company has agreed to issue to the Investing Members units of Membership Interest described herein.  Accordingly, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Manager and the Investing Members agree that this Amended and Restated Operating Agreement shall supersede the terms of the prior Operating Agreement, as amended, in all respects and for all purposes and shall comprise the new Operating Agreement as follows:

## OPERATIVE PROVISIONS

1.  **DEFINITIONS**.

Except as otherwise defined herein, the following terms shall have the following meanings ascribed to such terms:

1.1    "**Accountants**" means such firm of independent certified public accountants as may be engaged from time to time by the Manager on behalf of the Company to provide professional services to the Company.

1.2    "**Act**" means the Securities Act of 1933, as amended from time to time.

1.3    "**Adjusted Capital Account Balance**" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments.

(1)    Increase such balance by any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate (second to last) sentence of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(2)    Decrease such balance by such Members share of the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Balance is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.4    "**Processing and Marketing Expense**" means a fee paid to the Manager from a Member's Capital Account in accordance with this Agreement in an amount equal to Forty Thousand Dollars ($40,000.00).

1.5    "**Affiliate**" shall have the meaning set forth in Rule 405 promulgated under the Act, except as otherwise provided herein.

1.6    "**Agreement**" shall have the meaning set forth in the introductory paragraph hereof.

1.7    "**Articles of Organization**" means the valid Articles of Organization, duly filed in its original or any amended form in accordance with (and in all respects sufficient in form and substance under) the laws of the State of California.

1.8    "**Asset Management Fee**" means the compensation payable to the Manager for its services in managing the assets, business and affairs of the Company as set forth in Section 9.1(2).

1.9    "**Bankruptcy**" means with respect to a specified Person: (i) the appointment of a receiver, conservator, rehabilitator or similar officer for the specified Person, unless the

3

appointment of such officer shall be challenged in an application filed within thirty (30) days after the appointment and the appointment is vacated and such officer discharged within one hundred twenty (120) days of the appointment; (ii) the taking of possession of, or the assumption of control over, all or any substantial part of the property of the specified Person by any receiver, conservator, rehabilitator or similar officer or by the United States government or any agency thereof, unless such possession or control is challenged in an application filed within thirty (30) days after such possession or control is taken and property is relinquished within one hundred twenty (120) days of the taking; (iii) the filing of a petition in bankruptcy or the commencement of any proceeding under any present or future federal or state law relating to bankruptcy, insolvency, debt relief or reorganization of debtors by or against the specified Person, provided, if filed against (and not by) the specified Person, such petition or proceeding is not challenged within thirty (30) days after it is filed and if so challenged is not dismissed within one hundred twenty (120) days of the filing of the petition or the commencement of the proceeding; or (iv) the making of an assignment for the benefit of creditors or a private composition, arrangement or adjustment with the creditors of the specified Person.

1.10    "**Business**" means the business of the Company including an investment in Vertebral Technologies, Inc., a spinal device company develops, manufactures, and markets a patented and unique modular intraoperative assembly technology.

1.11    "**Capital Account**" means, with respect to any Member, the sum of his or her paid-in Capital Contribution (a) increased by all profits allocated to such Member; and (b) decreased by (i) the amount of all Cash Distributions to such Member, and (ii) all losses allocated to such Member.  Otherwise, each Member's Capital Account shall be maintained and adjusted in accordance with the Code and the Treasury Regulations thereunder, including expressly, but not by way of limitation, the adjustments to Capital Accounts permitted by Section 704(b) of the Code and the Treasury Regulations thereunder in the case of an Investing Member who receives the benefit or detriment of any special basis adjustment under Sections 734, 743 and 754 of the Code.

1.12    "**Capital Contributions**" means the total cash contributed to the Company by the Members pursuant to the terms of this Agreement, excluding the Expense Amount.   Any reference to the Capital Contribution of an Investing Member shall include the Capital Contribution made by a predecessor holder of the Interest of such Member

1.13    "**Cash Flow**" means the total cash receipts of the Company, plus any other funds (including amounts designated as reserves by the Manager, where and to the extent it no longer regards such reserves as reasonably necessary to the efficient conduct of the Company's business) deemed available for distribution and designated as Cash Flow by the Manager less (a) any operating expenses of the Company; and (b) reserves for working capital and anticipated expenditures in such amounts as may be determined from time to time by the Manager.  Cash Flow shall be determined separately for each Fiscal Year of the Company.

1.14    "**Code**" means the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent laws.

1.15    "**Company**" means **GSRV-VTI II, LLC**, the limited liability company subject to this Agreement, in its existing or any amended or reconstituted form.

1.16    "**Denial Date**" means the date upon which USCIS denies an Investing Member's I-526 Petition.

1.17    "**Denied Investing Member"** means an Investing Member whose I-526 Petition is denied by USCIS.

1.18    "**EB-5 Job Allocation Addendum**" means the document attached hereto as Schedule 2 and incorporated herein by this reference as if fully set forth in this Agreement.

1.19    "**Expense Amount**" means the Forty Thousand Dollar ($40,000) Processing and Marketing Expense funded pursuant to the Offering that will be credited to a Member's Capital Account.  Upon USCIS approval of an Investor's I-526 Petition, the Forty Thousand Dollars ($40,000) will be paid to the Manager to: (a) cover Offering-related expenses, migration costs, marketing and promotional fees and administrative costs and to cover other services related to the Offering; and (b) compensate Manager for its services rendered in managing the Company.

1.20    "**FATCA**" is defined in Section 13.1 hereof.

1.21    "**Fiscal Year**" shall have the meaning set forth in Section 14.4 hereof.

1.22    "**For Cause**" means acts or omissions by the Manager that constitute fraud, bad faith, gross negligence or willful misconduct, embezzlement, misappropriation or theft of funds or property, breach of fiduciary duties to the Company, or material breach of a material term of this Agreement, in any case that causes material damage to the Company.

1.23    "**Force Majeure**" shall have the meaning set forth in Section 20.17 hereof.

1.24    "**I-526 Petition**" means an I-526 Immigrant Petition by Alien Entrepreneur filed with USCIS by an Investing Member.

1.25    "**I-526 Petition Approval**" means the approval by USCIS of an Investing Member's I-526 Petition.

1.26    "**I-526 Petition Denial**" means the denial by USCIS of an Investing Member's I-526 Petition.

1.27    "**I-829 Petition**" means a Petition by Entrepreneur to Remove Conditions filed with USCIS by an Investing Member.

1.28    "**I-829 Petition Approval**" means the approval by USCIS of an Investing Member's I-829 Petition.

1.29    "**I-829 Petition Denial**" means the denial by USCIS of an Investing Member's I-829 Petition.

1.30    "**Interest**" or "**Membership Interest**" means the Membership Interest of each Investing Member in the Company.

1.31    "**Investing Member**" or "**Member**" means any Person executing this Agreement or causing the same to be executed as an Investing Member, as well as any other Person acquiring any portion of one or more Units from an Investing Member and admitted to the Company as a Substitute Investing Member.

1.32    "**IRS**" means the United States Internal Revenue Service.

1.33    "**Limited Liability Company Act**" means the California Revised Uniform Limited Liability Company Act, Section 17701.01, et seq. of the California Corporations Code, as amended from time to time.

1.34    "**Liquidation Event**" means the merger, purchase, sale or an initial public offering of Vertebral Technologies, Inc., or the Company's exercise of its put option.

1.35    "**Majority in Interest**" means Investing Members owning in the aggregate more than 50% of the Units then outstanding.

1.36    "**Manager**" means **GSRV-VTI MANAGMENT, LLC,** a California limited liability company.

1.37    "**Offering Memorandum**" means the Confidential Offering Memorandum of the Company dated April 27, 2015, utilized by the Company to sell Units, as amended or supplemented from time to time.

1.38    "**Offering Period**" means the period for the Offering which has commenced and will end on October 27, 2015, unless extended by the Company until not later than April 27, 2016, or otherwise extended so that the Company can attempt to obtain Substitute Investing Members if one or more Investing Member receives an I-526 Petition Denial.

1.39    "**Percentage Interest**" means, with respect to an Investing Member, a percentage equal to the Capital Contribution to the Company made by the Investing Member in proportion to the Capital Contributions made by all of the Investing Members.

1.40    "**Permanent Disability**" means, with reference to a specified Person, (i) any mental or physical illness, condition or incapacity which prevents the specified Person from performing his or her duties on behalf of the Company or any of its Affiliates for a period of 180 days during any 365 day period, (ii) a determination by an insurer that has issued a disability insurance policy to the Company or one or more Members or the Manager with respect to a Person that such Person is permanently disabled as defined in such policy, or (iii) the determination by a court of competent jurisdiction that the specified Person is legally incompetent.

1.41    "**Person**" means an individual, a partnership (general, limited or limited liability), a corporation, a limited liability company, an association, a joint stock company, a trust, a joint

6

venture, an unincorporated organization, or a governmental, quasi-governmental, judicial or regulatory entity or any department, agency or political subdivision thereof.

1.42    **"Preferred Return"** means a cumulative, non-compounded annual return on an Investing Member's Unreturned Invested Capital outstanding from time to time computed at the rate of two percent (2%) per annum calculated from the date or dates that an Investing Member's Capital Contributions comprising such Unreturned Invested Capital advanced by the Company to acquire up to 3,000,000 shares of Series B Convertible Preferred Stock of Vertebral Technologies, Inc.  **The Preferred Return is not a guaranteed return and will be distributed under this Agreement only to the extent there are Preferred Return Sources available for distribution, all as more particularly set forth in Section 10.4 below**.

1.43    "**Preferred Return Sources**" means dividends issued by Vertebral Technologies, Inc. and paid to the Company under that Series B Preferred Stock Purchase Agreement entered into as of June 28, 2013, as amended.

1.44    "**Profits**" and "**Losses**" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, including gain or loss from capital transactions, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(ii)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulation Section 1.704-l(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

(iii)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulation Section 1.704-l(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a Distribution other than in complete liquidation of an Investing Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(iv)    Notwithstanding any other provision of this Section, any items which are specially allocated pursuant to Article 10 shall not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 10.7 shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (iv) above.

1.45    "**Project**" means the expansion and operation of Vertebral Technologies, Inc. The Project is more particularly described in the Project Business Plan.

1.46    "**Project Business Plan**" means the Comprehensive I-526 Business Plan that as of April 27, 2015 has not been completed.  Once completed, it will be made available for review upon request, as the same may be amended or supplemented from time to time.

1.47    "**Property**" means all assets of the Company, including, but not limited to, shares of Series B Convertible Preferred Stock of Vertebral Technologies, Inc.

1.48    "**Regional Center**" means **GOLDEN STATE RENAISSANCE VENTURES, LLC,** a California limited liability company **DBA GOLDEN GATE GLOBAL.**  The Regional Center has obtained approval from USCIS to participate as a regional center under the EB-5 program ("**EB-5 Program**") with respect to certain specific counties in the greater San Francisco, California Bay area, including, but not limited to, the area of the Project.

1.49    "**Subscriber**" means those Persons that subscribe to become Investing Members in the Company pursuant to the Subscription Agreement.

1.50    "**Subscription Agreement**" means the Subscription Agreement utilized by the Company to sell Units to Investing Members, including all attachments thereto.

1.51    "**Substitute Investing Member**" shall have the meaning set forth in Section 10.2 hereof.

1.52    "**Total Subscription Payment**" means the full subscription amount of Five Hundred Forty Thousand Dollars ($540,000).

1.53    "**Unit**" means an Investing Member's Membership Interest, the acquisition of which shall entitle the holder thereof to the rights and benefits specified in this Agreement.

1.54    "**Unreturned Invested Capital**" means with respect to an Investing Member, an amount equal to the Capital Contributions made by the Investing Member less the sum of all distributions made to such Investing Member, excluding Preferred Returns, under Section 10.4(1).

1.55    "**USCIS**" means the United States Citizenship and Immigration Services.

2.    **FORMATION**.

The Company has been formed as a limited liability company pursuant to the Limited Liability Company Act and other applicable laws of the State of California.

3.     **NAME AND PLACE OF BUSINESS**.

The name of the Company is "**GSRV-VTI II, LLC**" or such other name as the Manager shall hereafter designate by written notice to the Investing Members.  The Company's principal mailing address shall be c/o GSRV-VTI II, LLC, Attention: Eric Chelini, One Sansome Street, Suite 2080, San Francisco, CA 94104, or such other location as the Manager may from time to time designate by notice to the Investing Members.

4.     **PURPOSE AND SCOPE OF COMPANY**.

4.1     (1)     The Company has been formed for the purpose of acquiring up to 3,000,000 shares of Series B Convertible Preferred Stock of Vertebral Technologies, Inc.  The primary objectives of the Company are to invest in Vertebral Technologies, Inc. ("VTI") by acquiring shares of stock of VTI ("Asset"); advancing the strict social criteria of the Golden State Renaissance Ventures, LLC dba Golden Gate Global ("Regional Center"); and assisting in the qualification of its Investing Members seeking lawful conditional and permanent residence ("Green Card") in the United States through the U.S. Citizenship and Immigration Service's "EB-5 Immigrant Investor" program (the "EB-5 Program"), in accordance with the confidential Private Offering Memorandum of the Company dated April 27, 2015, and all exhibits and supplements, if any, thereto (the "Memorandum").  In furtherance of the foregoing, but in no way limiting the generality of the foregoing, the Company may: (i) enter into, perform and carry out contracts and agreements as may be necessary, appropriate or incidental to the accomplishment of the purposes of the Company; (ii) and do all other acts and things which may be necessary, appropriate or incidental to the carrying out of the business and purposes of the Company.

4.2     Other Business Ventures:  The Manager or any Member or any officer, director, employee, stockholder or other Person holding a legal or beneficial interest in any Person that is an Investing Member may engage or possess an interest in other business ventures of every nature and description, independently or with others, and neither the Company nor any Member shall have any right by virtue of this Agreement in or to such independent ventures or the income or profits derived therefrom; provided that nothing contained in this Section is intended to absolve the Manager from any liability to the Company or the Investing Members arising as a result of a breach of any material fiduciary obligation owing to the Company or any Member.

5.     **TITLE**.

Title to any property and to any other assets acquired to affect the purposes of the Company shall be held in the name of the Company.  The Manager and its designee shall execute and file in all appropriate locations such documents, if any, as may be necessary to reflect the Company's interest in Vertebral Technologies, Inc.

6.     **COMMENCEMENT; TERM**.

The Company shall be deemed to commence its existence as of January 1, 2015.  The term of the Company shall continue until terminated in accordance with the provisions of Section 11 hereof, or as otherwise provided by law.

9

7.    **CAPITAL CONTRIBUTIONS**.

7.1    Investing Members:  Each Investing Member shall contribute his or her Capital Contribution (which excludes the Expense Amount) to the capital of the Company in the amounts set forth in Schedule 1 attached to this Agreement, in return for which they shall receive the Membership Interest described in Schedule 1.  The total amount to be contributed by each Investing Member shall be paid directly to the Company as set forth in the Subscription Agreement.  Capital Contributions shall be only in cash.

7.2    No Additional Contributions:   The Investing Members are not required to contribute additional capital or lend funds to the Company.

7.3    Capital Accounts:   The Company shall establish for each Member a Capital Account.  Voluntary loans by any Member shall not be considered contributions to the capital of the Company.

7.4    Withdrawal and Return of Capital: Except as otherwise set forth in this Agreement, an Investing Member may not withdraw from the Company unless the Manager consents to such withdrawal, which consent may be withheld in the Manager's sole discretion. All expenses incurred by the Company in connection with such withdrawal shall be paid for by the withdrawing Investing Member. If an Investing Member withdraws any part of his or her Capital Contribution of $500,000 before removal of conditions on his or her permanent residence, the Manager shall give notice to the Regional Center for prompt reporting to USCIS for possible revocation of immigration benefits arising from the initial investment.

7.5    Direct Investment; No Escrow Account; I-526 Denial; Cancellation of Offering and Rejection of Subscription.

(1)    Pursuant to the Subscription Agreement, the Total Subscription Payment is due to be paid by the Investing Member directly to the Company upon Subscription.  Interest will not accrue on the Total Subscription Payment.

(2)    There will be no escrow account holding an Investing Member's Total Subscription Payment pending an Investing Member's I-526 Petition submittal or Approval. Investing Member recognizes and agrees that the Company has a need for the Capital Contribution of each Investing Member and that the Company will utilize an Investing Member's Capital Contribution to commence operations before such Investing Member has submitted his or her I-526 Petition to the USCIS.

(3)    In the event an Investing Member's I-526 Petition is denied by USCIS or the Investing Member withdrew his or her I-526 Petition once the I-526 Petition was filed, the Investing Member shall have no right to withdraw from the Company and the Company shall have no obligation to return such Denied Investor's Capital Contribution. The Company will return an Investing Member's Processing and Marketing Expense within a reasonable time following receipt of written notice of USCIS I-526 Petition Denial.

10

(4)     At the option of the Company, a Subscription may be cancelled and made void at the complete discretion of the Company, which discretion shall include but not be limited to cancellation of the offering, of if any representations made by the Investing Member in his or her Subscription Agreement, or otherwise made to the Company, the Regional Center or others, or if information included in the Investing Member's I-526 Petition, are false or misleading.

8.     **RIGHTS AND DUTIES OF THE MANAGER**.

8.1     <u>Management of Company Business; Sole Discretion of Manager</u>:  The Manager shall have the complete and exclusive authority and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding the business of the Company and to undertake any and all acts necessary, appropriate or convenient in connection with or incidental to the management of the Company's business, property and affairs.  The Manager shall possess all of the rights and powers necessary and appropriate to perform all of its duties hereunder. The exercise of any power conferred by this Agreement shall constitute the act of and be binding upon the Company.  The Investing Members shall be provided those rights afforded members of a limited liability company formed pursuant to the California Revised Uniform Limited Liability Company Act. Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement the Manager is permitted or required to make a decision in its "sole and absolute discretion," or "discretion," the Manager shall be entitled to consider only such interests and factors as it desires, including its own interest, and shall, to the fullest extent permitted by applicable law, have no duty (including fiduciary duty) or obligation to give any consideration to any interest of or factors affecting the Members. The Manager may delegate any of its duties, subject to its overriding supervision and control.

8.2     <u>Specific Rights and Powers</u>:  In addition to any other rights and powers which it may possess under law, but subject to the provisions of Section 4, the Manager and/or its designated agents shall have such other rights and powers required for or appropriate to its management of the Company's business, which, by way of illustration but not limitation, shall include the following rights and powers:

(1)     to enter into any contract of insurance which the Manager may reasonably deem appropriate for the protection or conservation of Company property, or for any other purpose beneficial to the Company;

(2)     to employ attorneys, agents, consultants, accountants and other independent contractors to perform services on behalf of the Company, including Affiliates of the Manager; to the extent that such services are reasonably necessary or advisable and the compensation therefor is reasonable;

(3)     to bring or defend legal actions in the name of the Company, pay, collect, compromise, arbitrate, or otherwise adjust or settle claims or demands of or against the Company or its agents;

(4)     to perform or cause to be performed all of the Company's obligations under any agreement to which the Company is a party;

11

(5)     to acquire up to 3,000,000 shares of Series B Convertible Preferred Stock of Vertebral Technologies, Inc. following receipt and approval of the following reports:  (i) the Project Business Plan and (ii); and the Economic Impact Analysis report prepared by Beacon Economics;

(6)     to engage third parties to provide administrative services to the Company; and

(7)     to execute, acknowledge and deliver any and all instruments necessary to effectuate any of the foregoing.

