United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUI MA, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>GOLDEN STATE RENAISSANCE VENTURES, LLC DBA GOLDEN GATE GLOBAL, et al.,<br><br>    Defendants. | Case No. 3:21-cv-00856-WHO<br><br>**ORDER GRANTING MOTIONS TO COMPEL ARBITRATION**<br><br>Re: Dkt. Nos. 42, 44, 45, 48 |

The plaintiffs, five Chinese citizens, invested in and through the defendants, an interrelated group of U.S. corporations and their officers, to obtain permanent residence through the EB-5 Immigrant Investor Program ("EB-5 Program"). They claim that the defendants misused the money, committed fraud, breached their fiduciary duties, and a host of related claims. The defendants all move to compel the claims to arbitration; the plaintiffs oppose those motions because, according to them, they never assented to the contracts that include arbitration agreements. For the reasons that follow, applying standard contract-law principles, the plaintiffs at least assented to delegate the arbitrability of these claims to the arbitrator. The motions to compel arbitration of all claims against all defendants are granted.

## BACKGROUND

### I. FACTUAL BACKGROUND

#### A. The Parties

Plaintiffs Hui Ma, Ailing Zhao, Rui Zhang, Xi Liu, and Yixuan Wang are Chinese citizens who sought permanent U.S. residence through the federal government's EB-5 Program. Complaint ("Compl.") [Dkt. No. 1] ¶ 1. Under that program, in brief, applicants make an

1  investment in a commercial enterprise in the United States that plans to create or preserve at least
2  ten permanent full-time jobs for U.S. workers and can, in return, receive permanent residence. *See*
3  *generally* U.S. Citizenship and Immigration Services, *EB-5 Immigrant Investor Program*, USCIS,
4  https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-
5  program. Each plaintiff here made a $500,000 investment. Compl. ¶ 2. Each also paid $40,000
6  in fees to the relevant defendants, as discussed below. *Id.*

As a general matter, the Complaint alleges that the defendants used the funds for unauthorized purposes. It also asserts that the remaining assets from the company that was supposed to benefit from the EB-5 funding were then transferred to that company's directors. Accordingly, the Complaint claims that various defendants committed fraudulent inducement, breached their fiduciary duties, aided and abetted that breach, committed constructive fraud, committed fraudulent concealment, committed conversion, violated California's Unfair Competition Law, violated the Minnesota Uniform Fraudulent Transfer Act, and failed to disclose information they were required to.

Defendant Golden State Renaissance Ventures, LLC, d/b/a Golden Gate Global ("GGG") owns the "regional center" for the plaintiffs' investment. *Id.* ¶ 21. Regional centers are designated by U.S. Citizenship and Immigration Services and are "economic unit[s] . . . involved with promoting economic growth." U.S. Citizenship and Immigration Services, *EB-5 Immigrant Investor Regional Centers*, USCIS, https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/eb-5-immigrant-investor-regional-centers. Defendant GSRV Management, LLC, serves as GGG's manager. Compl. ¶ 22. Defendant Steven Kay is a member of GGG and manager of GSRV Management. *Id.* ¶ 25. GGG, GSRV Management, and Kay are collectively the "GGG Defendants." Defendant GSRV-VTI Management, LLC ("GSRV-VTI") is designated manager of defendant GSRV-VTI II, LLC ("the Investment LLC") and GSRV-VTI, LP ("the Investment LP"). *Id.* ¶ 23–24, 84, 90. Defendant Eric Chelini founded the regional center and was the sole member of GSRV-VTI. *Id.* ¶ 24. Defendant Vertebral Technologies, Inc. ("VTI"), is the company whose stock was issued in exchange for the investment and that was supposed to benefit from it. *Id.* ¶ 8.

Three of the plaintiffs—Ma, Zhao, and Wang (collectively, the "LP Plaintiffs")—invested through the Investment LP. Two of the plaintiffs—Liu and Zhang (collectively, the LLC Plaintiffs")—invested through the Investment LLC. This motion concerns the various agreements that each plaintiff assented to when carrying out these investments.