8.3    <u>Compliance with EB-5 Restrictions.</u>  The Manager shall operate the Company in a manner that is designed to comply with legal and policy requirements of the Immigrant Investor Program administered by USCIS, as advised by the Regional Center.  In particular, the Manager shall:

(1)     deploy the Capital Contributions of Investing Members in VTI and to keep such funds invested in VTI until Investing Members have received adjudication of their I-829 Petitions;

(2)     avoid reserve accounts designed to evade at-risk investment, and avoid agreements for redemption (including return on investment) of Investing Members' Capital Contributions before adjudication of the petitions for removal of conditions on their permanent residence;

(3)     avoid repayment of Investing Members' Capital Contributions other than at fair market rates, after adjudication of Investing Members' I-829 Petitions by USCIS, and only in the discretion of the Manager;

(4)     maintain an ongoing business deploying capital to job-creating activity unless and until USCIS has adjudicated the I-829 Petitions of all Investing Members;

(5)     track, maintain records, and share data and records with the Regional Center concerning the Company's investment in Vertebral Technologies, Inc. and the underlying Project, including the expenditure of funds, revenues of VTI, and operation of facilities and enterprises;

(6)     require Vertebral Technologies, Inc. to perform such tracking, documentation, and sharing with the Company in order to enable the Regional Center to meet its obligations to USCIS and to provide information to Investing Members needed for them to request removal of conditions from their U.S. permanent residence;

(7)     obtain Office of Foreign Assets Control approval, or confirmation of no need for approval, before subscribing an investor who is a native or citizen or whose capital derives from a country subject to embargo, such as Iran; and

(8)     cause the Investing Members to participate in making management decisions for the Company to comply with USCIS regulations.

8.4     Liability of the Manager to Investing Members and Company; Indemnification: The Manager, its agents and its Affiliates shall be required to devote only so much time and attention to the business affairs of the Company as is reasonably necessary or advisable to competently oversee such affairs.  Except as otherwise specifically set forth herein, neither the Manager nor its designated agents or Affiliates shall be personally liable to any Investing Member because any taxing authority disallows or adjusts any deduction or credit claimed in a Company income tax return, nor for the repayment of Capital Contributions of the Investing Members.  The performance of or the omission to perform any act, the effect of which may cause or result in loss or damage to the Company, if performed or omitted in good faith and in accordance with the terms of this Agreement, shall not subject the Manager nor its agents or Affiliates to any personal liability to either the Company or any Investing Members. The Company, its receiver, or trustee and each Investing Member shall indemnify and hold harmless the Manager (including any officer, director or employee or designated agent of the Manager), and each of their Affiliates from any claim, loss, expense, liability, action or damage resulting from any such act or omission, including, without limitation, reasonable costs and expenses of litigation and appeal (including reasonable fees and expenses of attorneys engaged by the Manager and/or its agents or Affiliates in defense of each such act or omission); but the Manager and its agents or Affiliates shall not be entitled to be indemnified or held harmless due to, or arising from, fraud, bad faith, gross negligence or willful misconduct by such parties.

8.5     Special Duties of the Manager:  In addition to and without limiting the duties and obligations specified or referenced hereunder, the Manager shall advise and take direction from professional advisors that it may choose to engage with respect to (a) any independent contractor or agent of the Company that is at all times performing and complying with the provisions of any agreement affecting Company property or the operation thereof, (b) cause the Company to file amended Articles of Organization and such other documents and to perform such acts as shall be required under California law in order to preserve the valid existence of the Company and the limited liability of the Investing Members.

8.6     Devotion of Time.  The Manager shall devote to the Company such time as may be necessary for the proper performance of its duties hereunder, and the Investing Members acknowledge that the Manager, the Manager's Affiliates and the Manager's members currently engage in other various for profit activities and will continue to engage in such activities including, without limitation, acquisition, financing, development and management activities. Such for profit business activities may include the formation of other similar private equity projects.  Any Member of the Company, the Manager, any member of the Manager and such Member's Affiliates may engage in any activities, whether or not related to the business of the Company and whether or not in competition with the Company.  Such Members may continue, or initiate further, such activities.  Each Investing Member agrees that the Manager, any Member and any Affiliate of the Manager or any Member (a) may engage in or possess an interest, direct or indirect, in any business venture of any nature or description for such Member's own account, independently or with others, including, without limitation, any business, industry or activity in which the Company may be interested in investing or may also have investments, and (b) may do so without any obligation to report the same to the Company or any Member or to afford the Company or any Member any opportunity to participate therein.  Neither the Company nor any

13

Member shall have any right in or to any such independent venture or investment or the revenues or profits derived therefrom.

8.7    Removal; Resignation:

(1)    The Manager may be removed For Cause by a written determination of a Majority in Interest of the Investing Members. Prior to voting to remove the Manager, the majority in Interest of the Investing Members must determine that a default as specified herein has occurred, must notify the Manager in writing of such default and provide the Manager a reasonable amount of time to cure the default.  If the Manager cures the stated default within a reasonable period of time, the Manager may not be removed.

(2)    The Manager may resign as an agent of the Company at any time upon written notice to the Company.

(3)    Upon removal or resignation of the Manager, the removed/resigned Manager shall immediately cease to have any authority to act as an agent for the Company.

8.8    Election of Successor Manager.  Within thirty (30) days after the removal or resignation of the Manager, the Investing Members shall select a successor Manager by a written determination of a Majority in Interest of the Investing Members.

8.9    Tax Matters Partner.  The Manager is hereby appointed as the Tax Matters Partner of the Company.

9.    **FEES, SALARIES AND EXPENSES**.

9.1    Manager Fees:  The Manager shall cause the Company to pay the Manager the following compensation:

(1)    Processing and Marketing Expense.  The Manager shall be paid that sum which is equal to the Expense Amount less the Offering-related expenses (including, but not limited to the migration costs, marketing and promotional fees and administrative costs).

(2)    Asset Management Fee.  The Manager is entitled to payment of an Asset Management Fee by the Company equal to five percent (5%) (1.25% per Fiscal Quarter) of an Investing Member's capital contributions invested in the Company per year. The Asset Management Fee shall be calculated from the aggregate Capital Account balances of the Investing Members as of the last day of the preceding Fiscal Quarter, and may be accrued without interest when Company funds are not available for its payment.  Each quarterly payment shall be equal to one fourth (1/4) of the above stated Asset Management Fee.  The measuring period for the payment of the Asset Management Fee shall begin for each Investing Member as of the date such Investing Member's Subscription Agreement was accepted by the Manager on behalf of the Company, or upon the date that an Investing Member makes a Capital Contribution, whichever is later. This Asset Management Fee shall accrue without interest, payable from accrued but unpaid dividends, and only payable after liquidation.

14

(3)     30% of Any Gain or Profit Realized from a Liquidation Event. The Manager is entitled payment by the Company of thirty percent (30%) of the gain or profit realized upon a Liquidation Event, following:  (i) payment in full to each Investing Member of its Preferred Return; and (ii) repayment to each Investing Member of its original Capital Contribution.

9.2    Expenses:  Except as otherwise provided herein, the Company shall pay from any funds available to the Company (but not including the Capital Contributions of an Investing Member) all ordinary expenses incurred in connection with the formation, operation and administration of the Company, which may include, but are not limited to:

(1)     Asset Management Fee. The Company shall pay an Asset Management Fee as defined in Section 9.2(2) above to the Manager; and

(2)     Company Expenses. The Company shall pay or reimburse the Manager for all costs and expenses incurred by or on behalf of the Company or for its benefit, including, without limitation, any sales or other taxes which may be assessed against the Company; the costs and expenses, including, without limitation, of reasonable travel and out-of-pocket travel related expenses, commissions, brokerage fees, closing costs, fees and expenses of appraisers, accountants, engineers, architects, specialists, lawyers and other service providers, investment banking fees or similar charges, or interest expense for borrowed money (if any); any expense of organizing, revising, converting, terminating or reconstituting the Company or negotiating, drafting, causing the execution of or amending the Manager, Articles of Organization, the operating agreement or other Company documentation; any indemnification expenses and costs pursuant to section 8.4 hereof; liquidation expenses of the Company; expenses attributable to normal and extraordinary investment banking, accounting, appraisal, legal, custodial, and registration services provided to the Company, including services with respect to the proposed purchase or sale of Assets by the Company (whether or not any such purchase or sale is consummated); costs of appropriate insurance coverage for the Company including, without limitation, premiums for liability insurance to protect the Company, the Manager, and the members and Affiliates of the Manager in connection with the performance of Company activities; interest and taxes related to the purchase, holding or sale by the Company of any Asset; costs incurred in registering (or obtaining exemptions from registration for) securities owned by the Company with the Securities and Exchange Commission, and any securities exchange or any other similar authority; costs incurred in qualifying and maintaining qualifications of such securities under applicable state "Blue Sky" laws; reports to governmental authorities; costs incurred in connection with any litigation in which the Company is involved, as well as in the examination, investigation or other proceedings conducted by any regulatory agency of the Company, including legal and accounting fees incurred in connection therewith the preparation of any audits of the Company, and other reports to the Investing Members; and all other expenses properly chargeable to the activities of the Company, including fees payable to third parties in connection with the selection, identification, analysis or evaluation of prospective or consummated investments of the Company.

9.3    Salaries, Drawings and Interest on Capital Accounts:  No Member shall receive any interest on a Capital Contribution or any salary, either with respect to any Capital

Contribution, for services rendered on behalf of the Company or otherwise in his or her capacity as Member, except as expressly provided elsewhere in this Agreement.

10. **PROFITS, LOSSES, DISTRIBUTIONS AND JOB CREATION ALLOCATION**.

10.1    <u>Generally</u>:  The following provisions shall apply with respect to the allocation of Profits and Losses:

(1)    Profits and Losses for all purposes of this Agreement shall be determined in accordance with the accounting method followed by the Company for federal income tax purposes and otherwise in accordance with applicable Treasury Regulations.  Every item of income, gain, loss, deduction, credit or tax preference entering into the computation of such profit or loss, or applicable to the period during which such profit or loss is realized, shall be considered allocated to each Member in the same proportion as profits and losses are allocated to such Member below.

(2)    Profits and Losses shall be allocated to the Members commencing with the Fiscal Year ending December 31, 2015 and annually thereafter.

(3)    <u>Allocation of Indebtedness</u>.  The Capital Account of the Investing Members shall include an initial allocation of Company indebtedness in the amounts for each Investing Member in accordance with the provisions otherwise set forth in this Agreement.

(4)    <u>Profits and Losses</u>.  Except with respect to the repayment of indebtedness and the allocation of any built-in gain provided for under Section 704(c) of the Code, all profits and losses of the Company shall be allocated as set forth hereinafter.

10.2    <u>Allocation Following Transfer of Interest</u>:  Except as otherwise provided herein, in any year in which an Investing Member transfers all or any portion of a Membership Interest to any Person who, during such year, is admitted as a Substitute Investing Member, the share of profits, losses and distributable Cash Flow allocated to or attributable to the Membership Interest sold, assigned or transferred, shall be divided between the assignor and the assignee on the basis of the number of days in such year before or on, and the number of days after, the execution by the assignee of this Agreement; provided, however, that the assignor and the assignee may by agreement make special provisions for the allocation of items of income, profit, gain, loss, deduction or credit as may from time to time be permitted under the Code, and for the distribution of Cash Flow, but such agreement shall be binding as to the Company only after it shall have received notice thereof from the assignor and assignee.

10.3    <u>Allocation of Profits and Losses</u>:

(1)    Profits shall be allocated to the Investing Members in accordance with their respective distributions pursuant to Section 10.5, or if no distributions, then in accordance with their Percentage Interests.  Losses shall be allocated to the Members in accordance with their Percentage Interests.

(2)     Limitation.  The Losses allocated to an Investing Member shall not exceed the maximum amount of Losses that can be so allocated without causing any Investing Member to have a deficit (determined after all Cash Distributions for the Fiscal Year at the end of the Fiscal Year for which the allocation relates.  All Losses in excess of the limitation set forth in the preceding sentence shall be allocated among those Investing Members that will not have a deficit at the end of the Fiscal Year in the ratio of their relative Percentage Interests, and any excess thereafter shall be allocated to the Investing Member in accordance with their Percentage Interests.

10.4    Distribution of Cash Flow:  Subject to Section 10.10, the Manager shall have the sole authority and discretion to determine when Cash Flow is available for distribution.  Cash Flow from Preferred Return Sources and from a Liquidation Event shall be distributed separately in accordance with clauses (1) and (2) below, respectively. Once a determination is made that such a Cash Distribution is in order, same shall be applied as follows:

(1)     Distributions of Cash Flow from Preferred Return Sources shall distributed:

(a)     First, to each Investing Member, pari passu and pro rata in accordance with his or her respective Percentage Interest, until such Investing Member has received his or her Preferred Return under this Section 10.4(1), taking into account the amount and timing of all prior distributions made to each Investing Member under this Section 10.4(1); and

(b)     Second, to the Manager in accordance with Section 9.1(2);

(2)     Distributions of Cash Flow from a Liquidation Event will be distributed:

(a)     First to Investing Members who have either received an I-829 Petition Approval or an I-829 Denial or those who are not seeking Green Card Status under the EB-5 Program; provided, however, that if such payment is made with respect to more than one such Investing Member and such payment is for less than the full amount of all such Investing Member's Unreturned Invested Capital, then such payment shall be distributed to the Investing Members pari passu and pro rata based Unreturned Invested Capital of such Investing Members.  Distributions under this Section 10.4(2) shall be applied first to the earliest Capital Contributions of the Investing Member; and

(b)     All remaining Cash Flow from a Liquidation Event will be distributed:  (i) seventy percent (70%) to the Investing Member pari passu and prorated based upon the Capital Contribution of such Investing Member; and (ii) thirty percent (30%) to the Manager in accordance with Section 9.1(3).

10.5    Liquidating Distributions:  The proceeds resulting from the liquidation of the Company property pursuant to Section 11.2 (but subject to the provisions of Section 11.2(3)), shall be distributed and applied in the following order of priority:

        (1)     To the payment of debts and liabilities of the Company, including all expenses of the Company incident to any such liquidation and all loans or any other debts and liabilities of the Company to the Members or their Affiliates;

        (2)     To the establishment of any reserves which the liquidating trustee deems reasonably necessary for contingent, unmatured or unforeseen liabilities or obligations of the Company; and

        (3)     Thereafter, applied in accordance with the provisions of Section 10.4 above.

     10.6   <u>Nonrecourse</u>:  Each Member shall look solely to the assets of the Company for all distributions from the Company and the repayment of his or her Capital Contributions, and shall have no recourse, upon dissolution or otherwise, against any Manager or Investing Member.

     10.7   <u>Authority of Manager to Vary Allocations to Preserve and Protect Members' Intent</u>:

        (1)     It is the intent of the Members that each Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined and allocated in accordance with this Section 10 to the fullest extent permitted by Section 704(b) of the Code. In order to preserve and protect the determinations and allocations provided for in this Section 10, the Manager is authorized and directed to allocate income, gain, loss, deduction, or credit (or item thereof) arising in any year differently than otherwise provided for in this Section 10 to the extent that allocating income, gain, loss, deduction or credit (or item thereof) in the manner provided for in Section 10 would cause the determination and allocation of each Member's distributed share of income, gain, loss, deduction or credit (or item thereof) to not be permitted by Section 704(b) of the Code and Treasury Regulations promulgated thereunder.  Any new allocation (the "**New Allocation**") made pursuant to this Section 10.7 shall be deemed to be a complete substitute for any allocation otherwise provided for in this Section 10, and no amendment of this Agreement or approval of any Member shall be required.

        (2)     In making any New Allocation under Section 10.7(1), the Manager is authorized to act only after having been advised by the Accountants to the Company that, under Section 704(b) of the Code and the Treasury Regulations thereunder, (i) the New Allocation is necessary, and (ii) the New Allocation is the minimum modification of the allocations otherwise provided for in this Section 10 necessary in order to assure that, either in the then current year or in any preceding year, each Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) is determined and allocated in accordance with this Section 10 to the fullest extent permitted by Section 704(b) of the Code and the Treasury Regulations thereunder.

        (3)     If the Manager is required by Section 10.7(1) to make any New Allocation in a manner less favorable to the Investing Members than is otherwise provided for in this Section 10, then the Manager is authorized and directed, insofar as it is advised by the Accountants to the Company that it is permitted by Section 704(b) of the Code, to allocate income, gain, loss, deduction, or credit (or item thereof) arising in later years in such a manner so as to bring the allocations of income, gain, loss, deduction, or credit (or item thereof) to the

Investing Members as near as possible to the allocations thereof otherwise contemplated by this Section 10.

(4)     New Allocations made by the Manager under Section 10.7(1) shall be made in reliance upon the advice of the Accountants to the Company, and no such allocation shall give rise to any claim or cause of action by any Investing Member.

10.8     Special Allocation.  Prior to making any allocations under Section 10.3 above, the following allocations shall be made:

(1)     Qualified Income Offset.   Except as otherwise provided in Sections 10.8(2) and 10.8(3), in the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in proportion to his respective deficit in his Adjusted Capital Account Balance in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit in his Adjusted Capital Account Balance as quickly as possible.  It is intended that this Section 10.9(1) qualify and be construed as a "qualified income offset" within the meaning of Treasury Regulation 1.704-1(b)(2)(ii)(d)(3) and shall be interpreted consistently therewith.

(2)     Minimum Gain Chargeback.  Except as provided in Treasury Regulation Section 1.704-2(f), if there is a net decrease in the Company's allocable profit for a Fiscal Year, each Member shall be allocated, before any other allocation of Company items for such Fiscal Year, items of gross income and gain for such year (and, if necessary, for subsequent years) in proportion to, and to the extent of, the amount of such Member's share of the net decrease in a company Minimum Gain during such year.  The income allocated pursuant to this Section 10.8(2) in any Fiscal Year shall consist first of gains recognized from the disposition of property subject to one or more nonrecourse liabilities, and any remainder shall consist of a pro rata portion of other items of income or gain of a company.

(3)     Code Section 754 Adjustments.   To the extent an adjustment to the adjusted tax basis of a Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its Membership Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their Membership Interests in the Company in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(4)     Regulatory Allocations.   The allocations set forth in Sections 10.8(1) through 10.8(4) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of Treasury Regulations Section 1.704-1(b).  Notwithstanding any other provision of this Section 10 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other Profits, Losses and items of income, gains, loss and

19

deduction among the Members so that, to the extent possible, the net amount of such allocations of other Profits, Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

10.9   Withholding Taxes with Respect to Members.   The Company shall comply with any withholding requirements under federal, state, local and foreign law and shall remit any amounts withheld to, and file required forms with, the applicable jurisdiction.   All amounts withheld from Company revenues or distributions by or for the Company pursuant to the Code or any provision of any federal, state, local or foreign law, and any taxes, fees or assessments levied upon the Company, shall be treated for purposes of this Section 10.9 as having been distributed to those Members upon whose behalf the amounts were withheld.   If the amount withheld was not withheld from the affected Member's actual share of cash available for distribution, the Manager on behalf of the Company may, at its opinion (a) require such Member to reimburse the Company for such withholding or (b) reduce any subsequent distributions to which such Member is entitled by the amount of such withholding.   Each Member agrees to furnish the Company with such representations and forms as the Manager shall reasonably request to assist it in determining the extent of, and in fulfilling, the Company's or Borrower's withholding obligations, if any. As soon as practicable after becoming aware that any withholding requirement may apply to an Investing Member, the Manager shall advise the Investing Member of such requirement and the anticipated effect thereof.   Each Member shall pay or reimburse to the Company all identifiable costs or expenses of the Company caused by or resulting from withholding taxes with respect to such Member.

10.10   Tax Distributions.   The Manager shall make good faith efforts to cause the Company to distribute to all Members within ninety (90) days after the close of each Fiscal Year of the Company in accordance with Sections 10.4 above distributions which, together with the other distributions to Members made with respect to such fiscal period, equal at least forty percent (40%) of the Members' respective anticipated allocation of taxable items pursuant to Section 10.4 above.

10.11   Job Creation Allocation.   The allocation to each Investing Member of job creation numbers arising from fulfillment of the Project Business Plan will be reported to the Regional Center, avoiding double counting of any job.   To the extent that there are insufficient jobs created for all Investing Members to qualify for I-829 Petition Approval, those jobs shall be allocated to the Investing Members in the order set forth in the EB-5 Job Allocation Addendum.

11.   **DISSOLUTUTION AND DISTRIBUTIONS**.