### B. The LP Plaintiffs' Alleged Agreements

As noted, the LP Plaintiffs all invested through the Investment LP. This motion concerns two contractual documents relevant to the LP Plaintiffs. The LP Plaintiffs and the defendants agree that the LP Plaintiffs agreed to and signed subscription agreements (the "LP Subscription Agreements") that governed the investment in exchange for stock. *See* Eric Chelini and GSRV-VTI Management's Motion to Compel Arbitration ("GSRV Mot.") [Dkt. No. 32] 13; GGG Defendants' Motion to Compel Arbitration ("GGG Mot.") [Dkt. No. 45] 9; Plaintiffs' Omnibus Brief in Opposition ("Oppo.") [Dkt. No. 49] 5. Those LP Subscription Agreements do not contain an express arbitration provision. *See* Declaration of Eric Chelini ("Chelini Decl.") [Dkt. No. 42-1] at 5–12. The other documents are the partnership agreements (the "LP Partnership Agreements") by which the LP Plaintiffs allegedly became limited partners in the Investment LP. *Id.* at 32–58. Those documents do contain an arbitration provision. *Id.* at 57. As explained below, the parties agree that the LP Plaintiffs never *signed* the documents but they dispute whether the LP Plaintiffs nonetheless agreed to them.

### C. The LLC Plaintiffs' Alleged Agreements

As noted, the LLC Plaintiffs invested through the Investment LLC. This motion concerns two contractual documents relevant to the LLC Plaintiffs. Like the LP Plaintiffs, the LLC Plaintiffs and the defendants agree that the LLC Plaintiffs agreed to and signed subscription agreements (the "LLC Subscription Agreements") that governed the investment in exchange for stock. GSRV Mot. 10; Oppo. 12. And like the LP Subscription Agreements, those LLC Subscription Agreements do not contain an express arbitration provision. Chelini Decl. at 60–75. The other documents are the operating agreements (the "LLC Operating Agreements") that govern the Investment LLC. *Id.* at 99–135. Those documents do contain an arbitration provision, *id.* at 130, but as explained below the parties dispute whether the LLC Plaintiffs signed and agreed to

3

1 them.

2 **II. PROCEDURAL BACKGROUND**

3 The plaintiffs filed their Complaint, premised on diversity jurisdiction, on February 3, 2021. Chelini and GSRV-VTI filed a motion to compel for themselves, the GGG Defendants filed one for themselves, and VTI filed a notice joining both motions. *See generally* GSRV Mot.; GGG Mot.; VTI's Notice of Joinder ("VTI Mot.") [Dkt. No. 44]. The plaintiffs filed a consolidated opposition. *See generally* Oppo.

**LEGAL STANDARD**

The Federal Arbitration Act ("FAA") governs motions to compel arbitration. 9 U.S.C. §§ 1 *et seq*. Under the FAA, a district court determines: (i) whether a valid agreement to arbitrate exists and, if it does, (ii) whether the agreement encompasses the dispute at issue. *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). "To evaluate the validity of an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (internal quotation marks and citation omitted). If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

**DISCUSSION**

"It is a settled principle of law that arbitration is a matter of contract." *Ingle*, 328 F.3d at 1170 (internal quotation marks omitted). As such, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks and citation omitted). To determine whether an arbitration agreement exists, federal courts apply ordinary state contract law. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014).

Under California law, a valid contract requires the "mutual consent of the parties," which

is "generally achieved through the process of offer and acceptance." *DeLeon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813 (2012) (internal citations omitted).[1] Whether such consent occurred is determined under an objective standard based on the parties' "outward manifestations or expressions" and "the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Id.* "[O]rdinarily one who signs an instrument which on its face is a contract is deemed to assent to all its terms." *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049 (2001), *as modified* (June 8, 2001).

"The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992); *see* CAL. CIV. CODE § 1636. To determine the parties' intent, California courts "look first to the language of the contract in order to ascertain its plain meaning." *Hartford Cas. Ins. Co. v. Swift Distribution, Inc.*, 59 Cal. 4th 277, 288 (2014) (internal quotations and citation omitted). If the language of the contract is "clear and explicit, it governs." *Bank of the W.*, 2 Cal. 4th at 1264; *see* CAL. CIV. CODE § 1638. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." CAL. CIV. CODE § 1641. "Particular clauses of a contract are subordinate to its general intent." *Id.* § 1650. If provisions of a contract are contradictory, they must be "reconciled, if possible, by such an interpretation as will give some effect to" both provisions, always "subordinate to the general intent and purpose of the whole contract." *Id.* § 1652.