11.1   Dissolution of Company:   Subject to the provisions of Section 4, the Company shall continue until terminated and dissolved upon the following: (i) The determination of the Manager to dissolve the Company with the prior written consent of a Majority in Interest of the Investing Members, (ii) An event of withdrawal of the Manager as defined in the Act (other than an event of bankruptcy) unless within ninety (90) days of such withdrawal the business of the Company is continued by a vote of those Investing Members owning more than fifty percent (50%) of the Percentage Interests owned by all Investing, (iii) on the sale or other disposition of all or substantially all of the Assets (unless the Manager elects within thirty (30) days, by written

20

notice to the Company, to continue the Company), (iv) when the Manager elects, by written notice to the Company, to dissolve the Company, the issuance of a judicial decree of dissolution by a court of competent jurisdiction, or (vi) Any other event causing the dissolution of the Company under the laws of the State of California.

11.2     Winding Up and Distribution:

(1)     Except as otherwise expressly permitted under this Agreement, upon the dissolution of the Company, the Company shall be liquidated by (1) the Manager, or (2) by the Company's Accountants.  In carrying out the liquidation of the Company, the liquidating trustee shall have all of the rights and powers of the Manager hereunder.

(2)     A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of the Company's liabilities so as to enable the liquidating trustee to minimize the normal losses attendant to liquidation.  The operations of the Company shall continue during such liquidation solely for the purpose of winding up the Company's business.  Upon completion of the liquidation each of the Investing Members shall be furnished with a statement setting forth the assets and liabilities of the Company as of the date of complete liquidation.  Upon approval of this statement by a Majority in Interest of the Investing Members, the liquidating trustee shall cause a certificate of dissolution of the Company to be duly prepared, executed and filed causing the dissolution of the Company under the laws of the State of California.  Nothing herein shall be construed as a limitation upon or termination of any of the rights of the Investing Members during or following any liquidation.

(3)     The proceeds of any liquidation shall be applied and distributed to the Investing Members in accordance with Section 10.5.

12.     **INVESTING MEMBERS**.

12.1     Admission:   The Company is authorized to admit to the Company Investing Members.  Unless otherwise approved by the Company in its sole discretion, only individuals shall be Members, either by admission or transfer.

12.2     Limitation on Investing Member Liabilities:   No Investing Member will be subject to assessment nor be personally liable for any of the debts of the Company or any of the losses thereof beyond the amount committed by him, her or it to be contributed to the capital of the Company; provided, that an Investing Member receiving a distribution in return, in whole or in part, of his or her Capital Contribution shall be liable to the Company for any sum, not in excess of such amount returned, plus interest thereon, necessary to discharge liabilities to any or all creditors of the Company who extend credit or whose claims arise before any such distribution is made.

12.3     Limited Authority.   Each Investing Member acknowledges that the Investing Members shall have no right to participate in the management or control of the business and affairs of the Company, and shall exercise only those voting rights as are specifically provided for in this Agreement.  No Investing Member as such shall be an agent of the Company or have the power or authority to bind the Company other than upon the express prior direction of the

21

Manager.  The Investing Members, in accordance with the provisions of this Section 12.3, shall have the right to vote solely with respect to those matters set forth immediately below and such shall require an affirmative vote as set forth below as to each such action:

(1)     The amendment of the Articles, which shall require the affirmative vote of the Manager and those Investing Members owning more than Fifty Percent (50%) of the Percentage Interests owned by all Investing Members;

(2)     The merger, consolidation or combination of the Company with any other entity, which shall require the affirmative vote of the Manager and those Investing Members owning more than Fifty Percent (50%) of the Percentage Interests owned by all Investing Members;

(3)     The dissolution of the Company under Section 11.1, which shall require the affirmative vote of the Manager and those Investing Members owning more than Fifty Percent (50%) of the Percentage Interests owned by all Investing Members;

(4)     The appointment of a new Manager as set forth in Section 8.8, which shall require the affirmative vote of those Investing Members owning more than Fifty Percent (50%) of the Percentage Interests owned by all Investing Members; and

(5)     The election to continue the business of the Company in the event of the withdrawal of the Manager as set forth in Section 11.1, which shall require the affirmative vote of those Investing Members owning more than Fifty Percent (50%) of the Percentage Interests owned by all Investing Members.

12.4   <u>Registered Holders</u>:  Upon the admission of an Investing Member, his or her address and Membership Interest shall be registered on the records of the Company maintained at its principal office and inserted in an amended and updated <u>Schedule 1</u> hereto.

12.5   <u>Withdrawal of Members</u>:  No Member may voluntarily withdraw or resign as an Investing Member of the Company, prior to the dissolution and winding up of the Company, without the Manager's prior written consent, and in accordance with Section 7.4 hereof.

12.6   <u>Nature of Members' Interest</u>:  Membership Interests in the Company shall be personal property for all purposes.  No Member or their successor, representative or assign, shall have any right, title or interest in specific Company property.

12.7   <u>Rights of a Representative</u>:

(1)     Upon the death, Permanent Disability or Bankruptcy of an individual who is a Member (including a substituted Member), his or her personal representative, guardian, trustee or Person serving in a similar capacity, as the case may be, shall have all of the rights of an Investing Member for the purpose of settling or managing his or her estate, and such power as the decedent, incompetent, or bankrupt possessed to constitute a successor as an Assignee and to join with such Assignee in making application under this Section 12 to substitute such Assignee as an Investing Member.

(2)    Upon the bankruptcy or insolvency of any Investing Member that is an entity, or the dissolution or other cessation to exist as a legal entity of any Investing Member which is not an individual, the authorized representative of such entity shall have all of the rights of an Investing Member for the purpose of effecting the orderly winding up and dissolution of the business of such entity and such power as such entity possessed to make an assignment of its Membership Interest in accordance with the terms of Section 13 and to join with any assignee in making application to substitute such assignee as an Investing Member.

12.8    Assignment Consent.  In the event of death of an Investing Member prior to removal of conditions, any assignment to a successor is automatically approved first to his or her spouse, then to any applicant child, or if none, then to the estate, as permitted by law and in accordance with the terms hereunder.

12.9    No Right to Revoke Subscription.  Upon subscription, the Investing Member shall no longer have the right to revoke his or her subscription and request a refund of his or her investment.  Subject to the terms hereof, the Investing Member hereby irrevocably commits the Investing Member's Capital Contribution to the Company.  In the event the Investing Member does not file his or her I-526 Petition within three (3) months of having subscribed, the Company in its sole and absolute discretion shall have the right to cancel such Investing Member's subscription and return his or her Total Subscription Payment.

12.10    Redemption upon Full Repayment of Capital Contributions.  The Membership Interest of an Investing Member shall have been redeemed in full, and such Investing Member shall have no further interest in the Company, upon the return to such Investing Member of his or her Capital Contribution.  No additional documents will be necessary to effectuate such redemption.  Upon such redemption, the Manager shall unilaterally amend Schedule 1 to reflect such redemption.

13.    **RESTRICTIONS ON TRANSFER OF MEMBERSHIP INTERESTS**.

13.1    Conditions Precedent to Transfer:  No Investing Member shall have the right to sell or assign all or any part of such Member's Interest except by reason of death, unless such assignment is effected by, and in any event not until the Investing Member has received an I-829 Petition Approval or an I-829 Petition Denial, (a) written instrument in form and substance acceptable to counsel for the Company, stating that the assignee intends to be substituted or admitted as an Investing Member and accepts and adopts all of the terms and provisions of this Agreement, as the same may have been amended, and providing for the payment of all reasonable expenses incurred by the Company in connection with such substitution or admission, including but not limited to the cost of preparing the necessary amendment to this Agreement; (b) the consent to such assignment of the Manager, which consent shall not be unreasonably withheld; and (c) if requested by the Manager, delivery to the Manager of an opinion of acceptable legal counsel stating that the substitution or admission is exempt from registration and qualification under the Act and any applicable state securities laws.  The Manager may not consent to any transfer or assignment of a Membership Interest (i) to a minor or person adjudged incompetent; or (ii) under circumstances which would result in the termination of the Company under the Code.  If an Investing Member sells any part of his or her Interest representing a base Capital Contribution of $500,000 before removal of conditions on his or her permanent

23

residence, the Manager shall give notice to the Regional Center for prompt reporting to USCIS for possible revocation of immigration benefits arising from the initial investment.

In connection with any assignment of an Investing Member's Membership Interest, such Investing Member shall confirm that the transferee is not a "foreign financial institution" or a "non-financial foreign entity" as defined in Sections 1471 through 1474 of the Code ("**FATCA**"). Any transfer to a foreign financial institution, non-financial foreign entity or any other Person potentially subject to withholding under FATCA shall be prohibited.

13.2     Legend:  Any certificate representing a Membership Interest shall bear on the face thereof legends substantially in the following form:

> "THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), IN RELIANCE UPON THE EXEMPTIONS FROM REGISTRATION PROVIDED IN SECTIONS 3(B) AND 4(2) OF THE ACT AND IN REGULATION S PROMULGATED UNDER THE ACT, NOR WITH ANY STATE SECURITIES REGULATORY AUTHORITY IN RELIANCE UPON PARTICULAR STATUTORY TRANSACTIONAL EXEMPTIONS.  IT IS UNLAWFUL TO CONSUMMATE A SALE OR OTHER TRANSFER OF THIS SECURITY WITHOUT PRIOR RECEIPT OF AN OPINION OF COUNSEL FOR THE COMPANY TO THE EFFECT THAT SUCH PROPOSED SALE OR OTHER TRANSFER DOES NOT AFFECT THE EXEMPT STATUS OF THE ORIGINAL ISSUANCE AND SALE OF THIS SECURITY AND IS IN COMPLIANCE WITH ALL APPLICABLE STATE AND FEDERAL SECURITIES LAWS."

13.3     Mechanics of Substitution or Admission:  Any substitution or admission of an Investing Member shall become effective as of the last day of the calendar month in which all the conditions of such substitution or admission as specified in Section 13.1 shall have been satisfied.  Any Person admitted as a substitute or additional Investing Member pursuant to this Section 13 shall (except as herein otherwise expressly provided) be an Investing Member for all purposes of this Agreement to the extent of the Interest acquired by such person.

13.4     Prohibited Assignments:  Any purported assignment of a Membership Interest otherwise than in accordance with this Section 13 shall be of no effect as between the Company and the purported assignee and shall be unenforceable as against the Company.  The Manager shall not be charged with actual or constructive notice of any such purported assignment and is expressly prohibited from making allocations and distributions hereunder in accordance with any such purported assignment.

14.     **MISCELLANEOUS FINANCIAL AND ACCOUNTING MATTERS**.

14.1     Availability of Financial Records:  At all times during the existence of the Company, the Manager shall keep or cause to be kept accurate and complete books of account in

accordance with generally accepted accounting principles applied in a consistent manner, which shall reflect all Company transactions (including Capital Contributions, income, expense, gain, loss and distributions) and shall be appropriate and adequate for the Company's business.  Such books shall be maintained at the principal place of business of the Company.  Any Investing Member or his or her duly authorized representative shall have the right, at his or her expense, to inspect and copy from such books and documents during normal business hours upon reasonable notice.

14.2    Financial Reports:  As soon as practicable after the close of the Fiscal Year, and in any event within 90 days thereafter, the Company shall deliver to each Investing Member a financial report of the Company for such period, including:  (a) a balance sheet, (b) a profit and loss statement, (c) a statement showing the source and amount of distributions made to the Members and the allocation to each Investing Member of Company income, gain, loss, deductions, credits and items of tax preference, and (d) full disclosure of such other matters as may be material to the financial operations of the Company or to an understanding by the Investing Members of such operations.  Such statements need not be audited but shall be on a basis consistent with the Company's method of accounting and shall be certified by the Company as complete and correct, subject to changes resulting from year-end adjustments.

14.3    Accounting Decisions:  All decisions as to accounting principles and procedures, except as specifically provided to the contrary herein, shall be made by the Manager in accordance with the recommendations of the Company's Accountants.

14.4    Taxable and Fiscal Year:  The Company's taxable and fiscal years (the "**Fiscal Year**") shall be selected by the Manager in its sole discretion.  The initial Fiscal Year of the Company shall end on December 31 of each year of the Company.

14.5    Income Tax Information:  Each Investing Member shall be provided with a copy of the Company's annual income tax return (by electronic delivery), and such additional data as is necessary to adequately disclose each class of income, gain, loss or deduction acquired or incurred by the Company during the preceding taxable year and each Investing Member's distributive share thereof.  Such return and data shall be furnished as soon as practicable after the close of the Company's taxable year, and at least one week prior to the due date (including any requested extension) of the filing of such return with the IRS.

14.6    Maintenance of Cash Assets:  All cash funds of the Company from whatever source received shall be deposited and maintained in one or more Company accounts located at the financial institution designated by the Manager.  All withdrawals from any such account or sale of any such investment shall be made upon the signature of the Manager, or by such other individual(s) as may be authorized in writing by the Manager.

14.7    Basis Election:  Upon the transfer of a Membership Interest, or a distribution of Company property, the Company shall have the right, but not the obligation, to elect pursuant to Section 754 of the Code to adjust the basis of Company property as allowed by Section 734(b) and 743(b) of the Code; provided, however, that if such an election is made, the Company shall not be required to make (and shall not be obligated to bear the expense of making) any

accounting adjustments resulting from such election in the information supplied to any Investing Member except to the extent required by applicable Treasury Regulations.

15.    **AMENDMENTS**.

15.1    <u>Procedure for Amendment</u>:  No amendment to this Agreement shall be valid or binding unless set forth in writing and duly executed by the Manager.

15.2    <u>Reasons for Certain Amendments</u>:  This Agreement shall be amended by the Manager whenever:

(1)    There is a change in the name of the Company or the amount or character of the contribution of an Investing Member;

(2)    A Person is substituted or otherwise admitted as an Investing Member;

(3)    There is a change in the character of the business of the Company;

(4)    The Agreement contains a materially inaccurate statement;

(5)    A time is fixed for dissolution of the Company or the return of contributions in contravention to the time specified in this Agreement;

(6)    There is a change in any right to vote given by this Agreement to an Investing Member on matters affecting the basic nature of the Company; or

(7)    To conform to USCIS regulations in order to comply with its requirements.

16.    **POWER OF ATTORNEY**.

16.1    <u>Description</u>:  Each Investing Member hereby irrevocably constitutes and appoints the Manager, with full power of substitution, as his or her true and lawful attorney in fact on his or her behalf and in his or her name, place and stead, to make, execute, consent to, swear to, acknowledge, publish, record and/or file the following:

(1)    Articles of Organization, a Fictitious Name Registration and any other certificate or instrument which may be required to be filed by the Company or the Members under the laws of any jurisdiction, to the extent that the Manager may reasonably deem such filing to be appropriate, including any and all amendments or modifications thereto;

(2)    Such instruments as may be required to effectuate the dissolution and termination of the Company pursuant to the provisions of this Agreement;

(3)    Any and all consents for the admission of substituted Investing Members, pursuant to the terms of this Agreement;

(4)     Such other instruments as the Manager may reasonably deem appropriate to fully carry out the provisions of this Agreement in accordance with its terms; and

(5)     Any necessary conforming changes, not to include material changes, to any of the execution documents related to an Investing Member's subscription that is required by USCIS guidelines, USCIS regulations, or applicable California law.  Such conforming changes may include, but are not limited to, correcting typographical errors, filling in missing blanks of inconsequential information and the like.

16.2   <u>Characteristics of Power</u>:  The grant of the foregoing power of attorney is coupled with an interest; shall be irrevocable and binding on any assignee of all or any part of a Membership Interest; shall survive the death, legal incapacity, bankruptcy or insolvency of any Investing Member during the term hereof; and shall survive the delivery of any assignment by any Member of the whole or any portion of his or her Membership Interest; and any assignee of an Investing Member hereby constitutes and appoints the Manager as his or her attorney in the same manner and force and for the same purposes as does the assignor.

17.     **<u>MEETINGS; MEANS OF VOTING</u>**.

17.1   <u>Meetings</u>:   Meetings of the Members shall be called by the Manager at its discretion, or whenever requested in writing to do so by Investing Members owning, collectively, Percentage Interests of fifty percent (50%) or more (whether or not held by Investing Members affiliated or unaffiliated with the Manager).   The call shall state the reason for the meeting. Notice of any such meeting shall be delivered to all Members in the manner prescribed in Section 17.2 not less than ten (10) days or more than sixty (60) days prior to the meeting.

17.2   <u>Record Date</u>:  For the purpose of determining the Investing Members entitled to vote at any meeting of the Company, the Manager or the Investing Members requesting such meeting may fix in advance a record date for any such determination of Investing Members. Such date shall not be more than 50 days nor less than 10 days before any such meeting.

17.3   <u>Proxies</u>:  An Investing Member may authorize any Person to act for him or her by proxy on all matters in which he or she is entitled to participate or vote.  Every proxy must be signed by the Investing Member or his or her attorney-in-fact.  No proxy shall be valid after the expiration of 11 months from the date thereof unless otherwise provided in the proxy.  Every proxy shall be revocable at the pleasure of the Investing Member executing it.

17.4   <u>Conduct of Meetings</u>:  Each meeting of the Members shall be conducted by the Manager or such other Person(s) as it shall appoint and pursuant to rules of conduct as it shall reasonably deem appropriate.

17.5   <u>Quorum for Meetings</u>:  There shall be deemed to be a quorum at any meeting of the Investing Members at which the voting power of the Investing Members attending such meeting plus the voting power exercised by Investing Members who have submitted to the Manager effective proxies or written consents to action at such meeting constitutes a Majority in Interest of such Investing Members.

17.6    Action by Written Consent.   Any action that may be taken at a meeting of the Investing Members may be taken without a meeting if a consent in writing setting forth the action is executed by those Investing Members required to approve the proposed action as provided in Section 12.3. Such Members shall respond to any request for approval given by another Member within ten (10) days following the date on which such request for approval is given. All such consents shall be filed by the Manager and maintained in the records of the Company.

18.    **INTENTIONALLY OMITTED**.

19.    **REPRESENTATIONS OF THE MEMBERS**.

By their execution below, each Person as an inducement to be admitted to the Company as an Investing Member represents and warrants to the Company as follows:

(1)    The Person has the requisite legal and mental capacity to acquire the Membership Interest and enter into this Agreement.

(2)    The Person is an "accredited investor" (as such term is defined in Rule 501(a) of the Act) and a sophisticated investor by virtue of his or her education, training and/or numerous prior investments made on his or her own behalf or through entities which it, alone or with others, controls.  The Person is knowledgeable and experienced in financial and business matters, especially in investments which are similar to the Company's business, and which have risks similar to those which may be encountered by the Company.  The Person is capable of evaluating the merits and risks of an investment in the Company.  The Person is not a "U.S. Person" as such term is defined in Regulation S promulgated under the Act.  The Person did not receive the Offering Memorandum or any other offering materials, nor did the Person receive an offer to purchase Membership Interests in the Offering, while within the United States and did not execute their order to purchase Membership Interests, by completing and delivering their Subscription Agreement and Capital Contribution as required by the Offering, from within the United States.

(3)    The Person has been furnished or otherwise obtained all information necessary to enable it to evaluate the merits and risks of his or her prospective investment in the Company.  The Person recognizes that Vertebral Technologies Inc. has limited prior operating history, and may incur leverage that involves certain risks.  The Person recognizes that the Project is in the development stage, there is no guarantee that the Project will be fully developed in accordance with current plans or if it is so developed that it will be developed in the levels and at the times currently predicted, and its future profitability or existence cannot be guaranteed. Even if the Project is completed and Vertebral Technologies Inc. are profitable, this does not assure that the investment will be repaid by Vertebral Technologies Inc. to the Company or that the Company will repay the Capital Contributions of its Members.  An investment in the Project is highly speculative and the Person may suffer a complete loss of his or her investment in the Company.

(4)    The Person has been furnished or has had access to any and all material documents and information regarding the Company, the Manager, Vertebral Technologies Inc.