## I. THE LP PLAINTIFFS' ARBITRATION AGREEMENT

All parties agree that the LP Plaintiffs agreed to and signed the LP Subscription Agreements. GSRV Mot. 13; GGG Mot. 9; Oppo. 5. Those agreements do not expressly include arbitration provisions. Chelini Decl. at 5–12. The parties also agree that the LP Plaintiffs did not personally sign the LP Partnership Agreements, which do contain arbitration provisions. GSRV Mot. 9; GGG Mot. 10; Oppo. 5; Chelini Decl. at 32–58. The defendants nonetheless contend that the LP Plaintiffs are bound by those agreements because, in their view, (1) the LP Subscription

---

[1] The parties all apply California law to the formation, validity, enforceability, and interpretation of the agreements and alleged agreements.

5

Agreement incorporates the LP Partnership Agreement and (2) the Subscription Agreement appointed Chelini as the LP Plaintiffs' agent and required him to agree to the LP Partnership Agreement, thereby binding the LP Plaintiffs to the LP Partnership Agreement. *See* GSRV Mot. 13. I agree that the LP Plaintiffs are bound by the LP Partnership Agreement.

The LP Subscription Agreement provides that the LP Plaintiffs subscribed to the investment "in accordance with the terms and conditions described herein and in the Limited Partnership Agreement of GSVR-VTI, LP." Chelini Decl. at 5. It further provides, "[t]he undersigned hereby irrevocably appoints Eric Chelini, the managing member of [GSVR-VTI's] general partner, [GGG], acting individually, as the undersigned's true and lawful representative and attorney in fact in the undersigned's name, place and stead, . . . to execute, acknowledge, swear to and file, in the same and on behalf of the undersigned: (A) the Partnership Agreement, to be entered into pursuant to this Subscription Agreement and any amendments to which the undersigned is a signatory; (B) any subsequent amendments to any such amendments as provided in the Partnership Agreement; . . . ." *Id.* at 14–15. The omitted portions of this provision give Chelini other powers and duties to effectuate the transaction on the LP Plaintiffs' behalf. *See id.*

As a result, the LP Plaintiffs expressly appointed Chelini as their agent for purposes of, at least, agreeing to and executing the LP Partnership Agreement on their behalf. *Tomerlin v. Canadian Indem. Co.*, 61 Cal. 2d 638, 643 (1964) ("Actual authority arises as a consequence of conduct of the principal which causes an agent reasonably to believe that the principal consents to the agent's execution of an act on behalf of the principal."); *N.L.R.B. v. Dist. Council of Iron Workers of the State of Cal. & Vicinity*, 124 F.3d 1094, 1098 (9th Cir. 1997) ("Express actual authority derives from an act specifically mentioned to be done in a written or oral communication."); 3 Am. Jur. 2d Agency § 15; Restatement (Third) Of Agency § 3.01 ("Actual authority, as defined in § 2.01, is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf."). Once an agency relationship is created, "an agent represents his principal for all purposes within the scope of his actual or ostensible authority." CAL. CIV. CODE § 2330. This authority extends to entering arbitration agreements. *Indep. Living Res. Ctr. San Francisco v.*

6

*Uber Techs., Inc.*, No. 18-CV-06503-RS, 2019 WL 3430656, at *3 (N.D. Cal. July 30, 2019) (collecting California authorities).

The declaration Chelini submitted with his motion states, "[t]he Partnership Agreement was entered into by and among GSRV-VTI Management, LLC, as its general partner, and the limited partners, i.e., the investors whose LP Subscription Agreements had been accepted by the General Partner. I executed this agreement on behalf of GSRV-VTI Management, LLC." Chelini Decl. ¶ 4. Accordingly, the LP Plaintiffs committed to being bound by the terms of the LP Partnership Agreement when they signed the Subscription Agreement, the Subscription Agreement explicitly contemplated that the LP Partnership Agreement was part and parcel of the broader agreement to invest, the LP Plaintiffs explicitly appointed Chelini to execute the agreement on their behalf, and Chelini did so. They are bound by it.