28

and the Regional Center.  The Person has had an opportunity to question the Company, the Manager, Vertebral Technologies Inc., the Regional Center and their officers, directors, partners, trustees, or other Persons who control or manage same, and receive adequate answers to such questions.  The Person hereby acknowledges that the Company has made available to the Person prior to any investment in the Company the Offering Memorandum and its exhibits, and all information requested by the Person and reasonably necessary to enable the Person to evaluate the risks and merits of an investment in the Company.  The Person, after a review of this information and other information it has obtained, is aware of the speculative nature of any investment in the Company.

(5)     The Person is aware that the Person will have to make the Capital Contribution required hereunder.  The Person can bear the economic risk of the investment in the Company (including the possible loss of his or her entire cash payment) without impairing the Person's ability to provide for himself and/or his or her family in the same manner that the Person would have been able to provide prior to making an investment in the Company.  The Person understands that it must continue to bear the economic risk of the investment in the Company for an indefinite period of time.

(6)     The Person understands that the Membership Interests have not been registered under the Securities Laws, inasmuch as the offering of Membership Interests is being made to a limited group of potential investors and/or potential investors who are not residents of the United States, pursuant to applicable exemptions under the Securities Laws.  The Person understands that it has no rights whatsoever to request, and that the Company is under no obligation whatsoever to furnish, a registration of the Membership Interests under the Securities Laws.

(7)     The Membership Interest that the Person is acquiring is being acquired solely for his or her own account and is not being purchased with a view to, or for resale in connection with, any distribution within the meaning of the Securities Laws.  The Person will not resell or offer to resell any Membership Interests except in accordance with the terms of this Agreement and in compliance with all applicable Securities Laws, including Regulation S under the Act, nor shall the Person conduct any hedging transactions involving the Membership Interest except in compliance with the Securities Laws.  Depending on the particular exemption from registration under the Securities Laws pursuant to which the Person acquires the Membership Interests, as determined by the Company, such exemption may impose additional restrictions on the ownership and transferability of such Membership Interest.

(8)     The Person acknowledges that there is no current market for the Membership Interests and none is anticipated to develop.  Moreover, there are substantial restrictions on the transfer of the Membership Interests.  Therefore, the Person has considered his or her prospective investment in the Company to be a long-term illiquid investment acceptable because the Person is willing and can afford to accept and bear the substantial risks of the investment for an indefinite period of time.

(9)     The Person acknowledges that an investment in the Membership Interests may be beneficial to foreign investors seeking lawful permanent residency in the United States pursuant to an I-526 Petition Approval issued by USCIS, as more fully described in the Offering

Memorandum.  Failure of an Investing Member to continue to own the Membership Interest it acquires may result in the denial of his or her application for conditional permanent residence or I-829 Petition.  There are other immigration requirements that the Person must satisfy or risk denial of his or her I-526 Petition or his or her application for conditional lawful permanent residence, as more fully described in the Offering Memorandum.

(10)    The Person is aware that there is no assurance, representation or warranty, by any Person, that VTI will operate at a profit.

(11)    The Person understands that if it receives a Cash Distribution from the Company in excess of that permitted by Law, the Person may be liable for the amount of such excess Cash Distribution.

(12)    The Person understands that major changes were made by tax laws enacted in the past, and more will likely be enacted in the future.  The Person is aware that he should understand that the tax consequences of an investment in the Company are subject to change.  The Person is further aware that this Agreement contains complex tax attribute allocations.  The Person agrees that the Regional Center and the Manager have not, will not, and cannot assure the Person that such allocations will be respected for federal income tax purposes by the IRS.  Depending on which allocations were to be disregarded if challenged by the IRS, the Person's share of income, gains, losses, deductions and credits of the Company could be affected and could change.  In such an event, the Person may have to amend his or her tax return for the year or years of such change(s).

(13)    The Person understands that the income tax treatment of the Company and the ownership of Membership Interests, whether direct or indirect, are complex and, in many cases, uncertain.  Statutory provisions and administrative regulations have been interpreted inconsistently by the courts.  Additionally, some statutory provisions remain to be interpreted by administrative regulations.  It is possible that the IRS may successfully challenge the tax treatment accorded certain items by the Company.

(14)    The Person is aware that the IRS may audit the income tax returns of the Company and may audit the Person's income tax return (if applicable) as the result of the Person's investment in or claimed deductions or losses from his or her investment in the Company.  Such deductions and losses, when taken together with other items reported on the Person's tax return, may prompt the IRS to examine the Person's return, both as to income and deductions relating to the Company and as to other matters.  The Company cannot assure the Person that such an audit or examination will not occur or that the Person will not incur additional liability and costs as a result of any such audit or examination.

(15)    The Person understands that the Manager may have the authority to negotiate, settle and compromise matters with the IRS relating to all Investing Members of the Company.  The Manager may take positions on issues or effect compromises binding on all Investing Members which the Manager believes are in the best interests of the Company, but which may not be in the best interests of individual Investing Members.  In the event of audit, each Investing Member must consult with his or her own tax advisor with respect to such Investing Member's rights and obligations.

20.    **MISCELLANEOUS**.

20.1    Copies of Documents:   Promptly upon the execution and delivery of this Agreement by an Investing Member, the Company shall deliver to such Investing Member a conformed copy of this Agreement and of the Articles of Organization (in the form in which it has been filed) (by electronic delivery at the option of the Company).

20.2    Notices:  Any notice, payment, demand, offer or other communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered and given for all purposes (a) if personally delivered, (b) whether or not actually received, if sent by registered or certified mail, postage prepaid, or (c) by electronic delivery, addressed as follows:

(1)    if to the Company or the Manager, then to:

GSRV-VTI II, LLC
Attention: Eric Chelini
One Sansome Street
Suite 2080
San Francisco, CA 94104
Telephone:  (415) 986-8888, Ext. 188
Email:  echelini@3gfund.com

(2)    if to an Investing Member, then to the address of such Investing Member as set forth in Schedule 1 hereto or such other address as such Investing Member may designate by notice to the Company.

All notices except notices of change of address shall be deemed given when mailed, and notices of change of address shall be deemed given when received.

20.3    Arbitration:   Any dispute, controversy or claim arising out of or in connection with, or relating to, this Agreement or any breach or alleged breach hereof, except allegations of violations of federal or state securities laws, shall, with the consent of the Manager (which must be given, if at all, in writing and within ten days of the date such matter matures), be submitted to and settled by arbitration in the State of California, pursuant to the rules then in effect of the American Arbitration Association (or at any other place or under any other form of arbitration mutually acceptable to the parties so involved), with venue in San Francisco, California.  Any award rendered shall be final and conclusive upon the parties, and a judgment thereon may be entered in the highest court of the forum, state or federal, having jurisdiction.  The expenses of the arbitration shall be borne equally by the parties thereto provided that each party shall pay for and bear the cost of its own experts, gathering of evidence and counsel's fees, except that in the discretion of the arbitrator, any award may include the cost of the party's counsel fees if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic or that such matter is frivolous.

20.4    Remedies:  The Company and the Members shall be entitled to all available legal and equitable remedies against each other.

20.5    Severability:  In the event any portions of this Agreement are found to be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby, and such invalidity, illegality or unenforceability in one jurisdiction shall not affect the validity, legality or enforceability of any portions of this Agreement in any other jurisdiction.

20.6    Captions:  Paragraph captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or extend, or describe the scope of this Agreement or the intent of any provision hereof.

20.7    Gender:  The masculine gender shall include the feminine and neuter genders, the singular shall include the plural.

20.8    Binding Agreement:  Subject to the restrictions on assignment herein contained, the terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, the successors, assigns, personal representatives, estates, heirs and legatees of the respective Members.

20.9    Applicable Law:  Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the State of California as now adopted or as may hereafter be amended and same shall govern the Company aspects of this Agreement.

20.10    Entire Agreement:  This Agreement constitutes the entire agreement of the parties hereto with respect to the matters set forth herein and supersedes any prior understanding or agreement, oral or written, with respect thereto.  There are no agreements, understandings, restrictions, representations, or warranties among the parties other than those set forth herein or herein provided for.  This Section 20.10 shall not limit the provisions of the Offering Memorandum and the Subscription Agreement.

20.11    Agreement in Counterparts:  This Agreement may be executed in any number of counterparts and all so executed shall constitute one Agreement, binding on all the parties hereto, notwithstanding that all the parties are not signatories to the original or the same counterpart.

20.12    Qualification in Other Jurisdictions:  In the event the business of the Company is carried on or conducted in one or more states in addition to the State of California, the Company shall exist under the laws of each state in which business is actually conducted by the Company, and the parties will execute such further documents as may be appropriate in order that the Manager may legally qualify the Company in each such state.  The power of attorney granted to the Manager by each Investing Member in Section 16, shall constitute the authority of the Manager to perform the ministerial duty of qualifying the Company under the laws of any state in which it is necessary to file documents or instruments of qualification.  A Company office or principal place of business in any state may be designated from time to time by the Manager.

20.13   Waiver of Partition:  Each of the parties hereto irrevocably waives during the term of the Company any right to maintain any action for partition with respect to any Company property.

20.14   Litigation:  The Company shall prosecute and defend such actions at law or in equity as may be necessary to enforce or protect the interest of the Company.  The Company shall respond to any final decree, judgment or decision of any court, board or authority having jurisdiction in the premises.  The Company shall satisfy any such judgment, decree or decision, first out of any insurance proceeds available therefor, and next out of assets of the Company. The cost of defending any actions brought against the Company and/or the Manager with respect to Company matters shall be borne by the Company except as otherwise provided in this Agreement.

20.15   Time:  Time is of the essence with respect to this Agreement.

20.16   Remedies Not Exclusive:   Any remedies herein contained for a breach of obligation hereunder shall not be deemed to be exclusive, and shall not impair the right of any party to exercise any other right or remedy, whether for damages, injunction or otherwise.

20.17   Force Majeure:  If any Person is rendered unable, in full or in part, by Force Majeure, to carry out his or her obligations under this Agreement, other than the obligations to make distributions to the Investing Members, the obligations of such parties, to the extent affected by such Force Majeure, shall be suspended during, but no longer than, his or her continuance.

For purposes of this section, "**Force Majeure**" means an act of God, strike, lockout or other similar disturbance or interruption, act of a public enemy, war, blockage, public riot, lightning, fire, storm, flood, explosion, governmental restraint, unavailability of equipment and any other act or event, whether of the kind specifically enumerated above or otherwise, which is not within the control of the Manager.

20.18   Legal Counsel:  Legal counsel for Vertebral Technologies, Inc. may also represent the Company, the Manager or its Affiliates and/or in connection with legal work or issues arising in connection with VTI.  Each Investing Member recognizes and acknowledges that any such counsel will be acting as legal counsel for the Company, the Manager and/or Vertebral Technologies, Inc. with respect to each such matter and shall not be acting as the legal counsel of any individual Investing Member.  Each Investing Member further recognizes and accepts that his or her interest with respect to any such matter may be adverse to the interests of Vertebral Technologies, Inc. and/or the Company and/or the Manager. Each Investing Member nevertheless consents to the representation of Vertebral Technologies Inc. the Company, and the Manager and by such counsel with respect to each such matter and waives for the benefit to such parties of such counsel having any potential or actual conflict of interest between or among such parties. Each Investing Member acknowledges that in the event of any future dispute or litigation between or among the Investing Members and/or between any of the Investing Members and VTI, the Company, and/or Manager, such counsel may continue to represent VTI, the Company and the Manager, notwithstanding any such dispute and its prior representation of such parties.

33

20.19   <u>Advice from Independent Legal Counsel; Voluntary Agreement</u>:  The Investing Members represent and warrant that (a) each of them has had the opportunity to be represented by legal and tax counsel of his or her choice, (b) each of them has had the opportunity to consult with such counsel regarding this Agreement, and (c) except as set forth herein, each of them has not relied in any way on any representation or other statement made by any other Member (including the Manager) or its legal or tax counsel or by any other Person.

20.20   <u>Patent Errors</u>:  The Members hereby authorize and direct the Manager to correct patent errors and to fill in any blanks, which blanks shall not be substantive to the terms hereof, in this Agreement or in any exhibit, instrument, document or agreement related hereto and to attach hereto or thereto any exhibits or schedules which are a part hereof or thereof.

20.21   <u>Currency</u>:  All references to "dollars" in this Agreement shall mean U.S. Dollars.

20.22   <u>Native Language Translation</u>.  Each Member hereby agrees that it is the sole responsibility of Member to ensure proper translation of this Agreement into their native language if necessary for Member's understanding of the rights and obligations contained herein. Any language translation of this Agreement provided by any of the parties hereto is not a binding legal document, and is being provided solely for the Member's convenience, and shall not in any way be construed as a contract or any part of this Agreement as set forth in English.  None of the parties hereto are liable for any inaccuracies in any language translation or for any misunderstandings due to differences in language usage or dialect.  In the event of any inconsistencies between this Agreement as set forth in English and any language translation, this Agreement as set forth in English and as executed shall govern.  Each Member assumes the responsibility for fully understanding the nature and terms of the rights and obligations under this Agreement.

*(Signatures are on the following page)*

**IN WITNESS WHEREOF**, the parties hereto have entered into this Agreement as of the date first above written.

**COMPANY:**

**GSRV-VTI II, LLC**, a California limited liability company

**By:**     **GSRV-VTI Management, LLC**,
            a California limited liability company,
            its Manager

By:         _____
Name:       Eric Chelini
Its:        Manager

**MANAGER:**

**GSRV-VTI Management, LLC**,
a California limited liability company,
its Manager

By:         _____
Name:       Eric Chelini
Its:        Manager

35

**GSRV-VTI II, LLC**

**OPERATING AGREEMENT**

SIGNATURE PAGE

_____
(Signature)

Print Name: ___ Xi   LIU _____

Address: ██████████████████████████

Telephon ██████████████████████████

Tax I.D. or Social Security #: __ N/A _____

Number of Units: ____ N/A _____

Email Address: ____ N/A _____

Fax Number: _____ N/A _____

36

**SCHEDULE 1**

**<u>List of Investing Members</u>**

**SCHEDULE 2**

**EB-5 JOB ALLOCATION ADDENDUM**

1.      The Company is a business with an investment opportunity associated with **GOLDEN STATE RENAISSANCE VENTURES, LLC,** a California limited liability company **DBA GOLDEN GATE GLOBAL** (the "**Regional Center**"), where the Regional Center has been designated by United States Citizenship and Immigration Services ("**USCIS**") as a regional center to participate in the EB-5 Immigrant Investor Program ("**EB-5 Program**");

2.      The Investing Member desires to be one of up to fifteen (15) limited liability members of the Company, making an investment in the Company to enable the Company to create ten (10) direct or indirect qualifying jobs for each $500,000 investment funded to the Company pursuant to the EB-5 Program;

3.      A member of the Company who receives USCIS' approval of his/her Form I-526 Immigrant Petition by Alien Entrepreneur (the "**I-526 Petition**") while outside the United States obtains conditional lawful permanent residency status on the date of his or her admission to the United States as a conditional permanent resident or on the date of approval of his or her I-485, Application to Register Permanent Residence or Adjust Status;

4.      The total number of qualifying positions created shall be allocated solely to those who have used the investment into the Company as the basis of an I-526 Petition; and

5.      Each member of the Company shall be required to demonstrate at the time of filing his/her respective I-829 Petition, within the 90-day period preceding the second anniversary of his/her (i) admission to the United States as a conditional lawful permanent resident or (ii) adjustment of status to that of a conditional lawful permanent resident, that ten (10) direct and/or indirect and/or induced full-time equivalent, qualifying positions have been created as a result of his/her $500,000 investment in the Company.

6.      The Investing Member has entered into the Agreement to which this Schedule 2 is attached and made a part of, and all definitions contained therein and incorporated herein by reference shall have the meanings ascribed in such Agreement.

# INTRODUCTION

The Company shall take such action to meet the objective of allocating to Investing Members a minimum number of ten (10) direct and/or indirect and/or induced full-time equivalent, qualifying positions created by the Company on the following basis. The Company shall seek to allocate jobs to Investing Members in the order of filing of Investing Member I-829 Petitions. However, the allocation of jobs lies solely in the discretion of the Company. As such, jobs may not be allocated in this order in all cases.

# ARTICLE I
## DUTIES OF INVESTING MEMBER

Prior to Investing Member's entry into the United States based on Investing Member's EB-5 Visa, Investing Member shall notify the Company of Investing Member's intent to enter the United States and provide the Company with Investing Member's expected travel dates.

Within thirty (30) days after Investing Member's entry into the United States, based on Investing Member's EB-5 Visa, Investing Member shall provide the Company with a copy of the I-551 Stamp located in Investing Member's passport. Upon receipt of Investing Member's and his or her dependents, as applicable, green cards, Investing Member shall provide the Company with copies of same.

Within thirty (30) days after Investing Member receives a Form I-797A Notice of Action indicating USCIS' approval of Investing Member's Form I-485, Application for Adjustment of Status, Investing Member shall provide the Company with a copy of such Form I-797A Notice of Action.

Within thirty (30) days after Investing Member either (i) entered the United States on an EB-5 Visa or (ii) received USCIS' approval of his/her Adjustment of Status, Investing Member shall provide the Company with Investing Member's electronic-mail address, new physical address, and telephone number where the Company may contact Investing Member. Should Investing Member's electronic-mail address, physical address, or telephone number change at any point during the two years after Investing Member's entry into the United States on Investing Member's EB-5 Visa or USCIS' approval of Investing Member's Adjustment of Status, Investing Member shall notify the Company of such change within thirty (30) days.

Within one hundred and twenty (120) days prior to the second anniversary of the Investing Member's entry into the United States, based on the Investing Member's EB-5 Visa, or USCIS' approval of the Investing Member's Adjustment of Status, the Investing Member shall notify the Company of the name and physical address of the attorney retained by Investing Member who shall file the Investing Member's I-829 Petition.

## ARTICLE II
## DUTIES OF COMPANY

The Company shall maintain a record at its principal place of business that shall state the date that each member of the Company (i) entered the United States based on such member's EB-5 Visa and (ii) received USCIS' approval of such member's Adjustment of Status.   The Company shall further maintain at its principal place of business a record of the number of direct and/or indirect and/or induced full-time equivalent, qualifying positions created by the Company.

Within ninety (90) days preceding the second anniversary of the Investing Member's admission to the United States as a conditional lawful permanent resident, the Company shall provide the Investing Member and/or the Investing Member's attorney with documentation regarding the full-time job creation by VTI.

## ARTICLE III
## NO GUARANTEES

Investing Member hereby acknowledges, understands, and agrees that the Company has not guaranteed, nor can it guarantee, that the EB-5 Program job requirements will be satisfied at the time Investing Member files his/her I-829 Petition.

# EXHIBIT H

# EXHIBIT H

# AMENDED AND RESTATED OPERATING AGREEMENT

## OF

# GSRV-VTI II, LLC

1.    **DEFINITIONS.** ................................................................................................ 3

2.    **FORMATION.** ................................................................................................. 8

3.    **NAME AND PLACE OF BUSINESS.** ........................................................... 9

4.    **PURPOSE AND SCOPE OF COMPANY.** ..................................................... 9

5.    **TITLE.** ............................................................................................................. 9

6.    **COMMENCEMENT; TERM.** ........................................................................ 9

7.    **CAPITAL CONTRIBUTIONS.** ................................................................... 10

8.    **RIGHTS AND DUTIES OF THE MANAGER.** ............................................ 11

9.    **FEES, SALARIES AND EXPENSES.** ........................................................... 14

10.   **PROFITS, LOSSES, DISTRIBUTIONS AND JOB CREATION ALLOCATION.** .............................................................................................. 16

11.   **DISSOLUTUTION AND DISTRIBUTIONS.** ............................................... 20

12.   **INVESTING MEMBERS.** .............................................................................. 21

13.   **RESTRICTIONS ON TRANSFER OF MEMBERSHIP INTERESTS.** ........ 23

14.   **MISCELLANEOUS FINANCIAL AND ACCOUNTING MATTERS.** ........ 24

15.   **AMENDMENTS.** ........................................................................................... 26

16.   **POWER OF ATTORNEY** ............................................................................. 26

17.   **MEETINGS; MEANS OF VOTING.** ............................................................ 27

18.   **INTENTIONALLY OMITTED.** ................................................................... 28

19.   **REPRESENTATIONS OF THE MEMBERS.** .............................................. 28

20.   **MISCELLANEOUS.** ..................................................................................... 31

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS, EITHER PURSUANT TO APPLICABLE EXEMPTIONS OR BECAUSE THE MEMBERSHIP INTERESTS ARE NOT SECURITIES. WITHOUT SUCH REGISTRATION, THE MEMBERSHIP INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE MANAGER OF THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE MANAGER TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR OTHER APPLICABLE STATE OR FEDERAL SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER.  ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THE MEMBERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS THAT ARE SET FORTH IN THIS AGREEMENT.