The LP Plaintiffs resist this conclusion by first arguing that the LP Partnership Agreement is not signed by any LP Plaintiff. *See* Oppo. 6. But it need not be, as explained above. They also argue that "[a]t no point has Mr. Chelini represented that he executed the [LP Partnership Agreement] on any Plaintiff's behalf." *Id.* Yet Chelini expressly states that he did so on behalf of GSRV-VTI Management, which the LP Plaintiffs committed themselves to being limited partners in in the Subscription Agreement, so it is unclear why the LP Plaintiffs believe he did not. Next, they say that the defendants have not put forward any copies of the LP Partnership Agreement signed by Chelini on the LP Plaintiffs' behalf. *Id.* 6–7. But the signed version of the LP Partnership Agreement attached to Chelini's declaration is on behalf of GSRV-VTI Management and explicitly says it is being agreed to also by the limited partners, with a reference to a "Schedule A" that lists those partners. *See* Chelini Decl. at 58. Although the defendants did not include a copy of Schedule A with their motion, the LP Subscription Agreements provide that the LP Plaintiffs are purchasing units to become limited partners, meaning the defendants have still shown assent by a preponderance of the evidence. *Id.* at 5. It would have been ideal for them to attach the schedule, but the documents they have attached are sufficient to meet their burden.[2]

---

[2] The defendants attached Schedule A to their Reply. Dkt. No. 52-1 at 34. Because it could and should have been submitted with the motion and the failure deprived the plaintiffs of a fair

7

Taking a different tack, the LP Plaintiffs argue that, no matter what agency authority was given, the LP Partnership Agreement did not give Chelini authority to enter into the arbitration agreements on the LP Plaintiffs' behalf because they "had no reason to expect as much." Oppo. 6–7. But the LP Subscription Agreement provided that the LP Plaintiffs would be bound by the LP Partnership Agreement and that Chelini would execute it on their behalf. There was, accordingly, an express grant of agency to Chelini to bind them to it. The LP Plaintiffs conclusorily suggest that enforcing the clause to "unwittingly" bind them would be "an unenforceable breach of fiduciary duty that goes against all principles of equity," *id.* 7, but they cite no authority for that view and, in any case, the *express* terms of the LP Subscription Agreement gave the grant of authority to Chelini. And the plaintiffs make much of the fact that the LP Partnership Agreement contemplates a different general partner (GSRV-VTI) than the LP Subscription Agreements (GSRV-Management), *id.* 8, but the *Complaint* alleges that this amendment occurred, so that is no reason to disbelieve the documents' authenticity. Compl. ¶ 84.[3]

Finally, the plaintiffs argue that they cannot be bound by the arbitration provision because they did not know about it, let alone sign it. Oppo. 7–8. But the case they rely on dealt with situation in which someone was never given a fair *opportunity* to review the arbitration agreement or put on notice they were agreeing. *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 566 (9th Cir. 2014) ("When Knutson purchased his vehicle from Toyota, he did not receive any documents from Sirius XM, and he did not know that he was entering into a contractual relationship with Sirius XM by using the service."). Here, the LP Plaintiffs were sufficiently put on notice and

---

opportunity to respond, I strike it. *Roe v. Doe*, No. C 09-0682 PJH, 2009 WL 1883752, at *5 (N.D. Cal. June 30, 2009).

[3] The plaintiffs also assert that the LP Partnership Agreement is dated after the LP Subscription Agreements were accepted, but that makes sense because it was those agreements that gave Chelini the power to then execute the LP Partnership Agreement. *Cf. Myers Bldg. Indus., Ltd. v. Interface Tech., Inc.*, 13 Cal. App. 4th 949, 967 (1993), *as modified on denial of reh'g* (Mar. 26, 1993) ("Several documents concerning the same subject and made as part of the same transaction will be construed together even if the documents were not executed contemporaneously."). They imply it is possible the document was altered and that is why the date is later, but they have no evidence of that, such as an earlier version of the LP Partnership Agreement that differed.

given a fair opportunity by expressly agreeing in the LP Subscription Agreement that they would be bound by the LP Partnership Agreement and giving Chelini the authority to then execute it on their behalf. The situation might have been different if they lacked the *opportunity* to review the LP Partnership Agreement before agreeing or if the version of the LP Partnership Agreement available to them did not have the arbitration clause but the final, executed version did. *See Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (1972). But here, the LP Plaintiffs' investment contract told them *in its first provision* that they were agreeing to terms in another document, Chelini Decl. at 5, § 1(a), and gave Chelini authority to execute it.