**NO PARTY EXCEPT THE COMPANY IS RESPONSIBLE FOR THE CONTENTS OF THE OFFERING MEMORANDUM, AND NO OTHER PARTY EXCEPT SALES AGENTS, INCLUDING OFFSHORE MIGRATION BROKERS, AUTHORIZED BY THE COMPANY WILL BE INVOLVED IN THE OFFERING OF UNITS UNDER THE OFFERING MEMORANDUM OR THE ACCEPTANCE OF SUBSCRIPTIONS FROM SUBSCRIBERS.**

# AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## GSRV-VTI II, LLC

**THIS AMENDED AND RESTATED OPERATING AGREEMENT OF GSRV-VTI II, LLC** (as further amended from time to time, this "**Agreement**"), dated as of April 27, 2015, is made by and among Manager and such persons as hereafter become members (more particularly defined below as the "**Members**" and "**Investing Members**") in accordance with the provisions of this Agreement and the Limited Liability Company Act, as amended, by executing or causing to be executed a signature page in the form attached hereto.

## BACKGROUND INFORMATION

The Articles of Organization for the Company have been prepared, executed and filed with the California Secretary of State and the Company has agreed to issue to the Investing Members units of Membership Interest described herein.  Accordingly, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Manager and the Investing Members agree that this Amended and Restated Operating Agreement shall supersede the terms of the prior Operating Agreement, as amended, in all respects and for all purposes and shall comprise the new Operating Agreement as follows:

**OPERATIVE PROVISIONS**

1.    **DEFINITIONS**.

Except as otherwise defined herein, the following terms shall have the following meanings ascribed to such terms:

1.1    "**Accountants**" means such firm of independent certified public accountants as may be engaged from time to time by the Manager on behalf of the Company to provide professional services to the Company.

1.2    "**Act**" means the Securities Act of 1933, as amended from time to time.

1.3    "**Adjusted Capital Account Balance**" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments.

    (1)    Increase such balance by any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate (second to last) sentence of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

    (2)    Decrease such balance by such Members share of the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Balance is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.4    "**Processing and Marketing Expense**" means a fee paid to the Manager from a Member's Capital Account in accordance with this Agreement in an amount equal to Forty Thousand Dollars ($40,000.00).

1.5    "**Affiliate**" shall have the meaning set forth in Rule 405 promulgated under the Act, except as otherwise provided herein.

1.6    "**Agreement**" shall have the meaning set forth in the introductory paragraph hereof.

1.7    "**Articles of Organization**" means the valid Articles of Organization, duly filed in its original or any amended form in accordance with (and in all respects sufficient in form and substance under) the laws of the State of California.

1.8    "**Asset Management Fee**" means the compensation payable to the Manager for its services in managing the assets, business and affairs of the Company as set forth in Section 9.1(2).

1.9    "**Bankruptcy**" means with respect to a specified Person: (i) the appointment of a receiver, conservator, rehabilitator or similar officer for the specified Person, unless the

appointment of such officer shall be challenged in an application filed within thirty (30) days after the appointment and the appointment is vacated and such officer discharged within one hundred twenty (120) days of the appointment; (ii) the taking of possession of, or the assumption of control over, all or any substantial part of the property of the specified Person by any receiver, conservator, rehabilitator or similar officer or by the United States government or any agency thereof, unless such possession or control is challenged in an application filed within thirty (30) days after such possession or control is taken and property is relinquished within one hundred twenty (120) days of the taking; (iii) the filing of a petition in bankruptcy or the commencement of any proceeding under any present or future federal or state law relating to bankruptcy, insolvency, debt relief or reorganization of debtors by or against the specified Person, provided, if filed against (and not by) the specified Person, such petition or proceeding is not challenged within thirty (30) days after it is filed and if so challenged is not dismissed within one hundred twenty (120) days of the filing of the petition or the commencement of the proceeding; or (iv) the making of an assignment for the benefit of creditors or a private composition, arrangement or adjustment with the creditors of the specified Person.

1.10    "**Business**" means the business of the Company including an investment in Vertebral Technologies, Inc., a spinal device company develops, manufactures, and markets a patented and unique modular intraoperative assembly technology.

1.11    "**Capital Account**" means, with respect to any Member, the sum of his or her paid-in Capital Contribution (a) increased by all profits allocated to such Member; and (b) decreased by (i) the amount of all Cash Distributions to such Member, and (ii) all losses allocated to such Member.  Otherwise, each Member's Capital Account shall be maintained and adjusted in accordance with the Code and the Treasury Regulations thereunder, including expressly, but not by way of limitation, the adjustments to Capital Accounts permitted by Section 704(b) of the Code and the Treasury Regulations thereunder in the case of an Investing Member who receives the benefit or detriment of any special basis adjustment under Sections 734, 743 and 754 of the Code.

1.12    "**Capital Contributions**" means the total cash contributed to the Company by the Members pursuant to the terms of this Agreement, excluding the Expense Amount.   Any reference to the Capital Contribution of an Investing Member shall include the Capital Contribution made by a predecessor holder of the Interest of such Member

1.13    "**Cash Flow**" means the total cash receipts of the Company, plus any other funds (including amounts designated as reserves by the Manager, where and to the extent it no longer regards such reserves as reasonably necessary to the efficient conduct of the Company's business) deemed available for distribution and designated as Cash Flow by the Manager less (a) any operating expenses of the Company; and (b) reserves for working capital and anticipated expenditures in such amounts as may be determined from time to time by the Manager.  Cash Flow shall be determined separately for each Fiscal Year of the Company.

1.14    "**Code**" means the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent laws.

4

1.15     "**Company**" means **GSRV-VTI II, LLC**, the limited liability company subject to this Agreement, in its existing or any amended or reconstituted form.

1.16     "**Denial Date**" means the date upon which USCIS denies an Investing Member's I-526 Petition.

1.17     "**Denied Investing Member"** means an Investing Member whose I-526 Petition is denied by USCIS.

1.18     "**EB-5 Job Allocation Addendum**" means the document attached hereto as Schedule 2 and incorporated herein by this reference as if fully set forth in this Agreement.

1.19     "**Expense Amount**" means the Forty Thousand Dollar ($40,000) Processing and Marketing Expense funded pursuant to the Offering that will be credited to a Member's Capital Account.  Upon USCIS approval of an Investor's I-526 Petition, the Forty Thousand Dollars ($40,000) will be paid to the Manager to: (a) cover Offering-related expenses, migration costs, marketing and promotional fees and administrative costs and to cover other services related to the Offering; and (b) compensate Manager for its services rendered in managing the Company.

1.20     "**FATCA**" is defined in Section 13.1 hereof.

1.21     "**Fiscal Year**" shall have the meaning set forth in Section 14.4 hereof.

1.22     "**For Cause**" means acts or omissions by the Manager that constitute fraud, bad faith, gross negligence or willful misconduct, embezzlement, misappropriation or theft of funds or property, breach of fiduciary duties to the Company, or material breach of a material term of this Agreement, in any case that causes material damage to the Company.

1.23     "**Force Majeure**" shall have the meaning set forth in Section 20.17 hereof.

1.24     "**I-526 Petition**" means an I-526 Immigrant Petition by Alien Entrepreneur filed with USCIS by an Investing Member.

1.25     "**I-526 Petition Approval**" means the approval by USCIS of an Investing Member's I-526 Petition.

1.26     "**I-526 Petition Denial**" means the denial by USCIS of an Investing Member's I-526 Petition.

1.27     "**I-829 Petition**" means a Petition by Entrepreneur to Remove Conditions filed with USCIS by an Investing Member.

1.28     "**I-829 Petition Approval**" means the approval by USCIS of an Investing Member's I-829 Petition.

1.29     "**I-829 Petition Denial**" means the denial by USCIS of an Investing Member's I-829 Petition.

1.30    "**Interest**" or "**Membership Interest**" means the Membership Interest of each Investing Member in the Company.

1.31    "**Investing Member**" or "**Member**" means any Person executing this Agreement or causing the same to be executed as an Investing Member, as well as any other Person acquiring any portion of one or more Units from an Investing Member and admitted to the Company as a Substitute Investing Member.

1.32    "**IRS**" means the United States Internal Revenue Service.

1.33    "**Limited Liability Company Act**" means the California Revised Uniform Limited Liability Company Act, Section 17701.01, et seq. of the California Corporations Code, as amended from time to time.

1.34    "**Liquidation Event**" means the merger, purchase, sale or an initial public offering of Vertebral Technologies, Inc., or the Company's exercise of its put option.

1.35    "**Majority in Interest**" means Investing Members owning in the aggregate more than 50% of the Units then outstanding.

1.36    "**Manager**" means **GSRV-VTI MANAGMENT, LLC,** a California limited liability company.

1.37    "**Offering Memorandum**" means the Confidential Offering Memorandum of the Company dated April 27, 2015, utilized by the Company to sell Units, as amended or supplemented from time to time.

1.38    "**Offering Period**" means the period for the Offering which has commenced and will end on October 27, 2015, unless extended by the Company until not later than April 27, 2016, or otherwise extended so that the Company can attempt to obtain Substitute Investing Members if one or more Investing Member receives an I-526 Petition Denial.

1.39    "**Percentage Interest**" means, with respect to an Investing Member, a percentage equal to the Capital Contribution to the Company made by the Investing Member in proportion to the Capital Contributions made by all of the Investing Members.

1.40    "**Permanent Disability**" means, with reference to a specified Person, (i) any mental or physical illness, condition or incapacity which prevents the specified Person from performing his or her duties on behalf of the Company or any of its Affiliates for a period of 180 days during any 365 day period, (ii) a determination by an insurer that has issued a disability insurance policy to the Company or one or more Members or the Manager with respect to a Person that such Person is permanently disabled as defined in such policy, or (iii) the determination by a court of competent jurisdiction that the specified Person is legally incompetent.

1.41    "**Person**" means an individual, a partnership (general, limited or limited liability), a corporation, a limited liability company, an association, a joint stock company, a trust, a joint

6

venture, an unincorporated organization, or a governmental, quasi-governmental, judicial or regulatory entity or any department, agency or political subdivision thereof.

1.42 **"Preferred Return"** means a cumulative, non-compounded annual return on an Investing Member's Unreturned Invested Capital outstanding from time to time computed at the rate of two percent (2%) per annum calculated from the date or dates that an Investing Member's Capital Contributions comprising such Unreturned Invested Capital advanced by the Company to acquire up to 3,000,000 shares of Series B Convertible Preferred Stock of Vertebral Technologies, Inc.  **The Preferred Return is not a guaranteed return and will be distributed under this Agreement only to the extent there are Preferred Return Sources available for distribution, all as more particularly set forth in Section 10.4 below.**

1.43 "**Preferred Return Sources**" means dividends issued by Vertebral Technologies, Inc. and paid to the Company under that Series B Preferred Stock Purchase Agreement entered into as of June 28, 2013, as amended.

1.44 "**Profits**" and "**Losses**" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, including gain or loss from capital transactions, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(ii) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulation Section 1.704-l(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

(iii) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulation Section 1.704-l(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a Distribution other than in complete liquidation of an Investing Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(iv) Notwithstanding any other provision of this Section, any items which are specially allocated pursuant to Article 10 shall not be taken into account in computing Profits or Losses.

7

The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 10.7 shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (iv) above.

1.45    "**Project**" means the expansion and operation of Vertebral Technologies, Inc. The Project is more particularly described in the Project Business Plan.

1.46    "**Project Business Plan**" means the Comprehensive I-526 Business Plan that as of April 27, 2015 has not been completed.  Once completed, it will be made available for review upon request, as the same may be amended or supplemented from time to time.

1.47    "**Property**" means all assets of the Company, including, but not limited to, shares of Series B Convertible Preferred Stock of Vertebral Technologies, Inc.

1.48    "**Regional Center**" means **GOLDEN STATE RENAISSANCE VENTURES, LLC,** a California limited liability company **DBA GOLDEN GATE GLOBAL.**  The Regional Center has obtained approval from USCIS to participate as a regional center under the EB-5 program ("**EB-5 Program**") with respect to certain specific counties in the greater San Francisco, California Bay area, including, but not limited to, the area of the Project.

1.49    "**Subscriber**" means those Persons that subscribe to become Investing Members in the Company pursuant to the Subscription Agreement.

1.50    "**Subscription Agreement**" means the Subscription Agreement utilized by the Company to sell Units to Investing Members, including all attachments thereto.

1.51    "**Substitute Investing Member**" shall have the meaning set forth in Section 10.2 hereof.

1.52    "**Total Subscription Payment**" means the full subscription amount of Five Hundred Forty Thousand Dollars ($540,000).

1.53    "**Unit**" means an Investing Member's Membership Interest, the acquisition of which shall entitle the holder thereof to the rights and benefits specified in this Agreement.

1.54    "**Unreturned Invested Capital**" means with respect to an Investing Member, an amount equal to the Capital Contributions made by the Investing Member less the sum of all distributions made to such Investing Member, excluding Preferred Returns, under Section 10.4(1).

1.55    "**USCIS**" means the United States Citizenship and Immigration Services.

2.    **FORMATION**.

The Company has been formed as a limited liability company pursuant to the Limited Liability Company Act and other applicable laws of the State of California.

3.    **NAME AND PLACE OF BUSINESS**.

The name of the Company is "**GSRV-VTI II, LLC**" or such other name as the Manager shall hereafter designate by written notice to the Investing Members.  The Company's principal mailing address shall be c/o GSRV-VTI II, LLC, Attention: Eric Chelini, One Sansome Street, Suite 2080, San Francisco, CA 94104, or such other location as the Manager may from time to time designate by notice to the Investing Members.

4.    **PURPOSE AND SCOPE OF COMPANY**.

4.1    (1)    The Company has been formed for the purpose of acquiring up to 3,000,000 shares of Series B Convertible Preferred Stock of Vertebral Technologies, Inc.  The primary objectives of the Company are to invest in Vertebral Technologies, Inc. ("VTI") by acquiring shares of stock of VTI ("Asset"); advancing the strict social criteria of the Golden State Renaissance Ventures, LLC dba Golden Gate Global ("Regional Center"); and assisting in the qualification of its Investing Members seeking lawful conditional and permanent residence ("Green Card") in the United States through the U.S. Citizenship and Immigration Service's "EB-5 Immigrant Investor" program (the "EB-5 Program"), in accordance with the confidential Private Offering Memorandum of the Company dated April 27, 2015, and all exhibits and supplements, if any, thereto (the "Memorandum").  In furtherance of the foregoing, but in no way limiting the generality of the foregoing, the Company may: (i) enter into, perform and carry out contracts and agreements as may be necessary, appropriate or incidental to the accomplishment of the purposes of the Company; (ii) and do all other acts and things which may be necessary, appropriate or incidental to the carrying out of the business and purposes of the Company.

4.2    <u>Other Business Ventures</u>:  The Manager or any Member or any officer, director, employee, stockholder or other Person holding a legal or beneficial interest in any Person that is an Investing Member may engage or possess an interest in other business ventures of every nature and description, independently or with others, and neither the Company nor any Member shall have any right by virtue of this Agreement in or to such independent ventures or the income or profits derived therefrom; provided that nothing contained in this Section is intended to absolve the Manager from any liability to the Company or the Investing Members arising as a result of a breach of any material fiduciary obligation owing to the Company or any Member.

5.    **TITLE**.

Title to any property and to any other assets acquired to affect the purposes of the Company shall be held in the name of the Company.  The Manager and its designee shall execute and file in all appropriate locations such documents, if any, as may be necessary to reflect the Company's interest in Vertebral Technologies, Inc.

6.    **COMMENCEMENT; TERM**.

The Company shall be deemed to commence its existence as of January 1, 2015.  The term of the Company shall continue until terminated in accordance with the provisions of Section 11 hereof, or as otherwise provided by law.

9

7.    **CAPITAL CONTRIBUTIONS**.

7.1    Investing Members:  Each Investing Member shall contribute his or her Capital Contribution (which excludes the Expense Amount) to the capital of the Company in the amounts set forth in Schedule 1 attached to this Agreement, in return for which they shall receive the Membership Interest described in Schedule 1.  The total amount to be contributed by each Investing Member shall be paid directly to the Company as set forth in the Subscription Agreement.  Capital Contributions shall be only in cash.

7.2    No Additional Contributions:  The Investing Members are not required to contribute additional capital or lend funds to the Company.

7.3    Capital Accounts:  The Company shall establish for each Member a Capital Account.  Voluntary loans by any Member shall not be considered contributions to the capital of the Company.

7.4    Withdrawal and Return of Capital: Except as otherwise set forth in this Agreement, an Investing Member may not withdraw from the Company unless the Manager consents to such withdrawal, which consent may be withheld in the Manager's sole discretion. All expenses incurred by the Company in connection with such withdrawal shall be paid for by the withdrawing Investing Member. If an Investing Member withdraws any part of his or her Capital Contribution of $500,000 before removal of conditions on his or her permanent residence, the Manager shall give notice to the Regional Center for prompt reporting to USCIS for possible revocation of immigration benefits arising from the initial investment.

7.5    Direct Investment; No Escrow Account; I-526 Denial; Cancellation of Offering and Rejection of Subscription.

(1)    Pursuant to the Subscription Agreement, the Total Subscription Payment is due to be paid by the Investing Member directly to the Company upon Subscription.  Interest will not accrue on the Total Subscription Payment.

(2)    There will be no escrow account holding an Investing Member's Total Subscription Payment pending an Investing Member's I-526 Petition submittal or Approval. Investing Member recognizes and agrees that the Company has a need for the Capital Contribution of each Investing Member and that the Company will utilize an Investing Member's Capital Contribution to commence operations before such Investing Member has submitted his or her I-526 Petition to the USCIS.

(3)    In the event an Investing Member's I-526 Petition is denied by USCIS or the Investing Member withdrew his or her I-526 Petition once the I-526 Petition was filed, the Investing Member shall have no right to withdraw from the Company and the Company shall have no obligation to return such Denied Investor's Capital Contribution. The Company will return an Investing Member's Processing and Marketing Expense within a reasonable time following receipt of written notice of USCIS I-526 Petition Denial.

(4)     At the option of the Company, a Subscription may be cancelled and made void at the complete discretion of the Company, which discretion shall include but not be limited to cancellation of the offering, of if any representations made by the Investing Member in his or her Subscription Agreement, or otherwise made to the Company, the Regional Center or others, or if information included in the Investing Member's I-526 Petition, are false or misleading.

8.    **RIGHTS AND DUTIES OF THE MANAGER**.

8.1    <u>Management of Company Business; Sole Discretion of Manager</u>:  The Manager shall have the complete and exclusive authority and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding the business of the Company and to undertake any and all acts necessary, appropriate or convenient in connection with or incidental to the management of the Company's business, property and affairs.  The Manager shall possess all of the rights and powers necessary and appropriate to perform all of its duties hereunder. The exercise of any power conferred by this Agreement shall constitute the act of and be binding upon the Company.  The Investing Members shall be provided those rights afforded members of a limited liability company formed pursuant to the California Revised Uniform Limited Liability Company Act. Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement the Manager is permitted or required to make a decision in its "sole and absolute discretion," or "discretion," the Manager shall be entitled to consider only such interests and factors as it desires, including its own interest, and shall, to the fullest extent permitted by applicable law, have no duty (including fiduciary duty) or obligation to give any consideration to any interest of or factors affecting the Members. The Manager may delegate any of its duties, subject to its overriding supervision and control.