## II. THE LLC PLAINTIFFS' ARBITRATION AGREEMENT

All parties agree that the LLC Plaintiffs agreed to and signed the LLC Subscription Agreements. GSRV Mot. 10; Oppo. 12. Again, those LLC Subscription Agreements do not expressly include arbitration provisions. Chelini Decl. at 60–75. The defendants assert that the LLC Plaintiffs also agreed to the LLC Operating Agreement. GSRV Mot. 10. *That* Agreement does have an express arbitration clause. Chelini Decl. at 130. The LLC Plaintiffs dispute that they ever agreed to the LLC Operating Agreement. Oppo. 12. For the reasons that follow, the defendants have met their burden to show that the LLC Plaintiffs did agree to it.

### A. The LLC Plaintiffs Agreed to the LLC Operating Agreement

Chelini states in a sworn declaration that the LLC Plaintiffs both executed the LLC Operating Agreement. Chelini Decl. ¶ 7. He includes executed copies from both that include, among other things, their signatures. *See* Chelini Decl. at 135 (Liu), 177 (Zhang). This direct evidence illustrates that the LLC Plaintiffs agreed to the LLC Operating Agreement. *See Marin*, 89 Cal. App. 4th at 1049 ("[O]rdinarily one who signs an instrument which on its face is a contract is deemed to assent to all its terms.").

Circumstantial evidence supports that conclusion. The LLC Plaintiffs agree in their brief that they *did* sign and agree to the LLC Subscription Agreements. Oppo. 12. Those Subscription Agreements repeatedly reference the LLC Operating Agreement. Chelini Decl. at 80. More importantly, the LLC Subscription Agreement provides that "[i]n addition to executing this Agreement and paying the Total Subscription Payment for subscribed Membership Interests to the

9

Company as described herein, the Subscriber will also need to execute the Company's Amended and Restated Operating Agreement ('Operating Agreement'), and deliver the executed Operating Agreement to the Company in order to complete its subscription. ***Please review the Operating Agreement in its entirety***." *Id.* at 81 (emphasis in original). In other words, the LLC Plaintiffs admit that they contractually committed themselves to agreeing to the LLC Operating Agreement, as the evidence shows they ultimately did.

The LLC Plaintiffs' counterarguments are unconvincing. They primarily rely on their own declarations, which state that they did not sign the forms. Oppo. 13; Dkt. Nos 49-1, 49-2. This statement, however, is necessarily only that they do not *recall* signing the forms. If all that the defendants had was a dueling declaration to the contrary, the situation might be different. But, as explained above, their evidence is more substantial. Especially in the context of multiple lengthy, dense, and technical forms being sent about a complicated investment process, it is reasonable that someone might not recall each form specifically.

The LLC Plaintiffs attempt to bolster this argument with a grab-bag of purported problems with the copies of the LLC Operating Agreements that the defendants have produced. First, they contend that they were sent several blank signature pages, so one of them might have been used and appended to the LLC Operating Agreement. Oppo. 13–14. This speculation is overcome by the sworn evidence to the contrary. Even if it were not, the pages themselves say "Operating Agreement" on them; they are not blank signature pages. *See* Chelini Decl. at 135, 177.

Relatedly, the LLC Plaintiffs speculate that the *signatures* are "not reliable." Their argument on Liu's is that the signature is written in a different color ink than her printed name. Their argument on Zhang's is that it is "exactly identical" to the signature on her Subscription Agreement. Oppo. 14 (emphasis in original). These oblique suggestions that fraud has been committed are unpersuasive.[4] There are many reasons why two different colors of ink may have been used, including signing at a different time (with different pens in reach) than filling out the printed information, an assistant or other person filling out the printed information before bringing

---

[4] In a footnote, the LLC Plaintiffs say they "are not accusing these Defendants of forgery." Oppo. 14 n.5.

for a signature from the plaintiff, wanting to differentiate them to show it is *more* authentic, or any number of other intentional or coincidental reasons. Without more, these bare accusations do not show that the signature is false. And as a factual matter, the LLC Plaintiffs are wrong that Zhang's signature is "exactly the same." A brief examination by the naked eye shows below they are similar only to the extent any signatures are, but they are not copies.