8.2    <u>Specific Rights and Powers</u>:  In addition to any other rights and powers which it may possess under law, but subject to the provisions of Section 4, the Manager and/or its designated agents shall have such other rights and powers required for or appropriate to its management of the Company's business, which, by way of illustration but not limitation, shall include the following rights and powers:

(1)     to enter into any contract of insurance which the Manager may reasonably deem appropriate for the protection or conservation of Company property, or for any other purpose beneficial to the Company;

(2)     to employ attorneys, agents, consultants, accountants and other independent contractors to perform services on behalf of the Company, including Affiliates of the Manager; to the extent that such services are reasonably necessary or advisable and the compensation therefor is reasonable;

(3)     to bring or defend legal actions in the name of the Company, pay, collect, compromise, arbitrate, or otherwise adjust or settle claims or demands of or against the Company or its agents;

(4)     to perform or cause to be performed all of the Company's obligations under any agreement to which the Company is a party;

11

(5)     to acquire up to 3,000,000 shares of Series B Convertible Preferred Stock of Vertebral Technologies, Inc. following receipt and approval of the following reports:  (i) the Project Business Plan and (ii); and the Economic Impact Analysis report prepared by Beacon Economics;

(6)     to engage third parties to provide administrative services to the Company; and

(7)     to execute, acknowledge and deliver any and all instruments necessary to effectuate any of the foregoing.

8.3     <u>Compliance with EB-5 Restrictions.</u>  The Manager shall operate the Company in a manner that is designed to comply with legal and policy requirements of the Immigrant Investor Program administered by USCIS, as advised by the Regional Center.  In particular, the Manager shall:

(1)     deploy the Capital Contributions of Investing Members in VTI and to keep such funds invested in VTI until Investing Members have received adjudication of their I-829 Petitions;

(2)     avoid reserve accounts designed to evade at-risk investment, and avoid agreements for redemption (including return on investment) of Investing Members' Capital Contributions before adjudication of the petitions for removal of conditions on their permanent residence;

(3)     avoid repayment of Investing Members' Capital Contributions other than at fair market rates, after adjudication of Investing Members' I-829 Petitions by USCIS, and only in the discretion of the Manager;

(4)     maintain an ongoing business deploying capital to job-creating activity unless and until USCIS has adjudicated the I-829 Petitions of all Investing Members;

(5)     track, maintain records, and share data and records with the Regional Center concerning the Company's investment in Vertebral Technologies, Inc. and the underlying Project, including the expenditure of funds, revenues of VTI, and operation of facilities and enterprises;

(6)     require Vertebral Technologies, Inc. to perform such tracking, documentation, and sharing with the Company in order to enable the Regional Center to meet its obligations to USCIS and to provide information to Investing Members needed for them to request removal of conditions from their U.S. permanent residence;

(7)     obtain Office of Foreign Assets Control approval, or confirmation of no need for approval, before subscribing an investor who is a native or citizen or whose capital derives from a country subject to embargo, such as Iran; and

(8)     cause the Investing Members to participate in making management decisions for the Company to comply with USCIS regulations.

8.4     Liability of the Manager to Investing Members and Company; Indemnification: The Manager, its agents and its Affiliates shall be required to devote only so much time and attention to the business affairs of the Company as is reasonably necessary or advisable to competently oversee such affairs.  Except as otherwise specifically set forth herein, neither the Manager nor its designated agents or Affiliates shall be personally liable to any Investing Member because any taxing authority disallows or adjusts any deduction or credit claimed in a Company income tax return, nor for the repayment of Capital Contributions of the Investing Members.  The performance of or the omission to perform any act, the effect of which may cause or result in loss or damage to the Company, if performed or omitted in good faith and in accordance with the terms of this Agreement, shall not subject the Manager nor its agents or Affiliates to any personal liability to either the Company or any Investing Members. The Company, its receiver, or trustee and each Investing Member shall indemnify and hold harmless the Manager (including any officer, director or employee or designated agent of the Manager), and each of their Affiliates from any claim, loss, expense, liability, action or damage resulting from any such act or omission, including, without limitation, reasonable costs and expenses of litigation and appeal (including reasonable fees and expenses of attorneys engaged by the Manager and/or its agents or Affiliates in defense of each such act or omission); but the Manager and its agents or Affiliates shall not be entitled to be indemnified or held harmless due to, or arising from, fraud, bad faith, gross negligence or willful misconduct by such parties.

8.5     Special Duties of the Manager:  In addition to and without limiting the duties and obligations specified or referenced hereunder, the Manager shall advise and take direction from professional advisors that it may choose to engage with respect to (a) any independent contractor or agent of the Company that is at all times performing and complying with the provisions of any agreement affecting Company property or the operation thereof, (b) cause the Company to file amended Articles of Organization and such other documents and to perform such acts as shall be required under California law in order to preserve the valid existence of the Company and the limited liability of the Investing Members.

8.6     Devotion of Time.  The Manager shall devote to the Company such time as may be necessary for the proper performance of its duties hereunder, and the Investing Members acknowledge that the Manager, the Manager's Affiliates and the Manager's members currently engage in other various for profit activities and will continue to engage in such activities including, without limitation, acquisition, financing, development and management activities. Such for profit business activities may include the formation of other similar private equity projects.  Any Member of the Company, the Manager, any member of the Manager and such Member's Affiliates may engage in any activities, whether or not related to the business of the Company and whether or not in competition with the Company.  Such Members may continue, or initiate further, such activities.  Each Investing Member agrees that the Manager, any Member and any Affiliate of the Manager or any Member (a) may engage in or possess an interest, direct or indirect, in any business venture of any nature or description for such Member's own account, independently or with others, including, without limitation, any business, industry or activity in which the Company may be interested in investing or may also have investments, and (b) may do so without any obligation to report the same to the Company or any Member or to afford the Company or any Member any opportunity to participate therein.  Neither the Company nor any

Member shall have any right in or to any such independent venture or investment or the revenues or profits derived therefrom.

      8.7    Removal; Resignation:

      (1)    The Manager may be removed For Cause by a written determination of a Majority in Interest of the Investing Members. Prior to voting to remove the Manager, the majority in Interest of the Investing Members must determine that a default as specified herein has occurred, must notify the Manager in writing of such default and provide the Manager a reasonable amount of time to cure the default.  If the Manager cures the stated default within a reasonable period of time, the Manager may not be removed.

      (2)    The Manager may resign as an agent of the Company at any time upon written notice to the Company.

      (3)    Upon removal or resignation of the Manager, the removed/resigned Manager shall immediately cease to have any authority to act as an agent for the Company.

      8.8    Election of Successor Manager.  Within thirty (30) days after the removal or resignation of the Manager, the Investing Members shall select a successor Manager by a written determination of a Majority in Interest of the Investing Members.

      8.9    Tax Matters Partner.  The Manager is hereby appointed as the Tax Matters Partner of the Company.

      9.    **FEES, SALARIES AND EXPENSES**.

      9.1    Manager Fees:  The Manager shall cause the Company to pay the Manager the following compensation:

      (1)    Processing and Marketing Expense.  The Manager shall be paid that sum which is equal to the Expense Amount less the Offering-related expenses (including, but not limited to the migration costs, marketing and promotional fees and administrative costs).

      (2)    Asset Management Fee.  The Manager is entitled to payment of an Asset Management Fee by the Company equal to five percent (5%) (1.25% per Fiscal Quarter) of an Investing Member's capital contributions invested in the Company per year. The Asset Management Fee shall be calculated from the aggregate Capital Account balances of the Investing Members as of the last day of the preceding Fiscal Quarter, and may be accrued without interest when Company funds are not available for its payment.  Each quarterly payment shall be equal to one fourth (1/4) of the above stated Asset Management Fee.  The measuring period for the payment of the Asset Management Fee shall begin for each Investing Member as of the date such Investing Member's Subscription Agreement was accepted by the Manager on behalf of the Company, or upon the date that an Investing Member makes a Capital Contribution, whichever is later. This Asset Management Fee shall accrue without interest, payable from accrued but unpaid dividends, and only payable after liquidation.

(3)    30% of Any Gain or Profit Realized from a Liquidation Event. The Manager is entitled payment by the Company of thirty percent (30%) of the gain or profit realized upon a Liquidation Event, following:  (i) payment in full to each Investing Member of its Preferred Return; and (ii) repayment to each Investing Member of its original Capital Contribution.

9.2    Expenses:  Except as otherwise provided herein, the Company shall pay from any funds available to the Company (but not including the Capital Contributions of an Investing Member) all ordinary expenses incurred in connection with the formation, operation and administration of the Company, which may include, but are not limited to:

(1)    Asset Management Fee. The Company shall pay an Asset Management Fee as defined in Section 9.2(2) above to the Manager; and

(2)    Company Expenses. The Company shall pay or reimburse the Manager for all costs and expenses incurred by or on behalf of the Company or for its benefit, including, without limitation, any sales or other taxes which may be assessed against the Company; the costs and expenses, including, without limitation, of reasonable travel and out-of-pocket travel related expenses, commissions, brokerage fees, closing costs, fees and expenses of appraisers, accountants, engineers, architects, specialists, lawyers and other service providers, investment banking fees or similar charges, or interest expense for borrowed money (if any); any expense of organizing, revising, converting, terminating or reconstituting the Company or negotiating, drafting, causing the execution of or amending the Manager, Articles of Organization, the operating agreement or other Company documentation; any indemnification expenses and costs pursuant to section 8.4 hereof; liquidation expenses of the Company; expenses attributable to normal and extraordinary investment banking, accounting, appraisal, legal, custodial, and registration services provided to the Company, including services with respect to the proposed purchase or sale of Assets by the Company (whether or not any such purchase or sale is consummated); costs of appropriate insurance coverage for the Company including, without limitation, premiums for liability insurance to protect the Company, the Manager, and the members and Affiliates of the Manager in connection with the performance of Company activities; interest and taxes related to the purchase, holding or sale by the Company of any Asset; costs incurred in registering (or obtaining exemptions from registration for) securities owned by the Company with the Securities and Exchange Commission, and any securities exchange or any other similar authority; costs incurred in qualifying and maintaining qualifications of such securities under applicable state "Blue Sky" laws; reports to governmental authorities; costs incurred in connection with any litigation in which the Company is involved, as well as in the examination, investigation or other proceedings conducted by any regulatory agency of the Company, including legal and accounting fees incurred in connection therewith the preparation of any audits of the Company, and other reports to the Investing Members; and all other expenses properly chargeable to the activities of the Company, including fees payable to third parties in connection with the selection, identification, analysis or evaluation of prospective or consummated investments of the Company.

9.3    Salaries, Drawings and Interest on Capital Accounts:  No Member shall receive any interest on a Capital Contribution or any salary, either with respect to any Capital

Contribution, for services rendered on behalf of the Company or otherwise in his or her capacity as Member, except as expressly provided elsewhere in this Agreement.

10. **PROFITS, LOSSES, DISTRIBUTIONS AND JOB CREATION ALLOCATION**.

10.1  <u>Generally</u>:  The following provisions shall apply with respect to the allocation of Profits and Losses:

(1)  Profits and Losses for all purposes of this Agreement shall be determined in accordance with the accounting method followed by the Company for federal income tax purposes and otherwise in accordance with applicable Treasury Regulations.  Every item of income, gain, loss, deduction, credit or tax preference entering into the computation of such profit or loss, or applicable to the period during which such profit or loss is realized, shall be considered allocated to each Member in the same proportion as profits and losses are allocated to such Member below.

(2)  Profits and Losses shall be allocated to the Members commencing with the Fiscal Year ending December 31, 2015 and annually thereafter.

(3)  <u>Allocation of Indebtedness</u>.  The Capital Account of the Investing Members shall include an initial allocation of Company indebtedness in the amounts for each Investing Member in accordance with the provisions otherwise set forth in this Agreement.

(4)  <u>Profits and Losses</u>.  Except with respect to the repayment of indebtedness and the allocation of any built-in gain provided for under Section 704(c) of the Code, all profits and losses of the Company shall be allocated as set forth hereinafter.

10.2  <u>Allocation Following Transfer of Interest</u>:  Except as otherwise provided herein, in any year in which an Investing Member transfers all or any portion of a Membership Interest to any Person who, during such year, is admitted as a Substitute Investing Member, the share of profits, losses and distributable Cash Flow allocated to or attributable to the Membership Interest sold, assigned or transferred, shall be divided between the assignor and the assignee on the basis of the number of days in such year before or on, and the number of days after, the execution by the assignee of this Agreement; provided, however, that the assignor and the assignee may by agreement make special provisions for the allocation of items of income, profit, gain, loss, deduction or credit as may from time to time be permitted under the Code, and for the distribution of Cash Flow, but such agreement shall be binding as to the Company only after it shall have received notice thereof from the assignor and assignee.

10.3  <u>Allocation of Profits and Losses</u>:

(1)  Profits shall be allocated to the Investing Members in accordance with their respective distributions pursuant to Section 10.5, or if no distributions, then in accordance with their Percentage Interests.  Losses shall be allocated to the Members in accordance with their Percentage Interests.

(2)      Limitation.  The Losses allocated to an Investing Member shall not exceed the maximum amount of Losses that can be so allocated without causing any Investing Member to have a deficit (determined after all Cash Distributions for the Fiscal Year at the end of the Fiscal Year for which the allocation relates.  All Losses in excess of the limitation set forth in the preceding sentence shall be allocated among those Investing Members that will not have a deficit at the end of the Fiscal Year in the ratio of their relative Percentage Interests, and any excess thereafter shall be allocated to the Investing Member in accordance with their Percentage Interests.

10.4      Distribution of Cash Flow:  Subject to Section 10.10, the Manager shall have the sole authority and discretion to determine when Cash Flow is available for distribution.  Cash Flow from Preferred Return Sources and from a Liquidation Event shall be distributed separately in accordance with clauses (1) and (2) below, respectively. Once a determination is made that such a Cash Distribution is in order, same shall be applied as follows:

(1)      Distributions of Cash Flow from Preferred Return Sources shall distributed:

(a)      First, to each Investing Member, pari passu and pro rata in accordance with his or her respective Percentage Interest, until such Investing Member has received his or her Preferred Return under this Section 10.4(1), taking into account the amount and timing of all prior distributions made to each Investing Member under this Section 10.4(1); and

(b)      Second, to the Manager in accordance with Section 9.1(2);

(2)      Distributions of Cash Flow from a Liquidation Event will be distributed:

(a)      First to Investing Members who have either received an I-829 Petition Approval or an I-829 Denial or those who are not seeking Green Card Status under the EB-5 Program; provided, however, that if such payment is made with respect to more than one such Investing Member and such payment is for less than the full amount of all such Investing Member's Unreturned Invested Capital, then such payment shall be distributed to the Investing Members pari passu and pro rata based Unreturned Invested Capital of such Investing Members.  Distributions under this Section 10.4(2) shall be applied first to the earliest Capital Contributions of the Investing Member; and

(b)      All remaining Cash Flow from a Liquidation Event will be distributed:  (i) seventy percent (70%) to the Investing Member pari passu and prorated based upon the Capital Contribution of such Investing Member; and (ii) thirty percent (30%) to the Manager in accordance with Section 9.1(3).

10.5      Liquidating Distributions:  The proceeds resulting from the liquidation of the Company property pursuant to Section 11.2 (but subject to the provisions of Section 11.2(3)), shall be distributed and applied in the following order of priority:

(1)     To the payment of debts and liabilities of the Company, including all expenses of the Company incident to any such liquidation and all loans or any other debts and liabilities of the Company to the Members or their Affiliates;

(2)     To the establishment of any reserves which the liquidating trustee deems reasonably necessary for contingent, unmatured or unforeseen liabilities or obligations of the Company; and

(3)     Thereafter, applied in accordance with the provisions of Section 10.4 above.

10.6    Nonrecourse:  Each Member shall look solely to the assets of the Company for all distributions from the Company and the repayment of his or her Capital Contributions, and shall have no recourse, upon dissolution or otherwise, against any Manager or Investing Member.

10.7    Authority of Manager to Vary Allocations to Preserve and Protect Members' Intent:

(1)     It is the intent of the Members that each Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined and allocated in accordance with this Section 10 to the fullest extent permitted by Section 704(b) of the Code.  In order to preserve and protect the determinations and allocations provided for in this Section 10, the Manager is authorized and directed to allocate income, gain, loss, deduction, or credit (or item thereof) arising in any year differently than otherwise provided for in this Section 10 to the extent that allocating income, gain, loss, deduction or credit (or item thereof) in the manner provided for in Section 10 would cause the determination and allocation of each Member's distributed share of income, gain, loss, deduction or credit (or item thereof) to not be permitted by Section 704(b) of the Code and Treasury Regulations promulgated thereunder.  Any new allocation (the "**New Allocation**") made pursuant to this Section 10.7 shall be deemed to be a complete substitute for any allocation otherwise provided for in this Section 10, and no amendment of this Agreement or approval of any Member shall be required.

(2)     In making any New Allocation under Section 10.7(1), the Manager is authorized to act only after having been advised by the Accountants to the Company that, under Section 704(b) of the Code and the Treasury Regulations thereunder, (i) the New Allocation is necessary, and (ii) the New Allocation is the minimum modification of the allocations otherwise provided for in this Section 10 necessary in order to assure that, either in the then current year or in any preceding year, each Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) is determined and allocated in accordance with this Section 10 to the fullest extent permitted by Section 704(b) of the Code and the Treasury Regulations thereunder.

(3)     If the Manager is required by Section 10.7(1) to make any New Allocation in a manner less favorable to the Investing Members than is otherwise provided for in this Section 10, then the Manager is authorized and directed, insofar as it is advised by the Accountants to the Company that it is permitted by Section 704(b) of the Code, to allocate income, gain, loss, deduction, or credit (or item thereof) arising in later years in such a manner so as to bring the allocations of income, gain, loss, deduction, or credit (or item thereof) to the

18

Investing Members as near as possible to the allocations thereof otherwise contemplated by this Section 10.

(4)     New Allocations made by the Manager under Section 10.7(1) shall be made in reliance upon the advice of the Accountants to the Company, and no such allocation shall give rise to any claim or cause of action by any Investing Member.

10.8     Special Allocation.  Prior to making any allocations under Section 10.3 above, the following allocations shall be made:

(1)     Qualified Income Offset.   Except as otherwise provided in Sections 10.8(2) and 10.8(3), in the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in proportion to his respective deficit in his Adjusted Capital Account Balance in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit in his Adjusted Capital Account Balance as quickly as possible.  It is intended that this Section 10.9(1) qualify and be construed as a "qualified income offset" within the meaning of Treasury Regulation 1.704-1(b)(2)(ii)(d)(3) and shall be interpreted consistently therewith.

(2)     Minimum Gain Chargeback.  Except as provided in Treasury Regulation Section 1.704-2(f), if there is a net decrease in the Company's allocable profit for a Fiscal Year, each Member shall be allocated, before any other allocation of Company items for such Fiscal Year, items of gross income and gain for such year (and, if necessary, for subsequent years) in proportion to, and to the extent of, the amount of such Member's share of the net decrease in a company Minimum Gain during such year.  The income allocated pursuant to this Section 10.8(2) in any Fiscal Year shall consist first of gains recognized from the disposition of property subject to one or more nonrecourse liabilities, and any remainder shall consist of a pro rata portion of other items of income or gain of a company.

(3)     Code Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of a Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its Membership Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their Membership Interests in the Company in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(4)     Regulatory Allocations.  The allocations set forth in Sections 10.8(1) through 10.8(4) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of Treasury Regulations Section 1.704-1(b).  Notwithstanding any other provision of this Section 10 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other Profits, Losses and items of income, gains, loss and

deduction among the Members so that, to the extent possible, the net amount of such allocations of other Profits, Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

10.9    Withholding Taxes with Respect to Members.  The Company shall comply with any withholding requirements under federal, state, local and foreign law and shall remit any amounts withheld to, and file required forms with, the applicable jurisdiction.  All amounts withheld from Company revenues or distributions by or for the Company pursuant to the Code or any provision of any federal, state, local or foreign law, and any taxes, fees or assessments levied upon the Company, shall be treated for purposes of this Section 10.9 as having been distributed to those Members upon whose behalf the amounts were withheld.  If the amount withheld was not withheld from the affected Member's actual share of cash available for distribution, the Manager on behalf of the Company may, at its opinion (a) require such Member to reimburse the Company for such withholding or (b) reduce any subsequent distributions to which such Member is entitled by the amount of such withholding.  Each Member agrees to furnish the Company with such representations and forms as the Manager shall reasonably request to assist it in determining the extent of, and in fulfilling, the Company's or Borrower's withholding obligations, if any. As soon as practicable after becoming aware that any withholding requirement may apply to an Investing Member, the Manager shall advise the Investing Member of such requirement and the anticipated effect thereof.  Each Member shall pay or reimburse to the Company all identifiable costs or expenses of the Company caused by or resulting from withholding taxes with respect to such Member.