Chelini Decl. at 135, 177. Among other things, the two marks in the top left curve at different angles, the horizontal line in the right half is bisected by a vertical line in one but not touching it in the other, the space between various marks varies, and there are many other small differences.

 

The LLC Plaintiffs also suggest that the signature pages are a different size than the remainder of the document, Oppo. 14, which appears true, but they both state they are for the "Operating Agreement," so the suggestion that they are mixed-and-matched from other places is unconvincing. And they point out that the pages are not dated. *Id.* Again true enough, but the plaintiffs have not justified that, in these circumstances, the lack of a date shows they did not agree. None of these arguments, nor all of them together, show that the defendants failed to meet their burden.

In a different vein, the LLC Plaintiffs argue that Chelini's declaration is unreliable because it does not lay out a chain of custody for the documents. Oppo. 14–15. Chelini's authentication is appropriate. He states that he executed those agreements on behalf of GSRV-VTI and that the copies attached are the true and correct versions of the executed agreement. *See* Chelini Decl. ¶ 7; Fed. R. Evid. 901(a), (b)(1).

**B. There is No Clause that Supersedes the Arbitration Provision**

The LLC Plaintiffs' other broad argument is that the LLC Subscription Agreement has a forum-selection clause that "supersedes" the arbitration provision of the LLC Operating

Agreement. Oppo 16–17. The clause they rely on follows a choice-of-law clause selecting California. Chelini Decl. at 71. It provides, "[a]ny litigation arising under this Agreement shall be prosecuted exclusively in the state or federal courts residing in San Francisco, California and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein or for lack of personal jurisdiction." *Id.*

The LLC plaintiffs overread this provision. All that it says is that any *litigation* under the agreement must occur in courts in San Francisco. The clause does not state or imply that the clear arbitration provision of the LLC Operating Agreement is void. It does not state or imply that the parties must litigate *instead* of arbitrate. This interpretation, which is compelled by the document's plain text, also ensures that all of the contractual documents work together harmoniously. *See Myers*, 13 Cal. App. 4th at 967 ("Several documents concerning the same subject and made as part of the same transaction will be construed together even if the documents were not executed contemporaneously."); *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 975 (9th Cir. 2010) ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (internal quotation marks, alteration, and citation omitted)).

### III. UNCONSCIONABILITY

The plaintiffs contend that the arbitration clauses are "invalid due to procedural unconscionability." Oppo. 21. They see the following issues: the arbitration clause of the LLC Operating Agreement is at page 27 of a 30-page document, it was not highlighted, the contract was only provided in English even though the plaintiffs' first language is Chinese, other documents were provided in Chinese, the LP Partnership Agreement was entered into after the LP Subscription Agreements leaving them without choice, and the commitment of authority was irrevocable. *Id.* 21–22. I am cognizant of the possible language barriers and the opportunities to take advantage of foreign investors navigating the EB-5 process. But, under California law, a contract is only invalid on unconscionability grounds when it is both procedurally and substantively unconscionable. *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 910, 353

12

P.3d 741, 748 (2015); *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1280 (9th Cir. 2006). Because the plaintiffs argue only the former exists, they cannot invalidate the contract on this basis.

In an errata filed five days after their brief and two days before the reply briefs were due, the plaintiffs sought to add a paragraph (that they argue was omitted) to their argument on interpreting the LLC Subscription Agreement. Dkt. No. 50. The errata argues that the forum-selection clause of the LLC Subscription Agreement renders the LLC Operating Agreement's arbitration clause substantively unconscionable for lack of mutuality because they will be compelled to arbitration while the defendants can use a judicial forum if they bring claims. *Id.* Then, in a footnote to that paragraph they suggest that applying the LP Partnership Agreement's arbitration clause would "likewise create a substantively unconscionable result." *Id.*