10.10    Tax Distributions.   The Manager shall make good faith efforts to cause the Company to distribute to all Members within ninety (90) days after the close of each Fiscal Year of the Company in accordance with Sections 10.4 above distributions which, together with the other distributions to Members made with respect to such fiscal period, equal at least forty percent (40%) of the Members' respective anticipated allocation of taxable items pursuant to Section 10.4 above.

10.11    Job Creation Allocation.  The allocation to each Investing Member of job creation numbers arising from fulfillment of the Project Business Plan will be reported to the Regional Center, avoiding double counting of any job.  To the extent that there are insufficient jobs created for all Investing Members to qualify for I-829 Petition Approval, those jobs shall be allocated to the Investing Members in the order set forth in the EB-5 Job Allocation Addendum.

11.    **DISSOLUTUTION AND DISTRIBUTIONS**.

11.1    Dissolution of Company:  Subject to the provisions of Section 4, the Company shall continue until terminated and dissolved upon the following: (i) The determination of the Manager to dissolve the Company with the prior written consent of a Majority in Interest of the Investing Members, (ii) An event of withdrawal of the Manager as defined in the Act (other than an event of bankruptcy) unless within ninety (90) days of such withdrawal the business of the Company is continued by a vote of those Investing Members owning more than fifty percent (50%) of the Percentage Interests owned by all Investing, (iii) on the sale or other disposition of all or substantially all of the Assets (unless the Manager elects within thirty (30) days, by written

notice to the Company, to continue the Company), (iv) when the Manager elects, by written notice to the Company, to dissolve the Company, the issuance of a judicial decree of dissolution by a court of competent jurisdiction, or (vi) Any other event causing the dissolution of the Company under the laws of the State of California.

11.2    Winding Up and Distribution:

(1)    Except as otherwise expressly permitted under this Agreement, upon the dissolution of the Company, the Company shall be liquidated by (1) the Manager, or (2) by the Company's Accountants.  In carrying out the liquidation of the Company, the liquidating trustee shall have all of the rights and powers of the Manager hereunder.

(2)    A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of the Company's liabilities so as to enable the liquidating trustee to minimize the normal losses attendant to liquidation.  The operations of the Company shall continue during such liquidation solely for the purpose of winding up the Company's business.  Upon completion of the liquidation each of the Investing Members shall be furnished with a statement setting forth the assets and liabilities of the Company as of the date of complete liquidation.  Upon approval of this statement by a Majority in Interest of the Investing Members, the liquidating trustee shall cause a certificate of dissolution of the Company to be duly prepared, executed and filed causing the dissolution of the Company under the laws of the State of California.  Nothing herein shall be construed as a limitation upon or termination of any of the rights of the Investing Members during or following any liquidation.

(3)    The proceeds of any liquidation shall be applied and distributed to the Investing Members in accordance with Section 10.5.

12.    **INVESTING MEMBERS**.

12.1    Admission:   The Company is authorized to admit to the Company Investing Members.  Unless otherwise approved by the Company in its sole discretion, only individuals shall be Members, either by admission or transfer.

12.2    Limitation on Investing Member Liabilities:   No Investing Member will be subject to assessment nor be personally liable for any of the debts of the Company or any of the losses thereof beyond the amount committed by him, her or it to be contributed to the capital of the Company; provided, that an Investing Member receiving a distribution in return, in whole or in part, of his or her Capital Contribution shall be liable to the Company for any sum, not in excess of such amount returned, plus interest thereon, necessary to discharge liabilities to any or all creditors of the Company who extend credit or whose claims arise before any such distribution is made.

12.3    Limited Authority.   Each Investing Member acknowledges that the Investing Members shall have no right to participate in the management or control of the business and affairs of the Company, and shall exercise only those voting rights as are specifically provided for in this Agreement.  No Investing Member as such shall be an agent of the Company or have the power or authority to bind the Company other than upon the express prior direction of the

Manager.  The Investing Members, in accordance with the provisions of this Section 12.3, shall have the right to vote solely with respect to those matters set forth immediately below and such shall require an affirmative vote as set forth below as to each such action:

(1)     The amendment of the Articles, which shall require the affirmative vote of the Manager and those Investing Members owning more than Fifty Percent (50%) of the Percentage Interests owned by all Investing Members;

(2)     The merger, consolidation or combination of the Company with any other entity, which shall require the affirmative vote of the Manager and those Investing Members owning more than Fifty Percent (50%) of the Percentage Interests owned by all Investing Members;

(3)     The dissolution of the Company under Section 11.1, which shall require the affirmative vote of the Manager and those Investing Members owning more than Fifty Percent (50%) of the Percentage Interests owned by all Investing Members;

(4)     The appointment of a new Manager as set forth in Section 8.8, which shall require the affirmative vote of those Investing Members owning more than Fifty Percent (50%) of the Percentage Interests owned by all Investing Members; and

(5)     The election to continue the business of the Company in the event of the withdrawal of the Manager as set forth in Section 11.1, which shall require the affirmative vote of those Investing Members owning more than Fifty Percent (50%) of the Percentage Interests owned by all Investing Members.

12.4    Registered Holders:  Upon the admission of an Investing Member, his or her address and Membership Interest shall be registered on the records of the Company maintained at its principal office and inserted in an amended and updated Schedule 1 hereto.

12.5    Withdrawal of Members:  No Member may voluntarily withdraw or resign as an Investing Member of the Company, prior to the dissolution and winding up of the Company, without the Manager's prior written consent, and in accordance with Section 7.4 hereof.

12.6    Nature of Members' Interest:  Membership Interests in the Company shall be personal property for all purposes.  No Member or their successor, representative or assign, shall have any right, title or interest in specific Company property.

12.7    Rights of a Representative:

(1)     Upon the death, Permanent Disability or Bankruptcy of an individual who is a Member (including a substituted Member), his or her personal representative, guardian, trustee or Person serving in a similar capacity, as the case may be, shall have all of the rights of an Investing Member for the purpose of settling or managing his or her estate, and such power as the decedent, incompetent, or bankrupt possessed to constitute a successor as an Assignee and to join with such Assignee in making application under this Section 12 to substitute such Assignee as an Investing Member.

22

(2)     Upon the bankruptcy or insolvency of any Investing Member that is an entity, or the dissolution or other cessation to exist as a legal entity of any Investing Member which is not an individual, the authorized representative of such entity shall have all of the rights of an Investing Member for the purpose of effecting the orderly winding up and dissolution of the business of such entity and such power as such entity possessed to make an assignment of its Membership Interest in accordance with the terms of Section 13 and to join with any assignee in making application to substitute such assignee as an Investing Member.

12.8    <u>Assignment Consent</u>.  In the event of death of an Investing Member prior to removal of conditions, any assignment to a successor is automatically approved first to his or her spouse, then to any applicant child, or if none, then to the estate, as permitted by law and in accordance with the terms hereunder.

12.9    <u>No Right to Revoke Subscription</u>.  Upon subscription, the Investing Member shall no longer have the right to revoke his or her subscription and request a refund of his or her investment.  Subject to the terms hereof, the Investing Member hereby irrevocably commits the Investing Member's Capital Contribution to the Company.  In the event the Investing Member does not file his or her I-526 Petition within three (3) months of having subscribed, the Company in its sole and absolute discretion shall have the right to cancel such Investing Member's subscription and return his or her Total Subscription Payment.

12.10   <u>Redemption upon Full Repayment of Capital Contributions</u>.  The Membership Interest of an Investing Member shall have been redeemed in full, and such Investing Member shall have no further interest in the Company, upon the return to such Investing Member of his or her Capital Contribution.  No additional documents will be necessary to effectuate such redemption.  Upon such redemption, the Manager shall unilaterally amend <u>Schedule 1</u> to reflect such redemption.

13.     **RESTRICTIONS ON TRANSFER OF MEMBERSHIP INTERESTS**.

13.1    <u>Conditions Precedent to Transfer</u>:  No Investing Member shall have the right to sell or assign all or any part of such Member's Interest except by reason of death, unless such assignment is effected by, and in any event not until the Investing Member has received an I-829 Petition Approval or an I-829 Petition Denial, (a) written instrument in form and substance acceptable to counsel for the Company, stating that the assignee intends to be substituted or admitted as an Investing Member and accepts and adopts all of the terms and provisions of this Agreement, as the same may have been amended, and providing for the payment of all reasonable expenses incurred by the Company in connection with such substitution or admission, including but not limited to the cost of preparing the necessary amendment to this Agreement; (b) the consent to such assignment of the Manager, which consent shall not be unreasonably withheld; and (c) if requested by the Manager, delivery to the Manager of an opinion of acceptable legal counsel stating that the substitution or admission is exempt from registration and qualification under the Act and any applicable state securities laws.  The Manager may not consent to any transfer or assignment of a Membership Interest (i) to a minor or person adjudged incompetent; or (ii) under circumstances which would result in the termination of the Company under the Code.  If an Investing Member sells any part of his or her Interest representing a base Capital Contribution of $500,000 before removal of conditions on his or her permanent

23

residence, the Manager shall give notice to the Regional Center for prompt reporting to USCIS for possible revocation of immigration benefits arising from the initial investment.

In connection with any assignment of an Investing Member's Membership Interest, such Investing Member shall confirm that the transferee is not a "foreign financial institution" or a "non-financial foreign entity" as defined in Sections 1471 through 1474 of the Code ("**FATCA**"). Any transfer to a foreign financial institution, non-financial foreign entity or any other Person potentially subject to withholding under FATCA shall be prohibited.

13.2    Legend:  Any certificate representing a Membership Interest shall bear on the face thereof legends substantially in the following form:

"THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), IN RELIANCE UPON THE EXEMPTIONS FROM REGISTRATION PROVIDED IN SECTIONS 3(B) AND 4(2) OF THE ACT AND IN REGULATION S PROMULGATED UNDER THE ACT, NOR WITH ANY STATE SECURITIES REGULATORY AUTHORITY IN RELIANCE UPON PARTICULAR STATUTORY TRANSACTIONAL EXEMPTIONS.  IT IS UNLAWFUL TO CONSUMMATE A SALE OR OTHER TRANSFER OF THIS SECURITY WITHOUT PRIOR RECEIPT OF AN OPINION OF COUNSEL FOR THE COMPANY TO THE EFFECT THAT SUCH PROPOSED SALE OR OTHER TRANSFER DOES NOT AFFECT THE EXEMPT STATUS OF THE ORIGINAL ISSUANCE AND SALE OF THIS SECURITY AND IS IN COMPLIANCE WITH ALL APPLICABLE STATE AND FEDERAL SECURITIES LAWS."

13.3    Mechanics of Substitution or Admission:  Any substitution or admission of an Investing Member shall become effective as of the last day of the calendar month in which all the conditions of such substitution or admission as specified in Section 13.1 shall have been satisfied.  Any Person admitted as a substitute or additional Investing Member pursuant to this Section 13 shall (except as herein otherwise expressly provided) be an Investing Member for all purposes of this Agreement to the extent of the Interest acquired by such person.

13.4    Prohibited Assignments:  Any purported assignment of a Membership Interest otherwise than in accordance with this Section 13 shall be of no effect as between the Company and the purported assignee and shall be unenforceable as against the Company.  The Manager shall not be charged with actual or constructive notice of any such purported assignment and is expressly prohibited from making allocations and distributions hereunder in accordance with any such purported assignment.

14.    **MISCELLANEOUS FINANCIAL AND ACCOUNTING MATTERS**.

14.1    Availability of Financial Records:  At all times during the existence of the Company, the Manager shall keep or cause to be kept accurate and complete books of account in

accordance with generally accepted accounting principles applied in a consistent manner, which shall reflect all Company transactions (including Capital Contributions, income, expense, gain, loss and distributions) and shall be appropriate and adequate for the Company's business.  Such books shall be maintained at the principal place of business of the Company.  Any Investing Member or his or her duly authorized representative shall have the right, at his or her expense, to inspect and copy from such books and documents during normal business hours upon reasonable notice.

14.2    Financial Reports:  As soon as practicable after the close of the Fiscal Year, and in any event within 90 days thereafter, the Company shall deliver to each Investing Member a financial report of the Company for such period, including:  (a) a balance sheet, (b) a profit and loss statement, (c) a statement showing the source and amount of distributions made to the Members and the allocation to each Investing Member of Company income, gain, loss, deductions, credits and items of tax preference, and (d) full disclosure of such other matters as may be material to the financial operations of the Company or to an understanding by the Investing Members of such operations.  Such statements need not be audited but shall be on a basis consistent with the Company's method of accounting and shall be certified by the Company as complete and correct, subject to changes resulting from year-end adjustments.

14.3    Accounting Decisions:  All decisions as to accounting principles and procedures, except as specifically provided to the contrary herein, shall be made by the Manager in accordance with the recommendations of the Company's Accountants.

14.4    Taxable and Fiscal Year:  The Company's taxable and fiscal years (the "**Fiscal Year**") shall be selected by the Manager in its sole discretion.  The initial Fiscal Year of the Company shall end on December 31 of each year of the Company.

14.5    Income Tax Information:  Each Investing Member shall be provided with a copy of the Company's annual income tax return (by electronic delivery), and such additional data as is necessary to adequately disclose each class of income, gain, loss or deduction acquired or incurred by the Company during the preceding taxable year and each Investing Member's distributive share thereof.  Such return and data shall be furnished as soon as practicable after the close of the Company's taxable year, and at least one week prior to the due date (including any requested extension) of the filing of such return with the IRS.

14.6    Maintenance of Cash Assets:  All cash funds of the Company from whatever source received shall be deposited and maintained in one or more Company accounts located at the financial institution designated by the Manager.  All withdrawals from any such account or sale of any such investment shall be made upon the signature of the Manager, or by such other individual(s) as may be authorized in writing by the Manager.

14.7    Basis Election:  Upon the transfer of a Membership Interest, or a distribution of Company property, the Company shall have the right, but not the obligation, to elect pursuant to Section 754 of the Code to adjust the basis of Company property as allowed by Section 734(b) and 743(b) of the Code; provided, however, that if such an election is made, the Company shall not be required to make (and shall not be obligated to bear the expense of making) any

accounting adjustments resulting from such election in the information supplied to any Investing Member except to the extent required by applicable Treasury Regulations.

15.     **AMENDMENTS**.

15.1     Procedure for Amendment:  No amendment to this Agreement shall be valid or binding unless set forth in writing and duly executed by the Manager.

15.2     Reasons for Certain Amendments:  This Agreement shall be amended by the Manager whenever:

(1)     There is a change in the name of the Company or the amount or character of the contribution of an Investing Member;

(2)     A Person is substituted or otherwise admitted as an Investing Member;

(3)     There is a change in the character of the business of the Company;

(4)     The Agreement contains a materially inaccurate statement;

(5)     A time is fixed for dissolution of the Company or the return of contributions in contravention to the time specified in this Agreement;

(6)     There is a change in any right to vote given by this Agreement to an Investing Member on matters affecting the basic nature of the Company; or

(7)     To conform to USCIS regulations in order to comply with its requirements.

16.     **POWER OF ATTORNEY**.

16.1     Description:  Each Investing Member hereby irrevocably constitutes and appoints the Manager, with full power of substitution, as his or her true and lawful attorney in fact on his or her behalf and in his or her name, place and stead, to make, execute, consent to, swear to, acknowledge, publish, record and/or file the following:

(1)     Articles of Organization, a Fictitious Name Registration and any other certificate or instrument which may be required to be filed by the Company or the Members under the laws of any jurisdiction, to the extent that the Manager may reasonably deem such filing to be appropriate, including any and all amendments or modifications thereto;

(2)     Such instruments as may be required to effectuate the dissolution and termination of the Company pursuant to the provisions of this Agreement;

(3)     Any and all consents for the admission of substituted Investing Members, pursuant to the terms of this Agreement;

(4)     Such other instruments as the Manager may reasonably deem appropriate to fully carry out the provisions of this Agreement in accordance with its terms; and

(5)     Any necessary conforming changes, not to include material changes, to any of the execution documents related to an Investing Member's subscription that is required by USCIS guidelines, USCIS regulations, or applicable California law.  Such conforming changes may include, but are not limited to, correcting typographical errors, filling in missing blanks of inconsequential information and the like.

16.2     Characteristics of Power:  The grant of the foregoing power of attorney is coupled with an interest; shall be irrevocable and binding on any assignee of all or any part of a Membership Interest; shall survive the death, legal incapacity, bankruptcy or insolvency of any Investing Member during the term hereof; and shall survive the delivery of any assignment by any Member of the whole or any portion of his or her Membership Interest; and any assignee of an Investing Member hereby constitutes and appoints the Manager as his or her attorney in the same manner and force and for the same purposes as does the assignor.

17.     **MEETINGS; MEANS OF VOTING**.

17.1     Meetings:  Meetings of the Members shall be called by the Manager at its discretion, or whenever requested in writing to do so by Investing Members owning, collectively, Percentage Interests of fifty percent (50%) or more (whether or not held by Investing Members affiliated or unaffiliated with the Manager).  The call shall state the reason for the meeting. Notice of any such meeting shall be delivered to all Members in the manner prescribed in Section 17.2 not less than ten (10) days or more than sixty (60) days prior to the meeting.

17.2     Record Date:  For the purpose of determining the Investing Members entitled to vote at any meeting of the Company, the Manager or the Investing Members requesting such meeting may fix in advance a record date for any such determination of Investing Members. Such date shall not be more than 50 days nor less than 10 days before any such meeting.

17.3     Proxies:  An Investing Member may authorize any Person to act for him or her by proxy on all matters in which he or she is entitled to participate or vote.  Every proxy must be signed by the Investing Member or his or her attorney-in-fact.  No proxy shall be valid after the expiration of 11 months from the date thereof unless otherwise provided in the proxy.  Every proxy shall be revocable at the pleasure of the Investing Member executing it.

17.4     Conduct of Meetings:  Each meeting of the Members shall be conducted by the Manager or such other Person(s) as it shall appoint and pursuant to rules of conduct as it shall reasonably deem appropriate.

17.5     Quorum for Meetings:  There shall be deemed to be a quorum at any meeting of the Investing Members at which the voting power of the Investing Members attending such meeting plus the voting power exercised by Investing Members who have submitted to the Manager effective proxies or written consents to action at such meeting constitutes a Majority in Interest of such Investing Members.

17.6   <u>Action by Written Consent</u>.   Any action that may be taken at a meeting of the Investing Members may be taken without a meeting if a consent in writing setting forth the action is executed by those Investing Members required to approve the proposed action as provided in Section 12.3. Such Members shall respond to any request for approval given by another Member within ten (10) days following the date on which such request for approval is given. All such consents shall be filed by the Manager and maintained in the records of the Company.

18.   **INTENTIONALLY OMITTED**.

19.   **REPRESENTATIONS OF THE MEMBERS**.

By their execution below, each Person as an inducement to be admitted to the Company as an Investing Member represents and warrants to the Company as follows:

(1)   The Person has the requisite legal and mental capacity to acquire the Membership Interest and enter into this Agreement.