To start, the plaintiffs cannot fundamentally alter their argument under the guise an errata about a different topic filed days away from when the Reply would be due—especially, particular to the LP Plaintiffs, in a footnote. But even if I were to consider this argument, the plaintiffs have failed to show substantive unconscionability. Their argument about the LLC Operating Agreement makes no sense: both clauses apply to all parties equally. The forum-selection clause simply selects the venue for when litigation between the parties does occur; it does not give either an advantage. The LLC arbitration provision likewise applies to claims brought by any party, not just the plaintiffs. The argument on the LP Partnership Agreement is thinner still. The footnote says that the LP Partnership Agreement "likewise" is invalid; that is, invalid for the same reasons just described. But the clause at issue in the LLC Subscription Agreement is not in any document the *LP* Plaintiffs signed. The plaintiffs also suggest that, because arbitration is more expensive than litigation, the defendants have an unconscionable advantage, but their argument would render all arbitration substantively unconscionable due to expense (they point to nothing special about the costs here), and arbitration agreements are not per se unconscionable.[5]

---

[5] Because the plaintiffs have not shown that the provision is at all substantively unconscionable, this is not a case in which placing procedural and substantive unconscionability on a "sliding scale" changes the analysis. *See Nagrampa*, 469 F.3d at 1281.

13

## IV. DELEGATION OF ARBITRABILITY

Both the LP and LLC Plaintiffs argue that the claims in their Complaint do not "arise from the terms of the" LP Partnership Agreement and LLC Operating Agreement, respectively. Oppo. 23–24. In other words, they contend that, even if they agreed to the LLC Operating Agreement, its arbitration clause does not cover the current dispute. *Id.*

Though parties may agree to arbitrate disputes so long as their agreement is consistent with the law, "gateway issues of arbitrability presumptively are reserved for the court." *Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011). These gateway questions typically include "whether the parties have a valid arbitration agreement or are bound by a given arbitration clause, and whether an arbitration clause in a concededly binding contract applies to a given controversy." *Id.* Even though judicial resolution, not arbitration, is the presumptive forum for disputes about arbitrability, "parties may agree to delegate them to the arbitrator." *Id.* As a result, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). If arbitrability is clearly and unmistakably delegated to the arbitrator, a court must enforce that delegation "in the absence of some other generally applicable contract defense, such as fraud, duress, or unconscionability." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016).

Here, there is no explicit provision delegating arbitrability to the arbitrator. Instead, the defendants rely on the Ninth Circuit's holding that, when both parties are sophisticated, there is a clear and unmistakable delegation of arbitrability "when the parties have incorporated by reference the rules of the" arbitration association if *those* rules provide that arbitrators should resolve arbitrability disputes. *Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 985 (9th Cir. 2017), *as amended* (Aug. 28, 2017); *Brennan v. Opus Bank*, 796 F.3d 1125, 1131 (9th Cir. 2015).

Both agreements here fall under this rule. The LLC Operating Agreement states that arbitration shall be conducted "pursuant to the rules then in effect of the American Arbitration Association [("AAA")] (or at any other place or under any other form of arbitration mutually

14

acceptable to the parties so involved), with venue in San Francisco, California." Chelini Decl. at 130. The LP Partnership Agreement provision that states arbitration be occur "in accordance with the rules of the Judicial Arbitration and Mediation Service ("JAMS") applying the laws of California." *Id.* at 57.

The Plaintiffs counter that are not sophisticated and were unaware of AAA, JAMS, or their rules.[6] Oppo. 24–25. Though at least one court has applied the rule when one party was unsophisticated, *see Caviani v. Mentor Graphics Corp.*, No. 19-CV-01645-EMC, 2019 WL 4470820, at *4 (N.D. Cal. Sept. 18, 2019), there is no need to determine whether or when the rule applies to unsophisticated parties because, for present purposes, the plaintiffs are sufficiently sophisticated. The plaintiffs were putting more than half-a-million dollars into a complicated investment that required navigating both an investor visa process and a foreign investment transaction. I am mindful that the plaintiffs carried out these transactions with a language barrier, and in many cases that would be quite significant. But here, they affirmatively and purposefully aimed their actions at a complex investment in another country, had sufficient wealth to facilitate the substantial investment here, and either retained or had the capacity to retain counsel to fully understand the transactions.

Accordingly, the parties' gateway dispute about whether the claims here are arbitrable belongs with the arbitrator.