(2)   The Person is an "accredited investor" (as such term is defined in Rule 501(a) of the Act) and a sophisticated investor by virtue of his or her education, training and/or numerous prior investments made on his or her own behalf or through entities which it, alone or with others, controls.  The Person is knowledgeable and experienced in financial and business matters, especially in investments which are similar to the Company's business, and which have risks similar to those which may be encountered by the Company.  The Person is capable of evaluating the merits and risks of an investment in the Company.  The Person is not a "U.S. Person" as such term is defined in Regulation S promulgated under the Act.  The Person did not receive the Offering Memorandum or any other offering materials, nor did the Person receive an offer to purchase Membership Interests in the Offering, while within the United States and did not execute their order to purchase Membership Interests, by completing and delivering their Subscription Agreement and Capital Contribution as required by the Offering, from within the United States.

(3)   The Person has been furnished or otherwise obtained all information necessary to enable it to evaluate the merits and risks of his or her prospective investment in the Company.  The Person recognizes that Vertebral Technologies Inc. has limited prior operating history, and may incur leverage that involves certain risks.  The Person recognizes that the Project is in the development stage, there is no guarantee that the Project will be fully developed in accordance with current plans or if it is so developed that it will be developed in the levels and at the times currently predicted, and its future profitability or existence cannot be guaranteed. Even if the Project is completed and Vertebral Technologies Inc. are profitable, this does not assure that the investment will be repaid by Vertebral Technologies Inc. to the Company or that the Company will repay the Capital Contributions of its Members.  An investment in the Project is highly speculative and the Person may suffer a complete loss of his or her investment in the Company.

(4)   The Person has been furnished or has had access to any and all material documents and information regarding the Company, the Manager, Vertebral Technologies Inc.

28

and the Regional Center.  The Person has had an opportunity to question the Company, the Manager, Vertebral Technologies Inc., the Regional Center and their officers, directors, partners, trustees, or other Persons who control or manage same, and receive adequate answers to such questions.  The Person hereby acknowledges that the Company has made available to the Person prior to any investment in the Company the Offering Memorandum and its exhibits, and all information requested by the Person and reasonably necessary to enable the Person to evaluate the risks and merits of an investment in the Company.  The Person, after a review of this information and other information it has obtained, is aware of the speculative nature of any investment in the Company.

    (5)  The Person is aware that the Person will have to make the Capital Contribution required hereunder.  The Person can bear the economic risk of the investment in the Company (including the possible loss of his or her entire cash payment) without impairing the Person's ability to provide for himself and/or his or her family in the same manner that the Person would have been able to provide prior to making an investment in the Company.  The Person understands that it must continue to bear the economic risk of the investment in the Company for an indefinite period of time.

    (6)  The Person understands that the Membership Interests have not been registered under the Securities Laws, inasmuch as the offering of Membership Interests is being made to a limited group of potential investors and/or potential investors who are not residents of the United States, pursuant to applicable exemptions under the Securities Laws.  The Person understands that it has no rights whatsoever to request, and that the Company is under no obligation whatsoever to furnish, a registration of the Membership Interests under the Securities Laws.

    (7)  The Membership Interest that the Person is acquiring is being acquired solely for his or her own account and is not being purchased with a view to, or for resale in connection with, any distribution within the meaning of the Securities Laws.  The Person will not resell or offer to resell any Membership Interests except in accordance with the terms of this Agreement and in compliance with all applicable Securities Laws, including Regulation S under the Act, nor shall the Person conduct any hedging transactions involving the Membership Interest except in compliance with the Securities Laws.  Depending on the particular exemption from registration under the Securities Laws pursuant to which the Person acquires the Membership Interests, as determined by the Company, such exemption may impose additional restrictions on the ownership and transferability of such Membership Interest.

    (8)  The Person acknowledges that there is no current market for the Membership Interests and none is anticipated to develop.  Moreover, there are substantial restrictions on the transfer of the Membership Interests.  Therefore, the Person has considered his or her prospective investment in the Company to be a long-term illiquid investment acceptable because the Person is willing and can afford to accept and bear the substantial risks of the investment for an indefinite period of time.

    (9)  The Person acknowledges that an investment in the Membership Interests may be beneficial to foreign investors seeking lawful permanent residency in the United States pursuant to an I-526 Petition Approval issued by USCIS, as more fully described in the Offering

Memorandum.  Failure of an Investing Member to continue to own the Membership Interest it acquires may result in the denial of his or her application for conditional permanent residence or I-829 Petition.  There are other immigration requirements that the Person must satisfy or risk denial of his or her I-526 Petition or his or her application for conditional lawful permanent residence, as more fully described in the Offering Memorandum.

(10)   The Person is aware that there is no assurance, representation or warranty, by any Person, that VTI will operate at a profit.

(11)   The Person understands that if it receives a Cash Distribution from the Company in excess of that permitted by Law, the Person may be liable for the amount of such excess Cash Distribution.

(12)   The Person understands that major changes were made by tax laws enacted in the past, and more will likely be enacted in the future.  The Person is aware that he should understand that the tax consequences of an investment in the Company are subject to change.  The Person is further aware that this Agreement contains complex tax attribute allocations.  The Person agrees that the Regional Center and the Manager have not, will not, and cannot assure the Person that such allocations will be respected for federal income tax purposes by the IRS.  Depending on which allocations were to be disregarded if challenged by the IRS, the Person's share of income, gains, losses, deductions and credits of the Company could be affected and could change.  In such an event, the Person may have to amend his or her tax return for the year or years of such change(s).

(13)   The Person understands that the income tax treatment of the Company and the ownership of Membership Interests, whether direct or indirect, are complex and, in many cases, uncertain.  Statutory provisions and administrative regulations have been interpreted inconsistently by the courts.  Additionally, some statutory provisions remain to be interpreted by administrative regulations.  It is possible that the IRS may successfully challenge the tax treatment accorded certain items by the Company.

(14)   The Person is aware that the IRS may audit the income tax returns of the Company and may audit the Person's income tax return (if applicable) as the result of the Person's investment in or claimed deductions or losses from his or her investment in the Company.  Such deductions and losses, when taken together with other items reported on the Person's tax return, may prompt the IRS to examine the Person's return, both as to income and deductions relating to the Company and as to other matters.  The Company cannot assure the Person that such an audit or examination will not occur or that the Person will not incur additional liability and costs as a result of any such audit or examination.

(15)   The Person understands that the Manager may have the authority to negotiate, settle and compromise matters with the IRS relating to all Investing Members of the Company.  The Manager may take positions on issues or effect compromises binding on all Investing Members which the Manager believes are in the best interests of the Company, but which may not be in the best interests of individual Investing Members.  In the event of audit, each Investing Member must consult with his or her own tax advisor with respect to such Investing Member's rights and obligations.

20.    **MISCELLANEOUS**.

20.1    <u>Copies of Documents</u>:   Promptly upon the execution and delivery of this Agreement by an Investing Member, the Company shall deliver to such Investing Member a conformed copy of this Agreement and of the Articles of Organization (in the form in which it has been filed) (by electronic delivery at the option of the Company).

20.2    <u>Notices</u>:  Any notice, payment, demand, offer or other communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered and given for all purposes (a) if personally delivered, (b) whether or not actually received, if sent by registered or certified mail, postage prepaid, or (c) by electronic delivery, addressed as follows:

(1)    if to the Company or the Manager, then to:

GSRV-VTI II, LLC
Attention: Eric Chelini
One Sansome Street
Suite 2080
San Francisco, CA 94104
Telephone:  (415) 986-8888, Ext. 188
Email:  echelini@3gfund.com

(2)    if to an Investing Member, then to the address of such Investing Member as set forth in <u>Schedule 1</u> hereto or such other address as such Investing Member may designate by notice to the Company.

All notices except notices of change of address shall be deemed given when mailed, and notices of change of address shall be deemed given when received.

20.3    <u>Arbitration</u>:  Any dispute, controversy or claim arising out of or in connection with, or relating to, this Agreement or any breach or alleged breach hereof, except allegations of violations of federal or state securities laws, shall, with the consent of the Manager (which must be given, if at all, in writing and within ten days of the date such matter matures), be submitted to and settled by arbitration in the State of California, pursuant to the rules then in effect of the American Arbitration Association (or at any other place or under any other form of arbitration mutually acceptable to the parties so involved), with venue in San Francisco, California.  Any award rendered shall be final and conclusive upon the parties, and a judgment thereon may be entered in the highest court of the forum, state or federal, having jurisdiction.  The expenses of the arbitration shall be borne equally by the parties thereto provided that each party shall pay for and bear the cost of its own experts, gathering of evidence and counsel's fees, except that in the discretion of the arbitrator, any award may include the cost of the party's counsel fees if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic or that such matter is frivolous.

20.4    Remedies:  The Company and the Members shall be entitled to all available legal and equitable remedies against each other.

20.5    Severability:  In the event any portions of this Agreement are found to be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby, and such invalidity, illegality or unenforceability in one jurisdiction shall not affect the validity, legality or enforceability of any portions of this Agreement in any other jurisdiction.

20.6    Captions:  Paragraph captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or extend, or describe the scope of this Agreement or the intent of any provision hereof.

20.7    Gender:  The masculine gender shall include the feminine and neuter genders, the singular shall include the plural.

20.8    Binding Agreement:  Subject to the restrictions on assignment herein contained, the terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, the successors, assigns, personal representatives, estates, heirs and legatees of the respective Members.

20.9    Applicable Law:  Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the State of California as now adopted or as may hereafter be amended and same shall govern the Company aspects of this Agreement.

20.10   Entire Agreement:  This Agreement constitutes the entire agreement of the parties hereto with respect to the matters set forth herein and supersedes any prior understanding or agreement, oral or written, with respect thereto.   There are no agreements, understandings, restrictions, representations, or warranties among the parties other than those set forth herein or herein provided for.   This Section 20.10 shall not limit the provisions of the Offering Memorandum and the Subscription Agreement.

20.11   Agreement in Counterparts:  This Agreement may be executed in any number of counterparts and all so executed shall constitute one Agreement, binding on all the parties hereto, notwithstanding that all the parties are not signatories to the original or the same counterpart.

20.12   Qualification in Other Jurisdictions:  In the event the business of the Company is carried on or conducted in one or more states in addition to the State of California, the Company shall exist under the laws of each state in which business is actually conducted by the Company, and the parties will execute such further documents as may be appropriate in order that the Manager may legally qualify the Company in each such state.  The power of attorney granted to the Manager by each Investing Member in Section 16, shall constitute the authority of the Manager to perform the ministerial duty of qualifying the Company under the laws of any state in which it is necessary to file documents or instruments of qualification.  A Company office or principal place of business in any state may be designated from time to time by the Manager.

20.13   Waiver of Partition:  Each of the parties hereto irrevocably waives during the term of the Company any right to maintain any action for partition with respect to any Company property.

20.14   Litigation:  The Company shall prosecute and defend such actions at law or in equity as may be necessary to enforce or protect the interest of the Company.  The Company shall respond to any final decree, judgment or decision of any court, board or authority having jurisdiction in the premises.  The Company shall satisfy any such judgment, decree or decision, first out of any insurance proceeds available therefor, and next out of assets of the Company.  The cost of defending any actions brought against the Company and/or the Manager with respect to Company matters shall be borne by the Company except as otherwise provided in this Agreement.

20.15   Time:  Time is of the essence with respect to this Agreement.

20.16   Remedies Not Exclusive:   Any remedies herein contained for a breach of obligation hereunder shall not be deemed to be exclusive, and shall not impair the right of any party to exercise any other right or remedy, whether for damages, injunction or otherwise.

20.17   Force Majeure:  If any Person is rendered unable, in full or in part, by Force Majeure, to carry out his or her obligations under this Agreement, other than the obligations to make distributions to the Investing Members, the obligations of such parties, to the extent affected by such Force Majeure, shall be suspended during, but no longer than, his or her continuance.

For purposes of this section, "**Force Majeure**" means an act of God, strike, lockout or other similar disturbance or interruption, act of a public enemy, war, blockage, public riot, lightning, fire, storm, flood, explosion, governmental restraint, unavailability of equipment and any other act or event, whether of the kind specifically enumerated above or otherwise, which is not within the control of the Manager.

20.18   Legal Counsel:  Legal counsel for Vertebral Technologies, Inc. may also represent the Company, the Manager or its Affiliates and/or in connection with legal work or issues arising in connection with VTI.  Each Investing Member recognizes and acknowledges that any such counsel will be acting as legal counsel for the Company, the Manager and/or Vertebral Technologies, Inc. with respect to each such matter and shall not be acting as the legal counsel of any individual Investing Member.  Each Investing Member further recognizes and accepts that his or her interest with respect to any such matter may be adverse to the interests of Vertebral Technologies, Inc. and/or the Company and/or the Manager. Each Investing Member nevertheless consents to the representation of Vertebral Technologies Inc. the Company, and the Manager and by such counsel with respect to each such matter and waives for the benefit to such parties of such counsel having any potential or actual conflict of interest between or among such parties. Each Investing Member acknowledges that in the event of any future dispute or litigation between or among the Investing Members and/or between any of the Investing Members and VTI, the Company, and/or Manager, such counsel may continue to represent VTI, the Company and the Manager, notwithstanding any such dispute and its prior representation of such parties.

20.19   <u>Advice from Independent Legal Counsel; Voluntary Agreement</u>:  The Investing Members represent and warrant that (a) each of them has had the opportunity to be represented by legal and tax counsel of his or her choice, (b) each of them has had the opportunity to consult with such counsel regarding this Agreement, and (c) except as set forth herein, each of them has not relied in any way on any representation or other statement made by any other Member (including the Manager) or its legal or tax counsel or by any other Person.

20.20   <u>Patent Errors</u>:  The Members hereby authorize and direct the Manager to correct patent errors and to fill in any blanks, which blanks shall not be substantive to the terms hereof, in this Agreement or in any exhibit, instrument, document or agreement related hereto and to attach hereto or thereto any exhibits or schedules which are a part hereof or thereof.

20.21   <u>Currency</u>:  All references to "dollars" in this Agreement shall mean U.S. Dollars.

20.22   <u>Native Language Translation</u>.  Each Member hereby agrees that it is the sole responsibility of Member to ensure proper translation of this Agreement into their native language if necessary for Member's understanding of the rights and obligations contained herein. Any language translation of this Agreement provided by any of the parties hereto is not a binding legal document, and is being provided solely for the Member's convenience, and shall not in any way be construed as a contract or any part of this Agreement as set forth in English.  None of the parties hereto are liable for any inaccuracies in any language translation or for any misunderstandings due to differences in language usage or dialect.  In the event of any inconsistencies between this Agreement as set forth in English and any language translation, this Agreement as set forth in English and as executed shall govern.  Each Member assumes the responsibility for fully understanding the nature and terms of the rights and obligations under this Agreement.

(<em>Signatures are on the following page</em>)

**IN WITNESS WHEREOF**, the parties hereto have entered into this Agreement as of the date first above written.

**COMPANY:**

**GSRV-VTI II, LLC**, a California limited liability company

**By:**     **GSRV-VTI Management, LLC**,
           a California limited liability company,
           its Manager

By:
Name:          Eric Chelini
Its:           Manager

**MANAGER:**

**GSRV-VTI Management, LLC**,
a California limited liability company,
its Manager

By:
Name:          Eric Chelini
Its:           Manager

35

**GSRV-VTI II, LLC**

**OPERATING AGREEMENT**

<u>SIGNATURE PAGE</u>

_____
(Signature)

Print Name: _Rui  ZHANG_____

Address: ███████████████████████

Telephon ███████████████████████

Tax I.D. or Social Security #: _____

Number of Units: _____

Email Address: _____

Fax Number: _____

36

**SCHEDULE 1**

**List of Investing Members**

## SCHEDULE 2

## EB-5 JOB ALLOCATION ADDENDUM

1.      The Company is a business with an investment opportunity associated with **GOLDEN STATE RENAISSANCE VENTURES, LLC,** a California limited liability company **DBA GOLDEN GATE GLOBAL** (the "**Regional Center**"), where the Regional Center has been designated by United States Citizenship and Immigration Services ("**USCIS**") as a regional center to participate in the EB-5 Immigrant Investor Program ("**EB-5 Program**");

2.      The Investing Member desires to be one of up to fifteen (15) limited liability members of the Company, making an investment in the Company to enable the Company to create ten (10) direct or indirect qualifying jobs for each $500,000 investment funded to the Company pursuant to the EB-5 Program;

3.      A member of the Company who receives USCIS' approval of his/her Form I-526 Immigrant Petition by Alien Entrepreneur (the "**I-526 Petition**") while outside the United States obtains conditional lawful permanent residency status on the date of his or her admission to the United States as a conditional permanent resident or on the date of approval of his or her I-485, Application to Register Permanent Residence or Adjust Status;

4.      The total number of qualifying positions created shall be allocated solely to those who have used the investment into the Company as the basis of an I-526 Petition; and

5.      Each member of the Company shall be required to demonstrate at the time of filing his/her respective I-829 Petition, within the 90-day period preceding the second anniversary of his/her (i) admission to the United States as a conditional lawful permanent resident or (ii) adjustment of status to that of a conditional lawful permanent resident, that ten (10) direct and/or indirect and/or induced full-time equivalent, qualifying positions have been created as a result of his/her $500,000 investment in the Company.

6.      The Investing Member has entered into the Agreement to which this Schedule 2 is attached and made a part of, and all definitions contained therein and incorporated herein by reference shall have the meanings ascribed in such Agreement.

## INTRODUCTION

The Company shall take such action to meet the objective of allocating to Investing Members a minimum number of ten (10) direct and/or indirect and/or induced full-time equivalent, qualifying positions created by the Company on the following basis.  The Company shall seek to allocate jobs to Investing Members in the order of filing of Investing Member I-829 Petitions.  However, the allocation of jobs lies solely in the discretion of the Company.  As such, jobs may not be allocated in this order in all cases.

## ARTICLE I
## DUTIES OF INVESTING MEMBER

Prior to Investing Member's entry into the United States based on Investing Member's EB-5 Visa, Investing Member shall notify the Company of Investing Member's intent to enter the United States and provide the Company with Investing Member's expected travel dates.

Within thirty (30) days after Investing Member's entry into the United States, based on Investing Member's EB-5 Visa, Investing Member shall provide the Company with a copy of the I-551 Stamp located in Investing Member's passport.  Upon receipt of Investing Member's and his or her dependents, as applicable, green cards, Investing Member shall provide the Company with copies of same.

Within thirty (30) days after Investing Member receives a Form I-797A Notice of Action indicating USCIS' approval of Investing Member's Form I-485, Application for Adjustment of Status, Investing Member shall provide the Company with a copy of such Form I-797A Notice of Action.

Within thirty (30) days after Investing Member either (i) entered the United States on an EB-5 Visa or (ii) received USCIS' approval of his/her Adjustment of Status, Investing Member shall provide the Company with Investing Member's electronic-mail address, new physical address, and telephone number where the Company may contact Investing Member.  Should Investing Member's electronic-mail address, physical address, or telephone number change at any point during the two years after Investing Member's entry into the United States on Investing Member's EB-5 Visa or USCIS' approval of Investing Member's Adjustment of Status, Investing Member shall notify the Company of such change within thirty (30) days.

Within one hundred and twenty (120) days prior to the second anniversary of the Investing Member's entry into the United States, based on the Investing Member's EB-5 Visa, or USCIS' approval of the Investing Member's Adjustment of Status, the Investing Member shall notify the Company of the name and physical address of the attorney retained by Investing Member who shall file the Investing Member's I-829 Petition.

## ARTICLE II
## DUTIES OF COMPANY

The Company shall maintain a record at its principal place of business that shall state the date that each member of the Company (i) entered the United States based on such member's EB-5 Visa and (ii) received USCIS' approval of such member's Adjustment of Status.  The Company shall further maintain at its principal place of business a record of the number of direct and/or indirect and/or induced full-time equivalent, qualifying positions created by the Company.

Within ninety (90) days preceding the second anniversary of the Investing Member's admission to the United States as a conditional lawful permanent resident, the Company shall provide the Investing Member and/or the Investing Member's attorney with documentation regarding the full-time job creation by VTI.

## ARTICLE III
## NO GUARANTEES

Investing Member hereby acknowledges, understands, and agrees that the Company has not guaranteed, nor can it guarantee, that the EB-5 Program job requirements will be satisfied at the time Investing Member files his/her I-829 Petition.