## V. THE DEFENDANTS THAT CAN COMPEL ARBITRATION

Although all defendants move to compel arbitration (or join others' motions), the plaintiffs argue that their claims against some of the defendants do not belong in arbitration because they did not sign the arbitration agreements. In particular, they contend that the GGG Defendants and VTI are not signatories and that Chelini is not a signatory in his personal capacity.

Under California law, "a nonsignatory defendant may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claims when the causes of action against the nonsignatory are 'intimately founded in and intertwined' with the underlying contract

---

[6] The plaintiffs do not dispute that the AAA and JAMS rules delegate issues of the scope of the arbitration clause to the arbitrator.

15

obligations." *Boucher v. All. Title Co.*, 127 Cal. App. 4th 262, 271 (2005); *accord Franklin v. Cmty. Reg'l Med. Ctr.*, No. 19-17570, 2021 WL 2024516, at *3 (9th Cir. May 21, 2021). This doctrine comes from equitable estoppel: "By relying on contract terms in a claim against a nonsignatory defendant, even if not exclusively, a plaintiff may be equitably estopped from repudiating the arbitration clause contained in that agreement." *Boucher*, 127 Cal. App. 4th at 271. And under substantive federal arbitration law, "a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013); *see Franklin*, 2021 WL 2024516, at *6–*7 (compelling claims to arbitration in this basis).

Here, the plaintiffs' claims are "intimately founded in and intertwined with" the contractual agreement. The first claim is for fraudulent inducement into the investment. Compl. ¶¶ 176–94. The second, third, fourth, fifth, sixth, and seventh are for breach of fiduciary duties (or aiding and abetting) that were allegedly owed as a result of the investment. *Id.* ¶¶ 195–247. The eighth is for constructive fraud from failing to disclose material facts related to the investment. *Id.* ¶¶ 248–50. The ninth is for fraudulent concealment along the same lines. *Id.* 251–55. The tenth is for conversion, which depends on wrongful taking of the investment funds. *Id.* ¶¶ 256–63. The eleventh and twelfth are state law claims premised on the alleged wrongful behavior the defendants took carrying out the investment. *Id.* ¶¶ 264–84. The thirteenth and fourteenth are for failure to disclose information the plaintiffs allege they are entitled to as a result of their investment. *Id.* ¶¶ 285–93.

The plaintiffs respond that their claims do not "arise[] under" the LP Partnership Agreement or LLC Operating Agreement because they do not assert claims for breach of them and they are mentioned only five times in the complaint. Oppo. 20. That argument misunderstands the inquiry. The doctrine does not apply solely when the claims are for *breach* of the contract at issue. *Boucher*, 127 Cal. App. 4th at 272. And a party cannot get around equitable estoppel with artful pleading. The question is whether the plaintiff relies on the contract such that her claim is "intimately founded in and intertwined with" its obligations. Here, the plaintiffs would have no claims against the nonsignatories without the agreement; those claims "are [not] fully viable

16

without reference to" the overall investment contract. *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 230 (2009). As shown above, all claims stem from the contractual relationship. The plaintiffs cannot "make use of" that contractual agreement "and then attempt to avoid the duty to arbitrate" that is part of it. *Boucher*, 127 Cal. App. 4th at 272; *see Myers*, 13 Cal. App. 4th at 967 (holding that the various documents must be treated as one contract).[7]

## CONCLUSION

The motions to compel arbitration are GRANTED. All claims against all defendants are compelled to arbitration. 9 U.S.C. § 4. This matter will be STAYED pending the outcome of arbitration. 9 U.S.C. § 3. The parties shall provide status updates every six months. If the arbitrator determines that any claims are not arbitrable, the parties shall file a notice within 14 days so stating and requesting a status conference. The parties shall file a notice within 14 days of the final disposition of the arbitration requesting that the stay be lifted or the case dismissed.

**IT IS SO ORDERED.**

Dated: May 31, 2021

William H. Orrick
United States District Judge

---

[7] The plaintiffs also allege the nonsignatory defendants are alter egos of the signatories, and the nonsignatory *defendants* attempt to compel arbitration on this alternate basis. Because arbitration is compelled based on equitable estoppel, there is no need to address the dispute on this issue.

17